1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT FOR THE

7                            EASTERN DISTRICT OF CALIFORNIA

8

9   RODNEY BERRYMAN, Sr.,                    )    Case No. 1:95-CV-05309-AWI
                                             )
10                     Petitioner,           )    DEATH PENALTY CASE
                                             )
11        vs.                                )    MEMORANDUM DECISION AND ORDER
                                             )    DENYING PETITIONER'S REQUEST FOR
12   Robert L. Ayers, Jr. as Warden          )    EVIDENTIARY HEARING AND DENYING
     of San Quentin State Prison,*           )    PETITION ON THE MERITS
13                                           )
                       Respondent.           )
14   _____)

15

16

17

18

19

20

21

22

23

24

25

26

27   *Robert L. Ayers, Jr. is substituted for his predecessor, Jill Brown, as Warden of San Quentin State
     Prison under Federal Rule of Civil Procedure 25(d).
28

1    Table of Contents

2    I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

3          A.    Overview of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

4          B.    Overview of the Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

5    II.   Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

6    III.  Summary of the State Trial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

7          A.    Evidence Presented During Guilt Phase Proceedings and Jury Deliberations. . . . . .    4

8          B.    Evidence Presented During Penalty Phase Proceedings and Jury Deliberations. . .    15

9          C.    Post-Verdict, Sentencing Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

10   IV.   Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

11         A.    Applicable Standard for Reviewing State Court Denials Involving the Application of
           Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

12
13         B.    Standard for Determining Presumption of Correctness of State Court Rulings on Factual
           Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

14         C.    Applicable Standard for Granting an Evidentiary Hearing. . . . . . . . . . . . . . . . . . .    39

15   V.    Berryman's Assertion He Was Denied Constitutionally Effective Counsel on Account of the
           State Courts' Treatment of his *Marsden* Motions (Claims 1, 2, and 3). . . . . . . . . . . . . . .    41
16
17         A.    Statement of the Facts Relevant to the *Marsden* Claims. . . . . . . . . . . . . . . . . . . . .    42

           B.    Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49
18
19         C.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51

20               1.    Adequacy of the State Trial Court Hearings. . . . . . . . . . . . . . . . . . . . . . . . .    52

21               2.    Grounds for Appointing Independent Counsel. . . . . . . . . . . . . . . . . . . . . . .    59

22               3.    The Presence of an Actual Conflict of Interest. . . . . . . . . . . . . . . . . . . . . . .    60

23               4.    Resulting Prejudice from the Alleged Inadequate Representation of Counsel.
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61

24   VI.   Berryman's Assertion He Was Incompetent to Proceed to Trial and Incompetent to have Waived
           His Rights Under *Miranda v. Arizona* (Claims 4, 5, 27, and 28). . . . . . . . . . . . . . . . . . . .    64
25
26         A.    Statement of the Facts Relevant to Berryman's Competence. . . . . . . . . . . . . . . . . .    65

                 1.    Berryman's Mental Status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    65
27
                 2.    Berryman's Excessive Alcohol Consumption. . . . . . . . . . . . . . . . . . . . . . . .    65
28

3. Evidence of and Relating to Berryman's September 7, 1987 Interview with Investigators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

B. Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

VII. Berryman's Assertion He Was Denied a Fair Trial Due to the Prosecutor's Status as an Elected Judge at the Time of Trial (Claims 7, 8, 9, 10, and 23). . . . . . . . . . . . . . . . . . . . . . . . . 72

A. Statement of the Facts Relevant to Mr. Moench's Status as an Elected Judge. . . . . 72

B. Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

C. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

VIII. Berryman's Challenge to the Fair Cross Section of the Jury (Claims 20 and 21). . . . . . . . 82

A. Berryman's Presentation of the Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

B. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

IX. Berryman's Challenge to the Death Qualification of the Jury (Claim 22). . . . . . . . . . . . . . 84

A. Statement of the Facts Relevant to the Death Qualification Process. . . . . . . . . . . . 84

1. Questionnaire Inquiries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

2. Death Qualification Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

a. Juror Billy Joe Honaker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

b. Juror LaVeta Morris. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

c. Juror Mary Donovan Radman. . . . . . . . . . . . . . . . . . . . . . . . . . . 86

d. Juror Helen Valdez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

e. Juror Steven Ray Greenwood. . . . . . . . . . . . . . . . . . . . . . . . . . . 87

f. Juror David Armendariz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

g. Juror Kimberly Kay Arnold. . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

h. Juror Jymme Lyn Ahl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

i. Juror Virginia Mae Douglas. . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

j. Juror Gene Henry Bibb. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

k. Juror Michael A. Carr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

l. Juror Margaret Anne Shea. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B. Berrryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93

X.      Berryman's Challenge to Juror David Armendariz (Claims 24 and 25). . . . . . . . . . . . . . .   95

        A.      Statement of the Facts Relevant to Juror Armendariz's Jury Service. . . . . . . . . . .   96

                1.      Trial Proceedings of Juror Armendariz's Revelation. . . . . . . . . . . . . . . . .   96

                2.      Declaration of David Armendariz, Executed February 4, 2001. . . . . . . . . .   97

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

XI.     Berryman's Assertion the State Interfered with his Communications with his Attorneys (Claim 17). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99

        A.      Statement of Facts Relevant to the Interference with Communications Claim. . . .   99

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   100

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   100

XII.    Berryman's Assertion that His Attorneys' Were Constitutionally Incompetent for Failure to Present a Mental Defense at Guilt Phase Proceedings (Claims 15 and 16). . . . . . . . . . .   101

        A.      Statement of the Facts Relevant to a Potential Mental State Defense.  . . . . . . . .   101

                1.      Evidence of Excessive Alcohol Consumption.  . . . . . . . . . . . . . . . . . . . .   102

                2.      Evidence of Voluntary Intercourse. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   104

                3.      Mental State Evidence Developed by Berryman.  . . . . . . . . . . . . . . . . . .   105

                        a.      Trial Testimony of Drs. Pierce and Benson.  . . . . . . . . . . . . . . .   105

                        b.      Mental State Declarations Appended to the First State Habeas Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   106

                        c.      Mental State Declarations of Drs. Pierce, Benson, Guisado, and Wu Developed in Federal Proceedings. . . . . . . . . . . . . . . . . . . . . . .   108

                        d.      Social History Prepared by Gretchen White, Ph.D., dated September 17, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   110

                4.      *Strickland* Expert Testimony.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   117

                5.      Mr. Soria's Explanation for his Failure to Develop Mental State Evidence at Guilt Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   118

                6.      Counter-Evidence Developed by the Warden. . . . . . . . . . . . . . . . . . . . . .   118

                        a.      Declaration of Marc R. Nuwer, Executed May 10, 2002.  . . . . . . .   119

b.        Reports of Alan Waxman, Dated May 14, 2002. . . . . . . . . . . . . . 120

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

        1.      Overall Comments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

        2.      The Performance Prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

        3.      The Prejudice Prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

XIII.   Berryman's Assertion that His Attorneys' Were Constitutionally Incompetent for Failure to
        Adequately Review and Develop Forensic Tire Track Evidence (Claim 30). . . . . . . . . . . 130

        A.      Statement of the Facts Relevant to the Defense Criminalist. . . . . . . . . . . . . . . . 130

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

XIV.    Berryman's Assertion of Trial Error for the Trial Court's Overruling Defense Objection to
        Questions Concerning Compensation Paid to Defense Forensic Expert (Claim 31). . . . . 132

        A.      Statement of Facts Relevant to Evidence of Defense Expert Compensation. . . . . 132

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

XV.     Berryman's Challenges to Sufficiency of the Evidence of Criminal Liability for Murder (Claims
        32 and 33). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

        A.      Statement of Facts Relevant to Berryman's Criminal Liability for Murder. . . . . . 134

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

XVI.    Berryman's Challenge to the Validity of the Special Circumstance Finding Due to Omission of
        the Intent to Kill Requirement (Claims 34, 42, and 43). . . . . . . . . . . . . . . . . . . . . . . . . . 136

        A.      Statement of the Facts and State of the Law Relevant to the Intent to Kill Requirement.
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

        C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

XVII.   Berryman's Challenge to his First Degree Murder Conviction Due Errors Regarding the Order
        of Deliberations (Claims 37 and 49). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

        A.      Statement of the Facts Relevant to Instructions on the Order of Deliberations. . . 139

        B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

XVIII. Berryman's Challenges to Lesser Included Offense Jury Instructions (Claims 39, 40, 41, 44, 45, 46, 47, 48, and 51). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

A.      Statement of the Facts Relevant to Lesser Included Offense Instructions. . . . . . . 146

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

XIX.    Berryman's Challenges to the Rape Conviction and Rape Murder Special Circumstance Finding (Claims 12, 29, 35, 50, 71, and 71A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

A.      Statement of the Facts Relevant to the Rape Conviction and Rape Murder Special Circumstance Finding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        1.      Relevant Trial Proceedings and Testimony. . . . . . . . . . . . . . . . . . . . . . . 153

        2.      Evidence Developed in Post-Conviction Proceedings. . . . . . . . . . . . . . . . 155

                a.      Declaration of Charles J. Soria, Executed August 20, 2001. . . . . . 155

                b.      Declaration of John E. Holloway, M.D., Executed July 25, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

                c.      Declaration of Silvia O. Comparini, M.D., Executed October 10, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

                d.      Declaration of David Armendariz, Executed February 4, 2001. . . 157

                e.      Declaration of Jesse Morris, Jr., Executed October 2, 2001. . . . . . 157

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

XX.     Miscellaneous Guilt Phase Challenge of Prosecutorial Misconduct (Claim 26). . . . . . . 161

A.      Statement of the Facts Relevant to Miscellaneous Prosecutorial Misconduct Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

XXI.    Miscellaneous Guilt Phase Challenges of Ineffective Assistance of Trial Counsel (Claims 18, 19, and 52). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

A.      Statement of the Facts Relevant to Berryman's Miscellaneous Claims of Ineffective Trial Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  171

XXII.   Berryman's Challenge to the Handling of the Berryman Family Member Outburst (Claims 73 and 74). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  175

A.      Statement of the Facts Relevant to Family Outburst Claims. . . . . . . . . . . . . . . .  175

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  176

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177

XXIII.  Berryman's Challenge to the Lack of Notice on Penalty Aggravating Evidence (Claims 13 and 14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  178

A.      Statement of the Facts Relevant to the Lack of Notice on Penalty Aggravating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  179

1.      Selling Narcotics to School Children. . . . . . . . . . . . . . . . . . . . . . . . . . .  179

2.      Extra-Marital Relations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  181

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  182

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  183

XXIV.   Berryman's Challenge to Evidence and Argument that He Stood on the Victim's Face for Three to Five Minutes (Claims 29 and 75). . . . . . . . . . . . . . . . . . . . . . . . . . .  186

A.      Statement of the Facts Relevant to Berryman's Challenge to Evidence and Argument He Stood on the Victim's Face for Three to Five Minutes. . . . . . . . . . . . . . . . . . . .  186

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  187

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  187

XXV.    Berryman's Challenge to Constitutionally Inadequate Investigation Efforts and Resulting Failure to Develop Mitigating Evidence at Penalty Proceedings (Claims 6, 63, 64, 65, 69, and 70). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  188

A.      Statement of the Facts Relevant to Investigator Inadequacies. . . . . . . . . . . . . . . .  188

1.      Qualifications of the Investigative Staff. . . . . . . . . . . . . . . . . . . . . . . . .  188

2.      Efforts Undertaken to Have Berryman Tested for Neurological Problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  189

3.      Mitigation Evidence Not Uncovered. . . . . . . . . . . . . . . . . . . . . . . . . . .  190

a.      Pertinent Records Not Uncovered. . . . . . . . . . . . . . . . . . . . . . . .  190

b.      Declarations Of Berryman's Mother, Lestine Bonty. . . . . . . . . .  192

c.      Declaration of Ronnique Berryman Appended to Berryman's First State Habeas Petition, executed August 26, 1993. . . . . . . . . . . . . . . . .  196

d.      Other Family and Friend Declarations. . . . . . . . . . . . . . . . . . . . . . 197

(1)     Disbelief Regarding the Charges Against Berryman. . . . . 197

(2)     Church Related Activities. . . . . . . . . . . . . . . . . . . . . . . . 198

(3)     Lack of Gang Affiliation. . . . . . . . . . . . . . . . . . . . . . . . 198

(4)     Childhood Neglect and Other Stressors. . . . . . . . . . . . . 198

(5)     Pre-Marital Living Arrangements. . . . . . . . . . . . . . . . . . 205

(6)     Industrial Accident. . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

(7)     Severe Headaches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

(8)     Academics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

(9)     Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

(10)    Relationship with Son. . . . . . . . . . . . . . . . . . . . . . . . . . 208

(11)    Alcohol Consumption. . . . . . . . . . . . . . . . . . . . . . . . . . 208

(12)    Mild Manner and Good Character. . . . . . . . . . . . . . . . . 208

e.      Report From Counsel Regarding Great-Grandmother Thelma Mitchell.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

4.      Appellate Counsel Mr. Posner's Opinion Regarding Investigation Efforts.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

XXVI.   Berryman's Assertion of Ineffective Assistance of Counsel for Failure to Obtain a Social History
of Berryman (Claim 59). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

A.      Statement of the Facts Relevant to the Obtaining a Social History. . . . . . . . . . . 217

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

XXVII.  Berryman's Challenges Arising from Miscellaneous Instances of Alleged Prosecutorial
Misconduct During Summation (Claims 76, 79, and 80). . . . . . . . . . . . . . . . . . . . . . . . 219

A.      Statement of the Facts Relevant to Miscellaneous Instances of Prosecutorial Misconduct.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd        vii

XXVIII. Berryman's Challenge to Improper Cross Examination Suggesting Berryman Subjected the Victim to Involuntary Oral Copulation (Claims 53 and 54). . . . . . . . . . . . . . . . . . . . . . . 222

    A.    Statement of the Facts Relevant to the Involuntary Oral Copulation Suggestion. . 222

    B.    Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

    C.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

XXIX. Berryman's Challenges Arising from Defense Misstatement About the Burden of Proof (Claims 80 and 91). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

    A.    Statement of the Facts Relevant to Defense Misstatements. . . . . . . . . . . . . . . . . 224

    B.    Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

    C.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

XXX. Berryman's Challenges Arising From Evidence and Instructions Concerning his Prior Convictions (Claims 56, 60, 62, 88, 89, 90 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

    A.    Statement of the Facts Relevant to Berryman's Prior Convictions. . . . . . . . . . . . 231

    B.    Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

    C.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

XXXI. Berryman's Challenges Arising from Miscellaneous Instructional Errors During Penalty Proceedings.  (Claims 81, 82, 83, 84, 85, 86, 87, 92, 93, and 94). . . . . . . . . . . . . . . . . . 237

    A.    Double Counting of the Rape Conviction (Claim 81). . . . . . . . . . . . . . . . . . . . . 237

    B.    Failure to Adequately Instruct that Pity and Sympathy Could Be Considered (Claims 82 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

    C.    Instructions Implying A Single Mitigating Factor Could Not Outweigh All Aggravating Factors (Claims 83 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

    D.    Refusal of Instruction that Aggravating Evidence Was Limited to the Statutory Factors (Claims 84 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

    E.    Double Counting of the Murder Conviction (Claims 85 and 93). . . . . . . . . . . . . 244

    F.    Refusal of Instruction That Less Than Extreme Mental or Emotional Disturbance Was Mitigating (Claims 86 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

    G.    Refusal of Instruction Permitting Jurors to Consider Lingering Doubt (Claims 87 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

    H.    Failure to Request Deletion of Inapplicable Sentencing Factors (Claims 92 and 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

    I.    Failure to Request an Instruction that Defendant's Failure to Testify Should Not Be Treated as an Aggravating Factor (Claim 94). . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

XXXII.   Berryman's Assertion of Ineffective Assistance of Counsel for Miscellaneous Short-Comings (Claims 58, 61, 66, 67, 68, and 72). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   252

A.      Statement of the Facts Relevant to Miscellaneous Attorney Short Comings. . . . .   253

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   256

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   257

XXXIII.   Berryman's Challenges Arising from the Automatic Modification Hearing (Claims 95 and 96). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   259

A.      Statement of the Facts Relevant to the Automatic Modification Hearing Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   259

B.      Berryman's Contentions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   263

C.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   263

XXXIV.   Berryman's Assertion the Death Penalty Charged Against Him Was Racially Motivated (Claim 11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   265

A.      Berryman's Presentation of the Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   265

B.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   266

XXXV.   Berryman's Challenges to the California Death Penalty Statute (Claims 97, 98, and 100). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   266

A.      Berryman's Presentation of the Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   266

B.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   267

XXXVI.   Berryman's Assertion He Was Denied Meaningful Review on Direct Appeal and State Habeas (Claims 99 and 101). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   270

A.      Berryman's Presentation of the Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   270

B.      Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   271

XXXVII.   Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   272

1   **I.      Introduction.**

2        This matter is before the Court on the request of Petitioner Rodney Berryman, Sr. ("Berryman")

3   for an evidentiary hearing as to Claims 2, 8, 12, 13, 14, 15, 18, 19, 24, 29, 37, 40, 46, 54, 56, 59, 60, 61,

4   63, 65, 66, 68, 69, 71A, 72, 75, 79, and 91.  Respondent Robert L. Ayers, Jr. as Warden of San Quentin

5   State Prison (the "Warden") opposes the request.  In addition to briefs submitted regarding the

6   evidentiary hearing request, the Court has before it the previously submitted briefs in support of and

7   opposition to each of Berryman's claims for relief.  All claims and defenses are at issue and properly

8   before the Court for merits resolution.

9        **A.      Overview of the Case.**

10       Berryman's present theory of the case, as presented in the briefing filed on his behalf by his

11  attorneys, is that the victim in this case, 17 year old Florence Hildreth, had voluntary intercourse with

12  Berryman prior to her death.  According to this version, the intercourse was followed by a verbal

13  altercation which escalated into a violent confrontation and resulted in a shallow stab wound to Ms.

14  Hildreth's neck.  Berryman argues that if his trial counsel adequately had presented this theory, the jury

15  would have acquitted him on the rape charge and returned a verdict of manslaughter on the homicide.

16  In contrast, Berryman alleges that the strategy utilized at trial, total denial of responsibility,[1] was a sure

17  loser, especially in light of forensic evidence connecting Berryman to the crime.

18       Berryman's alternative theory, the one that he advances in pro se documents transmitted to the

19  California Supreme Court, is that he did not commit any offense respecting the victim and that he was,

20  in fact, not present at the scene of her death, at all.  Rather, he claims his conviction followed the

21  admission of circumstantial and planted evidence by the prosecution and he complains that his trial

22  attorneys (as well as his present habeas counsel) failed to subject this admitted evidence to appropriate

23  testing.  The fact of Berryman's pro se profession of total innocence and perception that the various

24  governmental agencies connected with his case (including government appointed defense counsel) have

25

26  _____

27       [1] The defense contesting Berryman's identity as the perpetrator of the crime was advanced in the alternative.  Trial counsel also attempted to raise a reasonable doubt due to inconsistencies in the evidence and that if Berryman was responsible for the Ms. Hildreth's death, he committed something

28  less than first degree premeditated murder.

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd          1

1    conspired to secure and uphold his death sentence is further evidence, according to his present counsel,

2    of his mental illness.[2]

3         **B.        Overview of the Analysis.**

4         Each of the claims in the Petition, both those for which an evidentiary hearing is requested and

5    those Berryman concedes can be decided without an evidentiary hearing are addressed in conjunction

6    with one another.  The claims are presented by subject matter rather than as numbered in the Petition.

7    With the exception of Claim 18, all requests for further evidentiary development are denied.[3]  Further,

8    again with the exception of Claim 18, all claims presented in the Petition are denied on the merits in this

9    Memorandum Order.

10        Because habeas relief is not being granted by this order, the Court completely eliminates any

11   discussion about procedural default.  The "independent and adequate state ground" or procedural default

12   doctrine is not technically jurisdictional, but is "based on equitable considerations of federalism and

13   comity." *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997).  Since relief is not being granted, principles

14   of federalism and comity are not offended by this Court's decision to reach the merits of the claims.

15   Moreover, established precedent in this circuit dictates that a Court's decision with respect to evaluating

16   procedural default is to be informed by furthering the interests of "judicial efficiency" in addition to the

17   interests of federalism and comity.  *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998).  Thus, if

18   deciding the merits of a claim proves to be less complicated and less time consuming than adjudicating

19   the issue of procedural default, a court may exercise discretion to follow this course of action in its

20   management of the case.  *Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982), *quoted by Boyd*, 147

21   F.3d at 1127.  In light of the complex system for determining procedural default under present habeas

22   jurisprudence, the Court opts for the more judicially efficient merits analysis.  The Court specifically

23   declines to engage in a protracted analysis of independent and adequate state grounds and the excuses

24   of cause and prejudice or fundamental miscarriage of justice.

25

26        [2] None of Berryman's retained mental health experts have addressed this point.

27        [3] With respect to Claim 18, the Court is directing Berryman to conduct further investigation and/
     or discovery to make an offer of proof as to the somnolence of one of his attorneys.  Final resolution of
28   the claim will be reserved until Berryman presents his offer.  *See* Part XXI., *supra*.

The ensuing analysis some times includes and some times omits a summary of the arguments and contentions advanced by the Warden.  When the Warden's contentions are not included, this signals that the Court finds Berryman's contentions plainly unsupportable.  A summary of the Warden's contentions are included when the Court finds the Warden's additional argument is helpful to merits resolution.

## II.    Procedural History.

Berryman's state trial for the September 6, 1987 murder and rape of Ms. Hildreth commenced on August 11, 1988.  Born on December 29, 1965, Berryman was 21 years old at the time of the murder. Following jury selection, the prosecution and defense opening statements together with the examination of witnesses commenced on September 26, 1988.  The jury returned guilty verdicts as to both felony counts on October 18, 1988, and penalty proceedings thereafter began on October 24, 1988.  Penalty deliberations commenced on October 27, 1988 and were completed on October 28, 1988 with a death verdict.  Berryman's motions for a new trial and to strike the special circumstances were denied on November 28, 1988.  The trial court sentenced him to death on December 5, 1988.

Direct appeal proceedings were completed on December 27, 1993 with the issuance by the California Supreme Court of an opinion affirming the conviction, special circumstance findings, and sentence.  *People v. Berryman*, 6 Cal. 4th 1048 (1993).  On the same day, the state high court also summarily denied Berryman's state petition for habeas corpus, which he had filed September 3, 1993.[4]

This present federal action commenced on April 27, 1995 with a request for appointment of counsel and a request for a stay of execution.  After counsel were appointed, a petition was filed on November 4, 1996.  On July 30, 1997, the Court ordered Berryman to exhaust state remedies for certain claims presented in the original federal petition.  Berryman complied with this order by filing an exhaustion petition with the California Supreme Court, his second state petition, on March 20, 1998. On April 29, 1998, the California Supreme Court denied Berryman's exhaustion petition.[5]  Berryman

---

[4] The entire text of the state habeas denial is: "Petition for writ of habeas corpus DENIED on the merits."

[5] The first sentence of the state court's April 29, 1998 order is: "The petition for writ of habeas corpus is denied on the substantive ground that it is without merit."  Various specified claims additionally were dismissed on the procedural grounds that they were untimely, previously rejected on appeal, and successive.

1   filed his First Amended Petition in this Court on November 6, 1998 (the "Petition").  Accompanying the

2   Petition were supporting points and authorities filed on the same day.  The Warden filed his Answer on

3   February 22, 1999.  Thereafter, the parties conferred about the exhaustion status of the Petition and it

4   was determined that portions of Claims 4 and 11 were unexhausted.  Berryman filed a subsequent state

5   habeas petition on April 2, 1999, which was his third state habeas petition, to exhaust these allegations.

6   The California Supreme Court denied that petition on April 21, 1999.[6]  The Warden then filed an

7   Amended Answer on May 26, 1999 and points and authorities in opposition to the Petition on September

8   15, 1999.  Berryman filed his traverse on June 15, 2000.  After conducting investigation and further

9   testing, Berryman filed his request for an evidentiary hearing on October 10, 2001.  The Warden filed

10  an opposition to the request for an evidentiary hearing on May 17, 2002, and Berryman filed his reply

11  brief on July 29, 2002.  The matter has stood submitted since that time.

12      During the briefing for the evidentiary hearing request, Berryman filed a fourth state habeas

13  petition in pro per on October 25, 2001.  By order filed May 1, 2002, the California Supreme Court

14  denied this pro per petition in its entirety on the merits, and with respect to four of the five claims

15  presented, on procedural grounds as well.

16  **III.    Summary of the State Trial Proceedings.**

17      The evidence of the state trial proceedings consists of guilt phase proceedings; penalty

18  proceedings; and post-verdict sentencing proceedings.[7]

19      **A.    Evidence Presented During Guilt Phase Proceedings and Jury Deliberations.**

20      Kern County officials were notified on the morning of September 7, 1987, Labor Day, that the

21  body of a young woman had been found on an agricultural access road by a farm employee.  The only

22  clue to the victim's identity was a mail box key found on a key ring (along with a house key) in one of

23  her pockets.  Officers eventually located a mail box which was opened by the key.  Thereafter they

24  contacted Ms. Hildreth's mother and confirmed the victim's identity as Florence Hildreth.

25

26      [6] The first sentence of the April 21, 1999 state court's order is: "The petition for writ of habeas
    corpus is denied on the merits."  The claims in the petition also were denied on the procedural grounds
27  that they were untimely, pretermitted, and successive.

28      [7] Additional evidence relevant to Berryman's numerous claims are recounted in conjunction with
    the discussion of those claims.

The cause of Ms. Hildreth's death was a shallow stab wound to the right side of her neck, from which she bled to death, mostly internally. The pathologist, John E. Holloway, M.D., testified that the knife wound was only 3/4 of an inch deep, but because Ms. Hildreth was so thin, the depth of the wound was fatal. Dr. Holloway also noted that Ms. Hildreth sustained a blow to the left side of the back of her head, abrasions on both sides of her neck, a mild blunt force injury to her chest cavity, and more abrasions over both of her hips and pelvis. All of these injuries were inflicted while Ms. Hildreth was still alive, but her blood pressure was dropping due to internal bleeding. Although there was no evidence of trauma to the vaginal area, a vaginal swab taken from the body during the autopsy revealed recent sexual activity. The vaginal swab specimen was comprised of a small amount of blood consistent with Ms. Hildreth's blood, and a small amount of semen, which was verifiable only by the presence of spermatozoa. Prosecution forensic testing revealed that the semen was of an insufficient quantity to determine the identity of the donor.

At the crime scene, investigators documented and photographed the condition of the body and surrounding area, noting distinctive tire tracks, shoe impressions, a gold colored chain link that appeared to have been broken from a gold chain link necklace, circular impressions in the dirt, drag marks in the dirt, impressions that appeared to have been made by the victim's buttocks and thighs, and a hand print. Off to the side, away from her body was a discarded wine cooler bottle. Ms. Hildreth was laying on her back with her lower garments pulled off her right leg completely but still around her left ankle and blood soaked upper garments pulled above her breasts, a stab wound in the right front neck region, abrasions on both sides of her neck, abrasions on her right pelvis, dried reddish or brownish fluid staining on her abdomen, a dried deposit of fluid on her left thigh, and a patterned abrasion on her face over her right cheek and jaw.[8] The deposit of fluid on her left thigh was contiguous to the external genitalia. Dr. Holloway opined that Ms. Hildreth's body, including her left thigh and abdomen were covered with dust from a struggle in the dirt and then the fluid was deposited. Although Dr. Holloway did not test the fluid, it was tested by a government laboratory, but the results were negative for blood or semen. Ms.

---

[8] Very little testimony described the appearance of the victim at the crime scene. Numerous photographic exhibits of her appearance at the crime scene and at the autopsy were introduced into evidence.

1   Hildreth's legs were separated and her arms were extended out to the sides of her body with her elbows

2   bent over her head suggesting she had been pinned down on the dirt.  Dr. Holloway testified that due to

3   her slender build, the stab wound, which was very shallow, cut across her jugular veins and nicked her

4   carotid artery.  Her survival time from this wound was only three to five minutes.  Although Ms. Hildreth

5   was bare-foot, no bare foot prints were observed at the scene.  One thong sandal was found near the

6   body, but there also were no tracks from that (nor from a matching sandal) at the scene.

7         After authorities confirmed Ms. Hildreth's identity, they began questioning family members and

8   friends to determine her last contacts.  This investigation revealed that Ms. Hildreth was last seen about

9   10:45 p.m. on Sunday, September 6, 1987, visiting the home of one of her maternal aunts, Brenda Clark.

10  Ms. Hildreth had come to Mrs. Clark's house in order to use the telephone, but when she arrived, she

11  found the telephone was engaged by Mrs. Clark's daughter, Crystal Armendariz.  Ms. Hildreth's

12  presence at the Clark residence was noted by Crystal Armendariz (who heard her cousin's voice), by

13  Nathaniel Jackson a maternal uncle, and by Andrew Bonner, another cousin (and the younger brother

14  of Crystal Armendariz).  Mr. Jackson testified that he stayed at the Clark residence until 12:35 a.m. the

15  next morning, watching a movie that began at 11:00 p.m.  Before he departed from the Clark residence,

16  Mr. Jackson roused his nephew Andrew from the couch where he (Andrew) had been sleeping.  He did

17  not observe his niece, Crystal or Berryman at the time he departed.  Nor did he observe Berryman's pick

18  up truck parked outside when he departed.

19        At that time, and for the preceding three weeks, Berryman had been staying at the Clark residence

20  as a guest and boyfriend of Ms. Armendariz.  He shared sleeping quarters in a garage converted into an

21  apartment occupied by Ms. Armendariz's brother Andrew Bonner and their step-brother Ricky Aubrey.

22  Before residing at the Clark residence, Berryman had been living with his young wife and infant son in

23  Los Angeles County until July of 1987, in an apartment they rented.  Berryman's wife, Carol, and the

24  couple's baby, Rodney, Jr. moved in with her parents the first few days of August 1987.  By that time,

25  Berryman already was staying with friends, including girlfriends, in Delano.[9]  Although Berryman was

26  _____

27        [9] A hospital record appended to Berryman's first state habeas petition indicates that he visited
    an emergency room in West Covina just before midnight on August 10, 1987.  The Court discerns from
28  this that Berryman was traveling between eastern Los Angeles County and Delano, at least until August.

1  recently separated from his wife and son, he evidently established an abiding relationship with Ms.

2  Armendariz.  On the afternoon Florence Hildreth was killed, Berryman and Ms. Armendariz had visited

3  Bakersfield to look for an apartment they apparently intended to share, along with Ms. Armendariz's

4  eight-month old twins.[10]  While in Bakersfield Berryman was drinking malt liquor.  After returning to

5  the Clark home at 8:30 p.m.,  Ms. Armendariz testified that Berryman stayed for about an hour and then

6  left the house.[11]

7       When Berryman departed from the Clark residence, he first went to the home of Donna Faye

8  Warner, who lived nearby to the Clark residence.  Ms. Warner testified that he arrived at her house about

9  "ninish."  He asked Ms. Warner if she wanted to go for a ride to a liquor store, but she declined.  He then

10  proceeded to the home of Melinda Pena, also nearby, where he arrived at approximately 9:20 p.m.  After

11  coming out of her house and getting into to his Mitsubishi pick up truck, Berryman and Ms. Pena

12  stopped at two liquor/ convenience stores to purchase alcohol and then rode out east of Delano to a

13  nearby park where Lake Woollomes is located.  They talked and had sexual intercourse over a period

14  of approximately 40 minutes.  They then returned to Ms. Pena's house, talked a bit more, and Berryman

15  left.

16       While Berryman and Ms. Pena were at Lake Woollomes, Berryman's truck was observed by a

17  witness racing with another vehicle at about 10 p.m.  This witness, David Castillo, had been at the lake

18  fishing with two brothers and a cousin.  Mr. Castillo and his companions left the park (and lake) at

19  approximately 10:30 p.m.  Mr. Castillo first dropped his cousin home, since he lived nearest the lake on

20  the east side of Delano.  When he was on his way to take his brothers home, on the west side of Delano,

21  he again observed Berryman's Mitsubishi pick up truck at convenience store on Cecil Avenue.  Mr.

22  Castillo's brother, Andrew Castillo, also testified.  Although he testified first that he and his companions

23  (brothers and cousin) were out at the lake for two hours beginning at 9:30 p.m., on cross examination

24

_____

25       [10] In an initial statement to police investigators, Ms. Armendariz told officers that she and
26  Berryman left Delano to visit the apartment in Bakersfield between 5 and 5:30 p.m. and returned at 9:30
   p.m.

27       [11] Testimony of other witnesses indicate that Ms. Armendariz's estimate of when she and
28  Berryman returned to the Clark residence and/or how long Berryman stayed at the Clark residence was
   inaccurate.  He apparently departed the Clark residence at or just before 9 p.m.

by the prosecutor, Deputy District Attorney Romero J. Moench, he agreed with his brother, David, that he believed he saw Berryman's pick up truck at the convenience store on west Cecil Avenue at approximately 11 p.m.  Lorene Louis also testified that she saw Berryman's truck parked along the shoulder of Cecil Avenue at about 11 p.m.,[12] not far from the convenience store at which he was observed by David and Andrew Castillo.  Ms. Louis recognized Berryman's truck because she had seen him racing his truck in the vicinity of her house with her daughter's boyfriend earlier in the evening.[13]

About an hour and a half after being observed on Cecil Avenue, Berryman returned to the Clark home sometime around 12:30 a.m. early the next morning, but, apparently after Nathaniel Jackson left the Clark residence at 12:35 a.m. Berryman first awakened Ms. Armendariz, visited with her for a short time (in her bedroom), asked her to warm up some leftovers, and retired to the apartment (converted from the garage) in the rear of the house.[14]  She could smell alcohol on his breath, but did not know if he was intoxicated.  No one else was in the living room (particularly Nathaniel Jackson or Andrew Bonner) when Ms. Armendariz and Berryman came out of her room to heat up the leftovers.  Berryman returned to the main house briefly to obtain a glass of water.  Within another half hour, Ms. Armendariz received a collect call from Edward Armendariz, the father of her infant twins.[15]  According to a telephone bill introduced into evidence, the time that telephone conversation commenced was 1:24 a.m., slightly less than an hour after Berryman had returned to the Clark home from his outing.  Andrew

---

[12] The dirt road where Ms. Hildreth's body was found was off Cecil Avenue.  The location Ms. Louis observed Berryman's pick up truck was near the crime scene.

[13] Although none of the testimony is clear regarding time and sequences, it appears the description of Berryman racing with the boyfriend of Ms. Louis's daughter referred to a time before Berryman and Ms. Armendariz went apartment hunting in Bakersfield.

[14] The time of Berryman's return to the Clark home is sketchy.  Ms. Armendariz testified that after she and Berryman had been talking for a about a half hour, she went into the kitchen to heat up some leftovers and noticed that the time was 35 minutes after the hour of either 11 p.m. or 12 midnight. Based on her testimony about the span of time between Berryman's final departure for the garage apartment and her acceptance of a collect telephone call (see text), the Court discerns that, if the kitchen clock was accurate, the time was 12:35 a.m.  This estimate conflicts with Nathaniel Jackson's testimony the least.

[15] Ms. Armendariz testified at the preliminary examination hearing that Edward Armendariz was incarcerated at Folsom State Prison on this occasion.

1   Bonner testified that when Berryman returned to the garage apartment, he could smell the alcohol on

2   Berryman's breath.

3        The circular patterns in the dirt at the crime scene were said by prosecutor Mr. Moench, to have

4   indicated a struggle whereby Ms. Hildreth was trying to avoid Berryman's advances.  This evidence was

5   emphasized in addition to the state of Ms. Hildreth's clothing (with the upper garments pulled up to her

6   shoulders and the lower garments down around her left ankle).  The broken chain link and the fact that

7   three more broken chain links as well as a broken chain link necklace were found in Berryman's pick

8   up truck also were said to have indicated a struggle.  The final evidence of a struggle was the observation

9   of a scratch below Berryman's right eye the day after Ms. Hildreth's murder.  Berryman's contention was

10  that the scratch was inflicted on him during a game of pick up basketball.  He specifically asserted that

11  one of Ms. Armendariz's young cousins, Brooks Riopelle, caused the scratch, a fact which Brooks

12  denied on the witness stand.  In support of this theory Berryman's lead counsel, Charles J. Soria, recalled

13  Ms. Armendariz, Mr. Bonner, and Ms. Pena to testify.  Ms. Armendariz testified that when Berryman

14  returned to the Clark residence after being out from 9:00 (or 9:30) until sometime after midnight, he

15  looked no different than he had when he left.  Specifically, she observed no scratches or blood on his

16  face.  She also stated that he wasn't dirty.  Mr. Bonner testified that the next day when he and Berryman

17  along with other relatives and friends were playing basketball, he noticed a scratch under Berryman's

18  eye, but he only noticed it after his cousin, Brooks, brought it to his attention.  Ms. Pena testified that

19  she was watching Berryman play basketball (with the cousins and friends of Ms. Hildreth and Ms.

20  Armendariz).  She first observed a scratch under Berryman's eye during a break in the game.  At that

21  time, the scratch was bleeding.  On summation, in a final refutation of the notion that Ms. Hildreth

22  inflicted the scratch under Berryman's eye the night before in a struggle, Mr. Soria argued that nothing

23  in the autopsy records supported the prosecution contention.  One of the procedures of the autopsy was

24  that the clinicians examined Ms. Hildreth's fingernails to see if any skin had collected, indicating she

25  scratched someone.  None was found.  Notwithstanding the conflicting evidence on this point, based on

26  witness testimony of Brooks Riopelle that Berryman's scratch was observed prior to the basketball game,

27  Mr. Moench argued that Berryman sustained the scratch during his struggle with Ms. Hildreth the

28  previous night.

1   Besides the eye witness testimony regarding Berryman's pick up truck being observed near the

2   crime scene approximately 15 minutes after Ms. Hildreth was last seen alive and the fact that she

3   apparently had been engaged in a struggle before she died, forensic evidence connecting Berryman to

4   Ms. Hildreth's death was introduced at trial.   After identifying Berryman as a potential suspect,

5   investigators conducted comparison tests between evidence observed (and documented) at the crime

6   scene and Berryman's property.

7       There were positive tire track comparisons between impressions documented at the crime scene

8   and the left front tire on Berryman's pick up truck, the right rear tire on Berryman's pick up truck, and

9   a limited spare tire, which had been seen on Berryman's truck earlier,[16] but when seized was leaning up

10  against the backyard fence of the Clark home.[17]  Of significance to the defense case was that the limited

11  spare tire found in the yard of the Clark property was not mounted on a wheel.

12      There also were positive comparisons between shoe impressions at the crime scene and the high

13  top Brooks athletic shoes seized from Berryman at the time of his interview by investigators, including

14  shoe tread marks of the soles and the side of at least one shoe, showing it to be a high top athletic shoe.

15  Dr. Holloway and the criminalist,  Gregory Laskowski, separately also made comparisons between the

16  patterned bruise on Ms. Hildreth's right cheek and the sole pattern on Berryman's shoe, finding

17  similarities.  Dr. Holloway specifically testified that the bruise resulted more from sustained pressure

18  rather than quick, sudden pressure.  On summation, Mr. Moench combined Dr. Holloway's testimony

19  about Ms. Hildreth's survival time from the wounds (three to five minutes) and the fact that the bruise

20  on her face was caused by sustained pressure.  He argued to the jury that Berryman pressed his shoe into

21  Ms. Hildreth's face for three to five minutes as she lay bleeding to death.  Mr. Moench then reiterated

22  this theory of Berryman standing on Ms. Hildreth's face for from three to five minutes during penalty

23  proceedings.

24

25

---

26   [16] Ms. Armendariz's young step-brother. Ricky Aubrey, had observed the limited spare in the left
     rear position of Berryman's pick-up truck earlier in the week, whereas the sheriff's technician testified

27   that at the crime scene the limited spare had been mounted in the right front position.

28   [17] Mr. Clark testified that the limited spare tire was not a size that was suitable for any of his
     family member's vehicles.  It was, however, a suitable size for Berryman's Mitsubishi pick up truck.

In addition there was a positive correlation between a gold-colored chain link found at the crime scene and three gold-colored chain links found on the floor board of the cab of Berryman's Mitsubishi pick up truck.  Besides the chain links found on the floor of Berryman's pick up truck cab, there were two broken gold-colored chain link necklaces hanging over the rear view mirror of the truck, one of which contained chains found to have similarities to the links found on the cab floor and at the crime scene.  In particular, similar tool marks were noted on the edges of each link.

A latent finger print lifted off the inside passenger window of Berryman's pick up truck matched the print of one of Ms. Hildreth's thumbs taken at the autopsy.  One of two pubic hairs found on Ms. Hildreth's face was said to have borne substantial similarities to Berryman's pubic hair samples.[18] Finally, a forensic serologist testified that blood found on the canvas and on a shoe lace from Berryman's right shoe was consistent with Ms. Hildreth's blood type, but inconsistent with Berryman's blood type. Also, it should be noted that although independent testing could not be conducted separately by the defense litigation team (due to insufficient quantity of the sample), a defense serological expert was present and observing when the prosecution serologist conducted this testing.

Another factor that authorities used to connect Berryman to Ms. Hildreth's death was his knowledge about the fact of her death and how she was killed.  The prosecution evidence brought out that Berryman seemed to know Ms. Hildreth had been killed before members of her immediately family had disclosed this information to the rest of the family and friends.  Specifically, the prosecution called Berryman friend, Thellas Sanders, who had partied with Berryman on Labor Day, the day after Ms. Hildreth disappeared.  Berryman asked Mr. Sanders for a gun because Ms. Hildreth had been stabbed. At that time, circumstances of Ms. Hildreth's death, particular the cause of death by a knife wound, were not known to her friends and family members.

After the prosecution put on its case in chief (and before the defense began its case), Berryman's attorneys moved for judgment of acquittal pursuant to Penal Code § 1118.1 on the grounds the prosecution had not established the intercourse, if there had been intercourse, occurred while Ms.

---

[18] The other pubic hair was said to have come from Ms. Hildreth herself.

1    Hildreth was still alive.  Defense counsel also argued the absence of trauma to the victim's vaginal vault

2    signified the absence of non-consensual intercourse.

3         The trial judge denied the motion on the grounds that the presence of the victim's blood on the

4    vaginal swab specimen indicated she was alive during intercourse.  Next, the trial judge found sufficient

5    evidence of penetration even though semen had been deposited on Ms. Hildreth's body, outside of her

6    vagina.  Finally, the trial judge found that the victim's body position and the state of her clothing was

7    consistent with making her available for sexual intercourse.

8         Defense counsel Mr. Soria and Mr. George Peterson, called their own forensic expert, criminalist

9    Stephan A. Schliebe, to cast doubt on the comparison evidence of shoe tracks, gold-colored chain links,

10   pubic hairs, and tire tracks.[19]  With respect to the shoe tracks, Mr. Schliebe concluded Berryman's

11   Brooks athletic shoes could have been the source of the prints in the crime scene photographs, but that

12   there were too many variables, including differences between the composition of the ground at the crime

13   scene and the composition of the test mark, to be certain.  He stated he could not be at all sure that the

14   impression on the victim's cheek, as depicted in the autopsy photograph, was made by Berryman's shoe

15   for the reason that a significant line on the shoe sole was not replicated on the check.  Although the

16   bruise on the victim's face could have been made by Berryman's shoe, the bruise mark was much longer

17   than the shoe.  With respect to the gold-colored chain links, Mr. Schliebe testified the photographs of

18   the necklace chain links were of very little analytical value because they were out of focus and lacked

19   detail.  He offered that the positive comparison by the prosecution expert was a matter of subjective

20   determination.[20]  On cross examination, Mr. Schliebe further clarified that similarities found between

21   disconnected chain links and/or links still intact on a necklace are not persuasive for establishing a

22   positive comparison since metal composition of chains varies widely from link to link (since links are

23   put together in random order).  Mr. Schliebe also found the hair analysis to be sorely lacking.  First an

24   insufficient number of hair samples were gathered.  Second, there was no indication of where in the

25   pubic area the hair samples were taken.  Third, any comparison made should have been made by

26   ───────────────

27        [19] No evidence was introduced to contradict the serologic evidence presented by the prosecution.

28        [20] The defense expert did not actually conduct his own tests on the chain links at issue, although
     the evidence was available for this purpose.

1    comparing actual hairs, not photographs of hairs.  Finally regarding the tire tracks, Mr. Schliebe testified

2    there was a consistent pattern regarding left front tire and the crime scene impression.  The spare tire test

3    impressions showed some markings consistent with the crime scene impressions, but these consistencies

4    appeared to be more a manufacturing similarity rather than a unique wear characteristic.  The only way

5    to check this would be to obtain several tires manufactured by the same company and then conduct a

6    comparison.[21]

7         On summation, Mr. Soria stressed that the position of the limited spare impression at the crime

8    scene was said to have been in the right front position by the technical investigator, but the actual limited

9    spare tire that was found was in the Clark yard, completely off Berryman's truck and not mounted on

10   a wheel.  Moreover, Ricky Aubrey, who earlier had observed a limited spare on Berryman's truck, said

11   that it was in the left rear position.  Mr. Soria argued that for Berryman to have removed the limited

12   spare tire from the wheel rim after supposedly attacking Ms. Hildreth would have been a dirty and time-

13   consuming job, yet he was not observed by Ms. Armendariz to be dirty when he returned in the very

14   early hours of the next morning and, overall, he was not gone long (after being observed by Ms. Louis

15   and the Castillo brothers at 11 p.m. near the crime scene.)  Ms. Armendariz's equivocation as to whether

16   Berryman returned at 11:35 p.m. or 12:35 a.m. was also referenced by Mr. Soria to raise a reasonable

17   doubt in Berryman's favor.  On rebuttal, Mr. Moench argued the discrepancy between eye witness

18   testimony that a limited spare was mounted on the left rear position on Berryman's pick up truck and

19   the police investigators' conclusion that the limited spare had been mounted on the right front wheel

20   when Berryman was at the crime scene, was explainable by the fact that Berryman had moved the tire

21   to the front position in the interim.

22        Separate and apart from the defense forensic expert, defense counsel recalled Andrew Bonner

23   to testify that Berryman was not wearing Brooks-brand athletic shoes on the day of Ms. Hildreth's death.

24   Rather Mr. Bonner testified Berryman had been wearing Eagle-brand athletic shoes.  Mr. Soria argued

25   this inconsistency during his guilt phase summation along with his other arguments.

26

27   _____

28        [21] On cross examination, the defense expert conceded that he had not actually examined the tires
     (which were available to the defense).

1    As presented at trial, the guilt phase defense theory was to raise a reasonable doubt about

2    Berryman's guilt.  This was accomplished in two ways.  First, Mr. Soria suggested it would have been

3    impossible for Berryman to have attacked and killed Ms. Hildreth and then remove the limited spare

4    from a wheel on his truck within the brief window of time from Ms. Hildreth's last appearance and he

5    returned to the Clark residence.  Mr. Soria argued all the evidence of Berryman's guilt was

6    circumstantial; there were no eye witnesses.  Mr. Soria further argued that from the initial interviews

7    given by members of Ms. Hildreth's family to the testimony given at trial, some of the time estimates

8    had changed in order to incriminate Berryman, because they didn't like him and wanted to make him

9    responsible for the crime.[22]  This theory was consistent with Berryman's story when he was first

10   interviewed by authorities the night after Ms. Hildreth's death.  Specifically, he denied having been out

11   on Cecil Avenue the night of Ms. Hildreth's murder and he denied that Ms. Hildreth had ever been in

12   his car.[23]  A tape of his statements to investigators was played for the jury, as more fully discussed in

13   connection with Claims 27 and 28.  *See* Part VI., *infra.*  Mr. Soria also suggested that perhaps Ms.

14   Hildreth had been killed by the person or persons she was trying to reach by telephone when she came

15   over to the Clark residence.

16   In the alternative, Mr. Soria argued that if Berryman had been with Ms. Hildreth on the night she

17   died, the killing was either felony murder,[24] second degree murder, voluntary manslaughter, or an

18   accident.  Mr. Soria also tried to create a reasonable doubt about Berryman's responsibility for the shoe

19   sole impression on Ms. Hildreth's cheek.  He pointed out that the pattern on the face bruise did not

20   match the shoe tread.  He conceded, however, that the perpetrator of the crime had stepped on Ms.

21   Hildreth's face for approximately three to four minutes.  Next he argued that since the victim was

22

23        [22] Mr. Soria did not introduce any inconsistent statements from those reports at trial.  The Court
     has not been provided copies of any investigative reports from Sheriff's deputies.
24

25        [23] This latter denial has been retracted.  During penalty proceedings, Mr. Peterson argued that
     Berryman and Ms. Hildreth had an on-going sexual relation and *she* wanted him to give up his
26   relationship with Ms. Armendariz.  Similarly, in Berryman's pro se habeas petition, he states that Ms.
     Hildreth had been inside his pick up truck on many occasions and accordingly, her finger prints should
27   have been observed throughout the cab of his truck, and not merely on the inside of the passenger
     window (the print of which he also argued was a print of his thumb, not Ms. Hildreth's).

28        [24] That Mr. Soria argued for felony murder, when that is a death eligible offense, is puzzling.

1  bleeding profusely, and from an artery, there would have been more splatter on Berryman's shoes if he

2  had been standing near Ms. Hildreth, or stepping on her face, as she lay bleeding to death.

3      The instructions were read to the jurors in three phases.  First, there were pre-trial instructions,

4  which included a reading of the information as well as some general instructions about direct versus

5  circumstantial evidence and witness credibility, as well as more specific instructions about malice,

6  willfulness, felony murder, special circumstances, first and second degree murder, manslaughter, and

7  reasonable doubt. A second set of instructions were given after both parties rested, but prior to

8  summation of the prosecutor and defense counsel.  These pre-summation instructions repeated the

9  substantive instructions read in the pre-trial instructions, and in addition specifically delineated between

10  first degree murder, second degree murder, and voluntary manslaughter.  The concept that first degree

11  felony murder and the felony murder special circumstance predicated on completed or attempted rape

12  also were read.  The third and final set of guilt phase instructions were given just before the jurors retired

13  to deliberate.  These post-summation instructions focused on explaining the various special verdict forms

14  that needed to be completed for first degree murder, the lesser included offenses of first degree murder,

15  and the death eligibility special circumstances.  When the trial court completed jury instructions it was

16  12:30 p.m.  At that time, the court took a lunch recess and the jurors were to commence deliberations

17  directly after lunch, without the necessity of reconvening court.  At 1:45 p.m., the jurors requested a tape

18  player (to listen to the tape of Berryman's interview with authorities).  At 3:50 p.m. a note from the

19  foreperson informed the court that the jurors had reached a verdict on Count 1 (the murder charge).  The

20  bailiff advised the jury to continue to deliberate as to Count 2.  At 4:12 p.m., the jury noted it had

21  reached a verdict on Count 2.  Court was reconvened and guilty verdicts were read on both counts at

22  4:50 p.m.

23      The verdict on Count 1 was guilty of first degree murder with the rape murder special

24  circumstance.  An additional special finding was made as to the murder charge – that the killing of Ms.

25  Hildreth was intentional.  On Count 2, the jury found Berryman guilty of committing a completed rape.

26      **B.      Evidence Presented During Penalty Phase Proceedings and Jury Deliberations.**

27      The prosecution case in support of the death penalty focused mainly on the circumstances of the

28  crime under the sentencing factor codified at Penal Code § 190.3(a).  This statutory provision specifies

1   that the jury shall take into account the circumstances of the crime of which the defendant was convicted

2   and any special circumstances found to be true.  To a lesser extent, the prosecution case relied upon two

3   prior violent acts not resulting in criminal convictions, under § 190.3(b) (the presence or absence of

4   criminal activity which involved the use or attempted use of force or violence or the express or implied

5   threat of using force or violence), and evidence of two prior felony convictions, under § 190.3(c) (the

6   presence of absence of any prior felony conviction).  Finally the prosecution made a considerable and

7   forceful effort to undermine mitigation evidence presented by the defense.

8        The prosecution filed two notices regarding the evidence that it intended to present during

9   penalty proceedings.  The first notice was filed March 3, 1988 and included three categories of evidence.

10  First was evidence under § 190.3(a), the circumstances of the present offense and all acts committed by

11  Berryman in furtherance of the crimes committed.  Second was evidence under § 190.3(b) regarding an

12  assault on a fellow inmate housed at the County Jail.[25]  Third was evidence under § 190.3(c) regarding

13  Berryman's prior felony convictions.  On April 22, 1988, the prosecution filed an amended notice setting

14  forth five categories of evidence intended to be presented during penalty proceedings.  The second notice

15  reiterated the first three categories, and in addition added two more instances of prior violent acts which

16  did not result in convictions under § 190.3(b): an altercation between Berryman and his father-in-law,

17  Howard Fuller, in August 1987 and an attack on motorist David Perez with a wheel lock bar in July

18  1987.  During pre-trial proceedings, Mr. Soria mentioned that he had received notice of the prosecution's

19  intended aggravating evidence.  He stated that he would object if the prosecution introduced any

20  evidence in aggravation that wasn't listed in the notice.

21        The initial evidence presented in aggravation was a stipulation the prosecutor, Mr. Moench,

22  secured from Berryman's trial counsel to the effect that Berryman suffered two felony convictions in Los

23  Angeles County.  The first conviction involved three counts of marijuana transportation in March 1984

24  and second involved one count of grand theft in August 1984.[26]  The purpose of the stipulation regarding

25  these convictions, as discussed in court, was to avoid having the details of the crimes presented to the

26

27   [25] This evidence was not introduced at trial.

28   [26] Berryman was 18 years old when both of these convictions were imposed.

jury.  Mr. Moench agreed to a "sterile" presentation of the fact of the prior convictions so long as the defense team didn't attempt to downplay the significance of the marijuana transportation conviction. Although the defense did not offer evidence or argue in any way that the marijuana transportation conviction was insignificant, Mr. Moench breached the stipulation on many occasions in his cross examination of defense witnesses by repeatedly mentioning the fact that Berryman sold drugs to high school students (even though this wasn't the offense for which Berryman was convicted).  Defense counsel objected only to Mr. Moench's characterization of the three count conviction as three separate arrests rather than a single transaction.  The objection did not address the fact that Mr. Moench repeatedly informed the jury about Berryman's sales activities.

Next, the prosecution presented evidence under § 190.3(b).  The first witness was David Perez, a stranger Berryman encountered on the streets Los Angeles, and who Berryman attacked with an iron (wheel lock) bar after a dispute about blocking a public road.  The facts leading up to the attack are that three vehicles on a city street were completely blocking the road, preventing Mr. Perez, who was driving behind the trio, from moving forward.  Two of the vehicles were pick up trucks, one occupied by two males and the other occupied by Berryman, alone.  The middle vehicle was a small car occupied by two females with whom the men in the pick up trucks were talking.  When Mr. Perez sounded his horn for the pick up trucks to move, the passenger in the first pick up (not driven by Berryman) made a disrespectful hand gesture to Mr. Perez.  A short time later, when the road block dissolved, Mr. Perez challenged the occupants of that pick up truck, whereupon the passenger exited the truck and began kicking Mr. Perez's pick up truck.  Following this occurrence, Mr. Perez and that passenger became involved in mutual combat, to which the driver of the pick up and Mr. Perez's passenger also joined. Mr. Perez testified that when the driver of this first pick up entered the fight, he (the pick up driver) grabbed Mr. Perez from behind.  Then, Berryman entered the fray by striking Mr. Perez on the back of the head with a tire iron.  Mr. Perez was clear that he saw Berryman approaching, and he saw Berryman trying to strike him a second time, this time on the face, although he didn't see Berryman deliver the blow to the back of his head.  In light of Mr. Moench's later cross examination of defense witnesses, it must be emphasized that Mr. Perez *at no time* testified that Berryman struck him with the tire iron while

1   the driver from the other pick up truck was holding him.[27]  After Berryman's failed second attempt to

2   strike Mr. Perez, Mr. Perez fled.  He was pursued by Berryman as well as the driver and passenger of

3   the first pick up while the pursuers (including Berryman) were yelling "L.A. Cryps."

4         The other act of violence which did not result in a felony conviction under § 190.3(b) involved

5   an altercation between Berryman and his father-in-law, Reverend Howard Fuller.  This evidence was

6   presented on rebuttal.  The facts leading to this altercation involve the separation of Berryman from his

7   wife, Carol.  Rev. Fuller, a pastor at the Friendship Missionary Baptist Church in Los Angeles County,

8   testified that on August 4, 1987, Carol and her baby (Berryman's son)  moved back home (having lost

9   the apartment they had shared with Berryman).  On the next day, Berryman came by to collect Carol and

10  their infant son to move to Delano.  According to Rev. Fuller, when Berryman arrived at the house,

11  Carol had decided not to go with him to Delano.  Rev. Fuller would not allow Berryman to come into

12  the house, but Berryman did come to the door.  When Rev. Fuller reiterated that Berryman could not

13  come inside the house, he and Berryman began pushing each other and finally Berryman struck his

14  father-in-law on the bridge of the nose.  Rev. Fuller summoned the police.  Both the jury instructions

15  and Mr. Moench's summation clarified that the facts comprising these prior acts of violence had to be

16  established beyond a reasonable doubt.

17        The defense case consisted of 16 friends and relatives, who testified about Berryman's favorable

18  character, one former San Quentin inmate, who testified about death row, the criminalist, Mr.

19  Laskowski, and one of the detectives who testified to having observed two bibles in Berryman's truck

20  during the search, and two mental health experts.  The 16 friends and relatives included Berryman's

21  wife, his two brothers, his sister, his mother, two grandmothers, a cousin, a maternal aunt, and Melinda

22  Pena, as well as other friends from the Los Angeles area.  Mr. Peterson elicited from each of these

23

24        [27] Like Mr. Moench's argument, the Warden recites in his rendition of the facts that Berryman
      hit Mr. Perez on the back of the head with an iron bar while another of the combatants was holding him.
25    The Court has re-read the trial transcript and finds that version not sustainable.  The driver of the first
      truck grabbed Mr. Perez from behind as Mr. Perez was fighting with the passenger of that truck.  Then,
26    Mr. Perez's passenger got out of Mr. Perez's pick up truck and pulled the other pick up driver off of Mr.
      Perez.  *See* RT-27: 3550.  It was while all four of these individuals were fighting that Berryman came
27    over and struck Mr. Perez on the head.  As soon as Berryman struck Mr. Perez on the back of the head,
      Mr. Perez turned around and blocked the second blow.  *Id*.: 3551.  He did not testify he was being
28    restrained at that time.

1  witnesses that Berryman was not a violent person and he never demonstrated any aggressive behaviors

2  towards girls and/or women.  In addition to eliciting testimony that Berryman was a nice guy and a non-

3  violent gentlemen toward women, Mr. Peterson succeeded in having each witness affirm that he or she

4  had not spoken to any member of the defense team before testifying and that he or she would not lie for

5  Berryman.  Many witnesses attested to the fact that Berryman was very popular with girls and dated two

6  or three at a time.  His older brother, Ronald, Jr., described him as a "Casanova."  To accentuate

7  Berryman's non-violent conduct toward women, evidence was presented that on one occasion, Carol

8  Berryman[28] struck Berryman, but Berryman did not respond physically.  On the same or another

9  occasion, Berryman reportedly yelled at his wife after she and Berryman's younger brother, Bryan

10 Berryman, became embroiled in a heated verbal argument.  Relatives also testified that Berryman was

11 affectionate and respectful to his older relatives and often attended family reunions with his wife and

12 infant son accompanying him.  His sister, Ronnique Berryman, testified that Berryman drank a lot of

13 beer and she knew he had an alcohol problem, drinking morning, noon, and night.  Nonetheless, he was

14 not violent when he drank.

15      Various friends of Berryman testified similarly, starting with Melinda Pena, his occasional

16 paramour in Delano.  Ms. Pena added that every time he visited her during his stay in Delano up until

17 his arrest, he was drinking beer, about a quart at a time.  On cross examination, Mr. Moench elicited that

18 Berryman wasn't drunk as a result of his drinking, in that he could still operate his truck and perform

19 sexually.  Berryman's wife, Carol, also testified about Berryman's drinking, which she referred to as

20 excessive and the basis for conflict in their marriage.  His drinking also interfered with work, so much

21 so that he just stopped going to work.  She further testified that the more Berryman drank, the more he

22 strayed from church.  His response to his wife's nagging was to drink more (never to be physically

23 abusive).  Sometimes he drank so much, he staggered.  During these times, when Berryman was drinking

24 excessively, Carol Berryman testified that he complained of bad headaches and backaches.  With respect

25 to the backaches, she testified they followed from an accident whereby Berryman fell from a forklift.

26

27      [28] Carol Berryman filed to dissolve her marriage to Berryman sometime after his detention at San
28 Quentin State Prison.  Although she now uses her maiden name, Fuller, as her last name, she is referred
   to in this Memorandum Order as Carol Berryman.

1   With respect to the headaches, she personally observed veins in his head pulsating.  The onset of the

2   headaches was sudden and lasted about five minutes.  While the headache problem usually occurred

3   while Berryman was drinking (a couple times a week), Carol recalled one occasion when a headache

4   struck Berryman while he was sober.  The headaches were so severe that Berryman said he couldn't

5   drive when he was afflicted with one.  On one occasion he went to the hospital.  He was taken there by

6   his friend Yolande Rumford.  During Ms. Rumford's testimony, she confirmed that she took Berryman

7   to a hospital emergency room because his head was hurting and he was dizzy.  A cousin of Berryman's

8   mother, Maxine Coleman, also testified about her knowledge of Berryman's drinking problem.  She

9   testified that Berryman came to her and talked about his problem.  The last time she spoke to him, he

10  told her his drinking was under control and he was trying to get straight because he had a son.  The

11  testimony about Berryman's drinking was foundational for the expert testimony which followed and is

12  discussed in detail below.

13          The Court notes that Mr. Moench's cross examination was quite aggressive with respect to the

14  friend witnesses.  Two examples suffice.  During his examination of 19 year old Tamara Pearson, he

15  suggested that Berryman struck a man with a tire iron while he was being held by another and with

16  respect to the present crime, stood on the victim's face for three to five minutes while she was bleeding

17  to death.  Mr. Moench similarly suggested during his cross examination of family friend Yolande

18  Rumford that Berryman transported drugs to the high school he was attending, hit someone on the head

19  with a tire iron while that person was being held, and with respect to this crime, tricked a 17 year-old

20  girl to go out into the countryside, beat her, raped her and then tried to force her to orally copulate him.

21          Berryman's maternal grandmother testified that the Berryman children sometimes stayed with

22  her while their mother worked and that Berryman's parents experienced a tumultuous marriage that

23  finally ended in divorce.  Berryman's mother, Lestine Bonty, additionally testified that after she and

24  Berryman's father, Ronald Berryman, Sr. were divorced and her boys went to go live with their father,

25  she was estranged from the boys for approximately three years.  Ms. Bonty testified that while the boys

26  were living with their father, she chose not to communicate with them at all.  Her conduct was laid out

27  as foundation for the expert testimony about Berryman's emotional problems resulting from lack of

28  maternal nurturing.  Even Berryman's sister, who lived with the mother, testified she received inadequate

1    maternal guidance and encouragement.  When Berryman's father died and Berryman came back to live

2    with his mother, the mother-son relationship did not improve.

3         Berryman's paternal grandmother described Berryman's and his brothers' lives with their father

4    after the separation from their mother.  The father, Ronald, Sr., apparently had numerous girlfriends

5    himself and the boys were taken from girlfriend to girlfriend when they were young.  They also stayed

6    with their great grandmother.  The paternal grandmother stated that the boys were bounced from house

7    to house.  The fact that the father and boys moved around a lot was echoed by the testimony of

8    Berryman's older brother, Ronald, Jr..

9         Besides explaining further about the circumstances of Berryman's conviction for marijuana

10   transportation, Ronald, Jr., a convicted felon, also testified about the trouble convicted rapists have in

11   prison.  Ronald, Jr. testified that convicted rapists tend to be raped or subjected to violence in prison by

12   other inmates.  In order keep safe, a convicted rapist must exhibit violent behavior to avoid being

13   targeted for violence.  A rebuttal witness called by the prosecution refuted this notion.  That witness,

14   another Kern County Deputy District Attorney, testified that during his tenure in the District Attorney's

15   Office prosecuting crimes committed in the County's state prisons, he had not observed that any

16   particular number of convicted rapists had been victims of criminal conduct in prison.[29]

17        The former San Quentin inmate called by the defense described the degrading prison conditions

18   at San Quentin, as well as Folsom prison (where, among other correctional facilities he had at one time

19   been incarcerated).  He echoed the testimony of Berryman's older brother, Ronald, Jr.,  that child

20   molesters and rapists are the most reviled inmates by other inmates and that they're often hurt.  This

21   witness had information about how the gas chamber operated, since he wrote for a prison newspaper and

22   worked for a public relations group while at San Quentin.  He described the process for executing a

23   condemned inmate in the gas chamber, including the excruciating pain suffered and the lengthy duration

24   of the agony.  He also assured the jurors that if a defendant is sentenced to life without the possibility

25   of parole, there would, in fact be no parole; the defendant would spend the rest of his life in prison.  On

26   cross examination, Mr. Moench asked a question suggesting that Berryman may be a gang member, and

27

28        [29] Mr. Peterson's only impeachment tool for this testimony was that the witness was under the
     supervision of Mr. Moench at the time of his testimony.

1    as a lifer (sentenced to life without possibility of parole), would be most likely to be assigned a "hit"

2    behind prison walls for his gang.  At the culmination of this testimony, one of the jurors, Ms. Mary

3    Radman, informed the judge that this former inmate witness made an aside remark to the jury which she

4    heard but did not understand.

5          The prosecution criminalist, Mr. Laskowski, who also was a technical investigator for Kern

6    County testified that during the search of Berryman's truck (pursuant to a warrant), two bibles were

7    found, but not seized.  One of the sheriff's investigating officers, Detective Culley, who also was present

8    during the execution of the search warrant of Berryman's truck also noted that one or two bibles were

9    observed in the truck cab.  Detective Culley did not know what had become of them.[30]

10         The last two defense witnesses were Dr. William Pierce, a clinical psychologist and founding

11   member of the National Association of Black Psychologists, and Dr. Samuel G. Benson, a psychiatrist,

12   who in addition to his medical degree, held doctorate degrees in psychology and pharmacology.  A large

13   part of Dr. Pierce's expertise was in the development of black identity among black adolescents.  Dr.

14   Benson's practice specialty was performing consultations for physicians in other disciplines to determine

15   whether there was "a psychiatric overlay to a particular illness."

16         Dr. Pierce indicated he became involved with Berryman's case in  March of 1988 (seven months

17   before his October 1988 testimony) at the request of Mr. Soria.  He interviewed and administered

18   psychological tests to Berryman for approximately 12 to 13 hours.  He additionally reviewed numerous

19   documents and interviewed Berryman's mother, sister, wife, and mother's cousin, all of whom testified

20   at the penalty phase.  The battery of psychological tests he administered were to help him determine

21   whether Berryman's behavior was influenced by central nervous system damage, brain damage, or other

22   organic versus functional cause. For Berryman, Dr. Pierce's axis one diagnostic impression was "alcohol

23   induced organic disorder, alcohol intoxication and rule out organic mental syndrome, not otherwise

24

25

26

---

27         [30] Apparently Detective Culley's partner in the Berryman case investigation, Detective Lage,
      seized the bibles.  *See* summary of declarations of Jesse Morris, Jr. and Charles Bonneau, discussed in
28   connection with Claim 72, Part XXXII., *infra*.

specified."[31]  His axis two diagnostic impression of Berryman was personality disorder, not otherwise

specified, with dependent narcissistic and depressive features.[32]

Dr. Peirce's conclusions were influenced by a number of factors, including Berryman's early

history.  As a child, Berryman and his siblings, particularly his brothers were subjected to a great deal

of moving around, chaos in the marriage of his parents, and him living with different relatives.  During

the time Berryman lived with his father, there was quite a bit of moving.  School records Dr. Pierce

reviewed showed seven to eight different schools during that period.  To compound the interruption of

education experience, Berryman was identified as a slow learner in the third grade.  His learning ability

also suggested minimal brain syndrome.  He had difficulty reading and writing. Dr. Pierce stated this

history would not be atypical of people who developed personality disorders in reaction to their

environments. Another fact was the lack of maternal nurturing Berryman experienced as a child through

puberty.  Berryman's mother told Dr. Pierce she was not close to Berryman when he was growing up.

As a consequence, Berryman exhibited a great need to get his dependency needs fulfilled.  In his youth,

although Berryman's mother didn't provide the nurturing he needed, he had a way of finding people who

would take him in, because they liked him.   In the meantime, when Berryman was 15, his father was

lost in an airplane accident and never found.[33]  Berryman demonstrated to Dr. Pierce that he had a

difficult time believing his father actually was dead.  After his father was gone, Berryman was more

difficult to control as a teenager.  While still in his mid-teens, he started running away from home and

began to show "asocial" behavior and alcohol abuse.

Berryman's attempts at obtaining employment were largely frustrated by his lack of education

because he could not keep up with the requirements of the jobs he obtained – being unable to read or

write well.  In Berryman's marriage, there also were conflicts.  He attempted to carry out the "male role"

---

[31] An axis one diagnosis refers to symptoms a person is experiencing at the time of the evaluation.

[32] An axis two diagnosis would refer to long-standing personality characteristics that had been occurring over a longer period of time.

[33] It is not clear how old Berryman was when his father disappeared and was presumed dead. Other evidence in the record relays that Berryman was 17 when his father died. *See* discussion of Claims 15 and 16, Part XII.A.3.d., *infra*.

1   in having a job, attending church, and raising a family, but was not well-equipped to handle his role.

2   When he lost his job, everything unraveled.  His attempts to find other employment decreased as his

3   drinking increased.  Ultimately, his family was evicted from the apartment.  Then there was his

4   avoidance behavior and increase alcohol usage.

5          Dr. Pierce explained Berryman's apparently compulsive attraction and intimate relationships with

6   numerous females.  The attraction was driven by Berryman's "need for nurturance he missed in his early

7   childhood.  It wasn't so much [Berryman's] attraction to sexuality that impelled him, as his need to be

8   around someone who would treat him nicely. . . . There was a hole in the bucket around mothering and

9   nurturance, and . . . part of [Berryman's] behavior was to try to fill that hole in his interpersonal

10  relationships, particularly with women."

11         Dr. Pierce reported that Berryman also had an old head injury from a 1983 fall from a crane while

12  he was installing insulation.[34]  He became unconscious and was taken to the hospital.  Following this

13  accident, he began to report recurrent intense headaches.  The headaches had sudden onset, were

14  intensely painful, lasted 15 to 20 minutes,[35] and then suddenly terminated.  Dr. Pierce opined that these

15  episodes were seizure equivalents.  Corroborating this opinion, Dr. Pierce saw consistent signs of

16  organicity, in the psychological test results.  Specifically, Berryman had difficulty performing perceptual

17  motor tasks, indicating a central nervous system problem.  He also had difficulty in visual perceptual

18  organization and in immediate recall.  The signs of organicity included his history of learning

19  disabilities, head trauma, intense headaches, increased alcohol intake, particularly between May and

20  August 1987 (just prior to Berryman's move to Delano), and asocial, maladaptive behavior (referring

21

22

23

_____

24         [34] No other evidence about a fall from a crane while installing insulation was introduced at the
    trial.  It cannot be discerned whether this crane fall is the same as the fall from the forklift accident
25  described by Berryman's wife, Carol.  The Court notes that in the testimony of Berryman's wife, she
    stated that the forklift fall accident resulted in backaches.  She didn't attribute Berryman's headaches
26  to any particular cause.  Berryman's mother told the social historian hired by Berryman's federal habeas
    counsel that Carol was the cause of Berryman's headaches.  During an argument, she hit him over the
27  eyebrow with a metal flashlight and requiring him to go to the hospital.  *See* Part XII.A.3.d., *infra*.

28         [35] The testimony of Berryman's wife, Carol, was that the headaches lasted five minutes.

1    to the attack on Mr. Perez).[36]  Dr. Pierce specifically mentioned three to four arrests for driving under

2    the influence in the few months prior to his move to Delano.[37]  To confirm the existence of an organic

3    problem affecting Berryman's brain and central nervous system, Dr. Pierce wanted to have additional

4    tests performed.  That is why he called upon Dr. Benson for assistance in obtaining the needed tests.

5         Dr. Pierce observed that Berryman's customary pattern of behavior when he became angry at his

6    failures was to "leave the field."  Accordingly, he felt that the crime involving Ms. Hildreth didn't "fit"

7    Berryman's typical and historical response to frustration.  Dr. Pierce referred to the crime as a "very

8    bizarre act" on Berryman's part.  This was another basis for Dr. Pierce's belief that Berryman suffered

9    some sort of seizure or alcohol induced seizure on the night Ms. Hildreth was killed and the reason he

10   wanted certain tests conducted.  He called upon Dr. Benson to arrange the needed tests, for without

11   empirical evidence in the form of test results, Dr. Pierce had only the symptomatology he obtained.

12        On cross examination, Mr. Moench minimized Dr. Pierce's reliance on the fact that Berryman

13   suffered from intense headaches, because he himself had never observed Berryman having one.  Dr.

14   Pierce could not explain to Mr. Moench why the desired tests were not performed; that information

15   needed to be obtained from Dr. Benson.  Mr. Moench belittled Dr. Pierce's opinions because they were

16   based on everything except the fact that Ms. Hildreth had been raped and murdered.  Dr. Pierce denied

17   this.  Mr. Moench then asked Dr. Pierce what Berryman would have done if he came across a woman

18   that didn't "buy into his needs, that absolutely reject[ed] him."  Dr. Pierce explained that Berryman's

19   pattern was to try to get his needs fulfilled, and if he couldn't, to "avoid the field or become frustrated."

20   Dr. Pierce confirmed that Berryman had the capacity to become angry and demonstrate the entire range

21   of human emotions.  But, his typical pattern was not to leave someone as he left the victim in this case.

22   Then Mr. Moench's questions became quite caustic.  He asked Dr. Pierce to confirm that Berryman had

23   the capacity for violence and frustration because he wasn't a successful father, worker, or husband, and

24   that, having abandoned his wife and son in Los Angeles, he was living with one woman while dating

25

26   [36] The attack on Mr. Perez was referred to by Dr. Pierce as asocial on direct examination and maladaptive on cross examination.

27
28   [37] On rebuttal, this basis for Dr. Pierce's conclusions was vitiated.  The prosecution evidence was that there were only two stops for driving under the influence, one in June 1986, and the other in the spring of 1987.

two or three others and didn't want them to find out about one another.  Dr. Pierce responded that he did not recall that Berryman didn't want the various girlfriends to find out about one another.  On the contrary, the people in Berryman's life did know each other, though he did not disclose his relationships.  Dr. Pierce did not recall, or didn't hear Berryman's taped statement where he mentioned to authorities he didn't want Ms. Armendariz to find out about his other girlfriends.[38]  Dr. Pierce confirmed to Mr. Moench that Berryman did not suffer from severe psychological dysfunction, such as psychosis, schizophrenia, or Alzheimer's syndrome, but that he had long standing personality problems.  He emphasized that the "rule out organic mental syndrome not otherwise specified" referred to his attempt to determine whether Berryman suffered from "some brain disease."

Dr. Benson was next to testify.  As indicated in Dr. Pierce's testimony, Dr. Benson was brought in because Dr. Pierce's findings indicated the possibility of an organic problem that may have accounted for the violent killing of Ms. Hildreth.  Dr. Benson interviewed Berryman on three separate occasions.  The soft signs of organicity confirmed by Dr. Benson included Berryman's memory loss, poor performance in school, perceptual visual motor coordination difficulties, visual organization difficulties, ringing in his ears, and stress related headaches.  Dr. Benson opined that Berryman suffered from an organic mental syndrome, which he believed was largely alcohol induced, but with other contributors as well, including head trauma (referring to the 1983 fall from a crane).  Dr. Benson also mentioned that Berryman had been hit over the head with a metal pipe at one point, but no date for this injury was mentioned.[39]  The headaches were accompanied by facial contortions, ringing in his ears, and the sensation he was smelling oil or gas just prior to the headaches.  This olfactory sensation was referred to as an aura, commonly known to precede a seizure.  Dr. Benson was not able to rule out epilepsy or other seizure disorder as the cause for Berryman's behavior the night of the crime.  On cross examination, he explained that without sophisticated tests, he could not say that Berryman did not suffer

---

[38] By the time of this interview by the investigators, Berryman had already telephoned Ms. Pena from the Clark residence to have her confirm to Ms. Armendariz that he had been with her at the time Ms. Hildreth went missing, and not, as a family friend Lorene Louis stated, parked on Cecil Avenue (near the crime scene).

[39] There was no evidence presented regarding this injury.  The Court has no way of discerning whether this injury was connected with the report of Berryman's social historian that Berryman's wife hit him in the forehead with a metal flashlight.

from petit or gran mal seizures.  He further explained on cross examination that people who suffered from temporal lobe seizures had been known "to do all kinds of things, and particularly violent sort of things," but, he conceded that committing rape was not among them.  Dr. Benson concluded that Berryman was an alcoholic based on reports from investigators.[40]  According to information conveyed to Dr. Benson, Berryman started drinking around age 14 and became a heavy drinker at age 16, continuing since that time.  Further, in the late spring of 1987, Berryman's unemployment was accompanied by increased alcohol consumption and he received four driving under the influence in three or four months.[41]  On cross examination, Dr. Benson stated that this information was derived from Dr. Pierce's notes.  Mr. Moench then suggested that in fact Berryman only had two driving under the influence arrests, a year apart, and that witnesses who recounted a greater number of arrests either were mistaken or purposefully deceptive.  Dr. Benson responded that exaggeration by Berryman of his drunk driving arrests would not alter his opinion because there were other sources for the fact that he drank excessively.  That Berryman had a drinking problem was corroborated by many people, even though those reporting his drinking in August and September 1987 did not report that he was visibly intoxicated, had been picked up for drunk driving in Kern County, was falling down drunk, or vomited.  Dr. Benson explained the concept of tolerance developed by alcoholics.  He explained that for alcoholics to get the feeling they want, they drink more and more, and would not appear to be intoxicated, yet, would have alcohol blood levels much higher than individuals who were not tolerant.  Being tolerant, however, would not mean that the alcoholic would know where he was or was coherent.  Organic brain disease most commonly would develop in an individual who drank on a daily basis, like Berryman did.

The clinical diagnosis for Berryman included learning disability and middle brain dysfunction.  At this point in the proceedings, Mr. Moench interrupted Dr. Benson's testimony and requested a copy of the notes he was using in delivering his statements.  Mr. Peterson then spoke up, as if he heard nothing of the proceedings: "I'm sorry, your Honor, I was engaged in some other activity here.  You

---

[40] The content of those reports was not presented in evidence and is otherwise unknown.

[41] The number of driving under the influence arrests during the months prior to the crime apparently was exaggerated, which Mr. Moench brought out on cross examination, rebuttal, and summation.

1   asked him about notes, you wanted to know if he can make copies of his notes, is that the question?"

2   After that issue was resolved, the testimony continued.  In reaching his clinical opinion, Dr. Benson

3   considered Berryman's dependency, particularly on women, in wanting to be taken care of.  He tended

4   to get very close and obtain nurturing by being charming and somewhat immature.  The clinical opinion

5   also largely was based on Berryman's excessive and consistent drinking.  Whereas in February of 1987,

6   Berryman was doing well – nice wife, new apartment, baby son, church activities and a job, when he lost

7   his job, his alcohol consumption increased, he couldn't find another job, and he exhibited a real streak

8   of aggression exemplified by his altercation of Mr. Perez, the confrontation with his father-in-law, and

9   his anger at his mother because she would not replace the tires on his pick up truck.[42]  With all of this

10  and the break up of his marriage, Berryman ran away to Delano rather than try to deal with his problems.

11  His dependency needs, particularly with young women, increased in Delano, as did his alcohol

12  consumption.  In someone Berryman's age in September 1987 (21 years old), it was rare to see signs of

13  chronic alcoholism which he displayed.  Dr. Benson testified that one of the signs of chronic alcoholism

14  Berryman displayed was the onset of blackouts with aggressive behavior during the blackouts, the nature

15  of which behavior was reported to Berryman afterwards.[43]  On cross examination, however, Dr. Benson

16  conceded that no one Dr. Benson interviewed informed him that Berryman ever suffered a blackout,

17  disorientation, or inability to identify people as a result of his drinking.  Customarily, Berryman would

18  start drinking first thing in the morning, usually malt liquor, and continue his drinking throughout the

19  day.  Berryman's father likely was an alcoholic, and alcoholism is subject to genetic predisposition.

20          Independent of Dr. Pierce, Dr. Benson determined that further testing was necessary.  He wanted

21  to compare the results of an EEG, with an alcohol induced EEG to measure changes in brain waves

22  consistent with a seizure.  When inquiries were made at the local hospital, the defense team was turned

23  down by the hospital administrators.

24  ───────────────

25      [42] No evidence was offered about Berryman's anger at his mother because she would not replace
    his tires.  Although presumably Berryman's mother still was available to testify, she was not recalled.
26  During deliberations, the jurors asked for a read back of Dr. Benson's testimony about the dispute
    between Berryman and his mother over his truck tires.

27      [43] Although Berryman apparently told Dr. Benson about blackouts, there was no corroborating
    evidence presented supporting the notion that he suffered from blackouts, other than the attack on Ms.
28  Hildreth.  The attacks on Mr. Perez and Berryman's father-in-law were not described in this manner.

The first question asked of Dr. Benson on cross examination was his billing rate and how much he expected to bill the County.  Dr. Benson responded that his billing rate was $250 per hour and he anticipated billing for 32 hours ($8,000).  This amount included one full day for an intended visit with Berryman in the jail, which could not be accomplished because Dr. Benson, and Dr. Pierce, who had accompanied him, were denied entry.

On rebuttal and closing, Mr. Moench belittled the foundation for the expert testimony.  Rather than three to four driving under the influence arrests in the few months before his move to Delano, Berryman suffered only two driving under the influence citations, a year apart, one in June 1986 and one in the spring of 1987.  An attempt by Mr. Peterson to undermine the testimony about official reports of drunk driving arrests only served to confirm that the prosecution view was fully supported by current Department of Motor Vehicles records.  Mr. Moench also called on rebuttal an officer assigned to court services in the transportation section to testify that if defense counsel had obtained an order from the court, court services would have transported Berryman to any medical facility listed on the order.  On summation Mr. Moench argued that the reason the tests were not performed was that the defense experts failed to pursue that course diligently.  Alternatively, he suggested that the defense purposefully did not make arrangements to have the neurological tests discussed conducted in order give the experts "something to talk about" during their testimony.

Other issues discussed during closing arguments focused on the circumstances of the crime (under § 190.3(a)).  Significantly, Mr. Moench characterized Berryman as having no remorse for his cold blooded killing of Ms. Hildreth.  He emphasized that after the crime, Berryman came back to the Clark residence and woke up the victim's cousin so he could get something to eat.  Mr. Moench stated sarcastically that Berryman couldn't heat up his own food, but needed a woman to do it for him.  Women were "supposed to take care of him, . . . to come running out of the house and jump in his car and go have intercourse with him any time he want[ed]."  But, Mr. Moench continued, Berryman had to keep his women separate.  He stated that Berryman eliminated Ms. Hildreth so he wouldn't be inconvenienced if she told her cousin, Ms. Armendariz what had happened.  Another factor Mr. Moench emphasized in his argument that the killing was cold-blooded was the fact that after authorities identified Ms. Hildreth as the victim, Berryman tried to cause a diversion by getting a gun with the intent of shooting up the

1  home of Lorene Louis, one his detractors.[44]  Emphasizing Berryman's callousness, Mr. Moench

2  reminded the jurors his view that Berryman stood on Ms. Hildreth's face for three to five minutes as she

3  lay bleeding to death.

4      There were further misstatements when Mr. Moench characterized the testimony of the experts.

5  Without objection, he stated that Dr. Pierce testified Berryman had "an amoral personality," when in

6  fact, Dr. Pierce testified that Berryman exhibited a asocial and maladaptive behavior.  Mr. Moench's

7  interpretation of the experts' testimony was that Berryman would do anything he thought he could get

8  away with.

9      Moving to the sentencing factor under § 190.3(d), Mr. Moench argued that the defense evidence

10  did not establish that the offense was committed while Berryman was under the influence of extreme

11  mental or emotion disturbance.  He was  neither psychotic nor neurotic at the time of the commission

12  of the crime.  Rather, he had a personality disorder, which was no more serious than overeating or

13  overusing caffeine.  Emphasizing the expert diagnosis that Berryman's personality had dependent and

14  narcissistic features, Mr. Moench argued that Berryman was a "spoiled brat" who was in love with

15  himself and required everyone else to be too.

16      As relevant to Berryman's mental state, Mr. Moench minimized the significance of the moving

17  around he experienced as a child.  Mr. Moench also emphasized that even if the experts' opinions were

18  accepted, Berryman still had the capacity for violence and he knew the difference between right and

19  wrong.  He further suggested that Berryman's extreme headaches were nothing more than hangovers

20  (ignoring the testimony that Berryman was afflicted with headaches *while* he was intoxicated).  He also

21  argued that the psychological test results were invalid because Berryman purposefully performed poorly

22  on them.  He argued that the experts stated that Berryman's mental disorder would have impeded his

23  ability to play basketball or baseball, and since Berryman played all the time, he couldn't have any

24

25

26

27    [44]   The evidence adduced at trial was that Berryman attempted to obtain a gun from another
28  family friend, because he said he knew who had killed Ms. Hildreth, that is, someone from Los Angeles.
He wasn't able to obtain the gun and he never indicated that he was going to shoot up anyone's house.

organic brain disorder.[45]  With respect to the "soft signs" of organic brain disorder, Mr. Moench argued

they must be discounted because they were based on what Berryman told the experts.  He criticized the

experts' collective assessment that Berryman's crime was atypical for his behavior pattern on the

grounds that it involved circular reasoning, that is, Mr. Moench characterized their testimony that

Berryman didn't commit the crime because he's not the type of person who would commit the crime.[46]

In addition to criticizing the experts for basing their opinion about Berryman's compromised mental state

at the time of the crime on four drunk driving arrests, Mr. Moench further argued there was no indication

Berryman was drunk or out of control the night of the murder.  Rather, Mr. Moench asserted, Berryman

acted deliberately.  In the same vein, Mr. Moench argued Dr. Benson's assessment that Berryman was

an alcoholic lacked foundation.  The basis of the assessment was that Berryman's father was an

alcoholic, which was neither established by evidence nor necessarily relevant to Berryman's condition.

In a personal attack on Dr. Benson, Mr. Moench argued to the jury that he muttered through is testimony

as if they (the jurors) were idiots and treating him (Mr. Moench) as if he were asleep.[47]

Regarding the alcohol EEG discussed by the experts, Mr. Moench argued that even if it had been

performed, the results wouldn't have altered the aggravating nature of Berryman's conduct.  Mr. Moench

then, incorrectly reviewed the experts' testimony that if Berryman were experiencing a seizure he could

not commit rape *and murder*.[48]  Under Mr. Moench's theory of the facts, Berryman became angry at Ms.

Hildreth because she refused to have sexual intercourse with him and threatened to tell her cousin, Ms.

Armendariz, about Berryman's advances.  Even if this made Berryman angry, he killed Ms. Hildreth in

cold blood, not in a rage.  Moreover, there was no remorse.  The next day, Berryman expressed no

sorrow and carried on as usual.

---

[45] Neither Dr. Pierce nor Dr. Benson stated that Berryman's mental disorder would interfere with his playing sports. No objection was interposed.

[46] The argument did not well represent the experts' collective opinion, as neither said Berryman *didn't* commit the crime.  The argument drew no objection.

[47] Although the argument did not draw an objection, Mr. Peterson did comment on his own summation that Mr. Moench's personal attack on the experts was unprofessional and unwarranted.

[48] In fact what Dr. Benson said was that during a seizure Berryman could not commit *rape*. Committing a homicide during a seizure would be possible, and in fact was offered by Berryman's trial attorneys as the defense.

Mr. Moench argued other statutory sentencing factors were not applicable to Berryman.  Ms. Hildreth was not a participant in Berryman's homicidal act under § 190.3(e) (whether the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act).  To illustrate the point, he argued that Ms. Hildreth was not playing Russian roulette with Berryman; nor were they both involved in committing a robbery.  Berryman did not have a reasonable belief that his crime was justified under § 190.3(f) (whether the defendant reasonably believed the offense was committed under circumstances that were a moral justification or extenuation of his conduct).  Mr. Moench added that although Berryman may have thought that the crime was acceptable, since Ms. Hildreth wasn't willing to play by his rules, his belief wasn't reasonable.  Nor was Berryman acting under extreme duress or under the substantial domination of another pursuant to § 190.3(g).  It was a single offender crime.  Next, he argued, Berryman wasn't incapable of being able to appreciate the criminality of his conduct or conform his conduct to the requirements of the law due to mental impairment, disease, or defect, including intoxication under § 190.3(h).  Mr. Moench emphasized there was no evidence of any sort of psychotic break.  Similarly, Berryman's age at the time of the crime, that is, three months shy of his twenty-second birthday, was not mitigating under § 190.3(i).  Berryman had long been out of school; he was a grown man, yet still continued his "hustle."  The sentencing factor under § 190.3(j) was irrelevant because Berryman was the principal of the crime, not an accomplice.  Finally, § 190.3(k), the catchall factor, didn't apply.  With respect to sympathetic evidence, Mr. Moench described the defense witnesses as susceptible to Berryman's "con" over the years.  The testimony of the female witnesses, in particular, was not reliable because they all said that Berryman couldn't have or wouldn't have committed the crime of which he already had been convicted.  The testimony of Berryman's older brother that Berryman was a "Casanova" was emphasized as a factor in aggravation.

The defense summation was comprised of an amalgam of theories. Mr. Peterson began by complimenting the trial judge and jurors for their intellect, while criticizing Mr. Moench's personal

1    attacks on the experts.  Later in his summation, however, Mr. Peterson criticized the jurors as well for

2    their guilt phase verdict, which they reached after really only 15 minutes of deliberation.[49]

3         Turning to the sentencing factors, Mr. Peterson argued that Berryman's lack of capacity to

4    appreciate the criminality of his conduct under § 190.3(h) due to intoxication, should not be discounted

5    merely because he had developed a tolerance to alcohol and did not appear intoxicated.  He reviewed

6    the testimony that Berryman consumed alcohol for the better part of the day, beginning in the morning,

7    then, when he went out with Melinda Pena and another when he was with Ms. Hildreth.  The alcohol

8    he consumed was from 40 ounce containers of ale.  Mr. Peterson emphasized that despite Mr. Moench's

9    belittling of the experts, no prosecution evidence was presented to contradict the conclusions of the

10   defense experts.

11        Under the catchall factor, § 190.3(k), Mr. Peterson argued that Berryman didn't just "use"

12   women, he also had time for "the old and disfigured."  Separately, he argued that life was sacred.  A

13   death sentence would only be appropriate for someone who was a brutal and savage murder, not a human

14   being.  Even Mr. Moench didn't argue that.  Mr. Peterson discussed two purposes of the death penalty,

15   retribution and deterrence.  Retributive punishment was the infliction of that amount of pain, suffering,

16   and deprivation which was justified by the nature of the offense.  A condemned inmate suffers more than

17   merely death.  He also suffers psychological torture.  If the jurors were to sentence Berryman to death,

18   Mr. Peterson invited them to come to the execution.  Given the excruciating pain of death in the gas

19   chamber, Mr. Peterson argued it wasn't certain that the death penalty was the necessary or appropriate

20   punishment in Berryman's case.  He stressed that a verdict for life in prison without the possibility of

21   parole would condemn Berryman to die in prison and that life in prison was a harsh sentence appropriate

22   for first degree murder.  He would never again see the sun rise or set; it would be severe, and he would

23   

24       [49] Mr. Peterson recounted that after instructions and closing arguments in the guilt phase
     proceedings, the jurors were entrusted to the care of the bailiff at 12:35 p.m., whereupon they went to

25   lunch.  Upon completion of lunch until 1:45 p.m. they determined they needed a tape recorder and
     requested one.  A tape player was provided at 2:15 p.m. and the jurors listened to the 45 minute tape
     until 3 p.m. and then at 3:15 p.m. notified the court they had a verdict.  There is no indication in the

26   record, however, as to how long the jurors were at lunch, nor that they abstained from deliberation from
     1:45 p.m. to 2:15 p.m., nor that they listened to the entire 45 minute tape without deliberating.

27   Moreover, according to the Clerk's Transcript, the jurors did not advise the court they had a verdict on
     Count 1 (the murder) until 3:50 p.m. (Rather than 3:15 p.m.) and on Count 2 (the rape) until 4:12 p.m.

28   The verdict was read in court at 4:50 p.m.

not receive parole under a life without parole sentence.  The possibility of commutation of his sentence by the governor was extremely remote.  He implored the jurors not to be too harsh on a man who had sinned, unless they could be certain they had not also sinned.

Under the circumstances of the crime factor, § 190.3(a), he argued that even if Berryman forcefully pulled Ms. Hildreth from his pick up truck, she entered it voluntarily.  He also argued that no evidence ever was introduced to tie the murder weapon to Berryman.  He suggested that Ms. Hildreth herself brought the knife and perhaps threatened to use it on Berryman unless he discontinued his relationship with her cousin, Ms. Armendariz.  Berryman's response could have been to go into a seizure.

Addressing the prior acts of violent conduct, under § 190.3(b), Mr. Peterson stressed that in the altercation between Berryman and Mr. Perez, Mr. Perez was an active participant in the injury he sustained.

On rebuttal, Mr. Moench recoiled in his argument about how reprehensible it was for Mr. Peterson to have criticized the jurors for deliberating for too brief a period on the guilt phase issues.  He suggested that his own feeling of indignation would be shared by the jurors.  He cautioned the jurors not to engage in mechanical counting of aggravating versus mitigating factors and told them they were free to assign whatever moral or sympathetic value they deemed appropriate to each of the various sentencing factors.  The jurors also were at liberty to determine whether evidence presented constituted mitigating or aggravating circumstances.  Mr. Moench launched into a criticism of the former inmate defense witness (who discussed execution procedures).  He complained that this witness was brought in to improperly influence the jurors, because none of the evidence he presented fit into any of the sentencing categories.  Mr. Moench conceded that the catchall factor (§ 190.3(k)) might apply but argued the evidence was wholly unrelated to the issue of extenuation.  He insisted that the manner in which the execution is carried out should not be part of the jury's consideration.

On sur-rebuttal, Mr. Peterson resorted to calling Mr. Moench and his arguments insipid, repeatedly.  He stood by his earlier criticism of the jurors for taking only 15 minutes (even though it actually was longer) to reach a verdict on the guilt phase issues.  He stated it was his job to question the jury's verdict.

After reading the closing instructions, the jurors retired to deliberate at 3:47 p.m. At 4:48 p.m., the jurors requested a read back of Carol Berryman's testimony. After listening to her testimony on direct examination, the jurors went home for the evening. The jury resumed deliberations the following morning at 9:00 a.m. without the necessity of the court reconvening. At 12:05, the foreman requested a read back of portions Dr. Pierce's testimony, in particular, the paragraphs before and after the statement that the way the victim's body was left was not consistent with Berryman's behavior. The jury also wanted a read back of Dr. Benson's testimony about Berryman getting angry with his mother because she wouldn't buy him new tires for his truck and about Berryman's increasing aggressive acts. Mr. Peterson objected to the selective reading back of expert testimony, asking that if part of the testimony was read back, then all of it should be read back. The objection was overruled. At 1:56 p.m., portions of the defense expert testimony was read back to the jurors and deliberations recommenced on 2:08 p.m. The court received a note from the jury foreman showing the time to be 2:50 p.m. indicating that the jury had reached a verdict. The jury was called in and the verdict imposing the death penalty was read at 3:28 p.m.

## C.     Post-Verdict, Sentencing Proceedings.

During pre-trial and trial proceedings, Berryman insisted that he had nothing to do with Ms. Hildreth's death. He stated that he wasn't on Cecil Avenue the night of the crime, but rather was with Ms. Pena for the evening, remaining with her until he returned to the Clark home. He reiterated his denial to the probation officer who prepared the pre-sentence report (dated November 28, 1988), attributing the verdict against him to poor legal representation.

## IV.     Standards of Review.

This action is subject to the review provisions of the Anti-terrorism and Effective Death Penalty Act of April 24, 1996 ("AEDPA"), codified in amended 28 U.S.C. § 2254. Berryman did not file his initial petition until November 4, 1996, over six months after the effective date of AEDPA.[50] Under controlling United States Supreme Court precedent, it is the filing of "an application for habeas relief seeking an adjudication on the merits of petitioner's claims" that triggers applicability of AEDPA.

---

[50] Berryman's operative pleading his is First Amended Petition, filed on November 6, 1998, as noted in the Procedural History, Part II., *supra*.

*Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Cases with petitions on file prior to April 24, 1996 are not subject to AEDPA.  Cases with petitions filed subsequent to that date are.  Under AEDPA, three standards apply to the present proceedings.  The first involves a determination of when habeas corpus relief may be granted in the face of a state court denial of those same claims on appeal and post-conviction proceedings.  The second standard establishes when state court findings of fact are presumed correct.  The third is the standard for granting an evidentiary hearing.

**A.      Applicable Standard for Reviewing State Court Denials Involving the Application of Federal Law.**

Under AEDPA, a federal court is without authority to grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim [ ] resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has construed subsection (d)(1) of § 2254 in *(Terry) Williams v. Taylor*, 529 U.S. 362, 413-14 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

The Supreme Court has further explained that "A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled."  *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000).  In sum, to grant a writ of habeas corpus under § 2254(d)(1), a federal court must find that the state court decision to the contrary was objectively unreasonable.  *Bell v. Cone*, 535 U.S. 685, 699 (2002).  With specific reference to a state court's harmless error review, federal courts must practice deference unless the holding was in conflict with Supreme Court precedent, or the state court "applied harmless-error review in an objectively unreasonable manner."  *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).  If a state court harmless-error holding is found to be contrary to Supreme Court precedent or objectively unreasonable, "then no deference is owed."  *Inthavong v.*

1    *LaMarque*, 420 F.3d 1055, 1059 (9th Cir. 2005).  In that event, federal courts "revert to the independent

2    harmless error analysis" they "would apply had there been no state court holding." *Id*.  That harmless

3    error analysis requires resort to the standard described in *Brecht v. Abrahamson*, 507 U.S. 619 (1993),

4    namely that an error is not harmless if it has a "substantial an injurious effect or influence in determining

5    the jury's verdict." *Id*. at 637.  The federal habeas review process requires a two-step analysis:

6          To grant relief where a state court has determined that a constitutional error was
           harmless, we must both determine (1) that the state court's decision was "contrary to" or
7          an "unreasonable application" of Supreme Court harmless error precedent, and (2) that
           the petitioner suffered prejudice under *Brecht* from the constitutional error.
8

9    *Inthavong*, 420 F.3d at 1059.

10         Making the initial "contrary to" or "unreasonable application" determinations, however, are

11   somewhat hampered where the state court merits decision is unaccompanied by any *ratio decidendi*, as

12   is the case at bar.  *See Green v. Lambert*, 288 F.3d 1081 1088-89 (9th Cir. 2002); *Delgado v. Lewis*, 223

13   F.3d 976, 982 (9th Cir. 2000). "When a state court does not furnish a basis for its reasoning, [a reviewing

14   court has] no basis other than the record for knowing whether the state court correctly identified the

15   governing legal principle into a new context." *Delgado*, 223 F. 3d at 981-82.  The solution devised by

16   the Ninth Circuit for this dilemma is for federal reviewing courts to undertake "independent review" of

17   the record. *Id.*; *accord Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001).  The Ninth Circuit has

18   cautioned, however, that federal habeas review in these circumstances is not de novo.  *Delgado*, 223

19   F.3d at 982.  Although a federal court is to undertake independent review of the record in the absence

20   of a reasoned state court decision, the federal court must "still defer to the state court's ultimate

21   decision." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003).  Since the state court decision cannot

22   furnish any analytical foundation, the focus of this review is on Supreme Court cases for purposes of

23   determining "whether the state court's resolution of the case constituted an unreasonable application of

24   clearly established federal law." *See Greene v. Lambert*, 288 F.3d 1081, 1089 (2001).  Federal district

25   courts within the Ninth Circuit  also look to Ninth Circuit law for persuasive authority in applying

26   Supreme Court law and in determining whether a particular state court decision is an "unreasonable

27   application" of Supreme Court precedent. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

28

1    **B.     Standard for Determining Presumption of Correctness of State Court Rulings on**

2    **Factual Issues.**

3    A corollary to the standard for evaluating whether the state court application of federal law is

4    unreasonable is the standard for determining the presumption of correctness of state court rulings.  This

5    standard addresses the finding of facts by state court tribunals.  Under subsection (d)(2) of § 2254, an

6    application for a writ of habeas corpus cannot be granted on factual grounds unless the state court

7    adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light

8    of the evidence presented in the State court proceeding."  Subsection (e)(1) of § 2254 further clarifies

9    that a state court determination of a factual issue is "presumed to be correct," with the applicant bearing

10   "the burden of rebutting the presumption of correctness by clear and convincing evidence."   In a

11   situation where the state court post-conviction denial does not supply a reasoned analysis for the

12   decision, and no evidentiary development was permitted in advance of that denial, the Ninth Circuit

13   indicates that the AEDPA standard of review is inapplicable.  *See Killian v. Poole*, 282 F.3d 1204 (9th

14   Cir. 2002).

15       For claims for which no adjudication on the merits in state court was possible, however,
         AEDPA's standard of review does not apply.  Hence AEDPA deference does not apply
16       to Killian's perjury claim in this case because the state courts could not have made a
         *proper* determination on the merits.  Evidence of the perjury, after all, was adduced only
17       at the hearing before the [federal] magistrate judge.   Having refused Killian an
         evidentiary hearing on that matter, the state cannot argue now that the normal AEDPA
18       deference is owed the factual determination of the California courts.  *See Weaver v.
         Thompson*, 197 F.3d 359, 363 (9th Cir. 1999) (less deference accorded where the state
19       court fails to make finding of fact); *cf Michael Williams v. Taylor*, 529 U.S. 420, 444
         (2000) (state court denial of evidentiary hearing establishes cognizable cause for
20       procedural default in not presenting claims to state court).

21   *Id.* at 1207-08 (emphasis added).

22   In light of this precedent, the Court will apply the presumption of correctness under subsection

23   (e)(1) of § 2254, only as to state court factual decisions rendered after receiving and evaluating relevant

24   evidence.  Otherwise, the Court will, as instructed by the Ninth Circuit in *Delgado* and its progeny,

25   undertake an independent review of the record to determine whether the state court conclusions that bear

26   on factual issues were reasonable under § 2254(d)(2).

27

28

## C.    Applicable Standard for Granting an Evidentiary Hearing.

The standard for granting an evidentiary hearing requires Berryman to make a preliminary showing he is entitled to relief if the facts alleged can be proved.

> A habeas petitioner is entitled to an evidentiary hearing as a matter of right on a claim where the facts are disputed if two conditions are met: (1) the petitioner's allegations would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.

*Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) (citing *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992)); *see Rich v. Calderon*, 187 F.3d 1064, 1067-68 (9th Cir. 1999); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999); *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998).  *See also Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled in part, Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  The first prong commonly is referred to as the requirement of asserting a "colorable claim." *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir. 1994).  The six factors identified in *Townsend v. Sain* inform the judicial evaluation of the second prong of this test.  When any one or more of these factors is present, the state court trier of fact has not reliably found the relevant facts:

    1.    the merits of the factual dispute were not resolved in the state hearing;

    2.    the state factual determination is not fairly supported by the record as a whole;

    3.    the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing;

    4.    there is a substantial allegation of newly discovered evidence;

    5.    the material facts were not adequately developed at the state court hearing;[51]

    6.    for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

---

[51] In *Tamayo-Reyes*, the Court modified *Townsend* by adopting a stricter standard for granting an evidentiary hearing under the fifth enumerated factor.  Before *Tamayo-Reyes*, so long as the petitioner did not deliberately bypass the opportunity to develop facts at the state level, an evidentiary hearing on federal habeas still was available.  *See Fay v. Noia*, 372 U.S. 391, 438 (1963).  Under the standard stated in *Tamayo-Reyes*, a habeas petitioner must demonstrate cause for failure to develop facts in the state court proceedings and actual prejudice resulting therefrom, consistent with the reasoning in procedural default cases.  504 U.S. at 8, 11.  In the absence of cause and prejudice, the habeas petitioner must demonstrate a fundamental miscarriage of justice, also consistent with the analysis of procedural default cases.  *Id.* at 12.  AEDPA further modified the fifth *Townsend* factor, as fully explained in the ensuing text, *infra*.

372 U.S. at 313.  In addition to being entitled to an evidentiary hearing as of right when the petitioner presents a cognizable claim and the state court has not reliably found the relevant facts, a federal court retains discretionary authority to conduct an evidentiary hearing.  *Id*. at 318;  *Seidle v. Merkle*, 146 F.3d 750, 753 (9th Cir. 1998).

As relevant to the present proceedings, the impediment Berryman faces is meeting the "colorable claim" requirement.  A "colorable claim," for purposes of determining entitlement to an evidentiary hearing, is a claim which would entitle the petitioner to relief if the facts alleged were proved.  It is indistinguishable from a prima facie case under California law.[52]  More than just the allegations in the petition, however, must be considered when determining the existence of a colorable or prima facie claim for federal habeas purposes.  The Court will look to the entire record, including the evidence adduced at trial and the numerous offers of proof developed post-conviction, to assess whether any of Berryman's claims are "colorable."  In the recent Ninth Circuit case, *Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005), the court refers to the "colorable claim" standard as having a "low bar."  *Id*. at 1170.  In the context of the opinion, however, this description refers not to persuasiveness of the evidence, but to the form of the evidence.  Thus, the "low bar" language does not signify that the offers of proof need not be persuasive of a petitioner's entitlement to relief.

In that case, the petitioner, Earp, presented significant declaration testimony in support of his claim that the trial prosecutor committed prejudicial misconduct.  Specifically, Earp's trial defense team had located a witness who would have cast great doubt on the veracity of the chief prosecution witness, including pointing the finger at that prosecution witness as the perpetrator of the crime for which Earp was convicted (the rape and murder of a toddler).  The proffered declaration testimony not only deflected blame from Earp, but also described how the witness was strong-armed by the prosecution and law enforcement to recant his own story to defense investigators.  The Ninth Circuit found the evidence submitted was substantial enough to have warranted an evidentiary hearing in state court, and definitely should have resulted in an evidentiary hearing before the district court.  *Id*. at 1169.  The district court,

---

[52] In California, where summary denials by the California Supreme Court are routine on habeas corpus cases, the state court action signals its finding that all of the claims in the petition failed to state a prima facie case.  *See In re Robbins*, 18 Cal. 4th 770, 814, n. 34 (1998); *People v. Duvall*, 9 Cal. 4th 464, 474-75 (1995); *In re Clark*, 5 Cal. 4th 750, 769, n. 9 (1993).

however, denied Earp an evidentiary hearing on the grounds that statements of the defense witnesses were "inherently untrustworthy and not worthy of belief." *Id*. (internal quotes omitted). This was error. The appellate court held, in circumstances where declarations are submitted as offers of proof for an evidentiary hearing, the veracity of the declarants cannot be determined without conducting a hearing where witness credibility and demeanor can be assessed by the judge. *Id*. at 1170.

In specifically mentioned the colorable claim requirement, the court noted that Earp had only to raise allegations that would support his prosecutorial misconduct claim; he did not actually have to prove the prosecution committed misconduct. *Id*. (citing *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001). Although the credibility and colorable claim issues are discussed separately, they are components of a single concept. Earp presented allegations, which if established, would warrant relief under the theory of prosecutorial misconduct. The allegations were comprised in part of the proffered declarations. The key to establishing entitlement to an evidentiary hearing is whether the allegations point to grounds for relief. The form of the allegations is less crucial than the substance, although, the form of the allegations isn't completely discounted. As noted above, the allegations and proffered evidence also must be evaluated against the evidence in the record and against counter evidence proffered by the Warden.

**V.      Berryman's Assertion He Was Denied Constitutionally Effective Counsel on Account of the State Courts' Treatment of his *Marsden* Motions (Claims 1, 2, and 3).**

Three claims fall within Berryman's assertion he was deprived his constitutional rights on account of the state courts' treatment of his motions under *People v. Marsden*, 2 Cal. 3d 118 (1970). In Claim 1, Berryman challenges the trial court's denial of his motions, thus leaving him with counsel who did not adequately advocate and protect his interests. Claim 2 alleges a conflict of interest by counsel because Berryman was represented at the *Marsden* hearings by Mr. Soria, the very attorney he wanted replaced. Claim 3, which is closely related to Claim 2, alleges trial error for the trial court's failure to appoint independent counsel sua sponte at the *Marsden* hearings. Berryman requests an evidentiary hearing with respect to Claim 2.

**A.      Statement of the Facts Relevant to the *Marsden* Claims.**

Berryman made his initial *Marsden* motion orally, on December 15, 1987, at the culmination of the hearing on a prosecution motion to obtain from him, blood, hair, and saliva samples.   The judge presiding set a hearing on Berryman's *Marsden* motion for the following Thursday, December 17, 1987, before another judge, who it turns out was the eventual trial judge.   At the hearing, Berryman complained that Mr. Soria failed to call a witness at the preliminary examination hearing he (Berryman) had requested, that Mr. Soria told other jail inmates he (Mr. Soria) believed Berryman was guilty, and that Mr. Soria was in complicity with the prosecutor, Lisa Green,[53] to obtain his conviction.   In response, Mr. Soria denied telling other inmate clients he thought Berryman was guilty, although he did inquire of them about how they perceived Berryman was adjusting to the jail.   In addition, Mr. Soria reported that his relationship with Berryman had been poor all along because Berryman wanted a Los Angeles attorney to represent him, but the family could not afford one.   The trial court denied the *Marsden* motion, finding no incompetence for counsel's failure to present defense witnesses at the preliminary examination hearing, that jailhouse gossip was rarely beneficial, and that the court was certain no conspiracy existed between Mr. Soria and Ms. Green.   In fact, the judge explained in detail how Mr. Soria had presented a forceful discovery motion which at first was vigorously resisted, only to have the prosecutor ultimately accede.   1MRT: 2-10.

The second *Marsden* motion hearing was conducted over two days, May 5 and 9, 1988, before a different judge, and based on a memorandum of points and authorities dated May 3, 1988 filed by Mr. Soria and supported by a declaration over his signature.[54]   In pertinent part, the motion recites: Berryman "does not feel that court appointed counsel can effectively represent him and that there is a conflict between him and this counsel that will not allow counsel to competently represent him effectively."   Mr. Soria's supporting declaration relates that Berryman wished to address the court about the basis for his dissatisfaction with counsel.   During the first day of the hearing, on Thursday, May 5, 1988, the major

_____

[53] Ms. Green originally was assigned to prosecute Berryman's case   in September 1987. Sometime after June 1988, Mr. Moench was assigned to take Ms. Green's place because she took maternity leave.

[54] By This time, second counsel, George Peterson, had been appointed – on April 6, 1988.

1   conflict aired at this proceeding had to do with trial strategy and forensic testing of body fluid specimens.

2   Messrs. Soria and Peterson had apparently settled on trial strategy that although Berryman may have

3   been responsible for the homicide of Ms. Hildreth, the charged sexual contact was consensual, and thus,

4   there was no rape to make Berryman death eligible.  Berryman, on the other hand, wanted to proceed

5   with a total denial defense, that he had not even been present at the crime scene, even in the face of

6   substantial circumstantial evidence developed by the prosecution to the contrary.[55]  While Mr. Soria was

7   explaining this position, Berryman interrupted the presentation and exclaimed, "Because I wasn't out

8   there."

9        The confusing part of the hearing presentation came when Mr. Soria was describing problems

10  the defense team had encountered with DNA testing of samples taken from the victim's vaginal swab

11  specimen in comparison with blood and saliva specimens eventually obtained from Berryman.  Mr. Soria

12  started out by saying that specimens from the victim had been sent to a laboratory in New Jersey, but that

13  the laboratory had misplaced the specimens.  (In fact, as the record reveals, the laboratory was in

14  Valhalla, New York, and went by the name of Life Codes.)  Because of the reported loss of the

15  specimens, Mr. Soria directed his investigator to fly out to New Jersey (New York) to retrieve the

16  specimens.  Unfortunately, Mr. Soria continued, the investigator missed his connection in Santa Barbara

17  or Los Angeles, but in the meantime, the laboratory employee called back to say that the specimens had

18  been located.  Following this discovery, Mr. Soria directed that the specimens be mailed to another

19  laboratory in Southern California.

20       The veracity of this scenario was undermined when Berryman was allowed to speak and he

21  produced a letter he received from an employee at Life Codes Laboratory saying that the laboratory never

22  lost the specimens – rather the specimens were sent without any written instructions as to what tests to

23  perform.  Mr. Soria than had to back pedal and point out that the letter Berryman received was

24  explainable by the fact that all communications between counsel and the laboratory had been verbal.

25  The defense team didn't want testing on the specimens to take place (again, these are body fluid

26  _____

27  [55] Specifically, Mr. Soria mentioned tire tracks, a portion of a gold chain necklace, and shoe prints connecting Berryman to the scene of the crime.  Mr. Soria also informed the trial judge that a prosecution witness was prepared to testify she believed she saw Berryman's truck near the location

28  where Ms. Hildreth was killed.  All of this evidence, in fact, was presented at trial.

1   specimens from Berryman and the vaginal swab specimen from the victim) until after the prosecution

2   laboratory in Oakland, California completed its testing.  Once that testing was done, then the defense

3   team wanted to conduct its own testing.  According to Mr. Soria, when he received notice that the

4   prosecution laboratory completed its testing, and in fact could not identify Berryman as the source of the

5   semen found on the victim's vaginal swab specimen, he then called the New Jersey (New York)

6   laboratory and learned the specimens were missing (a fact Berryman vigorously disputed at the hearing).

7       A second specimen also was discussed at the hearing, separate and apart from the semen taken

8   from the victim's vaginal swab specimen, and that was blood found on the shoe lace of one of

9   Berryman's Brooks athletic shoes as well as blood on the canvas of one of his shoes (hereafter the

10  "blood-stain evidence").  Mr. Soria described this as the most damaging evidence because the

11  prosecution laboratory detected a genetic marker unique to the victim and that is what he understood the

12  prosecution intended to rely upon to place Berryman at the scene of the crime.[56]  He stated that no testing

13  of the blood-stain evidence had yet been conducted by the defense.[57]

14      The other matter that was particularly irksome to Berryman was Mr. Soria's failure to obtain

15  Berryman's personal belongings from his Mitsubishi pick up truck before the truck was released to the

16  finance company (on a writ of possession).  Berryman reported that Mr. Soria told him he (Mr. Soria)

17  didn't have to get his "junk."  At the hearing Berryman also reiterated his suspicion that Mr. Soria and

18  the prosecutor (Ms. Green) "got something going on and [he] would like both of them dismissed from

19  [his] case."

20      The court was concerned that without laboratory test results on the specimens, it was really too

21  early to determine a trial strategy.  There was considerable discussion about testing the specimens mailed

22  back from the New Jersey (New York) laboratory – but from the context of the discussion, it also is clear

---

[56] As the recitation of the facts discloses, there were numerous circumstantial indicators in evidence placing Berryman at the scene of the crime, which Mr. Soria mentioned when explaining the divergent strategies Berryman and his attorneys wanted to follow.

[57] As set forth in the factual summary, the prosecution serologist who analyzed the blood-stain evidence testified at trial that there wasn't a sufficient quantity to turn over any blood-stain evidence to the defense after the prosecution tested it.  However, Mr. Soria's statement that no defense testing had been conducted yet implies that the defense team planned to do so.  If the serologist trial testimony was accurate, there was nothing for the defense to test, contrary to Mr. Soria's suggestion. This conflict is not explained or addressed by the parties.

that the court had in mind the blood-stain evidence with the clear genetic markers rather than the semen on the victim's vaginal swab specimen.  Since Mr. Soria had represented the prosecution laboratory could not identify Berryman as the source of the seminal fluid on the victim's vaginal swab, the trial court ascribed greater significance to the genetic marker said to have been detected by the prosecution in the blood-stain evidence.  The court also subtly reprimanded Mr. Soria and his investigator for not recovering Berryman's personal belongings from the pick up truck.  The trial court directed counsel to find out about the status of the testing and to retrieve Berryman's personal belongings prior to the continuation of the hearing on Monday, May 9, 1988.  Supp.MRT:3-21.

At the reconvened hearing, much of the proceeding was taken up with discussing Berryman's back injury, his need for a wheelchair in order to be ambulatory, and the fact that Mr. Soria was unable to visit him in jail since the last hearing on account of his non-ambulatory status.  With respect to Berryman's personal belongings left in his truck, Mr. Soria stated that his investigator attempted to contact both the prosecution criminalist, Mr. Laskowski, who would not turn anything over, and an employee of the finance company, with whom there was no meaningful discussion.  The status of the laboratory testing was simply that the vaginal swab and Berryman's bodily fluid specimens originally in the possession of the New Jersey (New York) laboratory were transferred to a laboratory in Southern California, but due to a backlog there, in turn were transferred to another laboratory run by a criminalist who ultimately testified for the defense.  At the time of this hearing, the defense criminalist had not yet performed any tests on the specimens.  The criminalist recommended a DNA expert in northern California to conduct further more complicated DNA testing – possibly to eliminate Berryman as the source of the semen found in the vaginal swab specimen.  Mr. Soria posited that the same DNA testing might be performed on the blood-stain evidence, but that the specimen was still with the prosecution forensic people and a court order was needed to transfer it to the defense team.[58]  The court, mainly focusing on the blood-stain evidence, indicated that until the test results were complete, trial strategy determinations were premature.  In ruling on the *Marsden* motion, the court found that Mr. Soria was

---

[58] In light of the testimony of the prosecution serologist mentioned in the preceding footnote, 57, *supra*, Mr. Soria's suggestion that further defense testing would be considered for the blood-stain evidence appears to based on misinformation or misrepresentation.  Again, neither party addresses this discrepancy in Mr. Soria's representations.

1  not a fault for the mix-up with Life Codes Laboratory.  The court further found Mr. Soria and Mr.

2  Peterson competent in their representation and that the major source of Berryman's dissatisfaction had

3  to do with the failure of his attorneys to recover his personal belongings from the truck.  Those items,

4  however, were not considered to have any evidentiary value.[59]  Since Mr. Soria represented that the

5  defense team would be recovering those belongings, the motion to remove counsel was denied. 2MRT:

6  3-15.

7       One of two declarations over the signature of investigator Bruce Binns which Mr. Soria

8  submitted to the court on May 9, 1988[60] specifically addresses efforts of the defense team to recover

9  Berryman's personal belongings from his repossessed Mitsubishi pick up truck.  Those efforts were

10  undertaken by an employee, Doug Lemmons, of the defense investigator Bruce Binns.  About a month

11  after Berryman's truck was released to the finance company (following a hearing on a writ of possession

12  conducted on March 3, 1988), Mr. Lemmons attempted to track down the now-repossessed pick up truck

13  to ascertain the location of the personality.  He received a run-around from the dealer in possession.  Mr.

14  Lemmons also attempted to find out if anyone from the state might have removed personalty from the

15  truck before Mitsubishi took possession of it.  The person in charge was the prosecution criminalist Mr.

16  Laskowski.  Mr. Lemmons left a message for Mr. Laskowski on April 12, 1988 and followed up on May

17  5, 1988.  Mr. Laskowski said he had no personalty from the truck.  Also, on May 5, 1988, Mr. Lemmons

18  followed up with the dealer, who said he would call back after checking.  The dealer, however, did not

19  return Mr. Lemmons' call.  Earlier, on March 17, 1988, Mr. Lemmons had contacted Deputy District

20  Attorney Lisa Green.  At that time, Ms. Green, Mr. Laskowski, and District Attorney Investigator Mike

21  Mara all reported that they had no authority to release personalty from the truck.  On March 21, 1988,

22  Mr. Lemmons reported his findings to Mr. Soria and Mr. Soria told Mr. Lemmons not to spend any more

23  time on the matter.  Finally, on May 6, 1988 Mr. Lemmons received a call from the dealer who gave him

24  the telephone number of the actual recovery company.  The recovery company insisted on having a

25  _____

26  [59] As is set out below in the summary of Berryman's contentions, he argues two bibles found in the truck did have evidentiary value.

27  [60] Both of Mr. Binns' declarations were made part of the state record on a motion by the State of California before the California Supreme Court during record certification.  They are lodged by the
28  Warden in the state record as DEC-B1 and DEC-B2.

1   notarized authorization signed by the Berryman or a court order before property would be released.[61]

2   The recovery company, however, refused to provide an address, although there was an appointment for

3   May 10, 1988 to return property.  It is unknown whether the personalty in the pick up truck ever was

4   recovered.  Presumably it was not, in as much as other evidence in the record indicates that the

5   personalty of greatest significance, two bibles, was noted by investigating detective Mike Lage, but never

6   introduced into evidence.[62]  DEC-B1.

7        The other declaration, executed by Bruce Binns, provides an explanation about efforts Mr. Binns

8   personally made to track the bodily fluid and hair specimens taken from Berryman and the vaginal swab

9   specimen taken from the victim from Life Codes in New York.  His account is consistent with both Mr.

10  Soria's representations about Life Codes having misplaced the specimens and the letter Berryman

11  presented to the effect that no written request for specific testing had been transmitted.  Specifically, Mr.

12  Binns states that he was in telephone contact with the manager of Life Codes and when the specimens

13  were first transmitted, the manager was asked to store the specimens in the freezer.  One week later,

14  however, on March 7, 1988, Mr. Binns contacted the manager and "gave permission to run DNA prints"

15  on the specimens.  In April, Mr. Binns' assistant, Mr. Lemmons, was instructed to call Life Codes to

16  ascertain the results of the testing, and it was at that time that Mr. Lemmons was told the specimens

17  could not be located.  When the director (as opposed to the manager) of Life Codes informed Mr.

18  Lemmons there was no log of receipt of the specimens, Mr. Binns made plans to go to New York to

19  straighten out the matter in person.  The rest of his declaratory explanation is consistent with Mr. Soria's

20  representations to the trial court.  DEC-B2.

21       As relevant to forensic testing, a third in camera hearing, conducted during the actual trial

22  proceedings, on October 4, 1988, revealed that Mr. Soria still intended to conduct further tests on the

23  blood-stain evidence (from Berryman's shoe).  In spite of the prosecution serologist testimony to the

24  contrary, Mr. Soria told the trial court that the blood-stain evidence had been delivered to a DNA

25  specialist to determine, conclusively, whether the blood-stain evidence could be connected to the victim.

26

27       [61] In fact, the judge had issued such an order on May 6, 1988.

28       [62] Although Detective Lage was called on to testify in the guilt phase defense case, he was not asked about the bibles (or any other personalty found in the truck).

1  Mr. Soria continued that the testing was not, at that time, complete.  He represented to the court that the

2  defense would call the DNA specialist to testify if the test results showed that the blood was not the

3  victim's, but would not if he confirmed it was hers or if the results were inconclusive.  In fact, the

4  specialist was not called to testify, leading to the understanding that either the blood-stain evidence could

5  not be ruled out as belonging to the victim, or more likely, no testing *could* be conducted because all of

6  sample had been used up during testing by the prosecution serologist.[63]

7      In addition to the two actual *Marsden* hearings, Berryman has complained about the

8  representation he received from his lawyers on three more occasions prior to his sentencing.  First,

9  members of his family, on his behalf, complained bitterly to the court that Berryman's lawyers were

10 incompetent and inexperienced.  These sentiments were expressed during a hearing following an

11 outburst by family members directed at Berryman's jurors during penalty proceedings.  The facts

12 surrounding this incident are more fully discussed in connection with the analysis of Claims 73 and 74.

13 *See* Part XXII., *infra*.

14     The second post-*Marsden* hearing occasion where Berryman expressed his dissatisfaction with

15 appointed counsel was to the probation officer who prepared his pre-sentence report.[64]  According to the

16 probation officer, Berryman said that he did not commit the offenses for which he had been convicted

17 and believed he was found guilty because his lawyers did not represent him very well.  Berryman further

18 relayed to the probation officer that he felt his attorneys "did not bring up some things about his case that

19 would have helped him," although he declined to specify what those things were.

20     Third, Berryman complained at his actual sentencing on November 28, 1988.  He remarked:

21     There's a lot of things that I feel that my lawyers could have done in this case, but, you
       know, I just feel that he didn't represent me properly. [¶] I asked to get rid of him a
22     couple of times, but you all wouldn't let me – not you, but the other judges wouldn't
       relieve him, so I had to stick with him, and we had a conflict of interest between us since
23     day one. [¶] And just on that, I feel I had an unfair trial.

24

25

26

27   [63] No documentation for work conducted by this DNA specialist is referenced by either party, and the Court observed none in its review of the record.

28   [64] The probation officer's report is part of the state record lodged by the Warden.

1    The final relevant fact to the *Marsden* motions is the legal opinion of *Strickland* expert Stanley

2    Simrin[65] in a declaration executed June 4, 2001 and appended to Berryman's evidentiary hearing motion.

3    Mr. Simrin opines that when Berryman presented his *Marsden* motions, the trial judges should have

4    appointed independent counsel to question Mr. Soria.   Mr. Simrin believes the appointment of

5    independent counsel was compelled because Mr. Soria provided the only testimony credited by the

6    presiding trial judges.

7    **B.      Berryman's Contentions.**

8    Two of Berryman's arguments regarding the foregoing factual summary are directed at the state

9    trial court, and one is directed at his appointed counsel.  He maintains the trial court deprived him of his

10   constitutional rights by failing to grant his motion for replacement counsel (Claim 1) and not, sua sponte,

11   appointing independent counsel to represent him at the *Marsden* hearings (Claim 3).  He assails his

12   appointed attorneys for continuing to represent him at these hearings even though they labored under a

13   conflict of interest, also in violation of his constitutional rights. (Claim 2.)  He requests an evidentiary

14   hearing regarding the conflict of interest claim, and although he doesn't spell out precisely what evidence

15   he wants to develop, the Court understands that he seeks to explore the nature and extent of the alleged

16   conflict of interest suffered by counsel.

17   The primary justification Berryman advances for assigning error to the trial court's denial of his

18   *Marsden* motions is the court's failure to adequately inquire into the extent of the breakdown in attorney-

19   client relationship.  He claims that what began in December 1987 as a serious breakdown in the attorney-

20   client relationship evolved into an "irreconcilable conflict" by May 1988 as to appropriate defense

21   strategy.  Berryman maintains the trial court hearings did not permit full development of the existence

22   of this conflict.

23   The problem is said to have been Mr. Soria's pretrial preparation and investigation.  Since

24   favorable laboratory results on the victim's vaginal swab would have advanced the total denial defense

25   favored by Berryman, Mr. Soria's failure to request testing from the Life Codes Laboratory in New York

26   promptly was particularly maddening to Berryman.  Mr. Soria was unprepared for trial because of his

27

28   [65] Although his declaration discloses he is a long time practitioner in Bakersfield, no recitation of qualifications or a curriculum vitae are provided for Mr. Simrin.

1  failure to resolve the serology question, without which it was impossible to agree on an appropriate

2  defense strategy.  Mr. Soria's cover-up of his mishandling of the specimen issue and his mismanagement

3  of the retrieval of Berryman's personal belongings from the truck were cause for engendering further

4  distrust by Berryman.  Berryman contends the procrastination of the defense team in having the blood-

5  stain evidence tested was equally irresponsible and contributory to the continued breakdown in the

6  attorney-client relationship.  Ultimately, and certainly before the commencement of the actual trial

7  proceedings, in August 1988, Berryman contends he was unable and unwilling to confide and

8  communicate in his attorneys.  The most promising defense, that Berryman was responsible for Ms.

9  Hildreth's death, but did not commit rape or murder (as opposed to manslaughter), was sacrificed in

10  order to mollify Berryman's complaints, with disastrous results.  Berryman equates these facts to the

11  situation in *Johnson v. Baldwin*, 114 F.3d 835, 838-39 (9th Cir. 1997), where the court found ineffective

12  assistance of counsel for counsel's failure to investigate his client's false and "incredibly lame" denial

13  defense.  Berryman claims the only reason trial counsel originally agreed to advance the lack of identity

14  defense was that the serology results had not been obtained.  By that time Berryman's trust and

15  confidence were gone.

16      He also notes that the personal belongings never retrieved from his truck, namely the two bibles

17  previously mentioned, were important to his case.  At penalty proceedings, these bibles could have been,

18  but were not, offered to show that his Christian beliefs were honestly and genuinely held.  He claims this

19  information could have mitigated his sentence.

20      Berryman stresses that he repeatedly raised his argument that his attorneys were not effectively

21  representing him.  He not only advanced *Marsden* motions on two occasions before the trial, but his

22  family complained of the incompetence of counsel after the guilt proceedings concluded and Berryman

23  again raised the issue to the probation officer (who prepared the pre-sentence report) and to the judge

24  at sentencing.

25      Berryman argues that under Ninth Circuit authority a defendant's motion to substitute counsel

26  should be granted where the defendant makes a showing the attorney sought to be replaced was

27  incompetent for failure to conduct timely investigation, citing, *Johnson v. Baldwin*, 114 F.3d 835.  He

28  claims the trial court (as well as the California Supreme Court) seriously erred for ignoring his

1   complaints and that his attorneys were seriously incompetent for not promptly having forensic materials

2   tested.  He further argues no presumption of correctness should attach because the state court findings

3   are unsupported by the record.

4        Because of the failure to timely conduct testing of forensic evidence, an appropriate strategy

5   could not be devised.  The defense strategy ultimately followed, a combination of a total denial defense,

6   the contention that the offense was not first degree murder, and the theory there was no rape, was

7   improbable, unbelievable and "doomed to failure."   Berryman argues that had Mr. Soria conducted a

8   prompt investigation (ultimately producing negative results for the total denial defense), attorney-client

9   communications would have improved and Berryman would have acceded to a reasonable defense of

10   voluntary intercourse and an unintentional homicide following a "verbal altercation which escalated

11   [in]to a violent confrontation."

12        Separate and apart from the failure of the trial court (involving two different judges) to grant his

13   *Marsden* motions, Berryman argues that Mr. Soria's representation of his (Berryman's) interests at the

14   hearing is grounds for finding a conflict of interest.  In light of this, he claims the trial court judges

15   should have, *sua sponte*, appointed independent counsel to represent Berryman at the *Marsden* hearings

16   and that appointment of separate counsel is supported by *United States v. Del Muro*, 87 F.3d 1078, 1080

17   (9th Cir. 1996).  The procedure actually followed placed Mr. Soria in the untenable position of having

18   to question "his own professional competence" when arguing for the substitution of counsel.  Further,

19   had the trial court appointed separate *Marsden* counsel, the mishandling of the laboratory testing would

20   have been uncovered.  The defense investigation problems were not brought to light by Messrs. Soria

21   and Peterson "because they had a vested interest in not disclosing their own lack of preparation."  Under

22   *Cuyler v. Sullivan*, 446 U.S. 335 (1980),  Berryman claims he is not required to show prejudice once he

23   demonstrates a conflict of interest.

24       **C.**     **Analysis.**

25        The California Supreme Court held in *People v. Marsden*, 2 Cal. 3d 118 (1970) that an indigent

26   criminal defendant may request the trial court to discharge appointed counsel and substitute new counsel

27   if the defendant's right to counsel otherwise would be substantially impaired due to professional

28   incompetence of the original attorney.  *Id*. at 123.  Because a *Marsden* motion implicates Berryman's

Sixth Amendment right to counsel, the claim is cognizable on federal habeas corpus. *See Hudson v. Rushen*, 686 F.2d 826, 829 (1982). To prevail in habeas corpus proceedings on his *Marsden* challenge, Berryman must demonstrate that the denial violated his constitutional rights because the conflict between him and his attorneys prevented effective assistance of counsel as required by the Sixth Amendment. *Schell v. Witek*, 218 F. 3d 1017, 1026 (9th Cir. 2000) (en banc). The first step in analyzing these claims is to review the adequacy of the state trial court hearings. *Id*. at 1025. Second is assessing whether the trial court's failure to appoint and trial counsel's failure to request independent counsel violated Berryman's constitutional rights. The third step entails an assessment of whether counsel's representation of Berryman at the *Marsden* hearings was marred by an actual conflict of interest, which Berryman contends would entitle him to habeas relief without showing prejudice. *See Cuyler v. Sullivan*, 446 U.S. at 349. In the absence of a conflict of interest, the final step is determining whether the alleged representational inadequacies resulted in prejudice. With respect to each of these steps, and the to the extent the state courts have issued reasoned decisions, AEDPA requires deference to those state decisions under 28 U.S.C. § 2254(d)(1) and (2).

### 1.    Adequacy of the State Trial Court Hearings.

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system," *United States v. Cronic*, 466 U.S. 648, 653 (1984). To give effect to this right, the accused must receive "a reasonably competent attorney, whose advice is within the range of competence demanded of attorneys in criminal cases." *Id*. at 655 (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)) ( internal quotations omitted). With respect to indigent defendants, the Sixth Amendment requires more than the mere appointment of counsel. "The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Cuyler v. Sullivan*, 446 U.S. at 344. Accordingly, the adequacy of the state trial court hearing for substitution of counsel is measured by the extent to which the trial court explored the nature and extent of the conflict between defendant and appointed counsel. The ultimate issue is whether "the conflict deprived [the defendant] of the representation to which he was entitled by the Sixth Amendment." *Schell*, 218 F.3d at 1027. This is precisely the standard applied by California courts under *Marsden.* Under California law, in order to "thoughtfully exercise its discretion in this matter,"

the trial court must permit the defendant to specify the reasons "for requesting a change of attorneys." 2 Cal. 3d at 123.

Determining the existence of a conflict, even an irreconcilable conflict, however, does not entitle an indigent defendant to substitute counsel in all situations, even where the motion is timely. This follows from the fact that indigent defendants, like Berryman, have no right to "a meaningful relationship" with appointed counsel; rather they are entitled to "competent representation." *Schell*, 218 F.3d at 1026 (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). Accordingly, a mere personality conflict, or even a strategy disagreement concerning a matter committed to the judgment of the attorney does not result in the abridgement of the right to effective counsel. *Id.* Sometimes, the inquiry by the trial court is whether the defendant himself has "sabotaged the [attorney-client] relationship or failed to make reasonable efforts on his end to develop the relationship." *Id.* at 1027.

The California Supreme Court analyzed the assignment of error to the trial court's failure to grant Berryman's *Marsden* motion on direct appeal. With respect to Berryman's initial motion in December 1987, the court found that Berryman and Mr. Soria were not "embroiled in such an irreconcilable conflict that ineffective assistance of counsel in violation of the Sixth Amendment was likely to result." *People v. Berryman*, 6 Cal. 4th at 1070 (internal quotation marks and brackets omitted). The court specifically found that Berryman's lack of trust and inability to get along with Mr. Soria were insufficient to meet the constitutional standard. *Id.* The court then summarily dispatched Berryman's claim regarding the May 1988 motion, concluding, "[t]o the extent that he may be understood to assert that the [trial] court erred by denying a similar motion he made on May 5, 1988, he is not persuasive." *Id.* at 1070-71 (footnote omitted). The corollary claims that the trial court erred for failure to sua sponte appoint independent counsel and appointed counsel were ineffective for failure to request appointment of independent counsel at the *Marsden* hearings were denied summarily on Berryman's initial state habeas petition.

In the present case, Berryman does not argue that the state courts invoked the wrong legal principles. *See* 28 U.S.C. §2254(d)(1). Rather, Berryman argues that the trial court (in the two hearings) failed to inquire adequately into the extent of the breakdown in the attorney-client relationship, which he characterizes as "serious" in December 1987 and an "irreconcilable conflict" by May 1988. This

1   alleged failing implicates the reasonableness of the trial court's application of clearly established

2   Supreme Court precedent to the facts of Berryman's case under § 2254(d)(1) and the reasonableness of

3   the trial court's factual determination under § 2254(d)(2).

4         Neither trial court denial of Berryman's *Marsden* motions was an unreasonable application of

5   law or an unreasonable factual determination.  Berryman's primary complaint presented during the

6   December 1987 hearing was the notion that Mr. Soria actively was working against him.  Support for

7   this contention was comprised of Berryman's complaint about the lack of defense witnesses called at

8   the preliminary examination hearing, alleged comments Mr. Soria made to other County Jail inmates

9   about Berryman's guilt, and a perceived conspiracy between Mr. Soria and the originally assigned

10   prosecutor to obtain Berryman's conviction.  After hearing Mr. Soria's explanation that he had merely

11   asked other inmates how Berryman was adjusting, the trial court reasonably rejected Berryman's

12   contention, noting that jailhouse gossip was rarely beneficial and that any cordiality observed between

13   Mr. Soria and Ms. Green followed a vigorously contested defense discovery motion in which the

14   prosecution ultimately conceded.[66]  Since the trial court denial was reasonable, it follows that the

15   California Supreme Court determination on the same issue also was reasonable.

16         Addressing the May 1988 hearing is more complicated, largely because Berryman's and  Mr.

17   Soria's respective representations to the trial court were contradictory.  Indeed, Berryman's chief

18   complaint regarding the conflict between his attorneys and him was that Mr. Soria had not obtained the

19   promised forensic testing, and then misrepresented efforts to do so to the trial court.  Berryman's

20   secondary complaint concerns personalty left in his truck (that by the time of the hearing had long been

21   repossessed).  In fact, as the record reveals, there is merit to Berryman's complaints.  Mr. Soria's version

22   of the facts regarding the testing of Ms. Hildreth's vaginal swab specimen against samples obtained from

23   Berryman was not entirely accurate.  Only the subsequently filed declaration of investigator Bruce Binns

24   explained all of the details.  There was a "mix-up" with the laboratory, but it cannot be said that the

25   laboratory was completely at fault, because as the letter Berryman provided to the trial court established,

26

27         [66] Berryman does not contend in this proceeding that appointed counsel were in any way

28   incompetent for failure to call certain witnesses at the preliminary examination hearing, as he did at the
December 1987 *Marsden* hearing.

1  Mr. Soria and his investigators in fact did not initially ask the laboratory to perform any tests.  Although

2  the trial court credited Mr. Soria's explanation about the forensic testing and referred to the entire set

3  of circumstances as a mix-up that was not Mr. Soria's fault, the emphasis of that discussion was more

4  focused on the fact that testing was going to be conducted in California, and that the results of that

5  testing would determine a defense strategy on which both Berryman and his counsel could agree.

6         Based on the facts presented at the May 1988 *Marsden* motion hearing, this Court is compelled

7  to find that even though Mr. Soria did misrepresent facts to the trial court, the trial court's denial of the

8  motion was not unreasonable under § 2254(d)(1) or (2).  The primary reason is that tests left

9  unperformed by the New York laboratory were soon to be performed by a laboratory in California.  The

10  trial judge stressed this fact in rendering his decision.  Further, a separate specimen, namely a blood-

11  stained shoelace, was to be tested for genetic markers that the trial judge was told could rule out Ms.

12  Hildreth as the source of that blood.  With this as a back drop, Mr. Soria represented to the trial court

13  that he and Berryman were conflicted as to what trial strategy to follow, with Berryman urging total

14  denial of any complicity in Ms. Hildreth's death or sexual assault at all, and counsel favoring Berryman

15  acceptance of responsibility for the homicide, but claiming the homicide was not murder (or at least not

16  first degree murder) because the sex was consensual.  Mr. Soria clearly represented to the trial court that

17  he was still willing to alter his preferred trial strategy if results favorable to Berryman's total denial

18  defense were returned by either laboratory.  Moreover, in conducting the May 1988 hearing, the

19  presiding judge had the impression that Berryman's main bone of contention with Mr. Soria (and Mr.

20  Peterson) was centered around the failure to recover his personal belongings from his truck.  Since an

21  order issued by the trial court resolved this matter, and counsel represented (through their investigator

22  Mr. Binns) that they would retrieve Berryman's belongings, this issue was considered settled.  Whether

23  the belongings were or were or not retrieved, however, had no bearing on the presentation of evidence

24  at trial (as far as the judge presiding knew).  It is true that no one informed the trial judge of the potential

25  importance the two bibles found in the truck would have as mitigation evidence during penalty

26  proceedings.  As more fully discussed below in connection with the analysis of Claim 72. *See* Part

27  XXXII, *infra*, prejudice from failure to actually produce the bibles at the trial was significantly

28  ameliorated because the fact that the bibles had been found in the truck was brought out at trial.

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd          55

1    While it is regrettable that the California Supreme Court did not provide an analysis of its denial
2    of relief respecting the May 1988 hearing, the omission is not an impediment.  Based on the presentation
3    of the matter to trial court, the trial judge was more than reasonable to conclude that the trial strategy
4    conflict could be resolved once forensic testing was complete.  The judge had no basis to doubt that
5    favorable forensic test results might still be forthcoming and could resolve the dispute between
6    Berryman and his counsel about the appropriate defense strategy.  The state trial court decisions were
7    entirely appropriate and reasonable.  Under *Schell*, 218 F.3d 1017, the court clearly did not ignore the
8    motion or fail adequately to inquire into the nature of the conflict between Berryman and counsel.  *See*
9    *id*. at 1025.

10    In reaching this conclusion, the Court does not overlook the fact that Mr. Soria's representations
11    about being able to conduct further testing on the blood-stain evidence appear to be misrepresentations,
12    whether innocent, negligent, or intentional.  By May 1988, when the second *Marsden* motion hearings
13    were being conducted, the blood-stain evidence was already used up during prosecution testing (and
14    defense observation).  The Court cannot reconcile the testimony of the prosecution serologist with Mr.
15    Soria's statements to the *Marsden* hearing judge in May 1988 that the defense still wanted to conduct
16    further tests of the blood-stain evidence to finally determine an appropriate defense strategy.  Even more
17    perplexing are Mr. Soria's representations to the trial judge in October 1988 that blood-stain evidence
18    had been delivered to a DNA specialist for further testing and that the DNA specialist would be called
19    to testify if the results could eliminate Ms. Hildreth's blood as the source of that blood-stain evidence.
20    Neither the record nor the parties explain the discrepancy of representations, so the Court cannot make
21    a definitive determination.  It is clear, however, that the *Marsden* hearing judge at the May 1988
22    proceedings had no way of knowing that the blood-stain evidence was used up.  Thus, the ruling denying
23    the *Marsden* motion on the grounds that deciding on a defense strategy in advance of forensic testing
24    was premature cannot be said to be unreasonable, or even erroneous.  The discrepancy in representations
25    about the further testing of the blood-stain evidence is addressed in the discussion of prejudice arising
26    from presumed incompetent representation.  *See* Part V.C.4, *infra*.

27    The Court further distinguishes the present ruling that Berryman suffered no constitutional
28    violation on account of the *Marsden* motion denials from the recent Ninth Circuit decision in *Plumlee*

*v. Del Papa*, 465 F.3d 910 (9th Cir. 2006), which did find a such constitutional violation.  First and foremost, *Plumlee* is referred to in the opinion as both an "unusual case" and a case presenting "extraordinary circumstances."  *Id*. at 913, 924.  Second, that holding follows from the finding that Plumlee "reasonably and in good faith believed that [his appointed attorneys from] the [ ] Public Defender's Office were leaking information about his case to another suspect in the case and to the District Attorney."  *Id*. at 913.  Evidence adduced at a state court evidentiary hearing established that the chief deputy Public Defender was acquainted with Plumlee's former roommate, which roommate also was a suspected co-perpetrator in the crime, and Plumlee reasonably believed the chief deputy and the suspected co-perpetrator had discussed the case.  *Id*. at 913.  Separate and apart from that circumstance, the first deputy Public Defender appointed to represent Plumlee accepted a position with the District Attorney's Office during his representation of the defendant.  Plumlee reasonably believed the attorney-client privilege had been compromised during that relationship because he told this deputy Public Defender about the potential evidentiary value of his car to the defense, and thereafter, the vehicle, which was in police custody, was destroyed.  Plus, Plumlee claimed this deputy Public Defender lied about having accepted a job with the District Attorney's Office.  *Id*.  Finally, the second deputy Public Defender assigned to Plumlee's case denied the existence of a bail order in the case, although it turns out there was one, and when Plumlee insisted on this fact, the deputy Public Defender told him he (Plumlee) needed psychiatric treatment.  *Id*.  In finding a complete breakdown of the attorney client relationship, the Ninth Circuit was influenced by the trial judge's comments and findings that Plumlee's distrust of the Public Defender's Office was understandable and reasonable, even though the state trial judge also found no misconduct by members of that office.  *Id*. at 915, 916-17, 921-22.  Although there was no "actual conflict of interest" affecting the performance of the Public Defender deputies, the resulting distrust produced an irreconcilable conflict and a complete breakdown in communication between counsel and client" constructively resulting in the deprivation of counsel altogether.  *Id*. at 922.  The Ninth Circuit also was influenced in its holding that the breakdown was not caused by "the defendant's obstinance or delaying tactics," *id.*, distinguishing other cases where the conflict was of the defendant's own making.  *Id*. at 924 (citing *Schell*, 218 F.3d at 1026).

1    Berryman's case does not rise to this level of extraordinary circumstances.  His claim at the

2    *Marsden* hearings that Mr. Soria and the prosecutor were involved in a relationship and were colluding

3    to obtain his conviction was unfounded and the first hearing judge told him so.  His belief in the

4    existence of a conspiracy was not reasonable.  On habeas corpus, Berryman does not now advance this

5    conspiracy theory as grounds for the claimed irreconcilable breakdown in the attorney client relationship.

6    Rather he focuses on the attorneys' lack of prompt investigation of the case through forensic testing and

7    adhering to a viable defense.

8    The Court also must acknowledge a very recent Ninth Circuit case, *Daniels v. Woodford*, 428

9    F.3d 1181 (9th Cir. 2005), which embraces a different analytical model in addressing the trial court's

10   failure to grant a motion to substitute counsel.  In *Daniels*, the court found an irreconcilable conflict

11   between the defendant and his attorneys due to the defendant's lack of confidence in their ability to

12   represent him, and in the case of lead counsel, ties to the District Attorney's Office.  Indeed, the court

13   found appointed counsel to be ineffective for overlooking a viable mental state defense and putting on

14   a factually unsupportable denial defense.  Utilizing the abuse of discretion review standard previously

15   disapproved by *Schell*, 218 F.3d 1017, the court found that the defendant was entitled to habeas relief

16   because the extent of the conflict was beyond repair (largely due the defendant's clinical paranoia), the

17   trial court failed to question the appointed lawyers individually to really address the defendant's

18   concerns, and the motions to substitute counsel were timely.  Because *Daniels* is a pre-AEDPA case,

19   however, the appellate court there reviewed the state court conclusions de novo.  In the present case, this

20   Court must give deference to the state court findings and conclusions under 28 U.S.C. § 2254(d)(1) and

21   (2).  Berryman is not entitled to de novo review.  Moreover, even though the denial defense advanced

22   at Berryman's trial was unbelievable in light of substantial circumstantial evidence, that defense was

23   urged by Berryman throughout the trial, direct appeal proceedings, and state habeas corpus proceedings.

24   In contrast, the denial defense advanced in *Daniels* was developed and advanced by his appointed

25   attorneys.  Berryman cannot cast the total blame for his defense on counsel.  They walked a fine line

26   between trying maintain his trust and presenting a viable defense.  Indeed much of cause for the alleged

27   faulty trial strategy is attributable to Berryman's obstinance, insisting, as he did that he was neither

28

1 responsible for Ms. Hildreth's death nor even present at the crime scene. There was no constitutional

2 infirmity with the manner in which the trial court conducted the *Marsden* hearings. Claim 1 is denied.

3                    **2.       Grounds for Appointing Independent Counsel.**

4        The contention that independent counsel should have been appointed sua sponte under the

5 authority of *United States v. Del Muro*, 87 F.3d 1078, must be analyzed from the perspective of what

6 the two hearing judges had before them. During the first hearing, the judge determined there was no

7 conflict on account of the conduct of the preliminary examination hearing, jailhouse gossip, and the

8 alleged collusion between Mr. Soria and Ms. Green. During the second hearing, the judge understood

9 that the conflict over defense strategy was capable of resolution after further forensic testing and that

10 Berryman's unhappiness over personal property left in his pick up truck was not material to the defense.

11 Given this perspective, the claim that the trial judge should have appointed independent counsel, sua

12 sponte, is foreclosed by *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998). In *LaGrand*, the petitioner

13 advanced an identical claim of entitlement to independent counsel when making his motion for

14 substitution counsel at trial. The Ninth Circuit rejected his contention, finding it a "novel extension of

15 the right to counsel." 133 F.3d at 1277. The court determined that the "defendant's self-interest and his

16 lawyer's continuing professional obligation are sufficient to enable the trial court to make the necessary

17 determination." *Id*. The Ninth Circuit's characterization of the petitioner's claim in *LaGrand* as

18 "novel," implicates the *Teague* doctrine. *See* 489 U.S. at 310. Even without a *Teague*-bar, Berryman's

19 reliance on *Del Muro* is unavailing.

20        *Del Muro* involved a motion for new trial from the defendant's conviction of immigration laws,

21 where he claimed his appointed defense counsel "rendered ineffective assistance by failing to interview

22 [and] subpoena witnesses suggested by Del Muro." 87 F.3d at 1080. Specifically, Del Muro requested

23 appointment of substitute counsel to present the new trial motion and elicit testimony to prove the

24 ineffective assistance of counsel claim. The result of the trial court's denial of Del Muro's motion was

25 that his trial attorney was required to elicit testimony from witnesses and argue that his (the attorney's)

26 "own failure to investigate and call [these] witnesses prejudiced Del Muro's case." *Id*. The Ninth

27 Circuit agreed that "the district court created an inherent conflict of interest by forcing trial counsel to

28

1  prove his own ineffectiveness and thereby deprive Del Muro of his Sixth Amendment right to effective

2  assistance of counsel." *Id*.

3        No analogous conflict infected Berryman's case, since neither Mr. Soria nor Mr. Peterson were

4  asked to establish their own ineffectiveness at either *Marsden* hearing. The Court specifically does not

5  view Mr. Soria's explanations about the delay in completing forensic testing and retrieving Berryman's

6  personal belongings from his pick up truck as efforts to establish ineffective assistance of counsel.

7  Rather, those explanations were presented to assist the trial courts ascertain the nature of the asserted

8  conflict. Having reasonably determined the absence of a true conflict, the trial judges would have

9  discerned no need for independent counsel. The trial court did not commit error in not appointing

10  independent counsel to represent Berryman at the *Marsden* motions. There was no abuse of discretion,

11  let alone a constitutional violation. Claim 3 is denied on the merits.

12        **3.**      **The Presence of an Actual Conflict of Interest.**

13        When counsel labors under an actual conflict of interest affecting his/her performance the

14  defendant has been deprived of his Sixth Amendment right to counsel because the attorney "fails to

15  subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659 (citing *Cuyler*

16  *v. Sullivan*, 466 U.S. at 335). Failure of this nature would include a conflicted defense attorney not cross

17  examining or calling a particular witness, or not resisting the introduction of inadmissible evidence in

18  order to assist a co-defendant. *Sullivan*, 466 U.S. at 348-49 (quoting *Glasser v. United States*, 315 U.S.

19  60, 72-75 (1942)). However, the mere "possibility of a conflict is insufficient to impugn a criminal

20  conviction." *Id*. at 350.

21        Berryman's alleged conflict in the present case falls far short of establishing an actual conflict

22  under *Cronic* and *Sullivan*. His trial attorneys certainly did not make any strategic decisions to

23  compromise his defense for the benefit of another suspect in Ms. Hildreth's murder, and Berryman does

24  not contend they did. Rather, he complains that they (especially Mr. Soria) countered assertions of

25  mishandling the forensic testing in order to save face before the trial judges, that is, for their own

26  personal benefit. Recent Ninth Circuit authority, however, limits the circumstances under which an

27  attorney conflict of interest claim may be considered to cases of joint representation of multiple clients

28  with conflicting interests. *Earp*, 431 F.3d at 1184-85. Thus, in *Earp*, the court rejected the petitioner's

1   claim that his trial counsel labored under a conflict of interest warranting a presumption of prejudice on

2   account of her romantic involvement with him during the trial. *Id*. at 1185. Relying on United States

3   Supreme Court authority in *Mickens v. Taylor*, 535 U.S. 162, 176 (2002), the Ninth Circuit noted that

4   as of 2002, the issue of whether a *Sullivan* conflict of interest extended beyond joint representation

5   remained "an open question." *Earp*, 431 F.3d at 1184; *see also Foote v. Del Papa*, ___ F.3d ___, ___,

6   2007 WL 1892862, *4 (July 3, 2007). Absent clear authority handed down by the Supreme Court, lower

7   courts are not at liberty find state court rulings contrary or unreasonable applications of Supreme Court

8   precedent under 28 U.S.C. § 2254(d)(1). *See Kane v. Garcia Espitia*, 546 U.S. 9, ___, 126 S. Ct. 407,

9   408 (2005). The contention that Berryman was deprived of Sixth Amendment representation under the

10  presumed prejudice standard described in *Cronic* and *Sullivan* is without merit. Claim 2 is denied on

11  the merits and Berryman's request for an evidentiary hearing as to Claim 2 also is denied.

12          **4.       Resulting Prejudice from the Alleged Inadequate Representation of Counsel.**

13          Although Claims 1, 2, and 3 do not allege prejudice as an element of any of his claims, prejudice

14  is argued in his points and authorities. For the sake of completeness, that prejudice must be addressed.

15  The primary source of prejudice Berryman emphasizes is the unsuccessful and conflicting defense

16  presented as a result of counsel's unpreparedness, which he equates with the "incredibly lame" denial

17  defense trial counsel presented in *Johnson v. Baldwin*, 114 F.3d 835.

18          Under the familiar legal standard for evaluating prejudice pursuant to *Strickland v. Washington*,

19  466 U.S. 668 (1984), Berryman "must show that there is a reasonable probability that, but for counsel's

20  unprofessional errors, the result of the proceeding would have been different" with a "reasonable

21  probability" being one sufficient to undermine confidence in the outcome" of the trial. *Id*. at 694. To

22  conclude that his attorneys' alleged incompetent representation undermines confidence in the outcome

23  of the trial, Berryman resorts to a layered process. He maintains that if his attorneys had timely

24  conducted their investigation, he (Berryman) would have learned early that forensic testing could not

25  and did not exculpate him from the crime. Accordingly, the lack of identity defense would have been

26  abandoned, attorney-client communications would have improved, and Berryman would have agreed

27  to a reasonable defense of voluntary intercourse followed by an unintentional homicide, rather than the

28  two-pronged inconsistent defense that was presented.

1    In the present case the Court proceeds on the assumption that Berryman's counsel were

2    ineffective for their mishandling and unwarranted delay of forensic testing, followed by less than candid

3    representations to the trial court.   The Court further notes that Mr. Soria's repeated insistence that

4    additional testing could resolve the defense strategy dispute is disturbing in that the samples were so

5    small, only limited testing could be and already had been performed.   While the record discloses the

6    results of the prosecution serologic testing on the vaginal swab and blood-stain evidence, there is no

7    indication of defense forensic testing results.   No defense serologist testified at all, and the defense

8    criminalist did not testify about the results of specimen comparison tests.   The only testimony on this

9    forensic testing came from the prosecution serology expert, and his testimony was not dispositive.   The

10   prosecution serologist noted that from the vaginal swab specimen, there was a small amount of blood

11   and an even smaller quantity of semen (verifiable only by the presence of spermatozoa).   He testified that

12   the blood was consistent with Ms. Hildreth's blood, but the semen was of an insufficient quantity to

13   determine anything about the donor.   Hence Berryman could not be identified as the source of the semen

14   from that specimen.[67]   Testing of the blood-stain evidence also was somewhat inconclusive due to the

15   small quantity of the specimen available.   Comparing that specimen with only a few of 17 genetic

16   markers present in Berryman's and the victim's blood, the prosecution serologist concluded the blood-

17   stain was consistent with Ms. Hildreth's blood, but inconsistent with Berryman's blood.   Because the

18   testing procedure was observed by the defense serologist, there was no disagreement on this conclusion

19   – as far as it went.   In light of these results, particularly the inconclusive nature of those results due to

20   insufficient quantities, Mr. Soria's representations to the trial court during the *Marsden* hearings about

21   needing to send the specimens off to a specialized DNA laboratory in another part of the state appears

22   at best, disorganized, and at worst, disingenuous.   Whether or not he truly didn't know about the

23   insufficient specimen quantities, his representations served only to delay the inevitable conclusion that

24   forensic testing would not support Berryman's lack of identity defense.

25

26

27   [67] Indeed, given this inconclusive result and the small quantities the serologist had to work with, it's unclear why retesting the vaginal swab specimen was deemed so crucial.   From the beginning it was doubtful a more favorable result could be obtained by defense retesting, and in the end, that was exactly the outcome.

28

1    Turning to the issue of prejudice, despite the delay in reaching this inevitable conclusion, nothing

2    in the record or in the post-conviction evidence presented even vaguely indicates that Berryman would

3    have acceded to the defense advocated by Berryman's appointed attorneys (and advanced on habeas

4    corpus).  Even after the serology issue finally was resolved, and presumably conveyed to Berryman, with

5    neither the retesting of the vaginal swab nor the testing of the blood-stained shoe lace yielding results

6    which favored Berryman, he still has persisted in claiming innocence.  As noted, he told the probation

7    officer preparing a pre-sentence report that he did not commit the offenses for which he had been

8    convicted.[68]  *See* Part III.C., *supra*.  Next, in his pro se state habeas petition, filed in 2001, he argues that

9    numerous evidentiary inconsistencies about tire track evidence connecting him with the crime scene

10    create doubt that his pick up truck was even at the crime scene.   Similarly, he argues that other tire track

11    evidence was planted.  He makes the same argument about the presence of broken gold necklace chain

12    links.   Next, he calls into question the veracity of all evidence showing that the blood-stain evidence

13    (from his shoes) belonged to the victim.  He claims both inconsistencies in the evidence and intentional

14    governmental manipulation resulted in a wrongful and unwarranted conviction.

15    Berryman's post-trial statements (including those to the pre-sentencing probation officer) show

16    that even with the serology issue resolved as to both the vaginal swab specimen and the blood-stain

17    evidence, he was not and may still not be amenable to accepting any responsibility for Ms. Hildreth's

18    death, even with consensual sexual relations and an unintentional homicide.  Rather, he has continued

19    to focus on governmental malfeasance in obtaining his conviction by the alleged planting of inculpatory

20    evidence and manipulating facts.  The argument that trial counsel's prompt investigation and completion

21    of forensic testing would have motivated Berryman to accept what is said to be the reasonable defense

22    strategy embraced by trial counsel early on in the representation is mere speculation.  His reliance on

23    *Johnson*, 114 F.3d 835 is misplaced.

24    In *Johnson*, the defendant was charged with three counts of forcible rape. A physical examination

25    of the victim shortly after the incident, as well as her clothing and the bed on which the rape was said

26    _____

27    [68]  Berryman quotes from portions of the probation officer's report to make the point that he continued to complain about the representation he received throughout the trial proceedings. The Court, therefore, views any hearsay objection to the statements of the probation officer or of Berryman as

28    attributed by the probation officer to be waived.

1   to have occurred, revealed no physical evidence that she had been subjected to sexual intercourse.  The

2   prosecution theory that Johnson committed rape was predicated solely on the victim's testimony.  At

3   trial, Johnson testified that he had not been at the residence where the rape occurred.  After being

4   convicted of three counts of rape, Johnson again testified at the sentencing, admitting that he had been

5   at the residence at the time and place at issue, but denying that rape had occurred.  Johnson also

6   explained that "his attorney had told him to say he was not there."  114 F.3d at 836.  On state habeas

7   corpus, Johnson alleged, among other things, that his trial attorney had not adequately investigated the

8   case, had not adequately conferred with him, and had encouraged him to testify falsely.  Following a

9   state court evidentiary hearing, the state court found the trial attorney had met with Johnson on only two

10  occasions and had conducted a cursory investigation, only briefly interviewing two witnesses.  The state

11  court also found that Johnson had not carried his burden of establishing that his attorney suborned

12  perjury.  *Id*. at 837.  When the matter reached the Ninth Circuit, the alibi defense was referred to as

13  "incredibly lame" because no details of where Johnson may have been at the time of the alleged crime

14  were elicited on direct examination and no corroboration for the alibi was presented.  *Id*. at 839.  The

15  attorney's failure to adequately investigate was held to be constitutionally incompetent and prejudicial.

16  Had he investigated the proffered alibi defense, he would have discovered the implausibility of the story

17  and encouraged Johnson to follow a reasonable trial strategy which didn't include lying to the jury and

18  likely would have resulted in an acquittal.  *Id*. at 839-40.

19          In the present case, even after Berryman was confronted with the fact that his lack of identity

20  defense was not empirically supportable, he still clung to it throughout his trial and well into post-

21  conviction proceedings.  Berryman cannot establish prejudice for his attorneys' alleged incompetence

22  for failing to promptly investigate the case.  All residual allegations of Claims 1, 2, and 3 regarding

23  errors and omissions in the trial court's and the defense attorneys' handling of his *Marsden* motions are

24  denied.  No further evidentiary development is warranted.

25  **VI.    Berryman's Assertion He Was Incompetent to Proceed to Trial and Incompetent to have**

26  **        Waived His Rights Under *Miranda v. Arizona* (Claims 4, 5, 27, and 28).**

27          Claims 4 and 5 of the Petition allege that Berryman was incompetent to understand the trial

28  proceedings against him or to assist his appointed attorneys in his own defense.  In addition, in Claims

27 and 28, he claims that he was incompetent to waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), to consent to an interview by authorities on the night of his arrest, September 7, 1987. Berryman does not seek an evidentiary hearing with respect to any of these four claims.

### A.      Statement of the Facts Relevant to Berryman's Competence.

Berryman relies on the opinions of retained mental health experts to establish his alleged compromised mental state both at the time of his September 7, 1987 interview and at trial. In addition, as relevant to his statements made during the September 7, 1987 interview, he points to his chronic alcoholism and intoxication.    The substance of the September 7, 1987 interview also must be considered, along with the defense and prosecution comments about the admissibility of his statement at trial.

### 1.      Berryman's Mental Status.

The two mental health experts who testified at Berryman's trial also have provided post-conviction declarations expounding on their earlier assessments of Berryman's mental state. The trial opinions of these two experts, psychologist William Pierce, Ph.D. and psychiatrist Samuel Benson, M.D. are recounted above in the Summary of the State Trial Proceedings, Part III.B. Their post-conviction declarations in conjunction with Berryman's first state habeas petition (filed September 3, 1993) and the present federal habeas petition are more fully recounted in connection with the analysis of Claims 15 and 16.  *See* Part XII.A.3., *infra*. Dr. Pierce opines that Berryman suffers from alcohol organic disorder and an organic mental syndrome or seizure disorder, now and at the time of the offense.  Dr. Benson's assessment of Berryman is that he suffers from organic brain disease and possible alcohol seizure induced behavior.

### 2.      Berryman's Excessive Alcohol Consumption.

Berryman recites in his moving papers that numerous friends and relatives could have testified, and have provided evidence, that he was a chronic and heavy drinker, including at the time of the crime and his September 7, 1987 interview with authorities.  In fact, some did give trial testimony to this effect. The testimony of friends and relatives who did and could have testified to Berryman's excessive alcohol consumption is recounted in connection with Claims 15 and 16, below.  *See* Part XII.A.1., *infra*.  For

purposes of analyzing these incompetence claims, evidence of Berryman's excessive alcohol consumption is accepted as true.

### 3. Evidence of and Relating to Berryman's September 7, 1987 Interview with Investigators.

The content of Berryman's statements to authorities were introduced into evidence during the guilt phase proceedings.  Although initially, defense counsel moved to exclude the substance of the interview from the jury, and Mr. Moench indicated he would not introduce it except in rebuttal, an edited version of the statement was presented to the jury during the prosecution case in chief.[69]  The edited version of the interview was read to the jury by Mr. Moench.  In addition to this reading, an edited transcript of the interview was admitted together with a tape recording of the interview.

The transcript records that Berryman was told he had the right to remain silent, that anything he said could and would be used against him in a court of law, that he had the right to speak to a lawyer before proceeding with the questioning, and that if he couldn't afford an attorney, one would be appointed.  After confirming his understanding of these rights and waiving them, Berryman denied having seen Ms. Hildreth or having being on Cecil Avenue the previous night.  He told officers he had been with Melinda Pena, but he didn't want his girlfriend, Crystal, to know this, because he and Melinda engaged in sexual relations.  After returning Melinda to her home, he stated he went to a convenience store to purchase a beer and telephone another girlfriend.[70]  He then returned to the Clark residence, where he awakened Crystal and they talked a while.  In the course of delivering this chronology, Berryman told detectives that he had consumed a couple of beers earlier in the day, but that he was not disabled in anyway from continuing with the interview and had no problem talking with the detectives.

Detective Lage, one of the questioners, observed that Berryman had a "busted wheel" on the right side of his truck.  Berryman explained that earlier in the day (September 7, 1987) someone cut in front of him on the road, and when he chased that person, he ran his truck into a curb.  He also denied having

---

[69] The portions excised from the statement pertained to Berryman's prior arrest (for possession of marijuana) and the fact that he had a parole officer in Los Angeles County.

[70] The evidence at trial was that he telephoned the other girlfriend *before* going to Melinda's house.

1   ever given Ms. Hildreth a ride in his truck.  He claimed that the scratch on his face was the result of

2   playing basketball (that day), and that Crystal's younger brother, Andrew Bonner, inflicted the scratch.

3   When Detective Lage informed Berryman that his truck was seen on Cecil Avenue the previous night,

4   Berryman concluded that the person who told authorities this information did so because she had a

5   grudge against him.  When Detective Lage told Berryman that tire tracks matching the treads of his tires

6   were found at the crime scene, Berryman persisted in his denial of having been on Cecil Avenue or

7   anywhere near the crime scene.  Berryman gave officers permission to look at his clothes for "trace

8   evidence."

9        On April 22, 1988, Berryman's defense counsel presented ten in limine motions, including one

10  to exclude his September 7, 1987 statement on the grounds it was insufficiently reliable for a capital

11  prosecution.  In support of this motion, Mr. Soria wrote in a declaration: "The statement made by

12  [Berryman] in no way admits responsibility for the alleged crimes.  It is neither a confession nor an

13  admission. [¶] That for the reasons stated above, the 'Custodial Statement' taken from [Berryman] is not

14  reliable and should be excluded as evidence."  The prosecution filed a response to this particular motion

15  which stated: "The People do not intend to introduce defendant's statement during its case in chief and

16  the People are seeking an order prohibiting the defendant from questioning any officers about the

17  contents of the defendant's statements on the grounds it is inadmissible hearsay."

18       At the August 15, 1988 in limine motion hearing, the trial court declined to rule on this particular

19  motion because the prosecution only intended to use the statement for impeachment purposes, if at all.

20  If the defense raised the statement, the trial court noted that the prosecutor would "ask for a hearing as

21  to the propriety of going into his statement."  Since it is clear that the September 7, 1987 interview

22  statement (as edited) was introduced during the prosecution case-in-chief, either the issue was raised as

23  described in the trial court's ruling, or counsel had a change of strategy.[71]

24       Mr. Moench brought up the substance of the interview during his rebuttal argument at guilt phase

25  proceedings.  Of significance to Berryman is the fact that Mr. Moench used the statement to show that

26  Berryman was untruthful.  Specifically, Mr. Moench pointed out that when Berryman perceived

27

28           [71] The record before the Court sheds absolutely no light on this matter.

1   suspicion was focused on him, he developed an alibi, emphasizing his verifiable whereabouts at the time

2   Ms. Hildreth was killed, even though authorities had not yet released information regarding the timing

3   of her death to members of the family, and certainly not to Berryman.

4          **B.      Berryman's Contentions.**

5          Berryman's claimed mental impairments and deficiencies are legion.  He is said to suffer from

6   permanent pre-existing mental disorders, severe mental and emotional impairments, the pervasive effects

7   of organic brain disease with resulting limited intellectual and cognitive capacity, overwhelming

8   developmental trauma including neglect, abandonment, physical abuse, emotional abuse, sexual abuse,

9   plus, from the death of his father, post-traumatic stress disorder, depression, paranoia, and substance

10  abuse, all which qualified (at the time of his interview by authorities and at trial) as a developmental

11  disability.  Because of these many impairments, Berryman claims he was incompetent to stand trial

12  because he neither understood the proceedings against him nor was able to assist trial counsel.  He

13  advances a corresponding argument regarding his waiver of rights under *Miranda v. Arizona* relative to

14  his September 7, 1987 interview.

15         The legal basis regarding Berryman's competence to be tried is comprised of three arguments.

16  First, there is a straight due process substantive incompetency, as described in *Medina v. California*, 505

17  U.S. 437, 453 (1992).  Second there is trial error because the trial court did not sua sponte order a

18  competency hearing when counsel requested authorization to have Berryman examined by mental

19  experts to determine his mental condition at the time of the offense.  For this proposition, Berryman

20  relies on *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997).  In his traverse, Berryman emphasizes

21  that the trial court was on notice from early on that he had difficulty grasping the meaning of the

22  proceedings, especially distinguishing issues at his *Marsden* hearings and his fixation with what became

23  of his personal belongings left in his repossessed pick up truck.  Third, Berryman charges that his

24  attorneys were constitutionally incompetent for not requesting a competency hearing.  Berryman notes

25  that his mental and emotional impairments were exacerbated between his arrest and trial due to

26

27

28

conditions of confinement,[72] the lack of necessary communication with his lawyers, and fear he would not receive a fair trial.  With respect to all three theories, Berryman maintains that if mental health experts had examined him regarding his competence to stand trial (in addition to his mental condition at the time of the offense), "they would have concluded that [Berryman] lacked the ability to assist counsel with a reasonable degree of understanding, and lacked a rational as well as factual understanding of the proceedings."

Berryman relies on the same foundational underpinning of actual incompetence to support his claim that the content of his September 7, 1987 interview should have been excluded.  His theory is that because of his many impairments resulting in limited mental ability, plus, the fact that he was intoxicated at the time of the interview and not otherwise sophisticated in matters of criminal justice process, he was not sufficiently mentally competent to understand and waive his right to remain silent.  The corollary ineffective assistance of counsel claim is that his trial attorneys were constitutionally incompetent for failure to press for a ruling on the in limine motion to exclude the September 7, 1987 statement.  As far as prejudice, he claims that but for the admission of the pretrial statement, he would not have been convicted.

### C.    Analysis.

The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960)(per curiam), *quoted by Godinez v. Moran*, 509 U.S. 389, 398 (1993).  Berryman bears the burden of establishing his incompetence by preponderance of the evidence.  *Hayes v. Woodford*, 301 F.3d 1054, 1078, n. 28 (9th Cir. 2002) (citing *Simmon v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997)).

Traditionally, conduct which supports a determination of incompetence to stand trial includes "either extremely erratic and irrational behavior during the course of the trial [citation], or lengthy histories of acute psychosis and psychiatric treatment [citation]."  *Boag v. Raines*, 769 F.2d 1341, 1343

---

[72] Except for the the presence of an intercom device in the attorney room at the County Jail, no description is offered of these conditions of confinement.  The presence of the intercom device is discussed in Claim 17.  *See* Part XI., *infra*.

1  (9th Cir. 1985).  In more recent opinions, the court has held that a defendant's calm demeanor at trial

2  is not dispositive.

> Whether a defendant is capable of understanding the proceedings and assisting counsel
> is dependent upon evidence of the defendant's irrational behavior, his demeanor in court,
> and any prior medical opinions on his competence.  *Drope v. Missouri*, 420 U.S. 162,
> 180, [ ] (1975).  None of these factors is determinative.  Any one of them may be
> sufficient to raise a reasonable doubt about competence.  *Id*.

6  *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997).  The recent Ninth Circuit opinion in *Odle v.*

7  *Woodford*, 238 F.3d 1084 (9th Cir. 2001), further holds that "[c]alm behavior in the courtroom is not

8  necessarily inconsistent with mental incompetence.  Some forms of incompetence manifest themselves

9  through erratic behavior, others do not."  *Id*. at 1088.

10  Berryman's evidence, taken separately or cumulatively does not establish his incompetence to

11  stand trial.  The Court has carefully reviewed the entire trial proceedings.  In the first place, Berryman's

12  conduct at trial was not unusual.  It was certainly not erratic or disruptive.  At most, he could be said to

13  have been sullen because he did not agree with the defense strategy favored by his appointed attorneys.

14  Even his insistence on a denial defense, though presumably unwise, does not establish mental

15  incompetence or even confusion, and no expert has said so.  Second, his history of mental impairments

16  are not indicative of a pervasive mental disability.  Further, none of his retained experts have offered an

17  opinion that Berryman's alleged alcohol induced seizure disorder in any way compromised to his ability

18  to assist counsel at trial and understand the trial proceedings against him or rendered him incapable of

19  knowingly and intelligently waiving his rights under *Miranda v. Arizona*.  Moreover, the fact that

20  Berryman did not assist counsel does not demonstrate he was incapable of doing so.  Indeed, Berryman

21  offers absolutely no additional evidence from his retained experts that he was incompetent at the time

22  of trial.  Although he states in his traverse (at least with respect to Claim 4) that his ability to

23  communicate with and assist counsel must be resolved by an evidentiary hearing, he hasn't asked for

24  one.  The Court concludes that Berryman has failed to meet his burden of establishing mental

25  incompetence through record evidence or an offer of proof.  This finding forecloses relief on all four of

26  his incompetence allegations in Claims 4, 5, 27, and 28.

27  An additional legal impediment precludes relief as to Claims 27 and 28.  The standard for setting

28  aside a waiver of Fifth Amendment rights under *Miranda v. Arizona* is slightly different from the

1   standard for determining competence to be tried. *Miranda* itself holds that the defendant may waive the

2   rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently."

3   384 U.S. at 475, *quoted by Moran v. Burdine*, 475 U.S. 412, 421 (1986).  In *Moran v. Burdine*, the Court

4   sets out the two parts to a valid *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

9   475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  Berryman focuses the second

10  prong, that is, his awareness of the nature of the right and consequences for abandonment of that right.

11      It is well-settled, however, that even if the Court were to find Berryman suffered from a mental

12  impairment, such a finding, alone, would not support vacating his conviction based on an invalid

13  confession.  This follows because the purpose the exclusionary rule under the Fifth Amendment is to

14  deter police overreaching in obtaining confessions, *Colorado v. Connelly*, 479 U.S. 157, 166 (1986), and

15  that purpose could not be effectuated by excluding the statement unless the Court also were to find that

16  the detectives questioning Berryman on September 7, 1987 were aware of his mental infirmities and then

17  exploited the circumstances to extract inculpatory statements.  *See id.* at 165.  In this case, Berryman

18  cannot establish such official overreaching.  In fact, the detectives were careful in their questioning to

19  ensure that Berryman was not intoxicated or otherwise incapable of giving a statement.  They

20  specifically asked him if he had consumed any alcohol, and when he responded affirmatively, he assured

21  them he was not disabled in any way from continuing with the interview and had no problem talking

22  with them.   Further, his responses to those inquiries betray no confusion or lack of comprehension.

23      Nor can Berryman establish the prejudice component to a *Miranda* waiver challenge.  In order

24  to vacate a state court conviction based on an erroneously admitted confession, it must be determined

25  that the confession had a substantial and injurious effect on the verdict. *Taylor v. Maddox*, 366 F.3d 992,

26  1016 (9th Cir. 2004) (quoting *Brecht v. Abrahamson*, 507 U.S. at 637-39).  As argued by Mr. Soria in

27  his in limine motion, Berryman's statement was largely exculpatory.  Berryman told detectives he was

28  elsewhere at the time Ms. Hildreth was killed.  He now claims, however, that the prosecutor relied on

the September 7, 1987 statements to demonstrate his untruthfulness.  This prosecution argument, however, was merely a small part of the prosecution case.  Even without the argument bearing on Berryman's untruthfulness or reference to the content of the statement, there was more than enough evidence to establish Berryman's guilt of Ms. Hildreth's rape and murder.  The issue of Berryman's credibility at trial was minor.  Claims 4, 5, 27, and 28 are denied on the merits.

## VII.   Berryman's Assertion He Was Denied a Fair Trial Due to the Prosecutor's Status as an Elected Judge at the Time of Trial (Claims 7, 8, 9, 10, and 23).

Claims 7, 8, 9, 10, and 23 all revolve around the fact that the prosecutor, Mr. Moench, was a Municipal Court judge-elect at the time he tried Berryman's case.  As a result, Berryman alleges Mr. Moench exercised judicial powers in violation of the Separation of Powers Clause.  Further, Mr. Moench's participation in the proceedings is said to have violated Berryman's right to a fair trial and effective representation because the trial judge and defense counsel were aware of his judge-elect status and consequently, out of deference, did not challenge his many alleged prosecutorial misdeeds.  Finally, Berryman alleges his jury was not impartial because an unknown number of the jurors also were aware that Mr. Moench had been elected to the Municipal Court and were influenced by his status as a judge-elect.  Berryman requests an evidentiary hearing with regard to Claim 8, which alleges ineffective assistance of counsel for the failure of Messrs. Soria and Peterson to move to recuse Mr. Moench from prosecuting Berryman's case.

### A.   Statement of the Facts Relevant to Mr. Moench's Status as an Elected Judge.

The fact of Mr. Moench's election to the Municipal Court bench is undisputed.  On June 7, 1988, he was elected to serve as a judge in the Taft-Maricopa District of the Kern County Municipal Court.  On June 30, 1988, he signed a notarized oath of office[73] in which attested he would "support and defend the Constitution of the United States and the Constitution of the State of California," that he would bear "true faith and allegiance to the Constitution of the United States and the Constitution of the State of California," that he took "this obligation freely, without any mental reservation or purpose of evasion," and that he would "well and faithfully discharge the duties upon which [he was] about the enter."  His

---

[73] The Oath of Office is appended to Berryman's second state habeas petition.

1  term as a Municipal Court judge thereafter commenced on January 1, 1989.   Mr. Moench's first

2  appearance in Berryman's case was on August 1, 1988 (when the previously assigned prosecutor, Lisa

3  Green, took a leave of absence).  Mr. Moench continued as the prosecutor in the case until the trial court

4  handed down Berryman's death sentence on November 28, 1988.

5          Certain excerpts from the trial record are pertinent to this group of claims, particularly in support

6  of Berryman's allegations of prosecutorial misdeeds.  First, during the his guilt phase summation, Mr.

7  Moench misspoke when explaining the order of deliberations on the various degrees of homicide.  He

8  stated, "Only if everyone of you, beyond a reasonable doubt believed that he [Berryman] did not commit

9  a first degree murder, then and only then would you go down and consider murder second, or voluntary

10  manslaughter."   The misinformation in this statement is in the notion that before deliberating about a

11  degree of homicide less than first degree murder, the jurors had to agree *beyond a reasonable doubt* (as

12  well as unanimously) that Berryman was not guilty of first degree murder.  In fact, as the trial judge

13  instructed, the only requirement for proceeding to deliberate about the next lesser offense was that the

14  jury had to unanimously agree Berryman was not guilty of first degree murder.  After Mr. Moench made

15  the above quoted misstatement, the trial court called a side bar conference and pointed out the error.

16  When argument resumed, Mr. Moench explained, correctly, that a first degree murder guilty verdict

17  required a unanimous, beyond a reasonable doubt finding, but a first degree murder not guilty verdict

18  simply had to be unanimous before the jury properly could consider second degree murder or

19  manslaughter.

20          Next, during penalty proceedings, Mr. Moench elicited from motorist David Perez that as he (Mr.

21  Perez) was fleeing from Berryman and the other combatants, his attackers (including Berryman) were

22  yelling out "L.A. Cryps" while one of them continued to kick the quarter panel of Mr. Perez's truck.  The

23  specific question which produced this information was, "Did he [meaning Berryman] say anything to

24  you while he was doing this [hitting Mr. Perez with a tire iron]?"   In reference to another claim alleged

25  in the petition, Berryman submits a declaration from *Strickland* expert Mr. Simrin, in which Mr. Simrin

26

27

28

1   observes that the "L.A. Cryps" statement was included in police reports of David Perez which reports

2   were made available to defense counsel prior to trial."[74]

3       During penalty proceedings, Mr. Moench elicited from Berryman's older brother, Ronald, Jr.,

4   details about the conviction he and Berryman suffered for selling marijuana to students at West Covina

5   High School.  As noted in the Summary of the Facts, Part III.B., *supra*, this conduct was contrary to the

6   agreement the parties worked out before penalty proceedings commenced.  When cross examining

7   Yolande Rumford, Mr. Moench also managed to mention that Berryman had been involved in supplying

8   drugs to high school students.  No objections to Mr. Moench's questions were interposed.  In the same

9   manner, during cross examination of Ms. Yolande Rumford, Mr. Moench suggested proof existed that

10  Berryman subjected Ms. Hildreth to forced oral copulation.  *See* Part III.B., *supra*.  As noted in this

11  summary of the penalty phase evidence, the only fact that could conceivably lend support to the notion

12  Berryman forced Ms. Hildreth to orally copulate him was the presence of a pubic hair found on her face

13  and said by the prosecution criminalist to be consistent with a sample of Berryman's pubic hair.  Mr.

14  Moench also characterized Berryman's physical altercation with his father-in-law, Rev. Fuller, as an act

15  of violence (whereas Berryman apparently views it as a "minor fist fight").

16      The list of prosecutorial misdeeds continues with Mr. Moench's penalty phase argument that

17  Berryman stood on Ms. Hildreth's face for a full three to five minutes while she lay helplessly bleeding

18  to death.  To emphasize this "fact," Mr. Moench timed a three-minute interval for the jury.  In contrast

19  to Mr. Moench's argument, the testimony of Dr. Holloway was that Ms. Hildreth's survival time from

20  her wounds was from three to five minutes and that the patterned bruise on her face was caused to

21  sustained pressure of the perpetrator's shoe on her cheek.  There was no testimony that the sustained

22  pressure lasted three minutes, or any other duration.  Next, is Mr. Moench's misstatement (whether

23  deliberate or negligent) that Berryman's expert, Dr. Pierce, testified Berryman was "amoral" (when in

24  fact the testimony was that Berryman had exhibited *asocial* behavior).  Mr. Moench also argued that

25

26      [74] Mr. Simrin's declaration to this effect is attached to Berryman's motion for evidentiary hearing
    in connection with Claim 61.  No other evidence establishes that a police report containing this
27  information was included with the discovery material turned over to defense counsel.  For purposes of
    this Memorandum Order the Court will treat this notion as a fact.  Mr. Moench also mentioned the name
28  of this gang again during his cross examination of former inmate E.J. Corum.  This reference is
    discussed in connection with Claim 61, *see* Part XXXII.A., *infra*.

1   Berryman was not mentally impaired and did have the capacity to harbor the requisite intent for the

2   crimes charged because none of the experts, or anyone else, indicated that Berryman experienced any

3   sort of psychotic break.  The final argument relevant to the present group of claims concerns Mr.

4   Moench's characterization of Berryman's philandering as a factor in aggravation of his sentence.  As set

5   out in Part III.B., *supra*, Mr. Moench brought out the fact that Berryman had multiple sexual

6   relationships during cross examination of Berryman's older brother, Ronald, Jr., his aunt, Karen Bonty,

7   his younger brother, Bryan Berryman, and his wife, Carol.

8        Post-conviction evidence relevant to this group of claims consists of the June 4, 2001 declaration

9   testimony from *Strickland* expert Mr. Simrin, from trial counsel Mr. Soria, and from juror David

10   Armendariz.  Mr. Simrin opines that Berryman's trial counsel were incompetent for not having objected

11   to the assignment of Mr. Moench as the prosecutor of this case in as much as his presence in the case

12   was "bound to have an influence on the trial judge and the attorneys." Mr. Simrin believes a juror

13   questionnaire should have been employed to ascertain if any of the jurors were aware of or would have

14   been influenced by Mr. Moench's judge-elect status.

15        In his declaration, Mr. Soria confirms that he and Mr. Peterson were aware of Mr. Moench's

16   judge-elect status and states his belief that the trial judge also was aware of the election results.[75]  He did

17   not know, however, whether any of the jurors were aware of Mr. Moench's judge-elect status.  Mr. Soria

18   explains that he did not challenge the assignment of Mr. Moench to the case because he did not

19   recognize a constitutional or legal basis for doing so.

20        The declaration testimony of Mr. Armendariz clears up some of the mystery about what the jurors

21   knew concerning Mr. Moench's judge-elect status.  Although Mr. Armendariz did not know at the time

22   of the trial proceedings that Mr. Moench had been elected to the position of municipal court judge, he

23

24

25

26

27

28   [75] Mr. Soria prefaces all of his declarations with the disclaimer that his memory of representing Berryman in 1987 and 1988 "is not perfect."

believes that the trial judge informed the jurors of Mr. Moench's election after the penalty phase of the trial.[76]

In response to Berryman's 1999 investigation funding request to interview jurors (to see if they were aware of Mr. Moench's judge-elect status at the time of the trial), the Court reviewed proffered articles from the *Bakersfield Californian*.  Three articles published in advance of the election, the last of which was published over a month prior to the election, revealed the support, endorsement, and views of Mr. Moench.  No publicity concerning Mr. Moench's status as a judge-elect during the trial was offered, and as far as the Court is aware, no such publicity exists (or existed).  To determine whether any of the potential jurors lived in the Taft-Maricopa Judicial District, and may have voted in the election where Mr. Moench's name appeared on the ballot, the Court reviewed the jury questionnaires that are part of the record.[77]   That review reveals that none of the prospective jurors were from the Taft-Maricopa area.

**B.      Berryman's Contentions.**

Berryman maintains that as a judge-elect, Mr. Moench actually was exercising the powers of a judicial officer when he was prosecuting the case, in contravention to the Separation of Powers doctrine. Berryman relies on *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971), for the controlling principle that a prosecutor may not operate as a judicial officer in the same case.  He also relies on *Mistretta v. United States*, 488 U.S. 361, 404 (1989), for the proposition that judges must be sure not to impugn the integrity of the judiciary when performing non-judicial tasks.  Aside from the identified problem of having the prosecutor exercising executive and judicial authority at the trial, Berryman points out that defense counsel were placed in an "impossible conflict" forcing them to sacrifice their client's interests to further their own future careers, appeasing Mr. Moench to ensure future favorable rulings on appointments and fee requests.  He emphasizes instances where Mr. Peterson was actually "fawning"

---

[76] In reviewing the reporter's transcripts, the Court has observed no record of the trial judge saying anything about Mr. Moench's election to the bench.  Further, Berryman has not directed the Court's attention to any specific record reference supporting juror knowledge of Mr. Moench's judge-elect status.

[77] Juror questionnaires are part of the state record as Additional Clerk's Transcript, in five volumes, numbered page 1 through page 1295.

over Mr. Moench when working out differences concerning the admissibility of Berryman's prior marijuana transportation conviction. The fact that defense counsel failed to object to Mr. Moench's misstatements during his guilt and penalty closing arguments is said to support the conclusion that Berryman was prejudiced by Mr. Moench's status as a judge-elect. There also is the suggestion that the trial judge presiding at Berryman's trial failed to call Mr. Moench to task on his various misdeeds because it would be unseemly for a member of the bench to criticize a colleague. Berryman also challenges the constitutional effectiveness of his appellate counsel, Paul Posner, for failing to raise on direct appeal the challenge to Mr. Moench's assignment to the case. Finally, and consistent with the text of Mr. Simrin's supporting declaration, Berryman argues ineffective assistance of trial counsel because no effort was made, such as by use of questionnaires, to determine if members of the jury panel were aware of or influenced by Mr. Moench's judge-elect status. Berryman concludes the prejudice from jury awareness would be an unavoidable consequence.

## C.     Analysis.

Although the Warden has interposed a *Teague*-bar defense to each of the claims which comprise this group, a merits analysis nonetheless is appropriate. The *Teague* matrix simply does not fit these circumstances. There are two varieties of cases amenable to a *Teague*-bar defense. The first type involves a petitioner's reliance on a decision announced after his conviction became final. In the second, the petitioner relies on a decision announced before his conviction became final, but which is to be applied in a novel setting, thereby extending precedent in the present case. *See Stringer v. Black*, 503 U.S. 222, 228 (1992). Although in both instances, the *Teague* inquiry is to be resolved before courts address the merits, *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994), in the present case such a threshold inquiry is pointless, because there is no rule supporting Berryman's contentions. It's not a matter of whether a new rule was announced after Berryman's conviction became final, or alternatively whether an old rule is being applied in a new way. There is simply no rule, period. Based on the state record, the evidence offered, and Berryman's arguments, Claims 7, 8, 9, 10, and 23 cannot be sustained. In many cases, the facts simply do not support the allegations. In others, no controlling precedent supports Berryman's contentions.

1    The primary example of unsupported allegations is the total lack of evidence that Berryman's

2    jurors were aware of Mr. Moench's judge-elect status.  The Court already has expended considerable

3    effort on this finding in the context of investigation authorization requests in 1999 and 2000.  In the

4    Court's prior orders it concluded Berryman had not made a colorable claim that further investigation

5    would uncover possible juror knowledge of Mr. Moench's judge-elect status. First, Mr. Armendariz

6    denied such knowledge, and second, the Court's own careful review of juror questionnaires failed to turn

7    up any indication that any member of the venire resided in the judicial district where Mr. Moench's

8    election took place.  Berryman has not offered any evidence to suggest the contrary.

9    Another prime example of lack of factual support relates to Berryman's alleged Separation of

10   Powers challenge.  Contrary to the fundamental underpinning of his argument, there is absolutely no

11   indication that Mr. Moench was exercising judicial or quasi-judicial powers at the time he was

12   prosecuting Berryman's case.  At all times during the trial, as apparent from the record, he was

13   functioning as a prosecutor, notwithstanding his notarized signature on the oath of office he executed

14   on June 30, 1988.  Thus, even though Berryman's citation to *Coolidge v. New Hampshire* and *Mistretta

15   v. United States*, are accurate, they are inapposite.

16   Similarly, there is no factual bases for Berryman's complaint that Mr. Moench committed

17   misconduct for presenting Rev. Fuller's testimony about his altercation with Berryman in August 1987.

18   Contrary to Berryman's complaint, evidence of the altercation was entirely relevant as a prior violent

19   act under Penal Code § 190.3(b).  Berryman struck his father-in-law on the bridge of his nose.  It cannot

20   be seriously disputed that striking someone in the face is an act of violence.   The factual underpinning

21   for this claim is revisited in the discussion of Claim 60 (together with Claims 56, 62, 88, 89, 90, and 93).

22   *See* Part XXX., *infra*.

23   Berryman also misstates the record when he argues Mr. Moench's judge-elect status caused the

24   trial judge to hold back from criticizing Mr. Moench out of professional courtesy.  In fact, the trial judge

25   did correct Mr. Moench, as noted, in connection with the misstatement of the law regarding the order

26   of deliberations on degrees of homicide.  There also is no direct evidence that Messrs. Soria and Peterson

27   were seeking to curry favor with Mr. Moench for future appointments and fee requests.  Mr. Soria's

28   declaration is absolutely silent on the matter.

On the other hand, there is indirect evidence suggesting the failure of defense counsel to object to misstatements made during Mr. Moench's summation was motivated by a desire not to alienate a future judge. Assuming this is true, even though Mr. Soria's declaration does not substantiate it, the prejudicial value of Mr. Moench's arguments must be evaluated. In each instance of misstatement and/or improper argument, the Court is persuaded that the jury's verdicts were not adversely affected. *See Brecht*, 507 U.S. at 637.

First, while it is true Mr. Moench argued Berryman's innocence had to be proved beyond a reasonable doubt before a lesser included offense could be considered, the erroneous statement did not go uncorrected. The trial court called a side bar conference and informed Mr. Moench of the error. Mr. Moench then correctly stated the law in his argument and the trial court gave the correct instruction. Any prejudicial effect of the misstatement was cured. *See* discussion of Claims 37 and 49, Part XVII., *infra*.

Next is Berryman's complaint that Mr. Moench improperly argued the jury should not consider Berryman to have suffered from an impaired mental state because no one testified he sustained a psychotic break. Again, contrary to Berryman's characterization of this argument as improper, it was entirely proper for Mr. Moench to argue that Berryman was not mentally impaired and that he did have the mental capacity to understand the unlawfulness of his conduct. That is the purpose of summation, as discussed in connection with Claims 76, 79, and 80, *see* Part XXVII.C., *infra*, and Claims 86 and 93, *see* Part XXXI.F., *infra*.

The third instance involves, Mr. Moench's alleged misconduct for eliciting a reference to "L.A. Cyrps" from David Perez. Because of the existence of a police report which apparently includes Mr. Perez's statement that his attackers yelled "L.A. Cryps," the Court rejects the Warden's contention that Mr. Moench could not have known the reference would be made when he was conducting his direct examination. On the other hand, since Mr. Moench did nothing in his follow up to emphasize the reference and it wasn't mentioned again during the examination of other witnesses or summation, the Court cannot agree that eliciting the comment was prejudicial. Rather, the Court finds the gang reference was merely tangential, and not significant enough, alone or in conjunction with other

1   circumstances, to have swayed the jury to vote for death.  *See* discussion of Claim 61, Part XXXII.,
2   *supra*.

3          The fourth alleged misconduct pertains to the agreement of the parties to limit admissibility of
4   Berryman's prior marijuana transportation conviction by stipulation only.  Contrary to this agreement,
5   Mr. Moench actively elicited evidence that Berryman was selling marijuana to high school students.  The
6   Court is at a loss as to why Mr. Moench would go back on his agreement, why the trial court didn't put
7   an end to Mr. Moench's misleading questions after at least the second time the proscribed evidence was
8   elicited, and why defense counsel did not object.  The impact of the marijuana sales, however, remains
9   relatively insignificant.  As the Court reads the record, the evidence was emphasized by Mr. Moench to
10  establish Berryman's opportunistic character, namely, he would even sell drugs to high school students
11  to advance his own personal objectives.  But Berryman's selfishness was portrayed in many other ways
12  as well.  He was clearly a young man who constantly tried to get attention and consistently lied about
13  his abilities and/or actions to avoid unpleasant consequences.  Even Dr. Pierce referred to his personality
14  has having Narcissistic elements.  But selling marijuana is not, in an of itself, a heinous crime.  It does
15  not conjure up in the mind images of school children suffering the effects of a painful addiction.  The
16  Court is convinced that the fact of Mr. Moench's misconduct regarding revelation of the marijuana
17  offense had no impact on the jury's death verdict.  *See* discussion of Claims 56, 60, 62, 88, 89, 90, and
18  93, Part XXX., *infra*.

19         Fifth, Mr. Moench's false suggestion that Berryman forced Ms. Hildreth to orally copulate him,
20  while much more serious than selling marijuana, also would not have tipped the scales in favor of death.
21  By the time Mr. Moench suggested this theory of sexual abuse, the jury already had convicted Berryman
22  of first degree murder, rape, and use of a knife to commit both offenses.  While an objection from
23  defense counsel and an admonition by the trial court would have been preferred, the absence of objection
24  and admonition certainly were not dispositive.  If anything the suggestion of forced oral copulation was
25  merely cumulative, not prejudicial.  *See* discussion of Claims 53 and 54, Part XXVIII., *infra*.

26         Sixth, the erroneous argument about the length of time Berryman stood on the victim's face as
27  she lay dying actually constitutes one of the least prejudicial prosecutorial misdeeds.  The evidence
28  adduced at the trial was that a patterned bruise on Ms. Hildreth's face bore similarities to the tread design

of the bottom of Berryman's Brooks athletic shoes.  Dr. Holloway opined that the bruise was the result of sustained pressure of the perpetrator's foot on Ms. Hildreth's face.  Thus, even if Berryman had not planted his foot on the victim's face for the entire three to five minutes Dr. Holloway stated was her maximum survival time from the nicked carotid artery, the fact remains that he did apply sustained pressure of his foot for some significant amount of time (perhaps less than three minutes) in order to generate the patterned bruise.  Had Mr. Moench advanced an argument more consistent with Dr. Holloway's testimony, the argument still would have been highly prejudicial.  The incorrect information about the exact duration of the sustained pressure was not significant.  *See* Claims 29 and 75, Part XXIV., *infra*.

Seventh, Mr. Moench's erroneous characterization of experts calling Berryman "amoral" (rather than "asocial") also is relatively minor in light of the entire argument.  Mr. Moench forcefully urged the jury to impose the death penalty on Berryman because he had extinguished the life of a 17 year old high school senior, who was loved by many, many people.  He belittled Berryman's background and sarcastically referred to Berryman as a man who wanted women to do his bidding for him.  Mr. Moench actually described an amoral character.  Though it was wrong to attribute this characterization to the experts, Berryman's conduct, as described by Mr. Moench, fit the amoral label.  The misstatement was not prejudicial.  *See* discussion of Claims 76, 79, and 80, Part XXVII., *infra*.

Eighth, the Court agrees that Mr. Moench crossed the line of proper argument when he argued that Berryman's philandering should be viewed by the jurors as a factor in aggravation of the sentence.  However, this is not the only statement Mr. Moench made about Berryman's exploits with women.  Running from one woman to the next, to the next, until finally Ms. Hildreth said "no" was a circumstance of the crime, a proper subject for argument.  And the fact that in the course of a single evening, Berryman was in contact with four women, and spent time in the company of three, one of which he killed, properly is characterized as an aggravating factor.  Berryman transported Ms. Hildreth to the secluded area off of Cecil Avenue to have sex with her and avoid the reality of his self-created mess of a life at the Clark residence.  He was a philanderer and the jury surely was presented with evidence of this fact from both the prosecution and the defense.  It was not improper to argue that Berryman's character, as exhibited during the commission of the crime, was aggravating.  To be sure,

1    it was prejudicial, but that is the goal of the prosecution, to present prejudicial evidence that is properly

2    admitted. In this case that standard was met. *See* discussion of Claims 13 and 14, Part XXIII., *infra*.

3        Since the evidence and argument advanced did not violate Berryman's constitutional rights, his

4    appellate counsel was not in any way ineffective for failing to challenge Mr. Moench's judge-elect status

5    on direct appeal. Nor, was there any break down in defense counsel's professional competence for not

6    bringing the fact of Mr. Moench's judge-elect status to the forefront of the potential jurors' outlook for

7    the case. Just as Mr. Soria averred that he left Mr. Moench's assignment to the case unchallenged

8    because he was aware of no legal or constitutional basis for objection, the Court also finds no legal or

9    constitutional basis for a challenge. Had counsel asked any of the jurors if they knew Mr. Moench had

10   been elected to the Municipal Court bench prior to trial, the potential for prosecutorial bias complained

11   of in this group of claims certainly would have occurred.

12       Claims 7, 8, 9, 10, and 23 are denied on the merits. Berryman's request for an evidentiary

13   hearing as to Claim 8 is denied.

14   VIII.   **Berryman's Challenge to the Fair Cross Section of the Jury (Claims 20 and 21).**

15       In Claims 20 and 21 Berryman challenges the composition of his jury because no African

16   Americans were on the jury venire or jury panel from which his jury was drawn. Claim 20 is pleaded

17   in terms of a straight constitutional violation for violation of the fair-cross section requirement. Claim

18   21 alleges ineffective assistance of trial counsel for failure to object to the jury composition.

19       A.    **Berryman's Presentation of the Claims.**

20       Berryman offers no factual support for his claim. The Court is not supplied with any information

21   about the proportionate racial composition of Kern County or the proportion of African Americans (if

22   any) who were on jury venires at the time of his trial. No evidentiary development for these claims is

23   requested. The only law Berryman cites in his moving papers is *Batson v. Kentucky*, 476 U.S. 79 (1986),

24   for the proposition that racial discrimination in jury selection is unconstitutional. In his traverse,

25   Berryman recognizes that Claims 20 and 21 are controlled by the Ninth Circuit case of *Thomas v. Borg*,

26   159 F.3d 1147 (9th Cir. 1998), and that he cannot prevail unless the Ninth Circuit reexamines the issue,

27   or *Thomas* is reversed by the United States Supreme Court.

28

1

**B.      Analysis.**

2          The starting place for a fair-cross section challenge under the Sixth Amendment is *Duren v.*

3  *Missouri*, 439 U.S. 357 (1979).[78]  *Duren* holds:

4          In order to establish a prima facie violation of the fair-cross-section requirement, the
           defendant must show (1) that the group alleged to be excluded is a "distinctive" group
5          in the community; (2) that the representation of this group in venires from which juries
           are selected is not fair and reasonable in relation tot he number of such persons in the
6          community; and (3) that this underrepresentation is due to systematic exclusion of the
           group in the jury-selection process.

7

8  *Id*. at 364.

9          The first *Duren* prong is established, as African Americans are a distinctive group for purposes

10  of Sixth Amendment analysis.  Establishment of the second prong requires Berryman to show that

11  representation of African Americans in Kern County venires from which juries were selected at the time

12  of his trial was not fair and reasonable in relation to the number of African Americans in the community.

13  *Thomas v. Borg*, 159 F.3d at 1150.  This showing requires proof of an absolute disparity between the

14  percentage of the distinct group represented in the total community population and the percentage of the

15  distinct group represented on the master jury wheel.  *Id*. (quoting *United States v. Sanchez-Lopez*, 879

16  F.3d 541, 547 (9th Cir. 1989)).  Typically proof of this disparity is presented in the form of statistical

17  data. To establish that underrepresentation of African Americans is due to systematic exclusion under

18  the third *Duren* prong, Berryman must demonstrate that African Americans are actually subjected to a

19  different treatment in the jury selection process from other prospective jurors.

20          Since Berryman has neither presented nor asked to develop evidence which would support an

21  absolute disparity, the second prong of the *Duren* test cannot be established.  Nor has Berryman offered

22  any facts about the jury selection process in Kern County, much less information about the specific

23  treatment of prospective African American jurors.  Since no cognizable constitutional violation is

24  presented regarding the fair cross section requirement, it follows that Berryman's trial counsel cannot

25  have been constitutionally ineffective for their failure to raise the issue.  Claims 20 and 21 are denied

26  on the merits.

27

28          [78] *Duren* is not cited by Berryman at all.

**IX.   Berryman's Challenge to the Death Qualification of the Jury (Claim 22).**

In Claim 22, Berryman asserts that his trial counsel were ineffective for failing to ascertain whether prospective jurors held the belief that capital punishment should be automatically imposed in every case in which it is authorized.  He claims the subject was not adequately covered in the juror questionnaires or by the death qualification process conducted on voir dire.   He does not request an evidentiary hearing.

**A.   Statement of the Facts Relevant to the Death Qualification Process.**

Each of the twelve jurors who served on Berryman's jury were given questionnaires to complete and in addition were subject to individual death qualification voir dire.

**1.   Questionnaire Inquiries.**

Question 25 of the questionnaire (which every prospective juror completed), asked: "Do you believe you should hear and review all the circumstances surrounding the killing before you decide whether the State should impose the death penalty?" A-CT-1:6.  In the same vein, question 26 asks: "Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the Court explains it to you?" *Id*. at 7.  All of the jurors responded affirmatively.

**2.   Death Qualification Voir Dire.**

During individual voir dire, the jurors generally were asked whether they would automatically vote against the death penalty, whether they would automatically vote for the death penalty, and whether they would carefully weigh evidence presented by both the prosecution and the defense.  The Court has carefully reviewed the death qualification voir dire of the twelve jurors who served on Berryman's jury.

**a.   Juror Billy Joe Honaker.**

The death qualification voir dire of Mr. Honaker, conducted by the trial judge, proceeded as follows:

> Q. [by the trial judge] . . . And if the People prove their case beyond a reasonable doubt that Mr. Berryman did, in fact murder this young lady in the course of raping her, then there would be a second phase of the trial in which that jury would be asked to make a recommendation as to whether or not the death penalty should be imposed or whether a penalty of life without the possibility of parole should be imposed.  Those are the only two choices. [¶] Do you have any feelings about the death penalty that would preclude you from making that choice[?] In other words, would you automatically refuse to apply the death penalty regardless of what the evidence was?
> A. No sir, I wouldn't.

1   Q. On the other side of that coin, would you automatically apply the death penalty if Mr. Berryman was found to eligible for it?

2   A. No sir, not automatically.
Q. So, in other words, [you would] listen to all of the evidence that would be presented in that second phase of the trial?

3   A. Yes sir.
Q. And you would carefully weigh that evidence and deliberate that evidence with your

4   fellow jurors to come to – to attempt to come to a decision for yourself and then as a group of jurors on that issue?

5   A. Yes, sir.

6

7   RT-5: 404-05.

8        **b.    Juror LaVeta Morris.**

9      The death qualification of Ms. Morris by the trial judge, Mr. Soria, and Mr. Moench proceeded

10  as follows:

11   Q. [by the trial judge] Okay. Now Mrs. Morris, I mentioned on Friday, that due to the – or on Monday, rather, of last week, that due to the nature of the charges, that if the

12  People, the District Attorney's Office, representing the People, are able to prove their case to the jury, in the guilt phase of the trial, beyond a reasonable doubt, in other words,

13  to establish in the first phase of the trial, that Mr. Berryman did rape and murder this young lady, that the jury then will have to go through a second phase of the trial, in which

14  the jury will have to determine whether or not to impose the death penalty.  First of all, do you have feelings about the death penalty that would make it impossible for you to

15  vote for the death penalty, under any circumstances.
A. No.

16  Q. On the other side of that coin, do you have feelings about the death penalty, that in the event that your jury, in the first phase of the trial, found beyond a reasonable that Mr.

17  Berryman did rape, and in the course of that rape, murder this young lady?
A. Uh-huh.

18  Q. That you would automatically impose the death penalty, without hearing any further evidence concerning the issue of penalty?

19  A. No.
Q. All right.  You understand in the second phase of the trial, the so-called penalty phase,

20  the jury would not only consider all of the evidence that they previously heard in the guilt phase, but also would be hearing evidence from the People, evidence in what we call

21  aggravation, that would tend to support the death penalty, for example, and evidence from the defense, in mitigation, things that maybe Mr. Berryman had done during his life,

22  exemplary things and so forth, that would tend to establish that life in prison without the possibility of parole would be the proper penalty?

23  A. Uh-huh.
Q. Do you think you could listen to that evidence fairly and weigh that evidence as you'd

24  be instructed to do so by the Court?
A. Yeah, I think I could.

25

. . .

26

27  Q. [by Mr. Soria] And if that [reaching the penalty phase] were to happen, just saying if that were to happen, Rodney Berryman would stand before you guilty of the charges alleged, murder, and murder during the course of rape. [¶] Could you still give Rodney

28  Berryman a fair hearing regarding evidence we would present, regarding his life, or life

in prison with the possibility of parole, as opposed to Mr. Moench, representing the People, that he thinks would warrant death.  In other words, in the second phase, you weigh, you have an option of death, and an option of life in prison without the possibility of parole. [¶] Do you think you could listen to the evidence fairly at that point?
A. Yes.

. . .

Q. [by Mr. Moench] Do you think that you would be able to go through and if the evidence warrants the death penalty, do you think you could vote for that, and then come into court and say so in open court?  That's really the bottom line on this.
A. Yeah.  If I felt that it was warranted, I could do it.  I don't know if that – if I'd be that happy about doing that.

RT-6: 506-07, 513-14, and 524-25.

### c.      Juror Mary Donovan Radman.

The death qualification voir dire of Ms. Radman was conducted by the trial judge:

Q. [by the trial judge] So I need to ask you some questions about your feelings on the death penalty.
A. Uh-huh, sure.
Q. Do you feel or are your feelings on the death penalty such that there is no situation, no case in which you could vote for the imposition of the death penalty?
A. Sir, you're saying that under no circumstances would I say, you know, I mean, I would refuse the death penalty, either – regardless, right?
Q. Regardless, right.
A. No. Unh-unh.
Q. If your jury, for example, did convict Mr. Berryman in the guilt phase of the murder and rape, are you of a feeling in that situation, about the death penalty, that you would automatically impose the death penalty at that point?
A. No.
Q. Or would you listen – would you be able to listen to all of the evidence on the penalty phase, both from the People and the defense, and carefully weigh that evidence?
A. Oh, yeah.

RT-6: 565-66.

### d.      Juror Helen Valdez.

Ms. Valdez's death qualification voir dire also was conducted by the trial judge, as follows:

Q. [by the trial judge] . . . In the first phase, the jury doesn't involve itself with penalty, and would be expressly instructed not to concern itself with penalty, at all. [¶] But in the second phase, the jury would hear additional evidence from both the People and the defense, about the proper penalty to apply, and would you be able to consider that evidence, along with all of the evidence they heard in the guilt phase. [¶] The two penalty choices that they would have would be either death or life in prison without the possibility of parole.
A. Uh-huh.
Q. So, as you can see, the death penalty is a very serious consideration in this case.
A. Uh-huh.

1     Q. I need to ask you, do you have feelings about the death penalty that would make it
      impossible for you to vote for the death penalty under any circumstances?

2     A. I don't know.  I don't know how I feel about it, I really don't know.
      Q. All right.  As you sit there right now, and having heard what I've told you thus far this

3     afternoon, have you – do you have any feelings about the death penalty at this point, one
      way or the other?

4     A. No, I don't.
      Q. All right.  Do you feel that if you were selected on this jury, and, you know, went

5     through the first phase, and you and your fellow jurors determined that Mr. Berryman
      did, in fact, rape and murder this young girl, do you think that you could listen to the

6     additional evidence that was presented and fairly consider whether or not to apply the
      death penalty or life in prison without the possibility of parole?  Do you think you could

7     do that?
      A. I think I could.

8

9     RT-6: 635-36.

10                     **e.      Juror Steven Ray Greenwood.**

11    The death qualification voir dire of Mr. Greenwood was conducted by the trial judge, as follows:

12    Q. [by the trial judge] The questions I need to ask you are as follows, first question is
      this, are your feelings about the death penalty such that you could not vote for the death

13    penalty under any circumstances?
      A. Under any circumstances? No, sir.

14    Q. All right.  Are your feelings about the death penalty such that if you reach that penalty
      phase.

15    A. Uh-huh.
      Q. And Mr. Berryman was convicted by you and 11 other jurors of the rape and murder

16    of this young girl, would you automatically apply the death penalty?
      A. No, sir.

17    Q. All right.  So I take it what you're telling us, you would consider all of the evidence
      in the penalty phase and the evidence that you previously heard, you would weigh that

18    evidence, and make your decision on the basis of all the evidence?
      A. Yes, sir.  You know, it would have to be proven that that was warranted, yes.

19

20    RT-7: 718.

21                     **f.      Juror David Armendariz.**

22    Death qualification voir dire of Mr. Armendariz was conducted by the trial judge and Mr.

23    Moench:

24    Q. [by the trial judge] . . . I have to ask you some questions on how you feel about the
      death penalty. [¶] First question I want to ask you is this, are your feelings about the

25    death penalty such that you would not be able to vote for the death penalty, under any
      circumstances?

26    A. No, I feel I could vote for that.
      Q. All right.

27    A. I mean, depending on what my fellow jurors come up with, but as far as personally
      speaking, no, I wouldn't have any problem with it, once all the evidence has been

28    weighed and everything.

Q. All right.  On the other side of that coin, since in that second phase of the trial, Mr. Berryman would already have been convicted of the rape and murder of this girl, would you, based on the feelings that you have about the death penalty, automatically apply the death penalty, or would you consider all of the other evidence before making that decision?
A. I'd have to consider everything involved.

. . .

Q. [by Mr. Moench] . . . But do you feel that this particular kind of murder, that is murder in the course of a rape, would be one that you feel is appropriate [for the death penalty]?
A. I can't judge it right now.  I don't know the immediate, you know, facts in between.  But it – if the – do you want me to speculate that if, indeed, the jury, you know, whatever special circumstances were involved.
Q. Uh-huh.
A. I knew the outcome was a rape, are you asking me if I could say yes, when the death penalty should be implemented?
. . .
Q. What I need to know is if this is the type of case where, if – obviously it has to be proven, and once that's proven, do you think it's appropriate to seek the death penalty in those type of cases?
A. If it's proven, then yes.

RT-7: 735, 744-45.

g.      **Juror Kimberly Kay Arnold.**

Ms. Arnold's death qualification voir dire was conducted by the trial judge and Mr. Soria, as

follows:

Q. [by the trial judge] Okay.  Do you understand, under California law, that the death penalty is not automatic?
A. (Affirmative nod.)
Q. In other words, the jury in that second phase of that trial, would be required to weigh all of the evidence again, under a different method, but weigh all of the evidence that it's already heard, it wouldn't be presented again, you'd already heard it.
A. Yeah.
Q. But you'd weigh that evidence, along with the additional evidence that I talked about a moment ago, and weigh it all together, and then decide fairly and impartially which of the 2 penalties would be the appropriate penalty.  That's the job of the jury in that situation.
A. Uh-huh.
Q. I guess what you've indicated is that you could vote for the death penalty, if the evidence was appropriate.
A. Yeah.
Q. The other question, though, I need to ask you, is this.  If Mr. Berryman stood before you already convicted of the rape and murder.
A. Uh-huh.
Q. Would you then automatically apply the death penalty, or would you listen to this additional evidence?
A. I'd listen to the additional evidence.
Q. And you would give it fair consideration?
A. Uh-huh.

. . .

Q. Now, the other one thing that we ask you, also, to do in completing the questionnaire, is to indicate to us any areas in the questionnaire that you would prefer to talk to us about privately, as opposed to out in open court, so some of these areas can be further inquired into [¶] Two of the areas you did initial, one is the belief in the adage an eye for an eye. What did you want to tell us about that?

A. I just wanted to give an opinion myself on how I feel that if he's had a fair trial, and he's convicted, then I'm for eye for an eye, but, you know –

Q. Now, when you say a fair trial, are you talking about the first phase of the trial, in other words –

A. Well, both.

Q. All right.  Because if you're talking just about the first phase, and we get back to that question about automatically applying the death penalty.

A. Yeah.

Q. Which you said you would not do, or consider all the evidence.

A. Uh-huh.

. . .

Q. [by Mr. Soria] [Regarding Ms. Arnold's concern that people are sentenced to death, but no one is executed,] I think you would agree that somebody would have the right to appeal their case.

A. Yeah.

Q. That's what that is.  Your duty as a juror is not to consider what happens afterwards, if it were to reach the penalty phase and you'd have to make a determination.

A. That's true.

Q. You would be instructed by the Court that you're not to consider what happens after, you're just to consider what the evidence is the courtroom is, and make a decision on the evidence that's presented to you in the courtroom.

A. Uh-huh.

Q. And based on that, in the penalty phase, you have 2 choices, either life in prison without the possibility of parole or death, and that's what you concern yourself with.

A. Uh-huh.

Q. And that would be your duty as a juror.  Do you think you could fulfill that duty?

A. Yes, I could.

Q. And you can put all the concerns mentioned here out of your mind?

A. Oh, yeah.

RT-7: 764-65, 766, 768-69.

### h.    Juror Jymme Lyn Ahl.

Ms. Ahl's death qualification voir dire was conducted by the trial judge and Mr. Soria, as follows:

Q. [by the trial judge] Now, if, in that [the guilt] phase of the trial, you and 11 other jurors determine that Mr. Berryman is guilty of the rape and murder of this young girl, then there would be a second phase of the trial, and in that phase of the trial, the jury would have to weigh all of the evidence, including the evidence in the first phase, plus any additional evidence that would be presented by either the People or the defense, on the question of penalty.

A. Uh-huh.

Q. And decide whether or not to impose the death penalty or impose life in prison without the possibility of parole.

A. (Affirmative nod.)

Q. So it's important that we know some of your inner feelings about the death penalty. The first question I want to ask you is this, under those circumstances, if you and your fellow jurors came to the point of considering penalty, are your feelings about the death penalty such that you could not vote for the death penalty under any circumstances?

A. No, they're not.  I think – are you asking that if it came down to it, and it looked like the death penalty was warranted, whether or not I personally could do it?

Q. Yes.

A. I could personally do it.

Q. All right.  On the other side of that coin, if you and your fellow jurors had found Mr. Berryman guilty of the rape and murder, and had the choice between death or life in prison without the possibility of parole, would you automatically apply the death penalty, or would you consider –

A. No, sir.

Q. – all of the evidence?

A. No, sir.

Q. So I take it you would consider all of the evidence that would be presented, and make the weighing process that the law requires?

A. Yes, sir.

          . . .

Q. [by Mr. Soria] But in the abstract, you do believe that the death penalty should exist?

A. I believe it's applicable in some situations.

Q. All right.  But not in every situation.

A. No, sir.

Q. All right.  And that's what we're concerned about, as the defense, if we reach the second stage, and we only reach that if Mr. Berryman, my client, is found guilty of the charges alleged by the prosecutor.  Do you believe if that were to happen, you would still be listening to us with regards to considering whether he should live or die?

A. Yes, sir.

RT-9: 1032-34, 1037-38.

### i.    Juror Virginia Mae Douglas.

The trial judge conducted the death qualification voir dire of Ms. Douglas:

Q. [by the trial judge] The first question I need to ask you concerning your feelings about the death penalty is this, are your feelings about the death penalty such that you could not vote for the death penalty, as a trial juror in this case, under any circumstances?

A. I would have difficulty, but I would have to hear the evidence.

Q. Okay.

A. And all of the ramifications, as far as what reasons for it.

Q. All right.  So I take it, if you – you know, if the evidence was such that you felt the penalty was proper, you could, in that situation, vote for the death penalty?

A. Yes.

Q. Okay.  On the other side of that proposition, if you got to the penalty phase of the trial, Mr. Berryman would have already been convicted of the charge of rape and murder, by you and 11 other jurors.

A. Uh-huh.

Q. And in that situation, could you consider both possible penalties, or would you automatically vote for the death penalty?

A. No, I would – I would consider both of them.

Q. Okay. Do you feel you could consider and weigh all of the evidence that you would hear in that respect?
A. I would try to.
Q. Do you think you could do so fairly and impartially to both sides?
A. Hopefully.

RT-11: 1311-12.

### j.      Juror Gene Henry Bibb.

Mr. Bibb's death qualification voir dire was conducted by the trial judge and Mr. Soria:

Q. [by the trial judge] In that second phase of the trial, the jury would be instructed that they should weigh and consider all of the evidence that they heard in the first part of the trial, together with any additional evidence that would be presented on the issue of penalty.  So it's important, as you can tell, we need to know something about your feelings about the death penalty.
A. Uh-huh.
Q. The specific questions I need to ask you are as follows, first one is this, are your feelings about the death penalty such that you could not, as a juror, vote for the death penalty, under any circumstances?
A. No, they're not.
Q. All right.  Are your feelings such that if you were selected as a juror in this case, and Mr. Berryman was convicted by you and your fellow jurors of the rape a murder of this young girl, would you in the penalty phase of this trial, automatically impose the death penalty?
A. No, I don't believe it would be automatic.
Q. Then you I think are telling me, that you would weigh and consider all of the evidence that would be presented, and make an independent determination for yourself what the proper penalty would be?
A. Yes.
Q. Do you feel you can do that fairly and impartially to both sides?
A. Yes, I do.

              . . .

Q. [by Mr. Soria] My concern is question 22 [of the questionnaire], about the enforcement of the penalty.
A. Uh-huh.
Q. You realize that cannot be a concern?
A. Yes, I understand.
Q. But what your belief is, whether that is enforced or not, you would have to put that aside?
A. Yes, I understand.
Q. And I believe the Court would instruct you that you're not to think about what is to happen after your decision, just apply what you hear in the courtroom, though the witness stand and properly admitted exhibits and the law the court gives you, could you do that?
A. Yes.
Q. Give both sides a fair shake?
A. Yes.

RT-12: 1405-06, 1408.

1

**k.      Juror Michael A. Carr.**

2

The trial judge conducted the death qualification voir dire of Mr. Carr, as follows:

3

Q. [by the trial judge] So it's – as you can understand, it's necessary that we know generally your feelings about the death penalty. [¶] I want to ask you a couple of questions in that respect. First question is this, if you were selected as a juror in this case, are you feelings about the death penalty such that you could not vote for the death penalty under any circumstance?
A. No, I – if all the evidence weighed out, I – you know, I could vote that way, yes.
Q. All right.  Let me ask you this, that if you were on this jury, and you and your fellow jurors had found Mr. Berryman guilty of the rape and the murder this young girl in the course that rape, in the penalty part of the trial, would you automatically vote for the death penalty?
A. I would want to hear everything that was presented.
Q. Okay.  You would then follow the instructions and carefully weigh all of the evidence that was presented?
A. Yes.
Q. Do you think you could do that fairly and impartially to both sides?
A. Yeah.

4

5

6

7

8

9

10

11

12

RT-12: 1420-21.

13

**l.      Juror Margaret Anne Shea.**

14

Ms. Shea's death qualification voir dire also was conducted by the trial judge, as follows:

15

Q. [by the trial judge] The first question I need to ask you is this, are your feelings regarding the death penalty such that if you were selected as a juror in this case, that you could not under any circumstance, vote for the death penalty?
A. No.
Q. Okay.  Are you feelings about the death penalty such that if you and your fellow jurors had convicted Mr. Berryman of the rape and murder of this young girl, and thereby got to the penalty phase of the trial, would you in that penalty phase automatically vote for the death penalty?
A. No.
Q. Okay. So I gather what you would do is what I mentioned moments ago, that you would carefully consider all [ ] of the evidence and weigh that evidence and make a decision for yourself, based on all of the circumstances, what the proper penalty should be?
A. Yes, I would.

16

17

18

19

20

21

22

23

RT-13: 1622.

24

**B.      Berrryman's Contentions.**

25

Berryman recognizes that the controlling authority for Claim 22 is *Wainwright v. Witt*, 469 U.S.

26

412, 424 (1985) and *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  He states *Witt* stands for the

27

proposition that a prospective juror is unqualified to sit on a capital jury if the juror's views on capital

28

punishment would prevent or substantially impair the performance of the his or her duties as a juror in

1   accordance with the court's instructions.  He further correctly asserts *Morgan* holds a court may not

2   refuse defense counsel's question as to whether jurors would impose the death penalty automatically on

3   a finding of guilt, regardless of facts presented in mitigation.  He continues, that under *Morgan*, even

4   if one juror is empaneled who would automatically vote for the death penalty where authorized, without

5   consideration of mitigating and aggravating circumstances, the death verdict is void and must be set

6   aside.

7        Although the Court already has reviewed the death qualification process conducted on voir dire,

8   and determined Berryman's assertions to be unsubstantiated,[79] Berryman asks that the Court reconsider

9   its position in light of the reasoning in an Oklahoma state court case, *Jones v. State*, 990 P.2d 247 (Okl.

10  1999), particularly with respect to jurors Michael A. Carr, Jymme Lyn Ahl, Helen Valdez, and LaVeta

11  Morris.

12       **C.      Analysis.**

13       *Morgan* holds that a juror who will automatically vote for the death penalty in every case is one

14  who "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the

15  instructions require," and may be challenged for cause.  504 U.S. at 729.  "If even one such juror is

16  empaneled and the death sentence is imposed, the State is disentitled to execute the sentence."  *Id*.

17  Berryman's reliance on the reasoning in *Jones* is misplaced.  *Jones* adds nothing to the well-established

18  rule in *Morgan*.  As Berryman notes in his traverse, defense counsel in *Jones* was permitted to ask one

19  juror: "Do you feel that because he [the defendant] admits to the crime . . . that he should be given the

20  death penalty without further consideration?"  *Jones*, 990 P. 2d at 249.  The court characterizes this

21  question as the only question, of many, asked of prospective jurors which explored "a juror's inclination

22  to impose the death penalty automatically."  *Id*.  Had this question been asked of all the prospective

23  jurors (or at least all the jurors who ultimately were selected for jury service), the Constitution would

24  not have been violated.  But, counsel was only able to ask a single juror this question.  "The fact that

25  counsel succeeded in asking this question of one juror, but was prevented from similarly questioning any

26  other panel member, does not cure this error."  *Id*.

27  _____

28       [79] This determination was made in connection with an order filed September 9, 1999 largely
    denying Berryman's request for investigative funding.

Although the inclination of Berryman's jurors to automatically impose the death penalty was not explored in the juror questionnaires, during death qualification voir dire, each of the jurors, except for Helen Valdez, specifically was asked if s/he would automatically impose the death penalty in the event s/he and his/her fellow jurors found Berryman guilty of murder and rape.  Jurors Morris, Ahl, and Carr specifically were asked these questions.  *See* Part IX.A.2.b., h., and k., *supra*, respectively.  No further inquiry concerning their impartiality on the automatic imposition of the death penalty is warranted.

Notwithstanding that Juror Valdez was not asked if she automatically would vote for the death penalty in the event the jury found Berryman guilty of murder and rape, her voir dire  responses clearly indicate her impartiality on this issue.  Ms. Valdez equivocated when the trial judge asked her if she would refuse to vote <u>for</u> that punishment under any circumstances.  She responded, "I don't know. I don't know how I feel about it, I really don't."  *See* Part IX.A.2.d., *supra*.  Next, when asked whether she had "any feelings" about the death penalty, "one way or the other," she responded, "No, I don't." *See id.*  Finally, when asked whether she could listen to additional evidence presented during penalty proceedings and "fairly consider whether or not to apply the death penalty or life in prison without the possibility of parole," she responded, "I think I could."  *See id.*

Based on these responses, there can be no doubt but that Ms. Valdez was not predisposed, and did not believe she was predisposed, to vote automatically for the death penalty in the event Berryman became death eligible.  She could not answer definitely when asked whether she would refuse to vote for the death penalty, she affirmed that she had no feelings one way or the other about the death penalty, and she affirmed that she would consider penalty phase evidence before deciding to vote for death or life in prison without parole.  The fact that the trial judge did not use the precise phrase "would you automatically vote for the death penalty?" is not dispositive.  The Constitution "does not dictate a catechism for voir dire, [ ] only that the defendant be afforded an impartial jury."  *Morgan*, 504 U.S. at 729.  What is required is that the voir dire is adequate to identify unqualified jurors.  While the adequacy of voir dire is not easily reviewed, the key is that "certain inquiries must be made to effectuate constitutional protections."  *Id*. at 730.  Those inquiries were adequate in the case of Ms. Valdez.  The Court finds that the voir dire inquiries established her impartiality.

1     Since Ms. Arnold also equivocated on her belief in the automatic imposition of the death penalty,

2 in terms of the "an eye for an eye" concept, her voir dire responses also warrant further evaluation.  First,

3 Ms. Arnold indicated by an affirmative nod that she understood the death penalty was not automatic,

4 even in the event Berryman were convicted of murder and rape.  *See* Part IX.A.2.g., *supra*.  Second, she

5 agreed to weigh all the evidence presented during penalty proceedings before deciding on the two

6 available punishments.  *See id.*  Third, she specifically affirmed that she would listen to all the evidence

7 before making her decision.  *See id.*  When asked about her views on "an eye for an eye," Ms. Arnold

8 first responded that if Berryman had a fair trial at both the guilt phase and penalty phase, she would be

9 for "an eye for an eye."  When the trial judge reminded her this was the equivalent of believing in the

10 automatic imposition of the death penalty, a decision she said she would not make, Ms Arnold agreed

11 that she would not automatically impose the death penalty.  *See id.*  This questioning was then followed

12 up by Mr. Soria who asked for further clarification about Ms. Arnold's concern about death penalty

13 enforcement.  She clarified during this exchange that she would follow the trial court's instructions and

14 not consider enforcement matters, but would focus her consideration on the evidence presented during

15 the trial.  *Id.*  The Court finds these inquiries sufficient to ascertain Ms. Arnold's impartiality about

16 imposition of the death penalty under *Morgan*, 504 U.S. at 729.

17     Claim 22 is denied on the merits.

18 **X.     Berryman's Challenge to Juror David Armendariz (Claims 24 and 25).**

19     In Claims 24 and 25, Berryman alleges his conviction, the special circumstance finding, and

20 penalty were obtained in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because

21 the trial court failed to excuse David Armendariz from the jury after it was revealed that he had what

22 Berryman characterizes as "a close family relationship" to the victim's family.  Claim 24 presents a

23 straight juror bias, structural error challenge.  Claim 25 is pleaded in terms of ineffective assistance of

24 counsel for the trial attorneys' failure to challenge Juror Armendariz for cause.  Berryman requests an

25 evidentiary hearing with respect to Claim 24.

26

27

28

**A.      Statement of the Facts Relevant to Juror Armendariz's Jury Service.**

The facts relevant to Juror Armendariz's jury service consist of a review of trial proceedings where he revealed his potential connection to Crystal Armendariz and a declaration he executed during the investigation of Berryman's federal claims.

**1.      Trial Proceedings of Juror Armendariz's Revelation.**

After Crystal Armendariz completed her testimony during which she mentioned receiving a call from Edward Armendariz, the father of her infant twins, Juror Armendariz informed the trial court, privately, that he thought the Edward Armendariz referred to by Ms. Armendariz was a cousin of his. Upon being questioned by the trial judge, Mr. Armendariz stated that he was not close to his cousin and this fact would not affect his ability to deliberate or be impartial.  The dialogue between Mr. Armendariz and the trial judge is as follows:

> THE COURT: Let the record reflect that all of our jurors are excused, with the exception of juror number 8, Mr. Armendariz. I've asked Mr. Armendariz to remain behind for just a couple of moments.  He apparently expressed a bit of concern to our bailiff that possibly there may be some possible relationships between Crystal Armendariz, the witness that testified just prior to Mr. Jackson, and himself, and that it might bother him in his function as a juror. [¶] Mr. Armendariz, do you have some concern about that at this point?
> THE JUROR: No, I don't think it would bother me as far as my abilities as a juror or anything.
> THE COURT: All right.
> THE JUROR: The thing that rang a bell, I've never seen the witness before in my life.
> THE COURT: Okay.
> THE JUROR: It's just that when she mentioned that the father of her twins was Edward, which I have a cousin named Ed, but I've never heard [of] him as Edward.
> THE COURT: Having twins.
> THE JUROR: That kind of rang a bell, because like I said, when I stated in the peremptory and everything else, that I know – I'm not tight at all with my cousins, I'm just the type of person, I don't –
> THE COURT: All right.  We can simply leave the matter alone or we can certainly find out more about the witness or, you know, her husband or the father of the twins or whatever the case may be, if you would feel more comfortable if you knew.
> THE JUROR: No, I feel fine now.
> THE COURT: All right.  Well, if you have any concern or any problem about it, again, as Bill [the bailiff] suggested to you, and very properly so, let him know or write a note.
> THE JUROR: Yeah, I was in the process of leaving you something, and I only got as far as Judge Wallace, and then we came in.
> THE COURT: All right.  If it does become a problem, please bring to our attention, and we'll certainly be happy to get some additional information for you, if necessary, or whatever it may take to help you.  You know, either determine that it would be a problem, or satisfy yourself that it won't be. [¶] At this point, I assume it's not a problem, and I will assume that to be the case unless we hear from you to the contrary.
> THE JUROR: Okay.  I'm perfectly satisfied.
> THE COURT: All right.

THE JUROR: Like I said, I don't have much contact with my cousins.
THE COURT: All right. If it becomes a problem, let us know.
THE JUROR: It's just a concern, because I know the magnitude of the case, and I just want to be honest.

RT-18: 2502-04.

## 2.    Declaration of David Armendariz, Executed February 4, 2001.

In the declaration, Mr. Armendariz confirms what he thought might be true during the trial, that the Edward Armendariz referred to by Crystal Armendariz during her testimony, in fact is his first cousin. He explains that the father of Ms. Armendariz's twins was his cousin Eddie Armendariz, son of Mr. Armendariz's uncle Diego Armendariz. In the 15 years prior to 1996 (when Berryman's current investigator interviewed him), Mr. Armendariz had visited his uncle, Diego Armendariz on two occasions. He was not close to his cousin, Eddie, but knew that "he is trouble." At the time of Berryman's trial, Eddie Armendariz was in prison. At the time Mr. Armendariz executed his declaration, Eddie Armendariz was in prison again.

## B.    Berryman's Contentions.

Berryman relies on the concurring opinion of Justice O'Connor in *Smith v. Phillips*, 455 U.S. 209 (1982), in which she recognizes "extreme circumstances" in which a court would appropriately find "implied bias" of a juror or prospective juror. *Id*. at 222. As recited in the concurring opinion, those circumstances include: "a revelation that a juror is an actual employee of the prosecuting agency, that *the juror is a close relative of one of the participants in the trial* or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id*. (emphasis added). He maintains that Mr. Armendariz's relationship to his cousin Edward, and through him to Crystal Armendariz was sufficiently close to have triggered an finding of implied bias. He argues that the death in the family of Crystal Armendariz "undoubtedly affected" Mr. Armendariz's jury service. Berryman further notes that the "case was closely balanced as to penalty" and thus the familial relationship between Mr. Armendariz and Ms. Hildreth's family likely was a factor in the ultimate unfavorable verdicts. In his traverse, Berryman acknowledges that Mr. Armendariz denies his relationship to the victim's family had any effect on his judgment, but that Mr. Armendariz's self-assessment should be viewed with suspicion. He claims the only way to resolve the dispute is for the Court to grant an evidentiary hearing.

1

**C.      Analysis.**

2        As a preliminary matter, Claim 24 is not *Teague*-barred.  In *Dyer v. Calderon*, 151 F.3d 970 (9th

3  Cir. 1998) (en banc), the court rejected the notion that implied bias constitutes a "new rule" barred by

4  *Teague v. Lane*.   Rather, "[i]mplied bias may indeed be the single oldest rule in the history of judicial

5  review."  *Id*. at 984-85; *see also Fields v. Brown*, 431 F.3d 1186, 1195 (9th Cir. 2005).   In *Dyer*, the

6  majority acknowledged the dissent's complaint that no Supreme Court case actually had announced

7  implied bias as a rule of constitutional procedure.   But, the majority responded, "a rule needs to be

8  announced for purposes of *Teague* only if it's new.   What we have here is the antithesis of *Teague* – a

9  rule so deeply embedded in the fabric of due process that every one takes it for granted."  151 F.3d at

10  984.

11        Nonetheless, Berryman has not presented a colorable claim of implied bias sufficient to warrant

12  an evidentiary hearing and has not shown entitlement to relief under *Strickland v. Washington*.  Mr.

13  Armendariz's representations to the trial judge after the testimony of Crystal Armendariz, as well as his

14  declaration testimony belies the notion that he had a close relation with Crystal Armendariz, much less

15  the victim, Ms. Hildreth.  He stated he was not close with his cousin, Ed, rarely saw his uncle, and had

16  never met Crystal Armendariz.   The cases relied on by the Warden are instructive.   In *Andrews v.*

17  *Collins*, 21 F.3d 612, 620 (5th Cir. 1994), the Fifth circuit upheld the district court's finding that there

18  was no implied bias where a juror's daughter had been married to the victim's deceased grandson.   In

19  *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987), the Eleventh Circuit found that the trial court

20  had not committed an abuse of discretion for not excusing a juror who actually was a close friend of the

21  murder victim, where the juror assured the trial court he could be impartial.  In *United States v. Freeman*,

22  514 F.2d 171, 174 (8th Cir. 1975), the Eighth Circuit similarly found there was no abuse of discretion

23  for the trial court failing to excuse a juror who had been acquainted with the victim's family through a

24  mutual friend, a fact the juror disclosed to the trial court after she had been selected as a juror, but before

25  evidence was presented.  Berryman's case presents even less justification for excusing Mr. Armendariz.

26  First, despite the fact that his and Crystal's last names were the same, he did not at first appreciate the

27  fact that Crystal could have been the woman who bore the twins of his (Mr. Armendariz's) incarcerated

28  cousin Ed Armendariz.   Second, even when he informed the trial court about his suspicion to the

1   contrary, he was not certain of the connection (although his suspicion later was confirmed).  Third, Mr.

2   Armendariz was not close with his cousin and was only vaguely familiar with Ed Armendariz's life

3   situation.  Finally, Mr. Armendariz assured the trial judge he could be impartial; that the possibility he

4   may have been connected with Crystal Armendariz through his aloof cousin would not affect his duties

5   as a juror.

6          Berryman's contention that Mr. Armendariz's assurances of impartiality should not be credited,

7   but should be further explored during an evidentiary hearing, is unpersuasive.  There is nothing to

8   indicate that Mr. Armendariz would change his testimony were he examined live, before the Court.  No

9   other information or offer of proof is suggested to cast doubt on the veracity of Mr. Armendariz's

10  account of his relationship with Edward Armendariz or his confidence in his own impartiality.   The

11  Court finds that Berryman has failed make an offer of proof sufficient to warrant an evidentiary hearing

12  on Claim 24.  Further, in the absence of a showing that a cause challenge to Mr. Armendariz would have

13  resulted in his discharge from jury service, the ineffective assistance of counsel claim also must fall.

14  Claims 24 and 25 are denied on the merits.

15  **XI.    Berryman's Assertion the State Interfered with his Communications with his Attorneys**

16  **        (Claim 17).**

17         In Claim 17, Berryman argues that his communications with his attorneys, and consequent trial

18  preparation, were severely hindered because of an intercom device in the County Jail interview room.

19  Although Berryman does not claim that the device actually was connected, he maintains it had the

20  appearance of being connected, and thus gave him the impression that his conversations with counsel

21  were being overheard.  Berryman does not request an evidentiary hearing with respect to this claim.

22         **A.    Statement of Facts Relevant to the Interference with Communications Claim.**

23         Berryman's current investigator inspected the attorney interview room at the Lerdo branch of the

24  Kern County Jail.  He observed an intercom connection in the attorney visiting room "which could be

25  connected, and has the appearance of being connected, to custodial officers."  No information is supplied

26  as to whether at the time of Berryman's detention on the Lerdo facility the intercom devise actually was

27  connected or his conversations with counsel were being recorded.

28

1          **B.      Berryman's Contentions.**

2          In his traverse, Berryman clarifies the nature of Claim 17. He does not contend his conversations

3  were monitored by authorities, but rather that the presence of the intercom device gave the appearance

4  of being a monitoring device, and that this interfered with his ability to freely communicate with his

5  attorneys. As a result, he felt constrained to communicate by writing notes to his attorneys, an

6  ineffective means for someone with limited academic skills. Further, the inhibition caused by the

7  presence of the intercom device contributed to the breakdown of attorney-client communications

8  addressed in Claims 1, 2, and 3. *See* Part V., *supra*. As a consequence, Berryman alleges, important

9  information for the defense was not relayed to counsel. Relying on *Lakin v. Stine*, 44 F.Supp.2d 897

10  (E.D. Mich. 1999), he claims that he was essentially forced to relinquish his right to counsel because the

11  level of state interference made meaningful attorney-client communication impossible.

12          **C.      Analysis.**

13          As the Warden points out in his opposition brief, a Sixth Amendment violation for intrusion into

14  the attorney-client relationship requires actual and intentional governmental conduct. *See United States*

15  *v. Roper*, 874 F.2d 782, 790 (11th Cir. 1989). Further, the intrusion must have resulted in disclosure of

16  information which inured to the benefit of the prosecution and to the detriment of the defendant. *United*

17  *States v. Morrison*, 449 U.S. 361, 365 (1981); *United States v. Irwin*, 612 F.2d 1182, 1186-87 (9th Cir.

18  1980); *United States v. Glover*, 596 F.2d 857, 863-64 (9th Cir. 1979); *Cinelli v. City of Revere*, 820 F.2d

19  474, 478 (1st Cir. 1987).

20          The more recent decision by the Ninth Circuit in *Williams v. Woodford*, 384 F.3d 567 (9th Cir.

21  2004), clarifies the standard:

22          When the government deliberately interferes with the confidential relationship between
           a criminal defendant and defense counsel, that interference violates the Sixth
23          Amendment right to counsel if it substantially prejudices the criminal defendant.
           [Citations.] Substantial prejudice results from the introduction of evidence gained
24          through the interference against the defendant at trial, from the prosecution's use of
           confidential information pertaining to defense plans and strategy, and from other actions
25          designed to give the prosecution an unfair advantage at trial. [Citation.]

26  *Id*. at 584-85.

27          Berryman can satisfy neither the deliberate interference requirement, nor the substantial prejudice

28  requirement. He has alleged only an unfounded fear that his conversations might have been monitored,

not that they were, or that the prosecution benefitted from any information obtained as a result.  The Court also notes that the Michigan District Court decision, *Lakin*, 44 F.Supp. 2d 897, relied on by Berryman was been reversed by the Sixth Circuit for the very reason that the lower court granted relief without a showing of prejudice.  *Lakin v. Stine*, 229 F.3d 1152 (6th Cir. 2000).[80]  In the present case, Berryman suffered no actionable interference in his Sixth Amendment right to counsel.  Claim 17 is denied on the merits.

## XII.   Berryman's Assertion that His Attorneys' Were Constitutionally Incompetent for Failure to Present a Mental Defense at Guilt Phase Proceedings (Claims 15 and 16).

In Claims 15 and 16, Berryman alleges his attorneys were ineffective for not investigating, developing, and presenting evidence to defeat the prosecution case of premeditation, deliberation, intentional killing, and rape or attempted rape.  In Claim 15, he alleges that trial counsel should have presented at the guilt proceedings a minimum of the same evidence presented at the penalty phase to develop a mental state defense.  This includes the trial testimony of Drs. Pierce and Benson, as well as lay testimony supporting the fact of his excessive alcohol consumption.  In Claim 16, he contends counsel should have presented mental state evidence at the guilt phase above and beyond what was presented at the penalty phase.  Berryman requests an evidentiary hearing with respect to Claim 15.

### A.   Statement of the Facts Relevant to a Potential Mental State Defense.

The proffered evidence for Claims 15 and 16 focuses on evidence that could have been presented regarding the numerous causes for Berryman's alleged mental deficiencies, including excessive alcohol consumption, diminished intellectual functioning, and mental impairments stemming from his difficult upbringing.  This section also includes a summary of the social history report of psychologist Gretchen White, Ph.D., opinion testimony of *Strickland* expert Mr. Simrin, and explanation of efforts to develop mental state evidence by Mr. Soria, and counter evidence presented by the Warden.

---

[80] Berryman's current litigation team reasonably did not know of the reversal of the *Lakin* case because the Sixth Circuit opinion was decided on July 13, 2000 and Berryman's traverse was filed a month earlier, on June 7, 2000.

1        **1.      Evidence of Excessive Alcohol Consumption.**

2           The evidence supporting Berryman's excessive alcohol consumption is largely provided by lay

3   witnesses, some who testified at his trial.  In each instance of a trial witness testifying about Berryman's

4   alcohol consumption, the testimony was elicited by defense counsel.  During guilt phase proceedings,

5   *see* Part III.A., *supra*, witness Thellas Sanders testified that Berryman was drinking a 40 ounce bottle

6   of malt liquor, which he shared with Mr. Sanders during their conversation about the death of Ms.

7   Hildreth, the day after her death.  Ms. Armendariz testified that Berryman was drinking malt liquor

8   during their outing to Bakersfield (before Ms. Hildreth went missing) and that she could smell alcohol

9   on his breath when he returned (after Ms. Hildreth was killed).  Her younger brother, Andrew Bonner

10  confirmed the smell of alcohol on Berryman's breath when he returned to their garage apartment late

11  Sunday night/ early Monday morning (following Ms. Hildreth's death).  Melinda Pena testified that

12  when she was out with Berryman, the night of the killing, Berryman was drinking.  Finally, Berryman

13  points to the fact that a wine cooler bottle was found at the crime scene.[81]  Berryman's statement to

14  interrogating detectives also reveals that he had been drinking the day Ms. Hildreth was killed and on

15  the evening of the interview.  *See* Part VI.A.3., *supra*. Penalty phase evidence also confirms Berryman's

16  alcohol indulgence, including from Melinda Pena, Berryman's sister, Ronnique Berryman, his mother,

17  Lestine Bonty, his wife, Carol Berryman, and his cousin, Maxine Coleman.  *See* Part III.B., *supra*.

18          In addition to evidence elicited from witnesses at trial (by the defense team) about Berryman's

19  alcohol consumption, numerous post-conviction declarations developed on federal habeas corpus shed

20  light on the extent of his drinking.[82]  Family friend Johnnetta Reed was aware that Berryman drank prior

21  to his arrest in Delano.  Although she reports she didn't see him much in six to eight months prior to his

22  arrest and cannot recall "a particular problem" arising because of Berryman's alcohol consumption, Ms.

23  Reed was aware that Berryman stopped attending church, began using bad language, and hung out with

24  "the fellows."  Berryman's cousin, Maxine Coleman was interviewed by a "black doctor" or investigator

25  ─────────────

26      [81] No evidence actually connected this wine cooler bottle to Berryman, a point emphasized in the
    Warden's opposition papers.

27      [82] These declarations actually are offered in support of Berryman's request for an evidentiary
28  hearing regarding Claims 68 and 69 regarding the failure of trial counsel to adequately develop
    mitigation evidence at the penalty proceedings, *see* Part XXV., *infra*, but they are relevant here as well.

prior to her trial testimony about Berryman's drinking.  A few days before Berryman was arrested, he told Ms. Coleman he was "concerned he was drinking too much."  Ms. Coleman never saw Berryman when he was drinking.

Berryman's former wife, Carol Berryman,[83] avers that he drank socially when she met him in 1985.  He stopped drinking completely for six months when they were living together, and then resumed, drinking more and more.  Ms. Berryman was concerned about Berryman driving after or while drinking, particularly after they argued.  She avers that his "DUIs usually happened after one of these confrontations when he would leave [her] and go off driving."  Berryman and his wife separated because of his excessive drinking and unfaithfulness.  His drinking affected his ability to work as well as their marital relationship.  Ms. Berryman hoped the separation would motivate Berryman to stop drinking and get his life together.  When Berryman moved to Delano, he told Ms. Berryman "he had a warrant out on him" and wanted to spend time with his great-grandmother before turning himself in.  Ms. Berryman's sister, Margie Garcia, avers that she did see Berryman drink socially, but doesn't "ever recall seeing him drunk or out of line from drinking too much."

Berryman's maternal uncle, Lester Bonty avers that he is "somewhat aware that Rodney [Berryman] drank excessively."  Mr. L. Bonty's awareness, however came from reports of Berryman's drunken behavior from other family members, not from his own observations.  Besides this, Mr. L. Bonty heard that Berryman had a "run-in" with his step-father (Jon January).  When Mr. L. Bonty saw Berryman at the home of his (Mr. L. Bonty's) mother (Berryman's grandmother), Berryman seemed fine.

In contrast to the foregoing witnesses, Odesser Pearson, the grandmother of two of Berryman's female high school friends, did not observe any changes in Berryman's behavior in the time she knew him.  Nor did she observe him drinking alcohol.  Similarly, long-time friend Kandy Rumford did not observe Berryman consume alcohol and was unaware Berryman had a drinking problem.  A maternal aunt, Linda Mitchell, avers that she did not know Berryman was "a drinker."  She states she never saw him drink.  Maternal aunt, Carolyn Bonty, did see him drink occasionally, but was not aware "that he

---

[83] The declaration actually was executed under the name Fuller, but for consistency the Court refers to Ms. Fuller as Carol Berryman or Ms. Berryman, as she is referenced in other parts of this Memorandum Order.

1    had a problem with it." She concedes, however, that she saw less of Berryman when he was a teenager

2    because *she* was moving around so much. Similarly, maternal aunt Terrie Bonty knew Berryman

3    occasionally drank, but not that he "was having a problem with alcohol." Like Ms. C. Bonty, Ms. T.

4    Bonty was not around Berryman so much to have noticed. Maternal aunt Karen Bonty similarly cannot

5    recall ever seeing Berryman with a drink. Her twin sister, Sharon Bonty also states she is not aware he

6    had a problem. Maternal great aunt (in-law) Ann Bonty is unaware Berryman had any problems with

7    alcohol consumption.

8        Maternal uncle Emery Bonty recalls a family reunion in Pasadena where Berryman was "stone

9    drunk and behaving badly." Berryman was only 15 or 16 at the time. Mr. E. Bonty confronted

10   Berryman about his behavior at this time.[84] Maternal uncle (in-law) Perry McBride states that while he

11   didn't see Berryman drink, he learned that Berryman's father was "a drinker."

12                    **2.    Evidence of Voluntary Intercourse.**

13       In his moving papers, Berryman argues his trial counsel knew "there was evidence that the victim

14   voluntarily went with her assailant to a secluded spot and that there was consensual intercourse."

15   Although there is no such statement in any of Mr. Soria's offered declarations, one of Berryman's

16   attorneys in this federal action, Jessie Morris, Jr. provides a declaration appended to the second state

17   habeas petition that the proprietors of a refreshment stand at the Lake Woollomes recreational park

18   remembered Berryman coming out to the lake with Ms. Hildreth a week or two before her death.

19   According to Mr. Morris's 1998 declaration, the concessionaires gave a statement to this effect, although

20   no statement is provided. Mr. Morris also reports interviewing Ms. Armendariz and her mother, Brenda

21   Clark, in this same declaration. Had they been asked at trial, both would have testified that Ms. Hildreth

22   had been in Berryman's pick up truck prior to the night of her death. This declaration was updated by

23   Mr. Morris with the execution of a new declaration on October 2, 2001. In the updated declaration, he

24   reiterates that he interviewed Crystal Armendariz and her mother, Brenda Clark in February 1996. As

25   _____

26       [84] The chronology reported here is confusing, since other evidence indicates that Berryman was
     living with his father in Sacramento at the time he was 15 or 16, and often was under the jurisdiction of
27   juvenile authorities. In addition, Berryman's mother, Lestine Bonty, reports that she had no contact with
     Berryman from the time he moved out of her house at age 12, until he came back to live with her when
28   he was 17. It may be that the incident described occurred after Berryman returned to live with his
     mother, when he was 17.

1 documented by his interview notes, Mrs. Clark could have testified that Berryman gave Ms. Armendariz

2 and Ms. Hildreth a ride in his pick up truck and Ms. Armendariz could have testified that she drove

3 Berryman's pick up truck on one occasion, with Ms. Hildreth as a passenger.  Mrs. Clark also informed

4 Mr. Morris that Ms. Hildreth did not care for Berryman and didn't know why her cousin (Crystal) would

5 get involved with him.  Mrs. Clark further reported that she felt Berryman "eyeballing" her.  Mr. Morris

6 was not able to obtain declarations from Mrs. Clark or Ms. Armendariz because they "are to some extent

7 hostile."  Mrs. Clark specifically told Mr. Morris not to return.  The offered purpose of this testimony

8 is to establish that Berryman and Ms. Hildreth were well enough acquainted for her to have been in his

9 pick up truck prior to the night of her death, and that she may well have gone with Berryman voluntarily

10 to the agricultural field to have sexual intercourse.[85]

11 **3.      Mental State Evidence Developed by Berryman.**

12 The mental state evidence consists of trial and declaration testimony of Drs. Pierce and Benson,

13 the test results of two neurological tests, an alcohol induced EEG and a Positron Emission Tomograph

14 ("PET scan"), and the social history report of Dr. White.  Drs. Pierce and Benson each have provided

15 two declarations, one each attached to Berryman's first state habeas petition, and one each appended to

16 his evidentiary hearing request in this federal action.   In connection with the EEG and PET scan, the

17 experts who performed those tests, neurologist Paul Guisado, M.D. and neurologist Joseph C. Wu, M.D.,

18 respectively also provide background declarations as to their qualifications.

19 **a.      Trial Testimony of Drs. Pierce and Benson.**

20 The trial testimony of Drs. Pierce and Benson is recounted in the summary of the penalty phase

21 proceedings.  *See* Part III.B., *supra*.  To summarize, the gravamen of Dr. Pierce's testimony is that

22 Berryman suffered a personality disorder, largely due to his neglected and dysfunctional childhood.

23 Separately, Dr. Pierce opined that Berryman was afflicted with a seizure disorder triggered by alcohol

24 consumption.  Dr. Pierce believed the seizure disorder also was associated with a head injury Berryman

25

26

27

28 [85] The sufficiency of the evidence of rape and the rape murder special circumstances is separately addressed in Claims 12, 29, 35, 50, 71 and 71A.  *See* Part XIX., *infra*.

1   sustained.[86]  Dr. Pierce and Dr. Benson both wanted to have Berryman submit to an alcohol induced

2   EEG to confirm the presence of the seizure disorder, as they believed Berryman's aberrant behavior in

3   committing a violent act on Ms. Hildreth was caused by a seizure disorder that would be detectable by

4   the alcohol induced EEG.  Dr. Benson's diagnosis was that Berryman suffered from a learning disability

5   as well as organic mental syndrome, manifested by seizures, largely alcohol induced.  Berryman's past

6   head injury[87] also was said by Dr. Benson to be a cause of his organic mental syndrome.  The seizures

7   were described by Berryman and his wife as being preceded by the smell of gasoline or oil and

8   accompanied by facial contortions, severe headaches, ringing in the ears, blackouts, and aggressive

9   behavior.  Dr. Benson ascribed the cause of Berryman's attack on Mr. Perez, the altercation with his

10   father-in-law, a heated argument with his mother (over replacing tires on his pick up truck), and the

11   killing of Ms. Hildreth to aggressive behavior during seizures, explaining that people who suffer from

12   temporal lobe seizures had been known "to do all kinds of things, and particularly violent sort of things."

13   Nonetheless, he also conceded that committing rape was not among the violent acts that people

14   experiencing a seizure would do.

15                        **b.     Mental State Declarations Appended to the First State Habeas**

16                                **Petition.**

17         Dr. Benson executed a declaration dated August 17, 1993 which largely reiterates his trial

18   testimony, notably that after examination, he concluded Berryman suffered from organic mental

19   syndrome, probably aggravated by excessive alcohol consumption and two head injuries (which in turn

20   resulted in recurrent severe headaches).  Because of Berryman's scholastic history of having been placed

21   in special education classes and his head traumas, Dr. Benson arrived at a diagnosis of middle brain

22   dysfunction.  To confirm this diagnosis, Dr. Benson sought an alcohol induced EEG, compared to a

23   regular EEG (for determination of impact of alcohol on brain function), and a PET scan.  When Dr.

24   Benson learned that the tests could not be conducted in Kern County, he suggested to Mr. Soria that the

25

26   ───────────────

27         [86] The cause of the head injury could have been from Berryman falling down from a forklift or crane at a job-site, or from being struck on the head with a flashlight by his wife.

28         [87] Dr. Benson referred to the cause of the head injury as being hit with a metal pipe.

1    tests be conducted outside the county.  Mr. Soria replied, however, that the trial court would not grant

2    an order allowing such expensive tests to be performed, particularly outside of the county.

3            Dr. Benson believed Berryman's neurologic dysfunction was relevant to his guilt, in addition to

4    sentencing.  He was not, however, called to testify at guilt proceedings.  Since his trial testimony, Dr.

5    Benson learned that Berryman was the victim of sexual molestation by an uncle when he was seven or

6    eight years old, consisting of anal intercourse and oral copulation.[88]  Such molestation certainly would

7    have contributed to Berryman's personality disorder, particularly as this involved his relationship with

8    women and excessive alcoholism.  Knowing this information would have supported his and Dr. Pierce's

9    respective diagnoses.  Although Dr. Benson's diagnosis could not be confirmed with an alcohol induced

10   EEG or a PET scan at the time of trial, he adhered to his conclusion based on his own observations, even

11   without empirical confirmation.

12           Dr. Pierce's declaration executed on August 31, 1993, similarly reiterated the basis for his trial

13   diagnostic impressions, including Berryman's chaotic, unstable childhood and family history, an early

14   learning disorder, low self-esteem, excessive alcohol usage, head injury traumas, sudden onset and

15   termination of severe headaches, a declining marital relationship, and failed parental role.  Dr. Pierce's

16   diagnosis was two pronged: alcohol induced organic disorder and personality disorder, not otherwise

17   specified with dependent narcissistic and depressive features.  Dr. Pierce related his findings to Mr. Soria

18   and urged further neurologic testing to confirm brain damage.  Any such brain damage, in turn, would

19   have been relevant to a determination of Berryman's guilt.  Like Dr. Benson, Dr. Pierce felt that the post-

20   trial discovery of sexual molestation inflicted on Berryman would have been significant to his poor male

21   image development and relationship with females.  The molestation would have been very important in

22   the support of Dr. Pierce's diagnosis.

23           In appellate counsel Paul Posner's meetings with Drs. Pierce and Benson, he learned that defense

24   counsel never provided them with any foundational material regarding Berryman's scholastic,

25

26

———————————————

27       [88] As will be discussed in connection with Berryman's penalty phase arguments, *see* Claims 6,
     63, 64, 65, 69, and 70, the foundation for Berryman's sexual abuse as a child is not established by any
28   reliable evidence or offers of proof.  *See* Part XXV.C., *infra*.

1    psychological, medical, or injury history.  This omission was a basis for Mr. Posner's opinion that

2    Berryman's trial counsel were constitutionally ineffective.

3                      **c.      Mental State Declarations of Drs. Pierce, Benson, Guisado, and Wu**

4                                **Developed in Federal Proceedings.**

5          Dr. Pierce's most recent declaration, executed October 4, 2001, incorporates a report he authored

6    the same day the declaration was executed.  In preparation for his report, he consulted with Dr. Benson,

7    interviewed Berryman on three occasions (over and above prior interviews), reviewed prior records and

8    his prior trial as well as declaration testimony, examined the EEG report of Dr. Guisado and examined

9    the PET scan report of Dr. Wu.  In his present report, Dr. Pierce reiterates that during the period of his

10   pre-trial evaluation of Berryman, he urged Mr. Soria to subject Berryman to neurological testing to

11   confirm the existence of brain damage and that if brain damage could be confirmed by empirical test

12   results, that information should be presented during guilt phase proceedings.  The tests Dr. Pierce

13   requested were an EEG and an alcohol induced EEG.

14         Dr. Pierce states that the test results from Dr. Wu (PET scan) and Dr. Guisado (alcohol induced

15   EEG) confirm his initial diagnoses given in 1988, i.e., that Berryman suffers and suffered from an

16   alcohol organic disorder and an organic mental syndrome or seizure disorder.  Dr. Wu opines that his

17   preliminary impression of the PET scan was abnormal.  Dr. Guisado reports abnormalities in the alcohol

18   induced EEG based on "increased right temporal slowing and focal left temporal sharp wave activity .

19   . . consistent with bilateral temporal lobe dysfunction and alcohol induced left temporal paroxysmal

20   activity."  Dr. Pierce concludes that Berryman's alcohol consumption prior to the killing of Ms. Hildreth

21   "could have produced a seizure in Mr. Berryman, resulting in an altered state of consciousness . . .

22   leaving him amnestic or having no memory of the acts with which he was charged."

23         Dr. Benson's most recent declaration incorporates his report which is dated October 2, 2001.

24   He describes the EEGs (resting and then alcohol induced) and the PET scan performed by Drs. Guisado

25   and Wu, respectively, as objective tests that measure activity and function of the brain.  He opines that

26   the positive results support of the "diagnoses of organic brain disease and possible alcohol seizure

27   induced behavior."

28

Dr. Benson's assessment of Berryman additionally is based on his understanding of Berryman's childhood and adolescent history. He reports there had been discord between the parents before their divorce when Berryman was nine or ten, that a learning disability had been recognized by the time Berryman was in the third grade, that Berryman became a chronic abuser of alcohol by the age of 14, that Berryman sustained two significant head injuries during his adolescence, both causing brief periods of unconsciousness, that by age 21, Berryman was a chronic alcoholic, and that a seizure disorder was indicated due to sudden disabling headaches, ringing in the ears and the phantom smell of oil or gasoline.

Dr. Benson reports that the results of the alcohol induced EEG show increased wave activity in the right temporal and focal left temporal areas of Berryman's brain. When Berryman's blood alcohol level exceeded 0.1 mg, he suffered "intermittent seizure-like electrical activity." This was consistent with Dr. Wu's impression based on the PET scan that Berryman suffers bilateral temporal lobe dysfunction and also with alcohol induced left temporal paroxysmal activity.[89] Dr. Benson concludes, "The importance of these findings is that while the brain is seizing, the subject is incapable of conscious choice in his thoughts or behavior."

To qualify Drs. Wu and Guisado as appropriate experts in their fields, some background information additionally is provided with Berryman's reply brief in support of his evidentiary hearing request. In a declaration executed July 18, 2002, Dr. Wu describes his qualifications as a medical doctor and the Clinical Director of the Brain Imaging Center at the University of California, Irvine. He states that the PET scan described in July 18, 2001 report was based on techniques available at the Irvine "facility and elsewhere in 1988." He stresses there was "an appropriate database" for the conclusion of an abnormal scan. Dr. Wu also refers to the Warden's opposition declaration of Dr. Alan Waxman dated May 14, 2002. Dr. Wu points out that although Dr. Waxman "purports to be[ ] opposed to the use of functional brain imaging for assessment of brain trauma, [Dr. Waxman] . . .himself has utilized functional brain imaging to study mild head trauma." Dr. Wu describes three cases where Dr. Waxman utilized brain imaging procedures to study the patients' respective brain function. Dr. Guisado states that he is a medical doctor licensed to practice medicine in California. Referring to his July 28, 2001

---

[89] Dr. Peter Vaulk, who oversaw the administration of Berryman's PET scan, read the study as normal.

1  alcohol induced EEG examination report, he states that the techniques used in that examination "were

2  readily available in many locations in 1988." He stresses that even after reviewing the report of the

3  Warden's EEG expert, Marc Nuwer, M.D., Ph.D. dated May 10, 2002, he (Dr. Guisado) still adheres

4  to the conclusions of his report. He also notes that the abnormality observed in Berryman's EEG tracing

5  is evident visually and did not rely on the QEEG procedure.[90]

6                  **d.    Social History Prepared by Gretchen White, Ph.D., dated September**

7                  **17, 2001.**

8         In Claim 16, Berryman asserts that a social history would have given an accurate picture of his

9  difficult upbringing and development in support of a mental state defense. The actual social history

10 which Berryman's present litigation team obtained, however, is offered is support of his evidentiary

11 hearing request for Claim 59, discussed below. *See* Part XXVI., *infra*. Because it also serves as the

12 basis for Berryman's ineffective assistance of counsel guilt phase claims, Dr. White's findings and

13 conclusions are recited here.

14        To prepare this report, Dr. White reviewed declarations of family members and investigative

15 reports of family members. She did not interview Berryman or his wife Carol Berryman. She could not

16 interview either of Berryman's brothers, as the older brother, Ronald, Jr. was the victim of a homicide

17 in 1992, and the younger brother, Bryan Berryman was out of the country at the time she was preparing

18 her report.[91]

19        She describes Berryman as a person born from an unwanted pregnancy to a teenage mother and

20 irresponsible father. Because of the constant turmoil in his childhood, he made no attachments to any

21 adult in his life and was left to find his own way to adulthood. There is quite a bit of background about

22 Berryman's parents – that his mother became pregnant with her first child (Berryman's older brother,

23 Ronald, Jr.) at age 15, to the shame of both families, that she was unprepared for and didn't enjoy

___

25 [90] The Court does not observe a reference to a QEEG procedure in Dr. Guisado's July 28, 2001.
26 report. QEEG is described in Dr. Nuwer's declaration, as summarized in Part XII.A.6.a., *infra*.

27 [91] The foundational support for Dr. White's report is largely verifiable in other declarations and documents that are part of the record, particularly declarations of Berryman's mother, sister, and numerous school, juvenile, and medical records. The documentary evidence is appended to Berryman's
28 first state habeas petition.

motherhood, that she was uprooted from her family when Berryman's father joined the Air Force and they moved to Wyoming, that she was unhappy to learn of her second pregnancy (with Berryman) when the first child was only four months old, and that Berryman's father began engaging in a long line of extra-marital affairs during this difficult time. Berryman was born two months premature and remained in the hospital for a month. At the time, his young mother was anxious to leave her unfaithful husband and return to her family as soon as possible.

Dr. White points out that premature infants are at considerable risk for cognitive impairments and brain damage. They are four times less likely to graduate from high school – as was the case with Berryman. Berryman's impairments were compounded by the fact that his mother never bonded with or wanted him. Within the first 18 months of Berryman's life, his mother became pregnant on two more occasions, one ending in a miscarriage, and the other ending with the death of a premature sister. Within another year, Berryman had a little sister, Ronnique Berryman, a still depressed mother, and an philandering father. During this period, Berryman's father was physically abusive to his young wife, on one occasion choking her until she passed out.

Berryman's mother reported to Dr. White that Berryman was a sickly infant and on several occasions was taken out of the family home in Wyoming to be nursed back to health in Delano with relatives. With the birth of his sister, Berryman was shuttled to the homes of various relatives because his mother was unable (or unwilling) to care for him. Dr. White observes that nurturing was sorely lacking in Berryman's young life.

During Berryman's early childhood, the family left Wyoming, moved to Delano and then to Los Angeles. While in Los Angeles, there were numerous moves to various apartments. There also was the initial separation between Berryman's parents. The parents reconciled and resumed cohabitation in San Jose with the father's parents, but the problems were not dispelled. During a subsequent separation, the fourth Berryman child was born – Bryan. The parents apparently reconciled again, but the father remained very demanding, abusive, and unreasonable. Dr. White learned from a friend of Berryman that Berryman had reported observing several occasions where his father physically and seriously abused his mother. Even after the parents separated, and the father went to live in Delano while the mother and four children continued to lived in San Jose, the father visited. During the last of those visits there was a

violent exchange that resulted in the mother running away from his assault, falling down a flight of stairs into the street, and almost being run over by a car. All of this was observed by Berryman and his siblings.

When the couple finally separated for the last time, Berryman's mother endeavored to complete her high school education, vocational school, and work to support her children. During her long absences from home, her four children were left with their maternal grandparents and their mother's many siblings (some of whom were younger than Berryman). Berryman's sister, Ronnique, reported to Dr. White that the Berryman children were unwanted, ridiculed, unsupervised, uncared for, and unfed. Ronnique told Dr. White that one their mother's younger brothers, Kanda Bonty, lived in the Berryman household for a year, and was charged with the task of babysitting the Berryman children. Ronnique claimed that Kanda molested Berryman and her.[92] Dr. White additionally was informed by Berryman's mother that another one of her brothers, Lester Bonty, molested Berryman.[93]

There were a number of years when Berryman's mother was completely absorbed in her own pursuits, and what little attention she did bestow on her children was reserved for Berryman's older brother, Ronald, Jr. Ronald, Jr. went to live with his father when Berryman was ten years old. The next year, when Berryman was 11 and in the fifth grade, school records showed he had great scholastic difficulties, with an I.Q. of 75, reading at the first grade level, and being resistant to school. His mother did not follow through with programs to assist Berryman and informed school officials she had a hard time wanting Berryman. After a year of special education and assistance, Berryman's scholastic functioning improved to the point that he was re-introduced into regular classes. In Dr. White's opinion, Berryman's positive response to structure in his life demonstrates that "he was not beyond reach" but that "schools and institutions can rarely make up for parents' failure to nurture their children."

Home life in his mother's home for Berryman at this time was tumultuous. His mother began living with an older man, Jon January, who was like Berryman's father in that he was a philanderer.

---

[92] This report is consistent with Ronnique's August 26, 1993 declaration appended to Berryman's first state habeas petition. *See* Part XXV.A.3.c., *infra*.

[93] This report is consistent with Lestine Bonty's August 28, 1993 declaration appended to Berryman's first state habeas petition. *See* Part XXV.A.3.b., *infra*.

1    They broke up and the mother married another man, but reported to Dr. White that she divorced him

2    after six months and resumed her relationship with Jon January.  Berryman and January did not get along

3    and Berryman started to rebel.  Then the family finances plummeted and the mother returned to her

4    parents' house.  Apparently Berryman did not join his mother, but instead went to live with his father

5    in Long Beach.  Dr. White received conflicting reports as to whether Berryman was "kicked out" of the

6    house by his mother, or he ran away to his father's home.  Berryman was 12 years old at the time.

7         Family stability was shaky with his father as well.  Dr. White states that the father was working

8    full time, living with one woman and seeing another when his sons (eventually the youngest, Bryan,

9    joined them as well) came to live with him.  Dr. White reports that Berryman first came to the attention

10   of juvenile authorities in Long Beach when he was 14 and on the streets.[94]  The family moved to

11   Sacramento that same summer (1980).  In the next two and one-half years Berryman moved five times

12   during which he attended seven different schools.  During this period, Berryman had four out-of-home

13   placements, two at a local group home, one with his great-grandparents in Delano, and one at

14   Sacramento Boys Ranch.  The father was still gone long hours and expected Berryman to babysit his

15   younger brother, which Berryman resented.  Juvenile records indicate that Berryman wished for his

16   father to spend more time with him.  The records also indicate that when a probation officer contacted

17   Berryman's mother, she was uncooperative, refusing even to provide her current address.  During this

18   period Berryman was totally unsuccessful at school, with fighting, truancies, and poor grades the

19   hallmarks of his existence.  One probation officer observed that Berryman displayed symptoms of

20   rejection and appeared to be acting out his rejection by physical means.   Berryman's performance

21   improved in the juvenile hall and group home settings.  Berryman, however, committed a "sustained

22   battery" against a female teenager while in the group home and was sent back to juvenile hall in August

23   1981.  His father then requested to have Berryman back in the home and Berryman began making a

24   positive adjustment.  Due to a change in the father's employment, however, he chose to move Berryman

25   to Delano to live with Berryman's great-grandparents.  The great-grandparents returned Berryman to

26

27   ───────────────

28       [94] Juvenile reports that are appended to Berryman's first state habeas petition indicate Berryman's
     first run in with authorities was in Sacramento, when he was 14 ½ years old.

1 Sacramento by bus after he engaged in a fight at his new school.  Berryman's father could not receive

2 him, so Berryman returned to the group home, where he made solid progress.

3 Berryman entered the Sacramento Boys Ranch in January 1983 (when he was 17).  His

4 adjustment to the Boys Ranch was the best it had been since he received special assistance in the fifth

5 grade.  His adjustment was described as "outstanding."  Dr. White again notes that Berryman, even at

6 the age of 17, was "responsive to intervention."  When it was time for him to leave the Boys Ranch, it

7 was unclear where Berryman would live.  His father had decided to move to the Bahamas, and did not

8 want to take Berryman with him.  His mother told authorities she was experiencing marital and personal

9 problems and didn't want Berryman to live with her either.  Berryman's great-grandparents in Delano

10 agreed to take him, and when Berryman learned he was wanted by someone, his attitude changed.

11 In the summer of 1983, Berryman and his older brother, however, ended up at their mother's

12 house, shared with Jon January and a new toddler brother.[95]  They were 17 and 18 years old, respectively.

13 Then they received the news that their father was killed in a plane crash, his body never recovered.  The

14 father's death affected Berryman, his brother, Ronald, Jr. and his mother, who deeply mourned her

15 former husband.  For his part, Berryman refused to go to school after his father's death,[96] which led to

16 more conflict between him and January.  At that point his mother kicked him out of the house and did

17 nothing to ascertain where he might have gone and did not keep in contact with him for the next three

18 years.  Berryman lived with the family of a girlfriend, Tamara Pearson, and the ex-husband, Perry

19 McBride, of one of his mother's sisters (Donna McBride).

20 Because of his innate charm and good looks, Berryman attracted a lot of female attention, which

21 Dr. White reports "he seldom resisted."  He followed his father's pattern of maintaining several

22 relationships simultaneously.  With his father as a role model and his mother withholding affection,

23 Berryman was "hungry for female approval and attention."

24

25

26 [95] Younger sister Ronnique Berryman and younger brother Bryan Berryman presumably also were in the house.

27 [96] Apparently he was still enrolled in high school, because during this school year, he was

28 arrested for involvement with distributing marijuana.  The conviction was for three counts of transporting marijuana.

His employment endeavors were no more successful than his education pursuits.  Dr. White reports that he began working at a series of labor jobs.  In December 1984, shortly before his 19th birthday, Berryman fell from a forklift and either hit his chest or suffered a blow to his chest when a crate fell on him.  When he was able to return to work, he was discharged.  Dr. White then describes that he was convicted on three counts of transporting marijuana,[97] and five months later of grand theft.  He spent eight months in the County Jail.  Following this, Berryman met his wife, Carol, in 1985.  After she became pregnant (with Berryman's baby), Berryman moved in with her and her family in February 1986.  She and Berryman were married in May and their baby was born in August.  Life seemed to be going well; Berryman "had all the accouterments of adulthood," but, Dr. White stresses, he was ill-equipped to succeed.

The chronology of Dr. White's history becomes a little confused at this point.  She states that Berryman "received a drunk driving conviction in June," but doesn't say if that is in 1986 or 1987.[98] After the baby was born, Carol moved back in with her parents.[99]  As reported by Berryman's mother, at Thanksgiving time, Carol and Berryman engaged in an argument and she hit him over the eyebrow with a metal flashlight, giving him two black-eyes and causing him a great deal of pain in the frontal area of his head and nasal area.[100]

In February 1987, Berryman, Carol, and their baby moved into their own apartment.  Berryman received a settlement from his industrial accident (from December 1984) and he bought (or put a down payment on) his Mitsubishi pick up truck.  Dr. White reports that Berryman received another drunk driving violation that month.[101]  As his drinking increased, he stopped going to work, and then he lost

---

[97] The actual incident of marijuana transportation occurred the preceding year, while Berryman was still enrolled at West Covina High School.

[98] Evidence presented at his trial by the prosecution indicates that he was stopped for driving under the influence in June 1986 and again in the spring of 1987.  Neither party presents a clear picture of Berryman's drunk driving incidents to the Court.

[99] It's not clear where Berryman went when the couple separated.

[100] This incident is supported by emergency room records from November of 1986 during which Berryman complained of a frontal headache.

[101] No evidence in the record supports the existence of this citation.

his job and stopped looking for work.  Dr. White states that Berryman complained of frequent severe headaches since being hit with the flashlight (by his wife) a few months before.  Dr. White observes that within a few months, his marriage was the mirror-image of his parents' marriage, except that he was not abusive to his wife.  He was unemployed, drank excessively, and continued to see women outside of his marriage.  He tried to get counseling from his mother and his mother's cousin, Maxine Coleman.  By June 1987, he and Carol were "separated" though they still shared the same apartment.  In July, Berryman assaulted David Perez with a tire iron (or iron wheel lock bar) and then left Los Angeles for Delano, where he moved in with another family and started up a relationship with another woman (Crystal Armendariz).

Dr. White received reports from both Berryman's grandmother (possibly his maternal grandmother) and his mother that his drinking had escalated following his marriage to Carol Berryman. His mother reported that he seemed never to be without an open bottle (of liquor), even while driving. Notwithstanding Berryman's departure for Delano, he came back to his father-in-law's house to collect his wife and baby to move them to Delano in August of 1987.  Dr. White reports he had been drinking and got into an altercation with this father-in-law during which Berryman ended up hitting his father-in-law in the nose.  In Delano, life was not promising for Berryman the month before Ms. Hildreth's death. Berryman was not working or looking for a job.  At the same time, he was drinking heavily and had liaisons with numerous young women.

Based on her professional training and research, Dr. White concludes that children, like Berryman who do not bond with their mothers, "are vulnerable, throughout their lives, to depression and to chronic difficulties in interpersonal relationships."  Neither of Berryman's parents provided attention, affection, guidance, or supervision.  As a result, Berryman grew up with a sense of insecurity regarding his self-worth.  Dr. White further stresses that Berryman's sense of safety as a child was very compromised, based on the physical abuse he witnessed his father inflict on his mother as well as the sexual abuse to which he and his sister were subjected.  Dr. White further opines that Berryman's premature birth, low I.Q., and poor school achievement suggest the possibility of compromised brain functioning.  The numerous moves and family instability undermined his ability to form stable attachments that might have compensated for the indifference he felt from his parents.  Dr. White

1   concludes that Berryman's family history suggests a predisposition to substance abuse and depression.

2   She states his mother was chronically depressed, his older brother was addicted to cocaine and attempted

3   suicide, five relatives on his mother's side suffered from drug or alcohol abuse,[102] and his father also had

4   a drug and/or alcohol abuse problem. In response to Berryman's woeful lack of personal resources to

5   cope with adult life, he began drinking, which Dr. White describes as a temporary solution that only

6   compounded his problems.

7          With respect to Dr. Pierce's trial testimony, Dr. White points out that due to inadequacies in trial

8   preparation, his diagnosis of possible organic brain damage was neither well-documented nor well-

9   received by the jurors.  Evidence which would have strengthened Dr. Pierce's clinical observations

10  include the juvenile records from Berryman's residence with his father from age 12 to 17, particularly

11  the lack of supervision by the father, the father's ambivalence in wanting to care for his son, and the

12  outright rejection by his mother.  The trial testimony of Berryman's mother and sister at trial did not

13  capture the mother's total un-involvement with her children.  The jurors were not informed that when

14  Berryman lived with his mother after the parents' divorce, that she relied on her parents to care for the

15  children.  Nor were the jurors (or Dr. Pierce) aware that Berryman had been molested by two of their

16  mother's brothers.  The fact that Berryman sustained a frontal blow to his head (from his wife striking

17  him with a flashlight) in 1986 also was not made known to Dr. Pierce for him to figure into his

18  evaluation.  It was this injury, and not the 1984 industrial accident which preceded Berryman's

19  debilitating headaches and a change in his previously docile behavior to someone who was violent (as

20  in the assault on Mr. Perez).

21                 **4.**   *Strickland* **Expert Testimony.**

22         In support of Claim 15, Berryman's retained *Strickland* expert, Stanley Simrin, has supplied a

23  declaration in which he testifies about deficiencies at both the penalty and guilt phase proceedings.  He

24  opines that the testimony of Drs. Pierce and Benson presented during penalty proceedings would have

25  been far more persuasive had Messrs. Soria and Peterson obtained the empirical test results from the

26  PET scan and alcohol induced EEG finally conducted in the year 2001.  In Mr. Simrin's opinion, trial

27

28         [102] Nothing observed in the record corroborates that Berryman's brother attempted suicide or that maternal relatives suffered from alcohol or substance abuse.

1   counsel were constitutionally incompetent for not exerting further effort to obtain these tests. He further

2   opines that the testimony of these experts coupled with the testimony of the doctors who conducted the

3   empirical tests would have made a significant difference to the guilt phase proceedings. The supported

4   diagnoses of Drs. Pierce and Benson would have challenged the prosecution burden of establishing

5   intent to kill, the intent to rape, premeditation, and deliberation.

6           **5.    Mr. Soria's Explanation for his Failure to Develop Mental State Evidence**

7                   **at Guilt Proceedings.**

8           Two of Mr. Soria's declarations are relevant to the discussion of mental state evidence

9   development. In a declaration dated August 20, 2001, he discusses his failure to obtain an alcohol

10  induced EEG or a PET scan. He states he tried to obtain the appropriate neurological tests in Kern

11  County, but that a PET scan wasn't available in Kern County, and efforts of defense investigator Doug

12  Lemmons to obtain an alcohol induced EEG in Kern County were rebuffed. Mr. Soria did not attempt

13  to obtain an order to have Berryman transported outside of the county to complete the tests because he

14  "did not know if the [trial] court would approve the transportation order." Later, in 1990, he learned that

15  such a transportation order was available, when he and Mr. Peterson represented subsequent capital

16  defendant in Kern County, John Lee Holt. A transportation order for Mr. Holt to submit to a PET scan

17  in Orange County (University of California at Irvine) was approved.

18          In a separate declaration, executed September 17, 2001, Mr. Soria explains his failure to

19  commission a social history of Berryman's background was because he "had not been introduced to the

20  practice of obtaining social histories in capital cases." Despite this omission, Mr. Soria did have one his

21  investigators, Mr. Beadle, interview family members to get a general idea of Berryman's family history.

22          **6.    Counter-Evidence Developed by the Warden.**

23          The Warden proffers one declaration and two reports with his opposition brief to Berryman's

24  evidentiary hearing request. The declaration is subscribed by board certified neurologist and psychiatrist

25  Marc R. Nuwer, a professor in the Department of Neurology at the U.C.L.A. School of Medicine. The

26  reports are over the signature of board certified specialist in Nuclear Medicine, Alan Waxman, M.D.,

27  who, at the time of his declarations was director of the Nuclear Medicine Department at Cedars-Sinai

28  Medical Center in Los Angeles. There are additionally eight exhibits attached to Dr. Waxman's reports.

1

**a.      Declaration of Marc R. Nuwer, Executed May 10, 2002.**

2      Dr. Nuwer reviewed the EEG recordings obtained and reported on by Dr. Raul Guisado.  The

3  measurement of Berryman's brain activity was performed in three trials.  The first trial was conducted

4  without alcohol, the second was with six ounces of alcohol and the third was with an additional six (for

5  a total of 12) ounces of alcohol.  All three were undertaken while Berryman was awake (although he

6  became drowsy during the third trial) and included respective three minute intervals during which

7  Berryman hyperventilated.

8      Dr. Nuwer reports that the "changes in the three EEGs are consistent with Mr. Berryman having

9  become severely intoxicated over the course of these tests. . . . [not showing] any other effects beyond

10  drowsiness.  In particular, there is no evidence of any epileptic activity or seizure-related activity or any

11  other pathological abnormality in the recording."  Dr. Nuwer disagrees with Dr. Guisado's conclusion

12  that the tracings shown on the third trial are consistent with anything pathological or seizure-related.

13  Even if there had been any seizure-related epileptic spikes or sharp wave discharges in the third trial

14  EEG (which Dr. Nuwer insists there were not), "that would not necessarily be a sign of a seizure

15  disorder."  Such spikes and wave discharges in fact are common in patients who experience no seizures.

16  Further, EEGs, in general, are not diagnostic, but, rather, used to confirm a clinical suspicion.  Actual

17  seizures are identifiable by the patient's conduct, specifically, falling to the ground (convulsion) or

18  succumbing to a blank stare (partial seizure), both followed by disorientation and sleepiness.  After a

19  seizure, a person may try to run away and may resist people who try to restrain them.  Violent activity

20  committed during this period would be simple and non-directed.  Complex tasks, as in being able to

21  "carry out a plan of action" are not performed by people in a convulsion, a partial seizure, or in the state

22  of disorientation which follows.  Dr. Nuwer further opines that people in these states generally do not

23  commit violent acts.  Under the facts in the case, Dr. Nuwer concludes that Berryman's conduct

24  (disrobing the victim, stabbing her, and having sexual intercourse) were inconsistent with him having

25  had a seizure.

26      Dr. Nuwer also comments on the Quantitative EEG (QEEG) test results (i.e., topographic maps

27  showing bilateral temporal slowing of electrical waves) obtained by Dr. Guisado.  First Dr. Nuwer

28

1    opines that the results show normal EEG brain waves.  Second, he states that the QEEG has a poor

2    reputation for accuracy in the medical community and definitely was not accepted in 1988.

3                    **b.      Reports of Alan Waxman, Dated May 14, 2002.**

4          Dr. Waxman gives extensive information about his knowledge and qualifications to testify about

5    brain imaging procedures, particularly PET scans.   He begins his report by explaining his

6    "understanding" of the current view that "PET scanning has not been generally accepted by the scientific

7    community as a means of diagnosing traumatic brain injury, [e]specially in minor head trauma when the

8    scans are performed at a time remote from the injury."  Later in his report, he states, "It would be counter

9    intuitive to assume that functional brain imaging would have been acceptable in 1988" for mild head

10   trauma or alcoholism.

11         Dr. Waxman explains that in order to properly interpret PET scan results, there must be a control

12   group of normal database subjects to which individuals with alcoholism and/or mild head trauma can

13   be compared.  Further, interpretation of results would have to be accomplished by readers who are

14   "blind" to whether results being interpreted are from afflicted or normal subjects.  Because of the paucity

15   of information for evaluating mild head trauma patients, the Society of Nuclear Medicine as well as the

16   American Academy of Neurology have suggested caution using PET brain studies.  Dr. Waxman

17   continues that "[s]ensitivity, specificity, accuracy, negative and positive predictive value must be

18   determined to be acceptable before a test can be widely used.  This has **<u>not</u>** been done for head trauma

19   or toxic exposure (including alcohol)."  (Double emphasis in original.)  Rather accepted uses for

20   functional brain imaging (PET scans) include evaluating stroke, dementia (especially Alzheimer's), and

21   epilepsy.  Poor study designs not using a double blinded technique contribute to inaccurate results.

22   Interpretative errors are also a risk.

23         Dr. Waxman opines that Dr. Wu's report of Berryman PET scan demonstrates interpretative

24   error.  First Dr. Waxman points to Dr. Wu's conclusion that metabolic activity was lower in the right

25   temporal pole than in the left.  In Dr. Waxman's view, this difference is inconsequential because

26   temporal asymmetry increases as a person ages.  The difference in Berryman's temporal lobes is not

27

28

1  significant for a man of 36 years old.[103]  In any event, Dr. Waxman, himself, was unable to detect any

2  significant temporal asymmetry.  Dr. Waxman notes that the physician who initially read the PET scan

3  at the Northern California PET Center, Dr. Peter Vaulk, also found the scan to be normal, i.e., did not

4  detect any significant abnormalities (including temporal asymmetry).  In fact, the result of Berryman's

5  study "is entirely within normal limits with no significant asymmetries identified."

6       Dr. Waxman further points out that the control database which Dr. Wu used to compare

7  Berryman's scan results fails to show any real differences.  In fact 15 of the 56 subjects in the database

8  show temporal asymmetries equal to or greater than those shown on Berryman's scan.[104]  Based on the

9  fact "that there are no metabolic abnormalities demonstrated on the Berryman's scan, Dr. Waxman's

10  opines that Dr. Wu "incorrectly analyzed the scan on Rodney Berryman." Dr. Waxman agrees "entirely"

11  with the physician at the site where the PET scan was conducted, Dr. Vaulk, that Berryman's scan was

12  within normal limits.

13       In his second report, Dr. Waxman discusses a supplemental report which Dr. Wu prepared

14  concerning Berryman's PET scan.   Specifically, Dr. Wu provided a quantitative assessment showing

15  the difference in temporal lobe function (between the right and the left) of 33.8%, whereas the mean

16  temporal lobe difference in the normal database was 1%.  Dr. Waxman explains that this is intended to

17  imply that Berryman's temporal lobe differential is abnormal.  In Dr. Waxman's opinion, these figures

18  are not valid for demonstrating a disparity in the functioning of Berryman's right and left temporal lobes.

19  This follows from the fact that the 1% mean temporal lobe difference Dr. Wu found in his normal

20  database subjects was achieved by averaging the mean differences, which has the effect to minimizing

21  normal asymmetries.  Dr. Waxman indignantly states that Dr. Wu's method in this regard "is intended

22  to mislead the reader by suggesting that normal individual subjects have no asymmetries of the temporal

23  lobe."   (Emphasis in original.)   Dr. Waxman describes the whole quantitative comparison as

24  inappropriate: "It is much worse than comparing apples to oranges, it is comparing apples to bricks."

25

26       [103] Berryman actually was 35 when the scan was performed in July 2001.

27       [104] The exact language in the report is "at least 15 of the 56 normal subjects with temporal asymmetries present which are equal to greater than the PET brain scan on Rodney Berryman." The Court interprets the phrase, "equal to greater than" to mean, "equal to **or** greater than . . ." The Court

28  views the omission of the word "or" to be a typographical omission.

1    Next, addressing scientific acceptability of PET scans, Dr. Waxman notes that only recently, and

2    certainly not in 1988, have PET scans been approved for epilepsy reimbursement as a clinically accepted

3    procedure.  But the significant findings for finding epilepsy are mesial temporal lobe decreases.  In

4    Berryman's scan, there are no asymmetric regions in the mesial temporal regions to suggest temporal

5    lobe epilepsy.

6            **B.      Berryman's Contentions.**

7            As noted in the discussion of Claims 4, 5, 27, and 28, *see* Part VI., *supra*, Berryman's claimed

8    mental impairments and deficiencies are numerous.  He is said to suffer from permanent pre-existing

9    mental disorders, severe mental and emotional impairments, the pervasive effects of organic brain

10   disease with resulting limited intellectual and cognitive capacity, overwhelming developmental trauma

11   including neglect, abandonment, physical abuse, emotional abuse, sexual abuse,  plus, from the death

12   of his father, post-traumatic stress disorder, depression, paranoia, and substance abuse.

13           Berryman argues that evidence adduced during guilt phase proceedings, coupled with what was

14   presented at penalty proceedings, would have supported a mental state defense to defeat the prosecution

15   burden of establishing intentional killing, rape (or attempted rape), premeditation and deliberation.  He

16   claims he was too impaired to have known what he was doing when he stabbed Ms. Hildreth,

17   maintaining either that he did not become impaired until after the two engaged in consensual intercourse

18   or alternatively that the sexual attack possibly also was seizure related.  Relying solely on the evidence

19   developed for the penalty phase, as actually presented, to support a mental state defense, Berryman

20   focuses on his excessive alcohol consumption.  Although Penal Cole § 25(a) prohibited evidence of

21   diminished mental capacity at the time of his trial, voluntary intoxication or other mental conditions

22   nonetheless could have been considered by the jury.  In support of this argument, Berryman cites to

23   *People v. Molina*, 202 Cal. App. 3d 1168, 1173 (1988) (holding "an expert may testify regarding the

24   defendant's mental condition so long as the expert gives no opinion on the ultimate question of whether

25   or not the defendant actually had the requisite mental state"), *disapproved on other grounds, see People*

26   *v. Salle*, 54 Cal. 3d 1103, 1114, 1115-16 (1991), and *People v. Range*, 11 Cal. App. 4th 291, 302 (1992)

27   (holding evidence of voluntary intoxication would be admissible on the issue of a defendant's capacity

28   to harbor the requisite mental state).

1    The expert testimony of Dr. Benson, in particular, would have been key to establishing that the

2 increase in Berryman's alcohol consumption caused seizures manifested by the escalation of angry and

3 violent incidents (such as the altercation with motorist David Perez).  A finding of such resultant seizure

4 activity would have challenged the jury finding that Berryman intentionally killed Ms. Hildreth, a finding

5 that was required under then existing California law.  *See Carlos v. Superior Court*, 35 Cal. 3d 131, 142

6 (1983).  Berryman argues that his trial attorneys failed to consult adequately with the retained experts

7 in advance of the guilt phase, and thus the decision not to put on a mental state defense was uninformed.

8    Berryman further argues that the medical opinions of Drs. Pierce and Benson really only supplied

9 a partial mental defense and that trial counsel should have done much more, including commissioning

10 a social history, and obtaining neurological tests, notably an alcohol induced EEG and a PET scan.

11    **C.    Analysis.**

12    The analysis of Claims 15 and 16 follows the standard in *Strickland v. Washington*, 466 U.S. 668.

13 To obtain habeas relief, Berryman must establish both deficient performance and prejudice.  With

14 respect to deficient performance, he carries the burden of demonstrating that his attorneys' performance

15 fell below an "objective standard of reasonableness."  *Id.* at 688.  This assessment, however, must be

16 made "from counsel's perspective at the time," so as "to eliminate the distorting effects of hindsight."

17 *Id.* at 689.  In assessing trial counsel's performance, there is a "strong presumption that counsel's

18 conduct falls within the wide range of reasonable professional assistance." Accordingly, "[j]udicial

19 scrutiny of counsel's performance must be highly deferential."  *Id.*  To establish prejudice, Berryman

20 must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the

21 proceeding would have been different."  *Id*. at 694.  A reasonable probability is a probability "sufficient

22 to undermine confidence in the outcome."  *Id.*  Where individual deficiencies are not by themselves

23 sufficient to meet the *Strickland* prejudice standard, relief may be available when the deficiencies are

24 considered cumulatively.  *See Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).  Before addressing

25 the performance and prejudice prongs, the Court registers overall comments about both parties'

26 arguments.

27

28

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd        123

1          **1.      Overall Comments.**

2          As a preliminary matter, the Court is puzzled by Berryman's proffer of evidence in support of

3    an evidentiary hearing regarding Claim 15.  Whereas Claim 15 alleges ineffective assistance of counsel

4    for the failure to present at the guilt phase proceedings the evidence that actually was presented during

5    penalty proceedings, the proffered evidence consists of new declarations of the trial experts based on

6    neurological tests that were not performed during the state trial proceedings.  Reliance on this additional

7    evidence contradicts the gravamen of Claim 15, and conflates Claim 15 with Claim 16 (that additional

8    evidence should have been presented).[105]

9          On the Warden's side, the Court similarly is baffled by the repeated insistence that Drs. Pierce

10   and Benson did not (at trial) request further expert assistance in diagnosing Berryman's organic brain

11   dysfunction.  To the contrary, both have provided declaration testimony, and even trial testimony, that

12   they repeatedly urged trial counsel to obtain the neurologic tests to confirm their diagnostic impressions.

13   Similarly, both doctors have provided post-conviction testimony that they believed their impressions of

14   Berryman would have been helpful in formulating a mental state defense to the capital murder charge

15   during guilt proceedings.  Another wholly unsupported argument is that the experts testified Berryman

16   did not suffer from any serious psychological disorder.  This was the very argument Mr. Moench

17   advanced both during cross examination of Dr. Pierce and on summation.  During cross examination,

18   his efforts to label degrees of psychological impairment, however, were curtailed by the trial judge.

19   Whether psychosis is more serious than neurosis was determined by the trial judge to be irrelevant to

20   Dr. Pierce's testimony.  Both Dr. Pierce and Dr. Benson believed that Berryman's organic brain disorder

21   was a serious psychological impairment.  Putting these matters aside, Berryman's ineffective assistance

22   of counsel claims are reviewed under *Strickland v. Washington*.

23         **2.      The Performance Prong.**

24         With respect to the claim that a social historian should have been retained, no evidence is offered

25   (notably from Berryman's *Strickland* expert, Mr. Simrin) to the effect that the standard capital defense

26   practice in 1987 and 1988 dictated that Kern County counsel should to obtain a social history.  Thus, Mr.

27   _____

28         [105] The primary reason Claims 15 and 16 are discussed together is that the Court views the
     evidence proffered with the evidentiary hearing request actually supports Claim 16 more than Claim 15.

1  Soria's declaration that he was unacquainted with the practice for commissioning social histories in 1987

2  and 1988 is accepted as reasonable attorney performance under *Strickland*.

3          The matter of whether counsel were constitutionally deficient for failure to press for neurological

4  tests in or outside of Kern County is less clear cut on the present showing.  Berryman's theory of attorney

5  incompetence is the failure of Messrs. Soria and Peterson to provide Drs. Pierce and Benson with the

6  means to confirm their diagnostic impressions that Berryman suffers from an alcohol induced seizure

7  disorder.  Indeed, the prosecutor, Mr. Moench, emphasized at trial there was no empirical support for

8  this diagnosis.  He even went so far as to suggest that the defense team purposefully failed to obtain the

9  indicated neurological tests so the experts would have "something to talk about" during their testimony.

10 From the defense stand point, what was lacking was empirical support for the notion that Berryman

11 suffered from an alcohol induced seizure at the time of the crime.

12         In this case, alleged deficient performance necessarily overlaps with whether empirical test

13 results would support the existence of a seizure disorder.  Evidence establishing existence of a seizure

14 disorder, in turn, is an element of the prejudice inquiry.  If the empirical test results would have

15 supported the experts' diagnostic impression of the existence of a seizure disorder, the Court could

16 conclude counsel were constitutionally ineffective for failing to obtain those tests.[106]  The parties'

17 respective experts, however, do not agree on the import of the test results.  Drs. Pierce, Benson, Wu, and

18 Guisado claim the tests do support the existence of a seizure disorder.  Drs. Nuwer, Vault, and Waxman

19 conclude they do not.[107]

20         The Court is not able to resolve the conflict without further examination, including cross

21 examination, of the experts and the data relied on by the experts.  The Court would need to assess

22 witness demeanor and credibility.  *See Earp v. Ornoski*, 431 F.3d at 1170 (holding that where

23 declarations are submitted as offers of proof for an evidentiary hearing, the veracity of the declarants

24

---

25     [106] The other significant element of prejudice is whether the verification of a seizure disorder
26 supports the contention that Berryman was mentally impaired on the night of the crime.

27     [107] The Warden's argument extends even further – to the contention that the test results
   themselves are not admissible because they are not and were not accepted in the scientific community,
28 now or at the time of trial, citing *People v. Kelly*, 17 Cal. 3d 24, 30 (1976), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

1  cannot be determined without the court conducting a hearing where credibility and demeanor are

2  assessed by the judge). For the sake of proceeding with the second element of prejudice, that is, whether

3  the presence of a seizure disorder would have supported a viable mental state defense, the Court will

4  assume *arguendo* that the test results do support the existence of a seizure disorder.

5                    **3.      The Prejudice Prong.**

6        What really is at issue here is the relative impact between what was presented during guilt

7  proceedings, and what Berryman alleges could have been presented, both in terms of what was presented

8  during penalty proceedings and the additional proffered evidence, plus the evidence submitted by the

9  Warden. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding that in analogous examination of

10 penalty phase claim, assessing prejudice requires re-evaluating the prosecution evidence against the

11 totality of available defense evidence). Undertaking this task, the Court finds no reasonable probability

12 that the outcome of the guilt phase proceedings would have been different if the penalty phase and/or

13 additional evidence had been introduced (and admitted) at Berryman's guilt phase proceedings. *See*

14 *Strickland*, 466 U.S. at 694.

15       Drs. Pierce, Benson, and White all have carefully documented Berryman's history, revealing a

16 tumultuous childhood, with unhappy parents, turmoil, changing schools, and lack of supervision. These

17 factors have led the experts to opine that Berryman suffers from a personality disorder. The doctors

18 additionally document that Berryman, a charming and good-looking young man, experienced a great deal

19 of difficulty in intellectual functioning, possibly due to his premature birth and poor post-natal care. Drs.

20 Benson and Pierce further opine that Berryman suffers from an organic brain disorder which could have

21 caused alcohol induced seizures and the type of aggressive behavior consistent with killing Ms. Hildreth

22 in a rage. The three factors offered in support of this conclusion are (1) the EEG and PET scan results,

23 (2) Berryman's excessive alcohol consumption and/or alcoholism, and (3) two head injuries within the

24 two years prior to Ms. Hildreth's death.[108]

25

26

---

27       [108] For purposes of this analysis, the Court accepts the fact that Berryman sustained one or more
28 head injuries with two years prior to Ms. Hildreth's death, and that these injuries were caused by a fall
    from construction equipment and being struck on the head by a metal flashlight.

With respect to the post-conviction "discovery" that Berryman was sexually molested as a child by two of his mother's brothers, the Court specifically rejects the notion that Berryman's mental or emotional problems are attributable to sexual abuse.  The proffered evidence of Berryman's molestation, that is, declarations of Berryman's mother and sister about what Berryman told them when they visited him in the Kern County Jail for the present offense, even setting aside hearsay considerations, *see* Federal Rules of Evidence, 802, 803 and 804, is not reliable.  Neither Berryman's mother nor his sister are independently competent to testify about what happened to Berryman as a little boy, because they were not percipient witnesses and only learned about the alleged sexual abuse years later.  Moreover, Berryman never told any of his examiners, the social historian, or even counsel about his sexual abuse. The Court concludes that Berryman's proffered expert opinion of mental impairment, to the extent it is said to be due to sexual molestation, is not "based on sufficient facts or data" required under Federal Rule of Evidence 702.

On the other hand, the Court accepts the fact that in the months following the head injury described in Dr. White's social history, Berryman's alcohol consumption increased and his response to conflict became increasingly violent.  These violent episodes included Berryman's attack on Mr. Perez, an argument with his mother (over pick up truck tires), his altercation with his father-in-law, Rev. Fuller, and ultimately the sexual assault and stabbing death of Ms. Hildreth.  Acceptance of the chronology of violent acts following head injuries, however, does not signal the Court's endorsement of the theory that alcohol induced seizures were causative of the violence.  Even with the addition of the neurological test results, which are assumed for the sake of argument to support the presence of a seizure disorder, Berryman has come no closer than he did at trial to establishing he actually experienced a seizure when he attacked Ms. Hildreth.

First, there is no dispute about what a seizure means.  When a person experiences a seizure or partial seizure, he loses consciousness or partial consciousness, perhaps succumbs to convulsions, loses track of what he is doing, becomes disoriented, and cannot remember what he did while experiencing the seizure.  Although he may exhibit aggressive behavior, this behavior consists of non-directed violence, such as toward a person who might be trying to come to his aid.  He would not be able to perform complex tasks such as carrying out a plan of action or engaging in forcible sexual intercourse.

1  Even Dr. Benson conceded during his trial testimony (on cross examination) that if Berryman had

2  experienced an alcohol induced seizure, he would not have been able to commit rape or attempted rape.

3        The evidence, however, clearly demonstrates that significant goal-directed violence and sexual

4  assault was perpetrated against Ms. Hildreth at the location of her death.   Contrary to Berryman's

5  contention, the evidence does not support the notion that intercourse between Berryman and Ms.

6  Hildreth was voluntary.  Accepting the proffered evidence that Ms. Hildreth had been in Berryman's

7  truck before the crime and that he and Ms. Hildreth were seen together by the concessionaires at Lake

8  Woollomes within two weeks of her death, the fact they may have been together is not sufficient to raise

9  even an inference the sexual contact inflicted on Ms. Hildreth before her death was consensual.   In the

10  first place, as reported in Mr. Morris's notes of his interview with Ms. Hildreth's aunt, Brenda Clark,

11  she stated she didn't care for him. More significantly, the condition of Ms. Hildreth's body showed clear

12  indications of a struggle.  Her upper garments were pulled over her breasts.  Her lower garments were

13  pulled off her right leg completely but still around her left ankle.  Her legs were separated and her arms

14  were extended out to the sides of her body with her elbows bent over her head suggesting she had been

15  pinned down on the dirt.  There were circular impressions in the dirt that appeared to have been made

16  by her buttocks and thighs.  She had a stab wound in the right front neck region, abrasions on both sides

17  of her neck, abrasions on her right pelvis, and a patterned abrasion on her face over her right cheek and

18  jaw.  Further, there were drag marks in the dirt and no foot or sandal prints associated with her feet.

19  Moreover, with Dr. Holloway conducted the autopsy, he noted she had sustained a blow to the left side

20  of the back of her head, which contributed to her death.  Whether Berryman drank excessively or not,

21  the condition of Ms. Hildreth's body and the crime scene amply indicate that she was subjected to goal

22  directed violence.  She was dragged or carried (not escorted) from Berryman's truck to a dirt clearing,

23  had her clothes rearranged to give Berryman access to her breasts and genitalia, was struck or grabbed

24  harshly, subjected to some sort of sexual intrusion,[109] sustained a stab wound to her neck which caused

25  her to bleed to death, and finally suffered from having Berryman apply sustained pressure to her face

26

27      [109] The sufficiency of the evidence to support rape as well as the constitutional adequacy of the
rape instructions are discussed in connection with Claims 12, 29, 35, 50, 71, and 71A.  *See* Part XIX.,
28  *infra*.

with his shoe.  Even if Berryman did not take Ms. Hildreth to that remote place originally with the intent to kill her, but rather intended to engage in consensual sexual intercourse, at some point, Ms. Hildreth's resistance became clear, and Berryman overcame that resistance with deadly force.  His conduct, as evidenced by the scene of the crime, was not consistent with voluntary intercourse or a seizure.[110]  The absence of evidence that Berryman's alcohol induced seizure disorder was a factor at the time of the crime forecloses his ineffective assistance of counsel claim challenging the failure of Messrs. Soria and Peterson to develop a mental state offense.  *See Henley v. Crist*, 67 F.3d 181, 186-87 (9th Cir. 1995) (in federal habeas proceedings, no expert testified that the petitioner was mentally impaired *at the time* of the crime).

Considering all the evidence, both offered in post-conviction proceedings and adduced at trial, the introduction of mental state evidence during guilt phase proceedings would not have altered the verdict of first degree murder or the finding as true the rape murder death eligibility special circumstance.  Neither the neurological tests nor Dr. White's social history report connect Berryman's mental problems with his conduct on the night he killed Ms. Hildreth.  The proffered evidence does not satisfy Berryman's burden of demonstrating a reasonable probability of a different outcome.  The alleged inadequacies in mental defense development did not lead to Berryman's conviction.  Rather, it was the fact that he took Ms. Hildreth out to a remote agricultural area, sexually assaulted her and then stabbed her, that led to his conviction.  Claims 15 and 16 are denied.  The request for an evidentiary hearing as to Claim 15 is denied.

---

[110] In further support for this conclusion, the Warden points to the testimony of Crystal Armendariz, Andrew Bonner, and Melinda Pena that although Berryman had been drinking on the night of Ms. Hildreth's death, he did not appear intoxicated, was able to function normally, including having sexual intercourse with Ms. Pena, driving to various locations, and conversing with members of the Clark-Bonner-Armendariz household.  The Court considers this evidence along with the concession of Dr. Benson that a person in the throes of a seizure would not be able to perform complex tasks, including rape.

XIII.    **Berryman's Assertion that His Attorneys' Were Constitutionally Incompetent for Failure to Adequately Review and Develop Forensic Tire Track Evidence (Claim 30).**

In Claim 30, Berryman alleges ineffective assistance of his trial counsel for failure to adequately prepare the defense criminalist, Stephan A. Schliebe, to challenge the tire track evidence linking Berryman to the crime scene.  He does not request an evidentiary hearing for this claim.

**A.    Statement of the Facts Relevant to the Defense Criminalist.**

As noted in the summary of the guilt phase proceedings, Mr. Moench presented circumstantial evidence that Berryman's pick up truck had been at the scene of Ms. Hildreth's murder.  The evidence supporting this contention was presented in the form of photographs of tire tracks observed by investigators at the crime scene when compared to "tire roll" tests of actual tires seized from Berryman's truck and the Clark residence.  Defense expert, Mr. Schliebe, testified to cast doubt on this theory.  Mr. Moench, however, brought out on cross examination that Mr. Schliebe did not examine the actual tires seized from Berryman's pick up truck, although they were made available to him.  *See* Part III.A., *supra*.  Rather, Mr. Schliebe's analysis was limited to examination of "tire rolls" prepared by prosecution criminalist, Mr. Laskowski, and comparison photographs of the crime scene.  Nonetheless, Mr. Schliebe testified that one of the prosecution test impressions did show a consistent pattern with a photograph of a tire track at the crime scene, even though none of the comparison photographs showed an exact match.  The tire roll with the consistent pattern to the crime scene was the limited spare.

**B.    Berryman's Contentions.**

Berryman relies on *Strickland v. Washington*, 466 U.S. 668, for his challenge to the constitutional adequacy of his trial counsel.  In addition, he cites *Ake v. Oklahoma*, 470 U.S. 63 (1985), for the proposition that the Constitution grants criminal defendants the right to services ancillary to effective legal representation, including appointed experts.  He claims that because Mr. Schliebe was not afforded an opportunity to review exhibits in a meaningful manner, the prosecution was able to capitalize on his lack of preparation during cross examination.  Berryman clarifies in his traverse, that this cross examination adversely impacted Mr. Schliebe's credibility to the jury.  He concedes that "Mr. Schliebe's opinion would not have been any different had he viewed the tires . . . [b]ut his opinion would not have been so easily discounted by the prosecutor *and the jury* for lack of preparation." (Emphasis added.)

1

**C.      Analysis.**

2

With respect to Mr. Schliebe's preparation, the California Supreme Court held:

3

> [D]efendant does not establish ineffective assistance in defense counsel's asserted failure
> to more fully prepare criminalist Schliebe for his testimony.  He does not demonstrate that

4

> fuller preparation would have yielded favorable results.  Hence, he cannot
> demonstrate that its omission adversely affected the outcome within a reasonable

5

> probability.

6

6 Cal. 4th at 1082.

7

As Claim 30 is clarified by Berryman's traverse, however, the Court understands that he is not

8

claiming different or more favorable testimony would have resulted from better preparation, and thus,

9

the California Supreme Court decision is inapposite.  Rather, he is claiming that Mr. Schliebe's

10

credibility was damaged under Mr. Moench's cross examination.  The claim is without merit.

11

As a preliminary matter, Berryman's reliance on *Ake*, 470 U.S. 68, for the proposition that he has

12

a constitutional right to the assistance of a forensic expert on his litigation team is unsupported.[111]  *Ake*

13

stands for the proposition that a criminal defendant who demonstrates his sanity at the time of the

14

offense is likely to be a significant factor in determining guilt is constitutionally entitled to the assistance

15

of a psychiatrist at state expense.  *Id*. at 83.  The obligation for expert assistance in *Ake* is limited to

16

psychiatric experts and in no way extends to Mr. Schliebe.

17

Second, addressing the issue of prejudice as originally framed, Berryman has not established any.

18

Berryman hasn't alleged that Mr. Schliebe's credibility was determinative to the outcome of the guilt

19

verdict.  Besides, the idea that rigorous cross examination by Mr. Moench significantly diminished Mr.

20

Schliebe's conclusions to the jury is speculative.  Even if an offer or proof in this regard has been made,

21

it would be rejected because juror impressions in the deliberative process would be strictly proscribed

22

under Federal Rule of Evidence 606(b).

23

Claim 30 is denied.

24

25

26

27

_____

28

[111] The fact that Berryman does not provide a point-page reference to his *Ake* citation is not lost on the Court.

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd          131

1    **XIV.    Berryman's Assertion of Trial Error for the Trial Court's Overruling Defense Objection**

2    **to Questions Concerning Compensation Paid to Defense Forensic Expert (Claim 31).**

3    In Claim 31, Berryman challenges the trial judge's failure to sustain a defense objection to the

4    prosecution question about Mr. Schliebe's compensation.  No evidentiary hearing is requested.

5        **A.    Statement of Facts Relevant to Evidence of Defense Expert Compensation.**

6    During cross examination of Mr. Schliebe, Mr. Moench asked him what his fee was for the

7    examination of the exhibits which were the subject of his testimony.  Mr. Soria immediately objected

8    and there ensued a lengthy side bar conference.  RT-22: 3116-20.  Following a review of authorities

9    including Penal Code § 987.9 and Evidence Code § 352, the trial court ultimately overruled the

10   objection.  When the question was reiterated, Mr. Schliebe responded, "Are you interested in knowing

11   what Cal Lab charges for my time or my monthly salary?"  Mr. Moench replied, "assume Cal Lab

12   presented a bill to the defense on this particular thing, how much were you and/or your business

13   compensated for this?" Mr. Schliebe then testified that his bill for reviewing evidence was $2,500 and

14   $1,300 for giving his testimony.  *Id*.: 3121.

15       **B.    Berryman's Contentions.**

16   In his argument, Berryman acknowledges the California Supreme Court decision upholding the

17   trial court ruling on the grounds that Evidence Code § 722(b) permits evidence of compensation and

18   expenses paid to expert witnesses and that Penal Code § 987.9 (providing a confidential procedure for

19   indigent criminal defendants to obtain investigative and expert funding) provides no exception.  *See* 6

20   Cal. 4th at 1071.  He does not appear to dispute the applicability of Evidence Code § 722(b) whether the

21   expert is an independent contractor or is self-employed.  He complains, however, that the California

22   Supreme Court failed to take into account that Mr. Schliebe was employed by Cal Lab as a salaried

23   employee and would receive the same salary whether he testified or not.  He claims a salaried employee

24   testifying for the defense is no more subject to impeachment than a salaried employee testifying for the

25   prosecution, and since impeachment under § 722(b) is not available for salaried prosecution witnesses,

26   the statute discriminates. He provides no further information or argument.

27

28

1

**C.     Analysis.**

2

The starting point for analyzing Claim 31 is § 722 of the California Evidence Code.  Subsection

3

(b) provides that "compensation and expenses paid or to be paid to an expert witness *by the party calling*

4

*him* is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and

5

the weight of his testimony."  (Emphasis added.)

6

The Court understands Berryman's argument to be that expert witnesses who testified in the

7

People's case were not subject to the impeachment provisions of Evidence Code § 722(b), and that this

8

disparate treatment between prosecution and defense experts amounts to a constitutional violation.  This

9

would include criminalist Gregory Laskowski, pathologist, John E. Holloway, M.D., serologist Gary

10

Clayton Harmor, and fingerprint technician Opal L. Chappell.  However, all of these experts except

11

serologist Gary Clayton Harmor were employed by the Kern County government.  Dr. Holloway was

12

employed by the Kern County Coroner's Office, RT-17: 2256, Ms. Chappell was employed by the Kern

13

County Sheriff's Department,  RT-18: 2413, and Mr. Laskowski was employed by the Kern County

14

Regional Criminalistics Laboratory,  RT-19: 2600.  Accordingly, they would not have had their fees or

15

expenses paid for by the party calling them, within the meaning of § 722(b).  Only Mr. Harmor was

16

employed by a private company, Serological Research Institute, RT-18: 2382.  But Berryman never

17

questioned Mr. Harmor about his compensation, although he could have done so under the statute.

18

There is no support in the record or the law for the discriminatory construction attributed to the

19

California Evidence Code by Berryman.

20

Claim 31 is denied on the merits.

21

**XV.   Berryman's Challenges to Sufficiency of the Evidence of Criminal Liability for Murder**

22

**(Claims 32 and 33).**

23

In Claims 32 and 33 Berryman claims the trial evidence was insufficient to sustain his murder

24

conviction.  Claim 32 alleges there was insufficient evidence to identify Berryman as the perpetrator.

25

Claim 33 alleges insufficient evidence to support first degree murder on alternate theories of

26

premeditated or rape murder.  Berryman does not request an evidentiary hearing for either of these

27

claims.

28

**A.      Statement of Facts Relevant to Berryman's Criminal Liability for Murder.**

As more fully set forth in the discussion of evidence presented during guilt phase proceedings, *see* Part III.A., *supra*, the combination of circumstantial evidence in six categories identified Berryman and his pick up truck as having been present at the crime scene where Ms. Hildreth was killed.  First, there were positive tire track comparisons between impressions documented at the crime scene and two tires on Berryman's pick up truck, plus a limited spare tire which recently had been removed from his truck.  Second, there were positive comparison's between shoe impressions at the crime scene, including on Ms. Hildreth's face, and the high top Brooks athletic shoes seized from Berryman at the time of his interview by investigators.  Third there was a positive correlation between a gold-colored chain link found at the crime scene and three gold-colored chain links found on the floor board of the cab as well as broken gold colored chain link necklaces hanging over the rear view mirror of Berryman's pick up truck.  Fourth, a latent finger print lifted off the inside passenger window of Berryman's pick up truck matched the print of one of Ms. Hildreth's thumbs taken at the autopsy.  Fifth, one of two pubic hairs found on Ms. Hildreth's face was said to have borne substantial similarities to Berryman's pubic hair samples.  Sixth, blood found on the canvas and on a shoe lace from Berryman's right (Brooks athletic) shoe was consistent with Ms. Hildreth's blood type.  Additional circumstantial evidence supports the notion that Ms. Hildreth was raped, that is a vaginal swab revealed small amount of semen, verifiable by the presence of spermatozoa[112] and the appearance of her body, as encountered by investigating authorities when they arrived at the scene.  Matters of timing from the testimony of Crystal Armendariz, David Castillo, and Lorene Louis also are fully recounted in the statement of facts from the guilt proceedings.  *See* Part III.A., *supra*.  In particular, both Mr. Castillo and Ms. Louis testified to have seen Berryman's pick up truck near the crime scene at a time that was after Berryman dropped Melinda Pena off at her house.  RT-19: 2585-86 (Castillo); *id*.: 2593-94 (Louis)  Next, as emphasized by the Warden, trial testimony of Thellas Sanders demonstrates Berryman's knowledge that Ms. Hildreth had been stabbed, before authorities had made this information public, and Berryman's attempt to construct an

---

[112] Berryman's challenge to the rape conviction and rape murder special circumstance finding describe evidence of rape in more detail.  *See* Part XIX., *infra*.

1  alibi for his whereabouts with Melinda Pena at the precise time Ms. Hildreth went missing and was

2  killed demonstrates a consciousness of guilt.  RT-17: 2319 (Sanders' testimony); RT-25: 3358, 3365.

3       It bears stating here that Mr. Moench conceded in his guilt phase summation that the evidence

4  supporting the People's case was largely circumstantial.  RT-25: 3340.  He emphasized, however, that

5  raping Ms. Hildreth was Berryman's goal and that the killing took place in the course of that act.   He

6  argued Berryman intended to kill her and also that he killed her because he didn't want her telling

7  Crystal about the sex (rape).  *Id*.: 3356.

8  **B.**  **Berryman's Contentions.**

9       Based on the timing of Berryman's departure from the company of Melinda Pena and his return

10  to the Clark residence, Berryman refers to the prosecution theory of his criminal responsibility for Ms.

11  Hildreth's murder as a physical impossibility.  Accordingly, he further argues that the jury's finding he

12  was the perpetrator of Ms. Hildreth's death as an unreasonable determination of the facts.  He stresses

13  he could not have committed sexual assault and murder of Ms. Hildreth, and then changed his tires

14  (specifically removing the limited spare, rim and all) from his pick up truck between the time he dropped

15  Melinda Pena off at her house and the time he returned to the Clark residence.

16       With respect to the alternate theories of first degree murder (premeditated and rape felony

17  murder), Berryman points out that the prosecution theory during summation was focused on rape felony

18  murder. He then recites a portion of Mr. Moench's summation from *the penalty proceedings* in which

19  he (Mr. Moench) described that Berryman killed Ms. Hildreth in a rage because he was upset she would

20  tell her cousin, Crystal, about "what happened."   Berryman implies the "what happened" refers to

21  consensual sex, and since Mr. Moench endorsed a view that the sex was consensual, the rape felony

22  murder theory is unsupported. He further points out there was no connection drawn between the small

23  amount of blood detected in Ms. Hildreth's vagina (along with the presence of spermatozoa) and vaginal

24  trauma.[113]   Acknowledging that Ms. Hildreth's upper garment was pulled up over her breasts and her

25  lower garment was pulled down around her ankles, Berryman suggests the "disarrangement" was

26

27      [113] In fact, as pointed out by Berryman's retained pathologist, Dr. Camparini, the presence or
absence of vaginal trauma has no bearing on whether sex was or was not consensual. *See* discussion of

28  Claims 12, 29, 35, 50, 71, and 71A, Part XIX.A.2.c., *infra*.

1    occasioned by voluntary intercourse and that the injuries to her body were inflicted after this voluntary

2    intercourse.

3            **C.      Analysis.**

4            In addressing the sufficiency of the evidence supporting the notion that Berryman was the

5    perpetrator of the crimes against Ms. Hildreth, the California Supreme Court held:

6            [A] rational trier of fact could surely have found beyond a reasonable doubt that
             defendant was in fact the perpetrator.  One need only recall the evidence relating to
7            defendant's pickup truck, its tires, and the tire tracks; defendant's shoes and the shoe
             prints, defendant's jewelry clasp; the abrasion on Hildreth's right cheek displaying a
8            pattern similar to that of the sole of defendant's right shoe; the stain on the shoelace of
             defendant's right shoe apparently produced by Hildreth's blood; defendant's and
9            Hildreth's pubic hairs found on the latter's body; Hildreth's right thumbprint on the
             inside surface of the passenger-door window of defendant's pickup truck; and
10           defendant's self-incriminating statements to friends and acquaintances and to
             investigating law enforcement officers.

11

12   6 Cal. 4th at 1083.

13           The California high court similarly found the evidence sufficient to establish commission of a

14   rape to sustain the first degree murder conviction under the rape felony murder theory.  6 Cal. 4th 1084.

15   The findings made by the trial court in denying Berryman's motion for judgment of acquittal pursuant

16   to Penal Code § 1118.1 also support the rape felony murder theory.  Notwithstanding evidence creating

17   doubt about the timing of Berryman's actions, these factual findings are fully sustainable by the record

18   and cannot be upset on federal habeas.  28 U.S.C. § 2254(d)(2).

19           Moreover, even were the Court to evaluate the sufficiency of the evidence, the standard, as

20   articulated by *Jackson v. Virginia*. 443 U.S. 307, 319 (1979), is whether "any rational trier of fact could

21   have found the essential elements of the crime beyond a reasonable doubt."  Viewed in the light most

22   favorable to the prosecution, as *Jackson* requires, *see id.*, at 326, the evidence is sufficient to support

23   both the finding of Berryman as the perpetrator and that first degree murder was, at a minimum,

24   supported by the rape felony murder theory.  Claim 32 and 33 are denied.

25   **XVI.   Berryman's Challenge to the Validity of the Special Circumstance Finding Due to**

26           **Omission of the Intent to Kill Requirement (Claims 34, 42, and 43).**

27           In Claims 34, 42, and 43, Berryman alleges the jury's death eligibility finding must be vacated

28   because the intent to kill requirement for the felony murder special circumstance under *Carlos v.*

*Superior Court*, 35 Cal. 3d 131, was not satisfied.  Claim 34 charges that to the extent he was convicted of first degree murder under the felony murder theory, the jurors were not instructed to find the killing was intentional.  Claim 42 alleges trial error and Claim 43 alleges ineffective appellate counsel for failure to effectively raise the trial error on direct appeal.  No evidentiary hearing is requested.

      **A.**     **Statement of the Facts and State of the Law Relevant to the Intent to Kill Requirement.**

      These claims involve the application of changes in California law after the populace enacted the 1978 death penalty law by initiative.  In *Carlos*, 35 Cal. 3d at 153-54, decided in 1983, the California high court held that intent to kill was a necessary element of the felony murder special circumstance.  This holding was overruled just four years later in *People v. Anderson*, 43 Cal. 3d 1104, 1147 (1987).  Since Ms. Hildreth was killed after *Carlos* was decided, but before *Anderson* was decided, Berryman's case is said to have been in the *Carlos* window, wherein the former rule applies.

      During jury selection, counsel and the trial court reviewed jury instructions to be read.  Based upon a change in the law occasioned by *People v. Anderson*, the trial judge, at Mr. Moench's urging, eliminated the instruction that felony murder special circumstance required intent to kill.  In fact neither the pre-trial instructions nor the pre-summation instructions, informed the jury of the intent to kill requirement.  Prior to the pre-summation instructions, however, Mr. Moench experienced a change of heart about the reach of the new rule announced in *Anderson*.  RT-25: 3281-82.  He conceded that because the present offense occurred during the *Carlos* window, the intent to kill requirement for the felony murder special circumstance had to be met.  To satisfy this requirement, a special verdict form was devised to confirm the jury's finding that Berryman intentionally killed Ms. Hildreth.  *Id*. Anticipating the special verdict form, Mr. Moench in his guilt phase summation, mentioned the fact that the jurors would be asked whether Berryman intentionally killed Ms. Hildreth if they returned a verdict of first degree murder. RT-25: 3330.[114]

---

[114] The Court has carefully read Mr. Moench's summation regarding the explanation of felony murder and the felony murder special circumstance.  In his summation there is quite a bit of overlap between felony murder concepts and second degree murder under the theory of implied malice.  He told the jury that felony murder permitted a first degree murder conviction even if the killing was unintentional, or accidental.  Then, without clearly defining the special circumstance finding, he stated that the killing had to be intentional.  Mr. Moench also was quite clear in his insistence that the killing

1    It was not until the post-summation instructions, however, just before the jurors were sent out

2    for deliberations, that the trial judge explained the verdict forms, including the intentional killing special

3    verdict.  Specifically, the trial judge instructed that if the jury unanimously and beyond a reasonable

4    doubt found Berryman guilty of first degree murder, the next step was to proceed to the special verdict

5    forms.  The first special verdict form addressed whether the murder was committed in the course of rape.

6    If so, then the jurors proceeded to the second form which required a finding on whether Berryman

7    intentionally killed Ms. Hildreth.   RT-26: 3467.   In returning the verdict, the jury responded

8    affirmatively to all three inquiries: yes to first degree murder; yes to the finding that the murder was

9    committed in the course of the rape; and yes to the finding that the killing was intentional.  As part of

10   the general instructions the jurors were told that they must agree unanimously on whether Berryman was

11   guilty of first degree murder "and any of the special findings" they were directed to make.  The general

12   instructions also informed them that the prosecutor's burden of proof was beyond a reasonable doubt.

13        **B.     Berryman's Contentions.**

14        Despite the fact that the jurors were exposed to the intent to kill requirement prior to their

15   deliberations, Berryman stresses that the intent element does not appear on the actual jury instructions

16   and there is no indication that the intent to kill finding was made upon the proper beyond a reasonable

17   doubt standard of proof.  He argues prejudice resulted because his intent to kill was a close question on

18   the facts of the case.  He claims that although the issue was raised on direct appeal, appellate counsel

19   rendered constitutionally ineffective representation because he failed to press the argument that the

20   special finding of intentional killing did not satisfy standard of proof and unanimity requirements.

21        **C.     Analysis.**

22        The California Supreme Court addressed the instructional omission of the intent to kill

23   requirement on direct appeal, holding that the trial court "did indeed err" for its failure to instruct on

24   intent to kill for the special circumstance finding. *Berryman*, 6 Cal. 4th at 1089.  Upon conducting

25   harmless error analysis, however, the court found the error to be harmless because of the special verdict

26   that Berryman intentionally killed Ms. Hildreth. *Id*.

27   ─────────────────────

28   was intentional.

The state court decision on the issue is entirely reasonable and fully supported by the record.  The

jury was adequately instructed on the intent to kill requirement by inclusion of the special verdict form,

the trial judge's instruction about the special verdict form, and the strenuous argument by Mr. Moench

that Berryman actually intended to kill Ms. Hildreth.  Further, the general instructions directed the jurors

to decide special findings unanimously and beyond a reasonable doubt.  The state court decision cannot

be disturbed on federal habeas.  28 U.S.C. § 2254(d)(1).  There is no basis to address the Warden's

*Teague* bar argument.  The Court also finds that Berryman's contention that the issue of his intent to kill

was a close questions is without foundation. Claims 34, 42, and 43 are denied on the merits.

**XVII. Berryman's Challenge to his First Degree Murder Conviction Due Errors Regarding the Order of Deliberations (Claims 37 and 49).**

In Claim 37, Berryman contends counsel were constitutionally ineffective for not objecting to

and securing a judicial clarification of the prosecutor's argument that the lesser included offenses to first

degree murder could not be considered unless and until the jury agreed beyond a reasonable doubt that

Berryman did not commit first degree murder.  In Claim 49 he argues trial error because the trial judge

failed to give adequate instructions on the order of deliberations concerning lesser included offenses to

first degree murder.  Berryman requests an evidentiary hearing with respect to Claim 37.

**A.       Statement of the Facts Relevant to Instructions on the Order of Deliberations.**

Second degree murder and voluntary manslaughter, as lesser included offenses of first degree

murder, were explained to jurors in pre-trial, pre-summation, and post-summation instructions.   In

addition, these lesser included offenses were addressed in Mr. Moench's summation.  As far as the actual

instructions, read to the jury both before and after the presentation of evidence, the trial judge instructed:

> Now, murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine and state in your verdict whether you find the murder to be in the first or second degree.

> If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but have a reasonable doubt as to whether such murder was of the first or the second degree, you must give the defendant the benefit of the doubt and return a verdict fixing the degree as second degree.

> Now, if the jury is not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, that being the offense of murder, and it unanimously so finds, it may convict him of any lesser offense, if the jury is convinced beyond a reasonable doubt that the defendant is guilty of such lesser offense.

1   RT-25: 3310.

2          After these instructions were read, Mr. Moench delivered his summation, including a description

3   the manner in which jurors were to consider the varying degrees of murder in completing the anticipated

4   verdict forms.  The issue of his summation on this subject has been addressed in the discussion of Mr.

5   Moench's judge-elect status in Claims 7, 8, 9, 10, and 23, Part VII., *supra*.  Specifically, Mr. Moench

6   misspoke when explaining the order of deliberations on the various degrees of homicide.  He stated:

> Only if, and you would have to find beyond a reasonable doubt, and unanimously, everyone on the jury would have to agree beyond a reasonable doubt that he did not commit a first degree murder.

> Only if everyone of you, beyond a reasonable doubt believed that he [Berryman] did not commit a first degree murder, then and only then would you go down and consider murder second, or voluntary manslaughter.

> . . .  And only if there is a unanimous not guilty verdict in this area, then you would go down to this, then you go down to murder second.

13   RT-25: 3332.

14         At this point in Mr. Moench's summation, the trial judge interrupted and called for a side bar

15   conference.  During the side bar conference, the trial judge stated to counsel:

> Let the record reflect we're at side bar, out of the hearing of the jury. [¶] There's a little concern, unless I misunderstood your argument, it sounded like you indicated to the jury that they had to find the defendant not guilty beyond a reasonable doubt, in other words, have to determine beyond a reasonable doubt that he was not guilty of first before they can go down to second.  If – I may have misunderstood your argument, but that's kind of the way it sounded to me.

20   *Id*.: 3333.  In response, Mr. Moench said he would clarify the matter.  Following the side bar conference,

21   Mr. Moench clarified:

> If and only if you find unanimously the defendant is not guilty of Count 1, that is, this first degree murder, then you would move down to count two.

> If you find him guilty beyond a reasonable doubt of Count 1, you don't have to do anything – let me try that again.

> If and only if you find him not guilty of the first degree murder in Count 1, and you have to make that finding unanimously, that after a unanimous finding, then you would sign the verdict that says we find the defendant to be not guilty of first degree murder.

> Now, that's unanimous decision on your part.  Then you would go down and discuss and decide on whether or not he was guilty of the second degree murder, which is a lesser

1   included offense of Count 1, and if you find him guilty beyond a reasonable doubt, that would have to be unanimous, then you would sign the verdict form.

2

3   If you find him to be not guilty of the lesser included offense of murder second, and you would have to make that finding unanimously, then and only then you go down to the voluntary manslaughter consideration.

4

5   *Id*. 3334-35.

6   Prior to sending the jury out for deliberations, the trial judge explained the verdict forms:

7   Now, the Court will provide you with the verdict forms as to each count charged and for the lesser offense to the Count 1.

8

. . .

9

10  Now, if you unanimously agree that the defendant is not guilty of murder in the first degree, you will have your foreman date and sign the not guilty verdict of the offense of murder in the first degree, and then you will go on to your determination of whether the defendant is guilty or not guilty of murder in the second degree.

11

12

. . .

13  Now, if you unanimously agree . . . that the defendant is not guilty of murder in the second degree, and then you will determine whether the defendant is guilty or not guilty of the lesser included offense of voluntary manslaughter.

14

15  If you unanimously agree that the defendant is guilty or not guilty of the lesser and included offense of voluntary manslaughter, you will have your foreman date and sign such guilty or not guilty verdict.

16

17  RT-26: 3464-66.

18  Berryman's *Strickland* expert, Mr. Simrin has offered an opinion that Mr. Moench's argument

19  was objectionable for suggesting that a defendant bore the burden of proof on determining innocence.

20  He opines that Berryman's trial counsel were constitutionally ineffective for failing to object to and

21  request a curative instruction regarding Mr. Moench's incorrect statement.  He further concludes that

22  the subsequent statement by Mr. Moench and the guilt phase instructions read by the trial judge were

23  insufficient to overcome the suggestion to the jury that Berryman and not the prosecution bore the

24  burden of proof.

25  Mr. Soria states in his declaration he did not know why an objection was not interposed to Mr.

26  Moench's argument.  He also states that the law on whether the jury was permitted to consider a lesser

27  included offense before there was a verdict on the greater offense was unsettled at the time of

28  Berryman's trial.  The matter was not put to rest until the Supreme Court issued it's decision in *People*

1   *v. Kurtzman*, 46 Cal. 3d 322 (1988), which was during Berryman's trial.[115]  Mr. Soria states it is unlikely

2   he kept abreast of new cases by reading advance sheets during the trial.

3   **B.    Berryman's Contentions.**

4   Berryman concedes that under *Stone v. Superior Court*, 31 Cal. 3d 503, 519 (1982) and

5   *Kurtzman*, 46 Cal. 3d at 324-25, a trial court may restrict jurors from returning a verdict on a lesser

6   included offense before acquitting on a greater offense, but may not preclude the jury from considering

7   lesser offenses during deliberations.  This was the specific holding by the California Supreme Court

8   reviewing his arguments on direct appeal.  *See*, 6 Cal. 4th at 1073.  He argues that this process is

9   completely different, however, from requiring the jurors to find that Berryman was not guilty of first

10  degree murder beyond a reasonable doubt before they could consider lesser included offenses.  He

11  contends that when Mr. Moench "clarified" the misstatement (after having been questioned at the side

12  bar by the trial judge), the misstatement about the standard of proof remained uncorrected.  He further

13  claims Mr. Moench's summation essentially reversed the burden of proof and precluded the jurors from

14  giving adequate consideration to the alternatives of second degree murder and voluntary manslaughter.

15  Next, Berryman argues that the standard utilized by the California Supreme Court in denying relief on

16  this claim, that is the requirement that the prosecutor committed bad faith for a finding of misconduct,

17  6 Cal. 4th at 1073, has been overruled by *People v. Hill*, 17 Cal. 4th 800, 823, n. 1 (1998).

18  In his traverse, Berryman additionally argues that changes made to the standard jury instructions

19  after the *Kurtzman* decision reflect the erroneous nature of the instructions read at Berryman's trial.  In

20  the post-*Kurtzman* instructions on the order of deliberations, discretion has been conferred on the jurors

21  "to choose the order in which [they] evaluate each crime and consider the evidence pertaining to it."

22  This is in contrast to what Berryman refers to as the "acquittal first" instruction read to his jury.

23  He argues that the prejudice resulting from the misstatement of the order of deliberations was

24  devastating to his proffered trial defense.  Since Berryman's primary hope was to secure a conviction

25  of voluntary manslaughter or second degree murder, the argument that the greater offense must be

26

27  [115] The *Kurtzman* case was decided August 18, 1988.  The pre-summation instructions were read

28  to the jury on October 17, 1988, the argument proceeded on October 17 and 18, 1988, and the
concluding instructions were read on October 18, 1988.

1  disproved beyond a reasonable doubt reinforced the argument that the offense committed was rape

2  felony murder. Berrryman maintains that there is a reasonable probability that his jury would have found

3  no rape, no premeditation, and no intent to kill, had it received proper instructions.

**C.    Analysis.**

The California Supreme Court addressed the issue presented in Claim 37, under the theory of prosecutorial misconduct rather than ineffective assistance of counsel. The court first set out the rule from *Stone*, 331 Cal. 3d at 519, and *Kurtzman*, 46 Cal. 3d at 324-25, that a trial court may not preclude jurors from considering lesser offenses during deliberations, but may restrict them from returning a verdict on a lesser offense before acquitting on the greater offense. 6 Cal. 4th at 1073. In the *Kurtzman* decision, the court "impliedly rejected a 'strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses.'" *Id*. (quoting *Kurtzman*, 46 Cal. 3d at 333). Rather, California adheres to a "modified acquittal first rule." The state high court stated that even if Mr. Moench's remarks had amounted to a misstatement of the law, there was no reasonable likelihood the jury would have construed the complained of remarks to eliminate consideration of second degree murder or voluntary manslaughter during deliberations. The court also found Mr. Moench's misstatements were not intentional or made in bad faith, and therefore, independently not actionable. *Id*.

As relevant to the instructional error challenge in Claim 49, the California court rejected Berryman's contention that his jury was charged with the "strict acquittal-first rule" disapproved in *Kurtzman*, even taking into account that some of the language in the instructions suggested the jury was required to deliberate on the charges and allegations in a specified order. *Berryman*, 6 Cal. 4th at 1076-77. The court further determined that a reasonable juror "would have understood the instructions and employed the instructions . . . simply to govern how the jury was to return its verdicts and findings after it completed its deliberations on the charges and allegations." *Id*.

Berryman is correct that Mr. Moench's pre-side bar summation charged the jury to find beyond a reasonable doubt that Berryman "did not commit first degree murder" before deciding whether he was guilty of second degree murder. (Emphasis added.) He also told the jury that the lesser included offenses could not be *considered* until there was a unanimous decision acquitting Berryman of the greater offense. Both of these statements are misstatements of the law. The first is ambiguous as to

1   whether Berryman, as opposed to the prosecution, must bear the risk of non-persuasion to prove the

2   commission of first degree murder.  The second constitutes a misstatement because under *Kurtzman*, and

3   its progeny, jurors cannot be precluded from *considering* lesser included offenses before rendering a

4   verdict on the greater offense, they can only be precluded from *deciding* on a verdict for a lesser offense

5   before deciding on a verdict for a greater offense.  Under *Hill*, 17 Cal. 4th at 823, n. 1, Berryman is

6   further correct that Mr. Moench's good or bad faith in misstating the law is now irrelevant under

7   California law to establishing prosecutorial misconduct.

8       Berryman is not correct, however, when he states that the trial judge erroneously charged the jury

9   on the order of deliberating on lesser included offenses.  Consistent with California law, the jury was

10  instructed under the modified acquittal-first rule.  In fact, and as Berryman concedes, *Kurtzman* squarely

11  holds that a trial court may require a jury to return a verdict on a greater offense before returning a

12  verdict on a lesser offense, even though the instructions may not prohibit the jury from "considering or

13  discussing" the lesser offenses before returning a verdict on the greater offenses.  46 Cal. 3d at 329.

14  Taking all the instructions together, even with the argument of Mr. Moench on summation, this is the

15  charge the jury received.

16      Accordingly, Mr. Soria's failure to stay abreast on current California law, while neglectful of his

17  responsibilities as a lawyer,  was harmless.  His concomitant failure to interpose an objection to Mr.

18  Moench's misstatements of the law also was harmless.  The trial court clearly rectified the error and

19  correctly instructed the jury.  The Court therefore finds unpersuasive Mr. Simrin's opinion that the post-

20  side bar clarification summation given by Mr. Moench, after his error was pointed out to him, coupled

21  with the trial court's instructions failed to correct the initial misstatements.  Taken as a whole, the

22  instructions in no way informed or even suggested to the jury that Berryman bore the risk of non-

23  persuasion on his guilt or innocence.  Under these circumstances, it is not necessary to address the

24  Warden's *Teague*-bar contention that the unconstitutionality of a strict acquittal-first instruction is a new

25  rule.  This was not the charge.

26      Separately, Mr. Moench's misstatements were insignificant in light of the trial judge's side bar

27  interruption, Mr. Moench's correction of his misstatements after the side bar, and correct post-

28  summation instructions by the trial court.  Accordingly the misstatements did not render the trial

fundamentally unfair.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974).  Nor can it be said they "so infected the trial process with unfairness as to make the resulting conviction a denial of due process." *See id.* at 643, *quoted by Darden v. Wainwright* 477 U.S. 168, 181 (1986); *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996).  *See also Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (court consistently has refused to find a due process violation where improper prosecutorial remark is an isolated or one-time event).   The trial judge's instructions were not erroneous, Mr. Moench's misstatements were overcome by the correct instructions, and trial counsel's failure to object to Mr. Moench's misstatement does not constitute ineffective counsel.  Claims 37 and 49 are denied on the merits.  The request for an evidentiary hearing as to Claim 37 is denied.

## XVIII.    Berryman's Challenges to Lesser Included Offense Jury Instructions (Claims 39, 40, 41, 44, 45, 46, 47, 48, and 51).

The remaining guilt phase instructional challenges relate to lesser included offenses.  The first sub-category is comprised of Claims 39, 40, 41, and 51, which challenge the omission of proper implied malice instructions to support the lesser included offense of second degree murder.  The second sub-category is presented in Claims 44 and 45 regarding the absence of instructions on the lesser included offense of involuntary manslaughter.  The third sub-category, comprised of Claims 46, 47, and 48, involves the absence of instructions on the defense of accident.  The gravamen of all these claims is the contention that Berryman's jury was faced with an all or nothing choice between capital murder and acquittal because the instructions on the lesser included offenses were incomplete, erroneous, inapplicable, or omitted.  His overall challenge is based on *Beck v. Alabama*, 447 U.S. 625, 627 (1980), which stands for the proposition that "a death sentence may not be imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  Berryman contends the net result of the alleged defects is that the jury necessarily disregarded the inadequate and incomplete lesser included defenses on which they were instructed, and voted for capital murder.  Berryman requests an evidentiary hearing with respect to Claims 40 and 46 in this group of claims.

**A.      Statement of the Facts Relevant to Lesser Included Offense Instructions.**

Berryman's jurors were instructed on murder, its lesser included offenses, special circumstances, and rape both prior to the presentation of the prosecution and defense cases and prior to both parties' closing arguments.  RT-17: 2216-27; RT-25: 3293-3317.  In the first reading, the jury was told:

> In order to prove the commission of the crime of murder, each of the following elements must be proved, one, that a human being was killed; two, that the killing was unlawful; and three, that the killing was done with malice aforethought or occurred during the commission or attempt to commit a felony inherently dangerous to human life.  Rape is a felony inherently dangerous to human life.

RT-16: 2216.  The trial court then went on to define malice as either express or implied.  Regarding implied malice, the court instructed:

> Malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose, and with a wanton disregard for human life, or when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another, and whose acts – and who acts with conscious disregard for life.

*Id*.: 2217.  The court also explained that willful killing meant intentional killing.  *Id*.  Next, the court instructed about felony rape murder based on either a completed rape or attempted rape, and the rape murder special circumstances.  *Id*.: 2219, 2220.  After completing instructions of first degree murder and special circumstances, the court explained that second degree murder and voluntary manslaughter were lesser included offenses of first degree murder.  *Id*.: 2223.  The concept of express and implied malice for murder were not re-explained, but the jury was told that there is no malice element in voluntary manslaughter.  *Id*.

Following the close of evidence, the prosecution and defense attorneys participated in a jury instruction conference.  As Mr. Soria recites in his September 17, 2001 declaration in support of Claim 40, Mr. Peterson had the primary responsibility for drafting jury instructions in the guilt phase whereas Mr. Soria argued the guilt phase on summation.[116]  Pursuant to that division of labor, Mr. Peterson advanced his list of requested instructions at the pre-summation conference.  Just prior to the jury

---

[116] Mr. Soria also delivered the opening statement and conducted the examination of witnesses during the guilt phase.  Mr. Peterson was primarily responsible for argument and eliciting evidence during penalty proceedings.

1    instruction conference, however, Mr. Peterson's wife was in a serious automobile accident with life-

2    threatening injuries.  Mr. Peterson did not appear in court from Thursday, October 6, 1988 until Monday

3    October 17, 1988.  When he did resume his participation, he requested instructions on second degree

4    murder and voluntary manslaughter, but not involuntary manslaughter. RT-25: 3259-61.  Over the

5    objections of Mr. Moench, the trial court agreed to give those lesser included offense instructions.  *Id.*

6    3261-62.  Mr. Peterson again confirmed during the jury instruction conference that an instruction on

7    involuntary murder would not be requested.  *Id*. at 3268.  Nor was there a request to include instructions

8    on the defense of accident.

9         As read, the pre-summation instructions mirrored the pre-trial instructions delivered earlier.

10   Murder was defined as malice murder or felony murder.  RT-25: 3303.  Malice was then explained as

11   express malice or implied malice, with both concepts defined.  *Id*.: 3304.  The definition of implied

12   malice given before the presentation of evidence was repeated verbatim here.  *Id*.  First degree murder

13   was then defined as premeditated malice murder or felony rape murder.  *Id*.: 3305-06.  This was

14   followed by the rape murder special circumstance instruction.  *Id*.: 3306-08.  With respect to second

15   degree murder, the court instructed that if the jury were to convict Berryman of murder, it was required

16   to determine whether the murder was in the first or second degree.  *Id*.: 3310.  Also, if the jurors were

17   convinced Berryman committed murder, but had a reasonable doubt whether the offense was in the first

18   or second degree, they were to give Berryman the benefit of the doubt and return a verdict of second

19   degree murder.  *Id*.  The trial court did not instruct on the theories of second degree murder other than

20   just to inform the jurors that they had to choose between first and second degree.  Nor were they

21   instructed on involuntary manslaughter or the defense of accident.

22        With respect to the omission of instructions on accident and involuntary manslaughter, *Strickland*

23   expert Mr. Simrin opines that trial counsel were ineffective for not requesting them because it is

24   impossible to tell from the record whether the jury based its first degree murder verdict on premeditated

25   murder or felony murder.  Mr. Soria also avers in a supporting declaration puzzlement over the omission

26   of involuntary manslaughter and accident instructions since he argued to the jury that Ms. Hildreth's

27

28

death was accidental.[117]  The accidental character of the death stems from the fact that the knife wound on Ms. Hildreth's neck was only 3/4 of an inch deep, was only fatal because she was so thin, and the fact that the knife was broken in three pieces.  He argued that the breakage of the knife could not have occurred in the course of intentionally inflicting a 3/4 of an inch wound.  It had to have been intentionally broken following "an explosion of emotions" after Ms. Hildreth had been accidentally stabbed.

## B.      Berryman's Contentions.

Three theories underlie the various claims of omission an error: (1) trial error, for the trial court's failure to read omitted instructions or correct erroneous instructions sua sponte; (2) ineffective assistance of trial counsel for failure to request them; and (3) ineffective assistance of appellate counsel for failure to raise the trial court's errors on appeal.  Berryman claims the jury should have been instructed that second degree murder may be predicated on implied malice, where the killing resulted from an intentional act known to be dangerous and performed with knowledge of the danger in conscious disregard for human life.  He maintains involuntary manslaughter should have been defined as the "commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection."  Finally, an instruction of the defense of accident should have informed the jurors that a person who commits an act through misfortune or accident, in the absence of evil design, intention, or culpable negligence, is not considered by the law to be capable of committing a crime.

Under Berryman's view of the facts in these habeas proceedings, Ms. Hildreth's death was "no more than a lover's tryst gone bad," citing to the fact that the murder weapon was a steak knife either Berryman or Ms. Hildreth could have brought to the crime scene, innocently.  He points out that Ms. Hildreth went with him voluntarily to an isolated spot, generally viewed as a "lover's lane."  After

---

[117] In the course of this argument, Mr. Soria also conceded that if there had been a rape, the fact that the killing was accidental would make no difference.

voluntary intercourse, he argues they became "engaged in a tussle,[118] . . . that the knife was produced from some unknown location," and that Ms. Hildreth was stabbed as "an unintended part of the struggle."   He re-emphasizes in his traverse that the trial court decided to give implied malice instructions because the jury could have found consensual sex, as argued by Berryman, and then that the killing occurred during an altercation.   He also reiterates in his traverse that there was evidence the stabbing death of Ms. Hildreth was unintentional and accidental, and thus wholly consistent with the theory of implied malice second degree murder, involuntary manslaughter, and the defense of accident. He claims this case is controlled by *United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987) (reversing conviction of defendant who severely stabbed victim while both were drunk for trial court's failure to give an instruction on accidental death).

He argues that the trial court should have given all of these instructions sua sponte, since there was substantial evidence supporting them and they were not incompatible with the Berryman's presentation of the case.   *See People v. Beaverman*, 19 Cal. 4th 142, 155-56 (1998).   As it was the partial instructions given on second degree murder served to eliminate a practical alternative to a first degree murder special circumstance murder verdict.   Moreover, with respect to the implied malice instruction given, Berryman argues that no instruction connecting that concept to second degree murder was given to the jury, and that in any event, the instruction was defective because it created a mandatory presumption of malice if predicate facts were established.   He claims this presumption placed the burden of disproving malice on him.   In any event, he maintains, since the theory of premeditated murder was largely discounted during the trial proceedings in favor of felony rape murder, it was especially important to provide the jury with a meaningful choice of lesser included offenses.

With respect to his ineffective assistance of trial counsel claim, he alleges trial counsel's failure to request complete jury instructions was inexplicable and unreasonable.   The prejudice claimed is that had the correct and complete instructions been given, Berryman would not have been convicted of

---

[118] The altercation which supposedly followed the voluntary intercourse is said to have concerned whether Ms. Hildreth was going to tell Berryman's girlfriend and her cousin, Crystal Armendariz, about their encounter (or "relationship").

1  capital murder. Foreshadowing Claim 52,[119] Berryman argues in his traverse that a plausible reason Mr.

2  Peterson didn't request complete instructions is that he was preoccupied and distracted by the fact that

3  his wife had been in a serious automobile collision.

4       The assertion that appellate counsel was constitutionally ineffective stems from his failure to

5  raise the trial error on direct appeal. He argues his case is analogous to the situation in *Turner v.*

6  *Duncan*, 158 F.3d 449, 459 (9th Cir. 1998), where the trial court omitted an entire page out of the

7  CALJIC manual and appellate counsel failed to raise the omission on direct appeal.

8       **C.    Analysis.**

9       The Warden raises a number of procedural defenses, including *Teague*-bar. Because all of the

10 claims in this group are manifestly without merit, the Court does not address these procedural

11 defenses.[120] In the first place, the concept of implied malice as the foundation for second degree murder

12 was explained to the jury. As found by the California Supreme Court, the instruction given was perfectly

13 acceptable:

> There is no reasonable likelihood that the jury misconstrued or misapplied the challenged
> instruction as a "mandatory presumption" of implied malice, less still as one that reduced
> the People's burden of persuasion in any way. Indeed, a reasonable juror would have
> understood and employed the instruction in accordance with what it purported to be, to
> wit, a *definition* of implied malice – a definition, we may note that is adequate. [citations
> omitted.]

18 6 Cal. 4th at 1078. The finding that the implied malice instruction created no impermissible presumption

19 of malice cannot be disturbed on federal habeas. 28 U.S.C. § 2254(d)(1). Notwithstanding the propriety

20 of the implied malice instruction, the jury found Berryman guilty of a completed rape and returned a

21 special verdict form finding that he intentionally killed Ms. Hildreth. This is tantamount to a finding

22 of express malice. There can be no prejudice for failure to provide further or amplified instructions on

---

[119] The ensuing analysis here is dispositive as to Claim 52. *See* Part XXI. *infra*.

[120] The Court notes that although the allegation of a *Teague*-bar is to be resolved before courts
address the merits, *Bohlen*, 510 U.S. at 389, such a threshold inquiry here is pointless. As stated in
connection with the analysis of Claims 7, 8, 9, 10, and 23, *see* Part VII.C., *supra*, it's not a matter of
whether a new rule was announced after Berryman's conviction became final, or alternatively whether
an old rule is being applied in a new way, there is simply no rule, period, because the allegations are
totally unsupported by the record.

1   implied malice when the jury determined the killing was intentional and malice was express. *See Brecht*,

2   507 U.S. at 637.

3          On the subject of involuntary manslaughter, the California Supreme Court held:

4          Defendant contends that the court erred by failing to instruct the jury sua sponte
           on involuntary manslaughter as a lesser included offense.

5
           There was no error.  A court is not obligated to instruct sua sponte on involuntary
6          manslaughter as a lesser included offense unless there is substantial evidence from which
           a rational trier of fact could find beyond a reasonable doubt [citation] that the defendant
7          killed his victim "in the commission of an unlawful act, not amounting to felony; or in
           the commission of a lawful act which might produce death, in an unlawful manner, or
8          without due caution and circumspection." (Pen. Code, § 192, subd. (b)).  Such evidence
           is lacking here.  To be sure, one might speculate that defendant killed Hildreth as he
9          perpetrated some unspecified misdemeanor or performed some unspecified act with
           criminal negligence.  But speculation is not evidence, less still substantial evidence.
10         [Citation.]

11  *Id*. at 1080-81.   This finding is similarly resistant to collateral attack on federal habeas.  28 U.S.C. §

12  2254(d)(1) and (2).

13         The claim that lesser included offense omissions violated Berryman's due process rights under

14  *Beck v. Alabama*, 447 U.S. at 627 also is without merit because instructions on the lesser included

15  offenses of second degree murder and voluntary manslaughter were given.  In *Schad v. Arizona*, 501 U.S.

16  624, 647 (1991), the high Court rejected the notion that a jury must be instructed on every lesser

17  included offense and upheld a capital sentence in that case because the jury was not faced with the all-or-

18  nothing choice between a capital murder conviction and acquittal.  That principle applies here.  In any

19  event, there is no support for the notion that the jury chose rape felony murder because that was the only

20  alternative to acquittal.

21         Finally, as the Warden argues, Berryman's assertion of the accident defense is meritless because

22  applicable statute requires the absence of evil design, intention, or culpable negligence.  In contrast, here,

23  the record demonstrates that Berryman took Ms. Hildreth to a remote location where she was physically

24  abused, sexually violated, and stabbed to death.  There is no evidence suggesting the stabbing was

25  accidental,[121] much less "substantial evidence."  There is no evidence that Ms. Hildreth and Berryman

26  fought over some threat on her part to expose their liaison to Berryman's girlfriend, Crystal Armendariz.

27  ────────────────

28         [121] It may be that Berryman did not intend for Ms. Hildreth to die, but there is nothing to suggest
    that he did not intend to press the knife blade to her neck.

1   The jury's rape finding defeats Berryman's theory in this regard. *Lesina*, 833 F.2d 156 also is inapposite.

2   In that case, the evidence was that the defendant grabbed a knife to remove it from the area where he and

3   his girlfriend were fighting, and as he attempted to throw it back over his head, the victim, a mutual

4   friend who had entered the fray to attempt to break up the fight, collided with the knife, sustaining a

5   deep, penetrating wound. *Id*. 157. The defendant was convicted of second degree murder after the trial

6   court refused an instruction of accident. *Id*. at 160. The Ninth Circuit reversed in light of the

7   considerable evidence presented at trial that supported the accident theory. Here, in contrast, no

8   evidence supports that Berryman accidently stabbed Ms. Hildreth during a fight over whether she would

9   reveal her "relationship" with Berryman. Again, in his arguments, Berryman discounts the rape

10   conviction and the more than sufficient evidence supporting that conviction.

11   Claims 39, 40, 41, 44, 45, 46, 47, 48, and 51 are denied on the merits. Berryman's request for

12   an evidentiary hearing with respect to Claims 40 and 46 is denied.

13   **XIX.   Berryman's Challenges to the Rape Conviction and Rape Murder Special Circumstance**

14   **Finding (Claims 12, 29, 35, 50, 71, and 71A).**

15   In Claims 12, 29, 35, 50, 71, and 71A, Berryman advances a number of legal challenges to his

16   rape conviction and the rape murder special circumstance finding. In Claim 12 he alleges he wasn't

17   given adequate notice that the rape murder special circumstance could have been based on attempted

18   rape in the alternative to actual, completed rape. In Claim 29 he alleges trial counsel were

19   constitutionally ineffective for failure to retain an independent pathologist to testify about the lack of

20   physical evidence of a completed rape.[122] In Claim 35 he alleges the evidence adduced at trial was

21   legally insufficient to support the rape murder special circumstance. Claim 50 alleges that the trial court

22   committed reversible error for not instructing the jury that intent to rape must precede the killing and that

23   the victim must have been alive when the intercourse occurred. Claim 71 alleges that trial counsel were

24   constitutionally ineffective for failure to develop and present evidence that Berryman and Ms. Hildreth

25   had been alone together a few days before the homicide. Finally, in Claim 71A he alleges prosecutorial

26

---

27        [122] Claim 29 also addresses the issue of whether evidence supports the prosecution contention
during penalty proceedings that Berryman stood on Ms. Hildreth's face for three to five minutes as she
28   lay dying. *See* discussion of this portion of Claim 29 together with Claim 75 in Part XXIV., *infra*.

1    misconduct for the suppression of witness statements that placed the victim in Berryman's truck prior

2    to the night she was killed.  Berryman requests an evidentiary hearing with respect to Claims 12, 29, and

3    71A.

4          **A.     Statement of the Facts Relevant to the Rape Conviction and Rape Murder Special**

5          **Circumstance Finding.**

6          The relevant facts consist of a description of specified trial proceedings, trial testimony, and post-

7    conviction declaration testimony.

8                **1.     Relevant Trial Proceedings and Testimony.**

9          The information filed in the case alleged murder, the rape murder special circumstance, plus a

10   weapon enhancement in the first count, and rape, plus a weapon enhancement in the second count.  As

11   relevant here, the rape murder special circumstance allegation in the information provides:

12        [T]he murder of Florence Hildreth was committed by defendant RODNEY BERRYMAN
          while the defendant was engaged in the commission of the crime of rape or the

13        immediate flight after committing the crime of rape, in violation of Penal Code Section
          261(2), within the meaning of Penal Code Section 190.2(a)(17).

14

15   RT-17: 2214-15.

16        The information was read to the jury in the course of pre-trial instructions prior to opening

17   statements and the presentation of evidence.  Among other things, the pre-trial instructions defined

18   murder, its lesser included offenses, special circumstances, and rape.  Notwithstanding the language of

19   the information which covered only the actual commission of rape, the pre-trial instructions, read

20   directly after the information, defined felony murder as the killing of a human being that "occurs as the

21   result of the commission of *or the attempt to commit* the crime of rape" and  the rape murder special

22   circumstance as the commission of murder "while the defendant was engaged in the commission of *or*

23   *attempted commission* of rape, or that the murder was committed during the immediate flight after the

24   commission, *attempted commission*, of rape."  *Id*.: at 2219, 2221.  No comments or objections were

25   interposed to these pre-trial instructions by defense counsel or the prosecutor.

26        Evidence at trial pertaining to sexual assault was presented by the testimony of pathologist Dr.

27   Holloway and the results of laboratory tests.  Dr. Holloway noted there was no evidence of trauma to Ms.

28   Hildreth's vaginal vault.  The criminalist, Gregory Laskowski, collected a vaginal swab from her body

1   during the autopsy.  Later forensic testing of the swab revealed a small amount of Ms. Hildreth's blood

2   and a small amount of semen, verifiable by the presence of spermatozoa.  As noted above, Berryman

3   could not be identified as the person who deposited the semen.

4          Pre-summation instructions, read after the close of guilt phase evidence repeated the concept that

5   first degree felony murder and the felony murder special circumstance were predicated on the alternative

6   theories of completed or attempted rape.  Discussion concerning attempted rape as the predicate for the

7   rape murder special circumstance was generated by Berryman's motion for judgment of acquittal

8   pursuant to Penal Code § 1118.1.  After the prosecution put on its case in chief (and before the defense

9   began its case), Mr. Peterson argued that both the rape murder special circumstance and the rape charge

10  had to be resolved in Berryman's favor because rape cannot be committed against a victim who has

11  expired.  Alternatively, Mr. Peterson argued no rape occurred because there was no evidence of trauma

12  to the victim's vaginal vault.

13         Finding that substantial evidence had been presented to support a jury finding of a completed

14  rape, the trial judge first noted that the presence of the victim's blood on the vaginal swab specimen

15  indicated she was alive during intercourse (although no expert testimony had been adduced to support

16  this notion).  Addressing the issue of penetration, the trial judge observed that despite the fact a pool of

17  fluid believed to be semen had been deposited on Ms. Hildreth's abdomen and inner thighs, the

18  occurrence of penetration was not precluded.  The deposit could have meant no more than that Berryman

19  withdrew from Ms. Hildreth's vagina before ejaculation.  The judge then spoke to the matter of consent,

20  noting that the victim's body position and the state of her clothing was "more consistent, and the jury

21  could find, someone forcibly removing that clothing for the purpose of making her available for sexual

22  intercourse." During the course of the argument on this motion, Mr. Moench conceded that the evidence

23  he presented in the People's case in chief *might* be susceptible to an inference that the intercourse

24  occurred after death, in which case the attempted rape theory should be used.  Defense counsel did not

25  object or ask for more time to prepare their defense case.  Thus, when the jury was instructed on the guilt

26  phase issues, the concept of attempted rape was presented both in the context of the felony rape murder

27  definition and the rape murder special circumstance consistent with how it was presented before the

28  parties put on their cases.

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd        154

1   To punctuate the concept that rape requires a live victim, Berryman's trial counsel offered the

2   following instruction:

> The prosecution must also prove beyond a reasonable doubt that an act of sexual
> intercourse was accomplished against the victim's will by means of force, violence, or
> fear of immediate and unlawful injury on the victim or another person, and that the rape
> was accomplished with a "person," not a dead body.  Rape must be accomplished against
> a person's will.  A dead body cannot consent to or protest a rape, nor can it be in fear of
> immediate and unlawful bodily injury.  The essential guilt of rape consists in the outrage
> to the person and feelings of the victim of the rape.  If you have a reasonable doubt that
> an act of sexual intercourse was accomplished against the victim's will as opposed to a
> dead body, you may not convict the defendant of first degree murder on the felony
> murder rule.

The trial court refused this and additional proffered instructions on the grounds that the other instructions

adequately covered their content.  The instruction read to Berryman's jury provides:

> In order to prove the commission of the crime of rape, each of the following elements
> must be proved, one, that two persons engaged in an act of sexual intercourse.  Two, that
> the two persons were not married to each other.  Three, that the act of intercourse was
> against the will of one of the persons.  And four, that such act was accomplished by
> means of force, violence, or fear of immediate and unlawful bodily injury to such person.

After closing instructions were read, Mr. Soria continued to argue there was still a reasonable doubt

about Berryman's identity as the perpetrator, and that because there was no injury to Ms. Hildreth's

vagina vault, there was no rape.  He refrained from arguing there was no rape because Ms. Hildreth's

death preceded the penetration.[123]

### 2.   Evidence Developed in Post-Conviction Proceedings.

The post-conviction evidence for these claims consists of five declarations.  They are from trial

counsel Mr. Soria, trial pathologist Dr. Holloway, retained expert pathologist Silvia O. Comparini, M.D.,

juror David Armendariz, and one of Berryman's federal habeas attorneys, Mr. Morris.

### a.   Declaration of Charles J. Soria, Executed August 20, 2001.

Mr. Soria reports that his defense strategy at the guilt phase proceedings was based on the belief

that the prosecution intended to proceed on the theory of a completed rape to support the death eligibility

rape murder special circumstance.  He avers this belief was based conversations with the original

prosecutor in the case, Lisa Green, who "indicated" the completed rape as opposed to attempted rape

---

[123] As Berryman argues, this omission was logical since the jury was instructed that attempted rape could support the rape murder special circumstance.

theory was the predicate for the rape murder special circumstance.  Hence, the defense motion for

judgment of acquittal was predicated on the theory that the prosecution could not prove the victim was

alive during intercourse.  Mr. Soria avers he was surprised when the prosecutor, Mr. Moench, changed

the allegation to attempted rape after conclusion of the People's case.  He states the defense was misled.

Had attempted rape been alleged in the first instance, he insists, a different strategy would have been

formulated.  But, by the time the prosecutor changed theories, it was too late.  Mr. Soria does not explain

what different strategy he would have developed if attempted rape had been alleged in the information.

### b.      Declaration of John E. Holloway, M.D., Executed July 25, 2001.

Dr. Holloway states that at trial he was not asked about the significance of the trace of blood

determined to be on the vaginal swab taken from Ms. Hildreth during the autopsy.  Contrary to the

statement of the trial judge, Dr. Holloway clarifies that the trace of blood does not establish Ms. Hildreth

was alive at the time of intercourse: "In my opinion, the trace of blood in the vagina was not evidence

that the victim was alive at the time of the intercourse.  The trace of blood could have been present

before the intercourse occurred."  In other words, she could have been dead at the time of intercourse.

He also states that the trace of blood should not be attributed to menstruation, but that many other

causes, such as minor injuries, would account for the trace of blood.  He repeats his trial testimony that

the autopsy revealed no trauma to the vagina as the source of the blood.  Finally, he states that the

defense could have benefitted from the opinion of another pathologist at trial.

### c.      Declaration of Silvia O. Comparini, M.D., Executed October 10, 2001.

Dr. Comparini first observes that where a female does not give consent, an erect adult penis

cannot enter through the narrow passage from the external genitalia to the vagina (introitus) without

inflicting abrasions.  From this, she concludes that Ms. Hildreth was not subjected to non-consensual

intercourse because there was no trauma to the introitus or to the external genitalia.  Dr. Comparini

further notes that the fact there was no trauma to the vagina (or vaginal vault) is irrelevant, because

vaginal tearing does not occur as the result of even forcible penetration by a penis.  With respect to blood

observed on the vaginal swab, Dr. Comparini states that it is most likely the blood was deposited when

the swab was introduced into the vagina without use of a speculum.  The swab could have picked up

1    blood present or oozing in the introitus.  The presence of blood on the swab was "*not* evidence that Ms.

2    Hildreth was alive at the time semen was deposited."  (Emphasis in original.)  The presence of sperm

3    on the swab could have been residue from previous intercourse up to five days earlier.  Finally, the

4    "glossy material" or dried fluid deposited on Ms. Hildreth's left inner thigh was deposited above the dust

5    on her body, and accordingly "had to [have] be[en] deposited by ejaculation outside of the genitalia."

6                    **d.      Declaration of David Armendariz, Executed February 4, 2001.**

7          With respect to the rape challenges, Mr. Armendariz confirms that the combination of the rape

8    with the weapon provided the special circumstances that justified the death penalty.

9                    **e.      Declaration of Jesse Morris, Jr., Executed October 2, 2001.**

10         As summarized in the discussion of Claims 15 and 16, Part XII.A.2., *supra*, Mr. Morris

11   interviewed the proprietors of a refreshment stand at the Lake Woollomes recreational park, who

12   remembered seeing Ms. Hildreth in Berryman's company at the park about a week or two before her

13   death.  Mr. Morris also interviewed Crystal Armendariz and her mother Brenda Clark in February of

14   1996 and confirmed that both stated Ms. Hildreth had been in Berryman's pick up truck prior to the night

15   of her death.  Both witnesses also reported that they conveyed this information to a prosecution

16   investigator.  Mr. Morris states there was no mention of the fact that witnesses observed Ms. Hildreth

17   in Berryman's truck prior to her death in any discovery materials handed over to Berryman's trial

18   defense attorneys.

19         **B.      Berryman's Contentions.**

20         Berryman's argument does not acknowledge that attempted rape instructions were read to the

21   jurors at the beginning of the trial proceedings.[124]  His argument assumes that the first time the attempted

22   rape theory was raised was after all evidence was presented and that impetus for the introduction of this

23   theory was the failed defense motion for acquittal pursuant to Penal Code § 1118.1.

24         In his first challenge to the rape murder special circumstance, Berryman complains that he didn't

25   have adequate notice required under the Sixth Amendment that his death eligibility could be predicated

26   on attempted rape as opposed to an actual completed rape.  He argues that because the trial court refused

27   _____

28         [124] The Warden's argument also does not recite that the attempted rape theory was introduced
     at the beginning of the proceedings.

1    the defense instruction specifying that rape required a live victim, the issue of attempted rape nonetheless

2    was presented to the jury.  He argues he was prejudiced by the change in prosecution theory because

3    defense counsel didn't have time to rebut a new and different allegation with evidence of consensual

4    intercourse.  The foundation for consensual intercourse now advanced is evidence that Ms. Hildreth had

5    been seen in Berryman's truck and together with Berryman on previous occasions, and thus it would

6    have been reasonable to surmise she went with him voluntarily on the night of her death.  These facts

7    comprise both an ineffective assistance of counsel claim and a prosecutorial misconduct claim.

8    Additional evidence relied upon to negate a completed rape consists of the post-conviction declarations

9    of Dr. Holloway and Dr. Comparini to the effect that the trace of blood observed on the vaginal swabs

10   taken during Ms. Hildreth's autopsy do not establish her vitality at the time of penetration.  Berryman

11   maintains that because the trial judge interpreted the presence of a trace of blood as evidence of Ms.

12   Hildreth's vitality at the time of penetration, it is reasonable the jury also improperly interpreted this

13   evidence in the same manner.

14        Separately, he argues that because the trial court refused the proffered instruction that rape

15   required a live victim, the jury could have convicted him of rape, even though Ms. Hildreth was already

16   dead when Berryman conceived the notion of having sex with her body.  He claims the trial court erred

17   because the live victim principle was not covered by other instructions as the trial judge stated.  On the

18   same state of the evidence, he argues the evidence actually presented at trial was insufficient to support

19   the rape murder special circumstance because Ms. Hildreth was dead at the time of intercourse.

20        **C.    Analysis.**

21        Acknowledging the importance of the rape conviction, as evidenced by Mr Armendariz's

22   declaration, there is no merit to the contention that the completed rape finding was unsupported by the

23   evidence because there was no penetration, or if there was penetration, the sexual intercourse was

24   consensual or alternatively, occurred after Ms. Hildreth was dead.  The California Supreme Court so held

25   after reviewing the trial proceedings and making entirely reasonable findings.  6 Cal. 4th at 1084.  *See*

26   *also Jackson*, 443 U.S. at 319 (limiting review to whether "any rational trier of fact could have found

27   the essential elements of the crime beyond a reasonable doubt").  Because these claims introduce

28   additional evidence developed during post-conviction proceedings, however, the Court is compelled to

factor in this evidence when evaluating the endurance of the rape verdict. *See Wiggins*, 539 U.S. at 534 (referencing the evaluation of penalty claims by considering trial and post-conviction evidence). Under this augmented evaluation, the rape conviction and finding of a completed rape readily withstand scrutiny. The presence of sperm cells inside Ms. Hildreth's vagina evidences penetration. For sperm cells to end up in Ms. Hildreth's vagina, there had to have been some penal vaginal contact, even if Berryman withdrew and volitionally ejaculated extra-vaginally. Regarding Dr. Comparini's opinion that the presence of sperm cells could have predated Ms. Hildreth's encounter with Berryman by up to five days, the Court rejects the suggestion Ms. Hildreth was sexually active with other partners. The suggestion amounts to pure speculation with no offered support. Next, the Court is unpersuaded by Dr. Comparini's conclusion that penetration must have been consensual by virtue of the absence of abrasion in the introitus. Consent also is not suggested by evidence that Ms. Hildreth previously had been in Berryman's truck or that they had been seen together at the Lake Woollomes recreation park. *See* discussion in Claims 15 and 16, Part XII.A.2., *supra*. Accordingly, failure of law enforcement or the prosecutor to have disclosed this information to trial counsel is not actionable under *Brady v. Maryland*, 373 U.S. 83 (1963), because it is not material to Berryman's innocence. Rather, clear evidence of a struggle between Ms. Hildreth and Berryman, including bruises on her body inflicted ante mortem and the appearance her clothing, supports both implicit findings that the sex was non-consensual and that she was alive at the time intercourse took place. Separately, the Court finds the discussion about the blood observed on the vaginal swab to be irrelevant to Ms. Hildreth's vitality at penetration. Although the trial judge mentioned this fact when denying Berryman's motion for acquittal under Penal Code § 1118.1, the theory was not presented to the jury, so there is, as the Warden argues, no reason to speculate that the jury followed similar reasoning. Dr. Comparini's explanation for how the blood most likely was introduced to Ms. Hildreth's vagina is equally irrelevant, as well as speculative. Dr. Comparini surmises that because the criminalist obtained the vaginal swab without a speculum, the process of introducing a swab into the vagina likely transferred blood present or oozing from the introitus. There is no evidence, however, as to whether the criminalist, Mr. Laskowski, did or did not use a speculum to obtain the swab sample, and there is no evidence that blood was present or oozing at the time of the autopsy. Contrary to Berryman's arguments, the evidence in the record, even coupled with the expert testimony

offered in these federal proceedings, supports the jury finding that a completed rape was committed.  The

failure of defense counsel to retain an additional pathologist who could have testified as Dr. Comparini

testified in her declaration would not have made a difference in the outcome.

In light of this determination, Berryman's strenuous and lengthy arguments that he did not

receive adequate notice that the felony murder special circumstance was to be based on attempted rape

as well as completed rape, has no merit.  There is no Sixth Amendment violation when a defendant is

not given notice that a conviction *might have been predicated* on an attempted crime in the alternative

to a completed crime, when a completed crime was found by the jury and that finding is supported by

the evidence.  Berryman has offered no authority to the contrary.  Berryman received notice of the

predicate felony of which he was convicted, completed rape.  Besides, Berryman did have notice of the

attempted rape theory when the trial court read the pre-trial instructions to the jury.  The Court further

is persuaded by the Warden's argument that notice of attempted rape in the information was adequate

on account of citation to § 190.2(a)(17), which clearly predicates the special circumstance on the

commission or attempted commission of a target felony.  *See People Cain*, 10 Cal. 4th 1, 42 (1995).

This being a matter settled under California law, the Court is not at liberty to disturb it.  *Estelle v.*

*McGuire*, 502 U.S. 62, 71-72 (1991).  The Court also specifically rejects the notion that Berryman's

defense team was surprised by the clarification that the special circumstance was to be predicated on

completed or attempted rape.  In the first place, as just recited, the theory of attempted rape was

introduced in the pre-trial instructions.  Second, even if defense counsel were not attending to the details

of the instructions being read to the jurors, their § 1118.1 motion for acquittal was presented directly

after the prosecution completed its case in chief, with the defense case still to be presented.  Accordingly,

there was ample opportunity to rebut the clarified allegations.  No objection was interposed or request

for continuance requested.  Besides, even if counsel had proffered the evidence now before this Court

on the issue of consent, the evidence would have been unavailing.

The same result must obtain respecting the trial court's refusal to read Berryman's live victim

instruction.  The actual rape instruction makes clear that the victim must have been alive when

penetration occurred because a key element is that the violation occurs against the victim's will.  Ms.

Hildreth must have been alive for her will to have been overcome.  Moreover, as the Warden argues, the

1    plentiful signs of struggle refute the notion Ms. Hildreth was dead prior to intercourse, *see Doyle v.*

2    *State*, 921 P. 2d 901, 915 (Nev. 1996), or that Berryman had in mind wanting to have sex with a corpse

3    when he instigated his assault.  *See People v. Kelly*, 1 Cal. 4th 495, 527, n. 8 (1992).  The conclusion

4    of the California Supreme Court on this subject is factually supported as well as a matter of state law.

5    The denial of relief by the California Supreme Court must remain undisturbed under both 28 U.S.C. §

6    2254(d) and *McGuire*, 502 U.S. at 71-72.

7           The Court additionally agrees with the Warden's argument that Berryman's failure to disclose

8    information to counsel about whether he was keeping company with Ms. Hildreth before her death  must

9    influence the of assessment of whether trial counsel were ineffective.  The "reasonableness of counsel's

10   actions may be determined or substantially influenced by the defendant's own statements or actions."

11   *Strickland*, 466 U.S. at 691, *quoted by Langford v. Day*, 110 F.3d 1380, 1386-87 (9th Cri. 1997) (counsel

12   is not ineffective for failing to discover facts known to the defendant which the defendant didn't tell

13   him).   Claims 12, 29, 35, 50, 71, and 71A are denied on the merits.   Berryman's request for an

14   evidentiary hearing as to Claims 12, 29, and 71A is denied.

15   **XX.    Miscellaneous Guilt Phase Challenge of Prosecutorial Misconduct (Claim 26).**

16          Berryman alleges two instances of prosecutorial misconduct in Claim 26.  First he complains that

17   Mr. Moench improperly informed a panel of potential jurors during voir dire that he represented the State

18   of California *and* the victim, Ms. Hildreth.  Second, he improperly referred to the victim, Ms. Hildreth,

19   by her nickname, "Mimi," throughout the proceedings.  No evidentiary hearing is requested for this

20   claim.

21          **A.      Statement of the Facts Relevant to Miscellaneous Prosecutorial Misconduct**

22                  **Challenges.**

23          In addition to the summary of factual allegations stated above, the Warden points out that in the

24   course of Mr. Moench's summation, he properly and correctly informed the jury that he represented the

25   People of the State of California on at least three occasions.  With respect to the manner in which he

26   referred to the victim, the Warden notes that Mr. Moench did not use her first name exclusively.  As

27   often as not, when he referred to her, Mr. Moench used her nickname, Mimi, as her first name, coupled

28   with Hildreth, her last name.

1      **B.      Berryman's Contentions.**

2           Berryman contends Mr. Moench's conduct in referring to the victim by her nickname, Mimi, and

3    introducing himself to a panel of potential jurors as representing the victim amounts to prosecutorial

4    vindictiveness, citing *Blackledge v. Perry*, 417 U.S. 21 (1974).  He claims that to call the victim by her

5    nickname implies a level of familiarity beyond the obligations of a public prosecutor.  Similarly, to say

6    that he represented the victim put him on a superior plain to defense counsel, implied he had information

7    not shared with the jury, and was on a "crusade to vindicate the victim" rather than to determine the

8    truth.  Berryman equates such implications with discriminatory prosecution, citing *United States v.*

9    *Armstrong*, 517 U.S. 456 (1996).

10          In his traverse he cites to a number of state court cases which stand for the proposition that

11   prosecutors' arguments they represent crime victims are improper.  He claims the prejudice arising from

12   this misconduct his cumulative, going to Mr. Moench's superior knowledge as a basis for the death

13   penalty.

14     **C.      Analysis.**

15          As recited in connection with Claims 37 and 49, Part XVII.C., *supra*, the standard for evaluating

16   prosecutorial misconduct during trial proceedings is whether Mr. Moench's statements and descriptions

17   pertaining to Ms. Hildreth were so significant to have rendered the trial fundamentally unfair.

18   *DeChristoforo*, 416 U.S. at 647-48.  Examining the entire record, the Court confidently concludes they

19   did not.  *See id*. at 643, *quoted by Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir. 1991).  The statement

20   about representing Ms. Hildreth was made on one occasion to a group of potential jurors, only four of

21   whom ultimately served on Berryman's jury.  It was isolated, and as far as Berryman has argued and the

22   Court can discern, stated only on that single occasion.

23          Use of the victim's nickname, "Mimi," also was not fundamentally unfair, or even unfair at all.

24   "Mimi" was the name Ms. Hildreth was known has by her friends and family.  This is the name to which

25   she was referred by numerous witnesses.  It would have been odd indeed if Mr. Moench had called her

26   "Florence" or "Florence Hildreth" or "Ms. Hildreth" during trial proceedings when all the witnesses

27   referred to her as "Mimi."  Using Ms. Hildreth's nickname, alone, or in conjunction with her last name

28   did not infect the trial process with unfairness as to make the resulting conviction a denial of due

process.  *See DeChristoforo*, 416 U.S. at 643; *Darden*, 477 U.S. at 181 (1986); *Thompson*, 74 F.3d at 1576.  Claim 26 is denied on the merits.

## XXI.   Miscellaneous Guilt Phase Challenges of Ineffective Assistance of Trial Counsel (Claims 18, 19, and 52).

In Claims 18, 19, and 52, Berryman argues that his trial attorneys were variously disabled from adequately representing him: Mr. Soria for sleeping during substantial portions of the trial (Claim 18), Mr. Peterson for being deaf (Claim 19) and Mr. Peterson, again, for being distracted because of a serious automobile accident involving his wife (Claim 52).  Because of these disabilities, Berryman argues, neither attorney, alone or as a team, was competent to represent him.  He seeks an evidentiary hearing with respect to Claims 18 and 19.

### A.   Statement of the Facts Relevant to Berryman's Miscellaneous Claims of Ineffective Trial Counsel.

The primary evidence Berryman offers of Mr. Soria's somnolence comes from the declaration of Juror David Armendariz.  Mr. Armendariz avers Mr. Soria "was asleep during portions of the trial" without specifying nature or duration of the proceedings during these periods of slumber.  Mr. Armendariz continues that on "more than one occasion, Mr. Soria went to sleep with his head leaning on his arm" and was awakened when his head slipped off his arm.  He further recounts that Mr. Soria's slumber was noticed by all the jurors.

With respect to Mr. Peterson's hearing impairment, Mr. Armendariz recounts simply that Messrs. Soria and Peterson "didn't appear to be in sync."  Separately, Berryman refers to the incident just as Berryman's wife, Carol, commenced her penalty phase testimony.  During a side bar conference Mr. Peterson informed the trial court that he could not hear well out of his left ear and also had a hard time hearing out of his right ear, and as a result could not understand many of the side bar whispers.  RT-28: 3772.  Then, during his examination of Carol Berryman, he reiterated, in front of the jury: "Mrs. Berryman, I have a problem.  I don't hear out of the left ear and poorly out of the right so I'm going to ask you to speak up at least for me."  *Id.*: 3774.  A September 17, 2001 declaration of Mr. Soria confirms his awareness that Mr. Peterson was "somewhat hard of hearing in one ear," but that he "was not aware of any serious effect on the trial."  Mr. Peterson's distraction due to his wife's automobile accident is

1   evidenced by the omission of specific jury instructions, CALJIC 8.30 and 8.31, defining second degree

2   murder through express and implied malice. Berryman also claims Mr. Peterson's distraction is evident

3   by virtue his refusal of the lesser included offense instruction on involuntary manslaughter and failure

4   to request an instruction on the defense of accident. With respect to all the lapses, *Strickland* expert Mr.

5   Simrin opines that when a lawyer is "not there" due to being asleep or deaf, he cannot be giving

6   competent representation.  If neither lawyer was "there," the fact there were two of them would make

7   no difference.

8       Berryman also complains there were numerous occasions where neither Mr. Peterson, nor Mr.

9   Soria objected to improper evidence and prosecution argument.  After a careful review of the record, the

10  Court has logged a number of instances where objections were indeed made, but also where valid

11  objections were completely omitted at guilt proceedings as well as penalty proceedings.[125]

12      An early example of inattention to trial proceedings is described in the analysis of Claims 12, 29,

13  35, 50, 71, and 71A, *see* Part XIX., *supra*.  Specifically, the record reflects that prior to the presentation

14  of any argument or evidence at the guilt phase proceedings, pre-trial instructions explaining that the

15  felony rape murder and the rape murder special circumstance could be predicated on a completed or an

16  attempted rape. Mr. Soria claims in his declaration supporting this group of claims that he was surprised

17  by the prosecutor's inclusion of attempted rape to support the felony murder and the rape murder special

18  circumstance. *See* Part XIX.A.2.a., *supra*.  Mr. Soria evidently was not attending when the trial court

19  read the pre-trial instructions.

20      On the other hand, during the guilt phase, Mr. Soria closely followed the testimony of

21  prosecution criminalist Greg Laskowski.  When Mr. Laskowski began talking about the athletic shoes

22  he received from the authorities for analysis, Mr. Soria objected because no foundation had been laid

23  that the shoes belonged to Berryman.  RT-19: 2619.  Although Mr. Laskowski's testimony was quite

24  technical, from tire track rolls, to hair comparisons, to shoe prints, to necklace chain link comparisons,

25  Mr. Soria conducted a comprehensive cross examination, with no indication that he missed any of the

26  testimony.  RT-20: 2689- RT-21: 2866.  His cross examination of all technical witnesses for the

27

28      [125] Mr. Soria had primary responsibility for handling the guilt phase and Mr. Peterson for the penalty phase.

1    prosecution was equally comprehensive, including for pathologist John E. Holloway, M.D., technical

2    investigator Jerry L. Roper, forensic serologist, Gary Clayton Harmor, and fingerprint technical Opal L.

3    Chappell.   His cross examination of the family members and friends also was detailed, focusing

4    especially on timing issues (to advance Berryman's denial defense).   During the motion for judgment

5    of acquittal pursuant to Penal Code § 1118.1 and jury instruction conference, Mr. Soria was animated

6    and from the record, in full participation.   Mr. Peterson also had a part to play during guilt proceedings

7    as the attorney primarily responsible for requesting guilt phase instructions.   Although Mr. Peterson's

8    wife had been in an automobile accident, when the trial court reconvened after a reasonable period of

9    time during which Mrs. Peterson was recuperating, he also was involved and participating in the jury

10   instruction conference.   As noted in discussion of Claims 39, 40, 41, 44, 45, 46, 47, 48, and 51, *see* Part

11   XVIII.A., *supra*, lesser included offense instructions were given on second degree murder and voluntary

12   manslaughter, over Mr. Moench's objections.

13       Mr. Soria's guilt phase summation reflects his attention to the facts of the case and the defense

14   strategy favored by his client (denial), as well as the need to interject some argument about Berryman's

15   mental state and his degree of culpability.  RT-25: 3370- RT-26: 3334. Mr. Soria carefully and accurately

16   reviewed the testimony of the technical witnesses and lay witnesses to raise a reasonable doubt about

17   Berryman's ability to have committed the crime.   He argued that the state of Ms. Hildreth's injuries

18   appeared to have followed from an unplanned altercation.

19       The performance of trial counsel during penalty phase proceedings also was a blend of

20   appropriate participation and potential inattention.[126]   With respect to the prosecution notice of

21   aggravating evidence, both Mr. Soria and Mr. Peterson were active in objecting to evidence Mr. Moench

22   proposed to introduce in aggravation of the sentence under Penal Code § 190.3.  As a result, evidence

23   of an attempted sexual assault and uncharged but non-violent acts were excluded.  RT-27: 3500-3522.

24       On the other hand, introduction of evidence about Berryman's prior felony conviction for three

25   counts of transporting marijuana, is the subject of some of Berryman's current complaints.  As noted in

26

27         [126] The Court does not rule out that lack of active objection and interjection at every turn in the
      trial proceedings may just as well have been trial strategy to not call attention to evidence or arguments
28    that were harmful to the defense case.  Often trial attorneys will forego objections that can be made to
      avoid disrupting the proceedings and possibly incurring the annoyance of the jurors.

1   the statement of the facts of the penalty proceedings, *see* Part III.B., *infra*, his prior marijuana

2   transportation conviction was made the subject of a stipulation so that, as Mr. Peterson put it, there

3   wouldn't be a whole lot of detail about the circumstances of the crime.  RT-27: 3497-98.  In fact, during

4   Mr. Moench's opening penalty phase argument, he introduced the fact that Berryman had been so

5   convicted, *id*.: 3531.  When this fact was re-emphasized during cross examination of several defense

6   witnesses, however, Mr. Moench's questions overstepped the terms of the stipulation.  First, during the

7   cross examination of Berryman's younger brother, Bryan, Mr. Moench asked if Bryan had been involved

8   in the marijuana transporting venture.  *Id*.: 3621.  During his cross examination of sister Ronnique

9   Berryman, Mr. Moench suggested that Berryman had been arrested on *three separate occasions* for

10  marijuana transportation.  On this occasion, Mr. Peterson did object, clarifying there were not three

11  separate cases, but a single transaction.  *Id*.: 3658.  The most damaging information came from

12  Berryman's older brother, Ronald, Jr.  Ronald Jr. described his past convictions, including the felony

13  conviction for marijuana sales in which Berryman was involved.  He testified the marijuana conviction

14  involved a "sting" operation, in which Ronald, Jr. and Berryman thought they were selling marijuana

15  to students attending the high school Berryman attended, but actually, they were selling to undercover

16  narcotic agents.  *Id*.: 3678.  Mr. Moench also succeeded in getting Melinda Pena and Carol Berryman

17  to discuss the marijuana-related conviction.  RT-28: 3753, 3782.

18          With respect to Mr. Moench's treatment of mental health evidence, the inattentiveness of defense

19  counsel appears ambiguous.  One incident involves Mr. Peterson's interjection during the prosecution

20  cross examination of Dr. Benson.  After Mr. Moench asked for a copy of the notes Dr. Benson had been

21  referring to during his testimony, and the trial judge stated there would be a break in the proceedings so

22  appropriate copies could be made, Mr. Peterson spoke up, "I'm sorry, your Honor, I was engaged in

23  some other activity here.  You asked him about notes, you wanted to know if he can make copies of his

24  notes, is that the question?"  RT-28: 3900.  Another incident involved the cross examination of Dr.

25  Pierce, after Mr. Moench established that Berryman did not suffer from psychosis.  RT-28: 3885-86.

26  Mr. Moench then suggested that the next level of psychological dysfunction was neurosis, and that

27  Berryman did not suffer from that either.  Mr. Moench referred to an expert named Dr. Pollack at the

28  Institute for Forensic Psychiatry and the University of Southern California as the individual who

1    established levels of psychological problems.[127]  *Id.*: 3886.  Despite an objection from Mr. Peterson and

2    a statement by the court that ascending and descending levels of seriousness of psychological

3    impairments would not be relevant,[128] Mr. Moench persisted in referring to neurosis as the next level of

4    descending seriousness of psychological problems.  *Id.*: 3886.  No further objection to this line of

5    questioning is noted in the record.  The next incident occurred during penalty summation, where Mr.

6    Moench argued Dr. Pierce had testified Berryman had "an amoral personality."  RT-29: 3981.  This was

7    a misstatement.  Actually what Dr. Pierce said was that Berryman exhibited an "asocial" personality,

8    referring specifically to Berryman's attack on motorist David Perez.  RT-28: 3861.  The incorrect

9    reference drew no defense objection.  Reviewing psychological test results obtained by Dr. Pierce, Mr.

10   Moench further suggested that Berryman purposefully did not put the "blocks" together properly.  There

11   was no testimony about blocks.  He argued that the experts stated if Berryman had a mental disorder,

12   he wouldn't have been able to play basketball or baseball.  RT-29: 3985.  This was another misstatement

13   which drew no objection.  Finally, Mr. Moench misstated the testimony of Dr. Benson when he

14   described the expert's testimony that Berryman could not rape and murder someone during a seizure.

15   *Id.*: 3990.  In fact, Dr. Benson's testimony was that Berryman could not commit rape, not that he could

16   not commit murder, while he was having a seizure.[129]  (In other words, Dr. Benson said that Berryman

17   *could* commit murder during a seizure.)

18        Berryman also complains about Mr. Moench's characterization of Berryman as a "Casanova"

19   during his summation and that his attorneys did nothing to ameliorate the impact of argument which he

20   claims equated philandering with aggravating evidence.  RT-29: 3995.  This characterization actually

21   followed the testimony of Ronald, Jr., where he stated during direct examination that Berryman had

22   many girlfriends and was "like Casanova."  RT-27: 3672.  During Mr. Moench's cross examination of

23   Karen Bonty, Berryman's maternal aunt, about Berryman's character, he pressed her as to whether she

24

25   [127] Mr. Moench also indicated to the jury that Dr. Pollack provided services in cases of Charles Manson and Sirhan Sirhan.

26   [128] The objection did not mention the references to Manson or Sirhan.

27   [129] On the other hand, Mr. Moench validly argued that Berryman's experts agreed he had a
28   personality disorder, with Narcissistic features. The personality disorder was far from an extreme mental or emotional disturbance and the Narcissistic aspect merely demonstrated that Berryman was selfish.

knew Berryman was married to one girl, living with another, and dating others. RT-27: 3563. The question drew no objection. Mr. Moench also confirmed with Berryman's younger brother, Bryan, that Berryman had many girlfriends. *Id.*: 3623. Finally, he elicited testimony from Carol Berryman that she knew he was dating and having intercourse with several other women after they were separated in approximately June 1987. RT-28: 3801. Again, this testimony was given without objection.

With respect to the prosecution theory that Berryman stood on Ms. Hildreth's face for three to five minutes, while she bled to death, the defense response called Mr. Moench's characterization into question, but not by objection. As indicated in the recitation of facts in the guilt phase proceedings, *see* Part III.A., *supra*, Dr. Holloway testified that the bruise on Ms. Hildreth's face likely was caused by sustained pressure of Berryman's foot on her face as she lay dying and that her survival time from the stab wound was from three to five minutes. He did not testify that Berryman applied pressure from his shoe on her face for three to five minutes. On two occasions during his summation Mr. Moench reiterated his theory that Berryman stood on Ms. Hildreth's face for three to five minutes.[130] RT-29: 3980, 3982. Mr. Peterson's response was to sow doubt as to whether Berryman, in his inebriated condition, would have been able to stand on the victim's face for three minutes. *Id.*: 4018. During rebuttal argument, Mr. Moench stated that Dr. Holloway testified that the bruise on Ms. Hildreth's face actually was caused from someone standing on her face for from three to five minutes, again without objection from Mr. Peterson or Mr. Soria. *Id.*: 4027. On sur-rebuttal Mr. Peterson recounted the substance of Dr. Holloway's "testimony" exactly the opposite of what the pathologist actually stated on the stand. According to Mr. Peterson, Dr. Holloway said that the bruise on the victim's face could have been made by an impression of three to five minutes, but he did not testify that she would have died in this amount of time. Then in contradiction to that, he next said Dr. Holloway testified that a person who sustained a wound to the artery, as Ms. Hildreth sustained, could have lived a few minutes (which in fact is what Dr. Holloway did testify to, using the window of from three to five minutes). *Id.*: 4034.

Two miscellaneous prosecution theories also were advanced on cross examination: that Berryman struck motorist David Perez with a tire iron while others were holding Mr. Perez, and that

---

[130] On the first such occasion, Mr. Moench used his wrist watch to time for the jury a three minute interval.

Berryman attempted to force Ms. Hildreth to orally copulate him during the attack.  Of 19 year old Tamara Pearson, Mr. Moench pressed if her favorable opinion of Berryman would change if she knew he hit a man with a tire iron while that man was being held by another or others.[131]  RT-28: 3669.  Then he asked if her opinion would be altered if she,

> knew that he took, enticed a 17 year old girl out into the country on some pretense . . . [a]nd she declined to have sex with him, and he struck her and stunned her and pulled her out of the car and threw her down on the ground and took her clothes off and stabbed her in the side of the neck and stood on her face for three to five minutes while she was bleeding to death.[[132]]

*Id.*: 3770.  The witness responded she did not think he would do that, but that it would not change her opinion; she would still see him as the person she knew in high school.  *Id.*  Of Yolande Rumford, Mr. Moench asked her if she knew people purchased drugs from him or that he was transporting drugs to the school he attended.  *Id.*: 3813.  Specifically with respect to her favorable view of his character, he asked if her opinion would be altered if she knew that he hit someone on the head with a tire iron while that person was being held.[133]  She responded that she didn't think that one incident would have made her think he was a terrible person.  *Id.*: 3816-17.  Mr. Moench further tested Ms. Rumford's opinion, asking her if it would have been affected by the fact that he tricked a 17 year old girl to go out into the countryside where no one could see him and stunned her because she refused to have sex with him and then forcibly dragged her out of his truck to have sex with her, after pulling off her clothes.  Mr. Moench mentioned that Berryman also tried "to have her orally copulate him, give him a blow job."[134]  *Id.*: 3817.  To this hypothetical, which was not based on evidence presented at the trial, Ms. Rumford responded,

---

[131] There was no testimony that anyone was holding Mr. Perez when Berryman struck him.

[132] The hypothetical question did not draw an objection.

[133] See footnote 131, *supra*.

[134] Other than a far-reaching inference that could be drawn from the fact that a pubic hair found on the victim's face was said by the prosecution criminalist, Mr. Laskwoski, to have been consistent with another pubic hair taken from Berryman, there is no evidence of oral copulation completed or attempted, at all.  Nor did Mr. Moench argue this point in either his guilt phase or penalty phase summation.  Although, the Court notes that during the defense motion to dismiss during guilt phase proceedings, the trial judge suggested the fact that a pubic hair consistent with Berryman's was found on the victim's face indicated that Berryman could have penetrated the victim vaginally and then withdrawn prior to emission and engaged in "some movement" up her body towards her face.

1    "Yes, but he wouldn't do anything like that." *Id.*: 3818.  Defense counsel neither interposed an objection

2    nor questioned the witness further.

3         There was one further misstatement by Mr. Moench the Court has noted.  He argued that when

4    Ms. Hildreth's body was found, Berryman tried to cause a diversion by getting a gun and going to Lorene

5    Louis's house to shoot it up.  RT-29: 3979.  No testimony supports this argument and no objection was

6    interposed.

7         In reviewing Mr. Peterson's penalty phase summation, his argument was cogent and geared

8    toward the testimony.  He emphasized Berryman's excessive drinking, noting that even though Berryman

9    had developed a tolerance for alcohol (the hallmark of alcoholism), consuming excessive amounts of

10   alcohol still impaired his judgment, removed inhibition and affected his coordination.  RT-29: 4008.

11   As foundation, Mr. Peterson reviewed with the jury the number of alcoholic beverages Berryman

12   consumed throughout the day and evening of Ms. Hildreth's death.  *Id.*: 4009.  Similarly, Mr. Peterson's

13   sur-rebuttal argument assiduously tracked Mr. Moench's rebuttal argument, point by point.  By all

14   indications, he heard the rebuttal argument.  *Id.*: 4031-37.

15        **B.      Berryman's Contentions.**

16        Berryman cites a number of cases in support of his request for an evidentiary hearing and his

17   entitlement to relief.  First, under *Javor v. United States*, 724 F.2d 831, 833 (9th Cir. 1984), he argues

18   he is not required to demonstrate prejudice from Mr. Soria's somnolence where evidence supports the

19   conclusion he was asleep during substantial portions of trial.  Equating being asleep during substantial

20   portions of the trial to a total deprivation of counsel, Berryman argues a structural defect occurred in his

21   trial and no prejudice need be established, citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).  In

22   any event, he argues that there is little difference between saying prejudice is presumed and prejudice

23   has been demonstrated in cases where an attorney's somnolence is pervasive and the attorney-client

24   relationship during trial is "subject to repeated suspensions." *Tippins v. Walker*, 77 F.3d 682, 687 (2d

25   Cir. 1996).

26        With respect to Mr. Peterson's alleged deafness, Berryman relies on *People v. Butterfield*, 37 Cal.

27   App. 2d 140, 143 (1940) for the proposition that a lawyer who cannot hear the murder proceedings he

28   was supposed to be defending does not provide constitutionally adequate counsel.  He analogizes an

1   attorney's inattention due to deafness with an attorney's inattention due to being asleep.  Mr. Peterson's

2   alleged distraction over his wife's automobile accident is placed in the same category.

3        Berryman claims an evidentiary hearing is necessary to sort out the real issue, as to whether Mr.

4   Soria was asleep during substantial portions of the trial, citing, *United States v. Petersen*, 777 F.2d 482,

5   484 (9th Cir. 1985).   He claims entitlement to prove this contention because the Court denied

6   investigation funding on September 9, 1999 which would have permitted further juror interviews.  An

7   evidentiary hearing as to Mr. Peterson's deafness is wholly predicated on the declarations of Messrs.

8   Soria and Simrin.

9        **C.      Analysis.**

10        Addressing the issue of Mr. Peterson's deafness and alleged distraction first, the Court find no

11   evidence to support the claim he was essentially absent from the proceedings.  While the record reflects

12   Mr. Peterson's own admission that he was hard of hearing out of both ears, one more than the other, his

13   participation in the trial proceedings does not support Berryman's claim that he was absent on account

14   of deafness or distraction for a substantial portion of the trial.   The case relied by Berryman for the

15   proposition that a deaf attorney cannot provide constitutionally adequate counsel, *Butterfield*, 37 Cal.

16   App. 2d 143, is inapposite.   In *Butterfield*, the court's decision to vacate the petitioner's murder

17   conviction was based on prosecutorial misconduct from the collusion among the sheriff, the prosecutor,

18   and a jailhouse informant to induce the petitioner's confession.  *Id*. at 144.  A hearing disability which

19   afflicted the petitioner's elderly attorney was only mentioned in passing, *see id.* at 143, and formed no

20   basis for the conclusion.  Putting aside the support or lack of support offered by *Butterfield*, the analogy

21   to *Javor*, 724 F.2d 831, also fails.   Unlike the situation in *Javor*, in the present case, there is every

22   indication here that Mr. Peterson was "present and attentive in order to adequately test the credibility

23   of witnesses on cross-examination." *See id*. at 834.  Mr. Peterson also demonstrated familiarity with the

24   testimony to formulate a closing argument consistent with the defense strategy.  In light of this finding,

25   the Warden's *Teague*-bar contention need not be addressed.  Claim 19 is denied on the merits.  The

26   contention that Mr. Peterson was too distracted because of his wife's injury to give proper attention to

27   appropriate guilt phase jury instructions also does not support the notion he was absent for a substantial

28   portion of the trial.  As discussed in connection with Berryman's lesser included offense instructional

1   challenges, *see* Part XVIII.A., *supra*, Mr. Peterson was absent from trial proceedings from October 6,

2   1988 through October 17, 1988, apparently in connection with his wife's automobile accident, but no

3   proceedings were conducted in his absence.   After Mr. Soria informed the trial court of the

4   circumstances of the accident, trial proceedings were suspended altogether until Mr. Peterson was able

5   to return to his duties as Berryman's attorney.   Accordingly, the issue of Mr. Peterson's distraction at

6   most, was isolated, and thus "amenable to analysis under the *Strickland* prejudice test." *Tippins*, 77 F.3d

7   at 686.   With respect to each instance of attorney error attributable to Mr. Peterson, the *Strickland*

8   analysis has been undertaken in the evaluation of Claims 40, 45, and 46.   *See* Part XVIII., *supra*.   Claim

9   52 is denied on the merits.

10         Mr. Soria's alleged somnolence poses more of an analytical problem.   *Javor*, 724 F.2d 831, is

11   controlling.   "[W]hen an attorney for a criminal defendant sleeps through a substantial portion of the

12   trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary." *Id*.

13   at 833 (citing *Holloway v. Arkansas*, 435 U.S. 475, 489-91 (1978)).   The conclusion that prejudice is

14   inherent  follows from the court's conclusion that "unconscious or sleeping counsel is equivalent to no

15   counsel at all." *Id*. at 834.   The harm to a defendant "lies in what the attorney does not do, and is either

16   not readily apparent on the record, or occurs at a time when no record is made." *Id*. (internal quotations

17   and citations omitted).

18         Since the Ninth Circuit equates somnolence over a substantial portion of the trial with no counsel

19   at all under *Holloway v. Arkansas*, 435 U.S. at 489, the Warden's *Teague*-bar argument must fail.   The

20   holding in *Holloway*, namely, "when a defendant is deprived of the presence and assistance of his

21   attorney, either throughout the prosecution or during a critical state in, at least, the prosecution of a

22   capital offense, reversal is automatic," *id*., was decided in 1978, long before Berryman's trial and finality

23   of his conviction.   Moreover, *Holloway* relies on *Gideon v. Wainwright*, 372 U.S. 335 (1963).   *See also*

24   *Sullivan v. Louisiana*, 508 U.S. at 279.   Berryman is not seeking the benefit of a new rule.

25         Based on the record and on Mr. Armendariz's declaration, this Court is called upon to determine

26   whether Mr. Soria in fact slept during a substantial portion of the trial, and, if so, whether the presence

27   of his co-counsel obviated the prejudicial impact.   The Second Circuit opinion in *Tippins*, 77 F.3d 682,

28   and the Fifth Circuit opinion in *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (en banc), both

adopting the presumed prejudice holding of *Javor*, 724 F.3d at 833, offer helpful analyses. *Tippins* involved a three defendant trial for illegal sale of narcotics. 77 F.3d at 683. After raising the issue of his attorney's competence in state court post-conviction proceedings, an evidentiary hearing was conducted at which testimony was given by the trial judge, the court reporter, the prosecutor, a juror, Tippins' co-defendants, his mother, and his girlfriend. *Id*. at 684. The trial judge testified that Tippins' attorney "slept every day of the trial." On one occasion, the trial judge halted the trial and spoke to all the attorneys outside the presence of the jury for the purpose of instructing the attorney for one of the co-defendants to wake Tippins' attorney up. The trial judge testified that this conference occurred during the testimony of one of the co-defendants. The court reporter testified that Tippins' attorney slept a "significant" portion during the testimony of five witnesses. *Id*. at 687. The court reporter also testified that the slumber was continuous and occurred "almost every day." The prosecutor recounted that the trial judge called all the attorneys outside the presence of the jury on at least two occasions during the trial to address the slumber of Tippins' attorney. The juror who testified stated that Tippins' attorney slept during the testimony of the confidential informant, and that he was asleep approximately 65% of the trial. One of the co-defendants also testified that Tippins' attorney was asleep during the testimony of a key prosecution witness, the supposed buyer of the narcotics. The other co-defendant testified that the attorney was always sleeping and was asleep practically the entire trial. Tippins' mother and girlfriend also recalled seeing the attorney sleep possibly three or four times during the testimony of a co-defendant. *Id*. at 688. In trying to sort out the facts, the Second Circuit focused on whether the portions of the trial through which Tippins' attorney slept were substantial enough to warrant a presumption of prejudice. Because the record evidence indisputably demonstrated that counsel was "unconscious for numerous extended periods of time during which the defendant's interests were at stake," there was an breakdown in the adversarial process and the fundamental fairness of the proceedings against Tippins was called into question. *Id*. at 685. The court further noted that when "counsel sleeps, the ordinary analytical tools for identifying prejudice are unavailable. The errors and lost opportunities may not be visible in the record, and the reviewing court applying the traditional *Strickland* analysis may be forced to engage in 'unguided speculation.'" *Id.* at 686 (quoting *Javor*, 724 F.2d at 824.

In *Burdine*, a single defendant capital case arising in Texas, the state habeas court conducted a hearing at which Burdine called eight witnesses, including three of his jurors and the court clerk. These witnesses testified they had observed defense counsel sleeping during the prosecutor's examination of witnesses on numerous occasions and up to 10 minutes per incident. 262 F.3d at 339. The state court made factual findings that Burdine's attorney was repeatedly asleep "as witnesses adverse to Burdine were examined and other evidence against Burdine was introduced." *Id*. at 349. The federal courts accepted those state court findings as presumptively correct. This finding, in turn compelled the finding that Burdine's counsel could not function as constitutionally required because he was not able "to exercise judgment, calculation, and instinct." *Id*. (citing *Tippins*, 77 F.3d at 687).

On the present record in Berryman's case, the Court has the single declaration of David Armendariz recounting that Mr. Soria fell asleep on "more than one occasion" and that his slumber was noticed by all of the jurors. Also before the Court is Berryman's request for further evidentiary development from the other jurors and a prior denial issued by this Court in September 1999. However, as the Warden points out, Mr. Soria was not Berryman's only attorney, and it is true that under *Alford v. Rolfs*, 867 F.2d 1216, 1220 (9th Cir. 1989), a defendant cannot make out a claim for deprivation of counsel where two attorneys represented him, one of which is deemed to have been competent. Although Mr. Peterson admittedly was hard of hearing, the record refutes Berryman's contention that he was constructively absent from the trial. Nonetheless, the Court finds that reliance on *Alford*, does not obviate the need for further factual inquiry. In *Alford*, the two attorneys mentioned in the opinion represented Alford successively, not contemporaneously. Moreover, the second attorney was given an opportunity in state court to raise the exact argument Alford claimed was omitted by the first attorney which rendered his representation defective. *Id*. at 1220. No such analogy can be drawn in Berryman's case. In the absence of controlling authority on the issue, the Court is compelled to provide Berryman the opportunity to make a further offer of proof regarding Mr. Soria's conduct at trial.

Although the Court's review of the record appears to demonstrate that Mr. Soria did not sleep during "a substantial portion of the trial," the earlier denial of evidentiary development must be rectified before a final judgment is entered. Accordingly, Berryman will be permitted further evidentiary development of Claim 18, only, as specified in the Order, Part XXXVII., *infra*.

**XXII.  Berryman's Challenge to the Handling of the Berryman Family Member Outburst (Claims 73 and 74).**

Berryman complains that a family member outburst following the verdicts at the guilt phase proceedings tainted the jury for further service during penalty proceedings because the jurors were not adequately examined to determine prejudice.  In Claim 73, Berryman assails the trial court's failure to properly admonish the jurors, to properly examine the jurors, and to determine whether the family outburst prejudiced the jurors.  In Claim 74, Berryman claims trial counsel were ineffective because they did not demand a proper examination and did not otherwise move for a mistrial.  He does not request an evidentiary hearing regarding either of these claims.

**A.      Statement of the Facts Relevant to Family Outburst Claims.**

Following the first day of penalty proceedings, members of Berryman's family directed loud remarks at jurors as the jurors were leaving the courtroom.  Mr. Moench reported to the Court that one of the Berryman family members yelled to the jurors that they didn't know about "the girl's history."  Mr. Moench also reported that he heard one family member complain while still in the courtroom that Berryman didn't receive a fair trial because that there weren't any blacks on the jury, and the jurors deliberated on the guilt issues less than an hour.[135]  Mr. Peterson advised the court that although he heard voices directed at the exiting jurors, he didn't recognize any voices.  Then two jurors, Mary Donovan Radman and Billie Joe Honaker, returned to the courtroom to discuss what had been said or yelled to them.  Ms. Radman informed the court that she was concerned because people (referring to Berryman's family members) were yelling at them (the jurors) as they left the courtroom.  Without inquiring about what was said to the jurors, the trial judge told these two jurors that they should not give consideration to any comments made outside of the courtroom when deciding the case.  He told them that any comments made by Berryman's family members should be ignored.  Neither Ms. Radman, nor Mr. Honaker felt threatened by the comments made.  The trial judge, however, assured the jurors that their entrance and exit from the courtroom on succeeding days would be without confrontation or incident.

---

[135]  Assuming the jurors took an hour for lunch beginning at 12:30 p.m., when the trial proceedings recessed, the jurors took approximately two and one-half hours until they reached a verdict on Count 1 at 3:50 p.m., and Count 2, at 4:12 p.m.  *See* Part III.A., *supra*.

RT-27: 3681-88.  After the two jurors left the courtroom, the judge spoke to the members of Berryman's family who had been in the hallway and were summoned back into the courtroom, including Berryman's brothers, mother, sister, his cousin, his maternal aunt, and both grandmothers.  The trial judge told the family members that the female juror felt "somewhat threatened," and that she and another juror "were concerned about it." *Id*.: 3689.  He admonished the family that the jurors spent what he was sure was a very hard time deciding the guilt phase issues, in spite of the swiftness in returning their verdict and would not be appreciative of being told they didn't do their job or that they weren't fair.  The judge advised the family members that the entire jury would be advised the next morning to ignore comments made outside of the courtroom, but that if any family member spoke or attempted to speak to any of the jurors, that person would be cited for contempt of court and punished accordingly. *Id*.: 3690-93.

The next morning, the trial judge admonished all of the jurors that the issues before them must be determined solely from the evidence presented in court, and not from anything that might have occurred outside the courtroom.  He instructed them that they had to disregard anything they may have heard in the corridor and not to attribute comments made by Berryman's family members to any participant in the case.  When the trial judge asked if any of the jurors would have difficulty ignoring what comments and questions directed toward them the previously day, none of the jurors responded. RT-28: 3696-3700.  Other than Ms. Radman and Mr. Honaker no member of the panel was asked if he or she felt threatened as a result of the family member outburst.

**B.     Berryman's Contentions.**

Berryman maintains that when the trial judge informed family members that at a female juror felt somewhat threatened, the court made an implicit finding that she, in fact, felt threatened.  This is notwithstanding the fact that the female juror in question, Ms. Radman, denied that she felt threatened when the trial judge questioned her.  Berryman posits that the trial judge detected something in her demeanor that contradicted her words.  Berryman also contends that other jurors may have felt threatened as well, but because the trial judge failed to conduct individual examination, or failed to ask that specific question, their sense of security was not elicited, and may not now be ruled out.  He further argues individual examination should have been conducted to determine prejudice.

1    In his points and authorities, he argues that close examination of individual jurors is required

2   when there has been a prima facie showing of intimidation.  He refers to *Smith v. Phillips*, 455 U.S. 209

3   (1981), as supporting the examination of jurors when misconduct is suggested by observable facts, and

4   claims the holding in *Lawson v. Borg*, 60 F.3d 608 (9th Cir. 1995), entitles him to habeas relief due to

5   the trial court's failure to conduct such an examination.  He challenges the representation of his trial

6   counsel on the grounds that they did absolutely nothing to determine whether the jurors were prejudiced

7   against him.

8    Referring to the Court's September 9, 1999 ruling denying investigation funding to interview

9   jurors, Berryman asks for reconsideration, disagreeing with the Court's assessment that admonition

10  given by the trial court was sufficient to dispel any presumption of prejudice.

11  **C.    Analysis.**

12   There is no authority for the proposition that further examination of Berryman's jurors was

13  constitutionally mandated on account of the family outburst.  The fundamental and applicable principle

14  here is that due process "means a jury capable and willing to decide the case solely on the evidence

15  before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect

16  of such occurrences when they happen." *Phillips*, 455 U.S. at 217.  That principle was played out here.

17   When the problem of family members inappropriately speaking to exiting jurors arose, the trial

18  judge immediately dealt with the issue informing counsel that he would admonish the jury the following

19  morning that statements made by family members should be disregarded.  The judge also gave the two

20  jurors who remained behind an audience, to explore with them the full extent of their concerns.  He then

21  addressed offending family members, explaining to them the detriment their remarks potentially could

22  cause.

23   Despite the fact the trial judge told the family members that a female juror felt "somewhat

24  threatened" by their conduct, the Court does not agree with Berryman's assessment that the judge

25  actually made a finding Ms. Radman felt threatened.  Rather, in the context of the entire proceedings,

26  it is clear that the trial judge accepted Ms. Radman's statement that she did not feel threatened, but gave

27  family members a contrary account to impress upon them the detrimental potential they could have on

28  jurors by inappropriate communication.  It also is clear from the record that remarks directed toward the

1   exiting jurors were not threatening.  The comments recounted in the record pertain to the feelings family

2   members had about the proceedings, not statements about what they intended to do to jurors.  If there

3   were any additional comments, that may have been actual threats, Berryman could have developed that

4   evidence by interviewing the family members who made them or were present when they were made,

5   including Berryman's mother, sister, younger brother, and cousin.  There is no basis now, and there was

6   no basis in September 1999, to grant investigative funds to interview jurors, when the information sought

7   to be obtained would have been available from Berryman's family.  Further, based on the character of

8   the remarks family members made, as recounted in the record, the Court finds that the admonishment

9   given by the trial judge to the jurors was entirely adequate to ensure juror impartiality.  In any event, the

10  relevant question is not whether the jurors felt threatened, but whether they could disregard the family

11  outburst and render their decision impartially, solely on the evidence presented.  *See Patton v. Yount*,

12  467 U.S. 1025, 1035 (1984).  Having made the determination that Berryman's jurors could continue to

13  sit as an impartial body, the trial court's finding is entitled to deference that cannot be disturbed on

14  federal habeas.  28 U.S.C. § 2254(d)(2).  The trial court did not err in failing to conduct further

15  examination and trial counsel were not ineffective for not asking that the trial court to do so.

16      Although the allegation of a *Teague*-bar is to be resolved before courts address the merits,

17  *Bohlen*, 510 U.S. at 389, such a threshold inquiry here is pointless.  *See* discussion of Claims 7, 8, 9,

18  10, and 23, Part VII.C., *supra*.  Claims 73 and 74 are denied on the merits.  Berryman's request for

19  reconsideration of the funding request with respect to Claim 73 is denied.

20  **XXIII.**      **Berryman's Challenge to the Lack of Notice on Penalty Aggravating Evidence**

21              **(Claims 13 and 14).**

22      Claims 13 and 14 allege that evidence in aggravation of Berryman's sentence was introduced

23  during penalty proceedings without notice as required by Penal Code § 190.3.  He claims a straight due

24  process violation for the lack of notice in Claim 13 and ineffective assistance of counsel from his trial

25  attorneys' failure to object to introduction of unauthorized evidence in Claim 14.  He seeks an

26  evidentiary hearing with respect to both claims.

27

28

1    **A.    Statement of the Facts Relevant to the Lack of Notice on Penalty Aggravating**

2    **Evidence.**

3    During trial proceedings, Mr. Moench advised Berryman's trial counsel of evidence on which

4    he intended to rely in aggravation of the sentence:  circumstances of the crime (§ 190.3(a)), separate

5    assaults on motorist David Perez and Berryman's father-in-law (§ 190.3(b)),[136] and two prior

6    convictions, one for three counts of marijuana transportation and the other for grand theft (§ 190.3(c)).

7    The parties agreed that evidence of the two prior convictions would be introduced by way of stipulation,

8    whereby only the fact of the convictions would be before the jury and the circumstances of the

9    underlying crimes would not be described.   Berryman complains that the prosecution wrongfully

10   introduced testimony of his brother, Ronald, Jr. that he (Berryman) sold narcotics to school children and

11   testimony of various witnesses that he (Berryman) had numerous sexual liaisons outside of his marriage.

12   Relevant to the commentary on the sale of drugs is the discussion between the trial judge and the parties

13   about what aggravating evidence would be introduced.   As for evidence of Berryman's extra-marital

14   affairs, trial testimony of lay witnesses about his treatment of women and mental health experts about

15   his need for nurturing is relevant.  With respect to both categories, *Strickland* expert Mr. Simrin offers

16   opinions about the manner in which trial counsel should have conducted themselves.[137]

17   **1.    Selling Narcotics to School Children.**

18   The trial court entertained in limine motions prior to penalty proceedings.  With respect to

19   Berryman's prior felony conviction for the transportation of marijuana, the court accepted the parties'

20   joint stipulation that there would be no "extensive recitation" of the acts that led to the conviction,

21   unless, as Mr. Moench phrased it, the defense attempted to downplay the seriousness of the conviction.

22   RT-27: 3497-3499.  The trial judge agreed that delving into the circumstances of the marijuana

---

[136] As noted in the summary of the penalty phase proceedings, Part III.B., *supra*, Mr. Moench also advised the defense he intended to introduce evidence of Berryman's assault on a fellow inmate at the County Jail.  This evidence was never introduced.

[137] A proffered declaration on the issue of the marijuana conviction from Mr. Soria is submitted, but not credited by the Court.  The declaration text states that Mr. Soria objected to evidence elicited by Mr. Moench that Berryman sold narcotics to school children and that in retrospect, he (Mr. Soria) should have objected more.  However, the declaration is not executed, but includes a handwritten sentence that states: "I don't remember any of this but if true I agree with the declaration."  Moreover, the notion that Mr. Soria objected to any penalty phase evidence conflicts with the trial record.

1   transportation conviction would only be appropriate under the circumstances outlined by Mr. Moench.

2   *Id.*: 3500.  During his opening statement, Mr. Moench in fact told the jurors that Berryman had suffered

3   two convictions, one for three counts of marijuana transportation and one for a single count of grand

4   theft.[138]  *Id.*: 3528.  Mr. Peterson also mentioned the convictions in his opening statement, giving the

5   jurors the actual code sections.  *Id.*: 3531.

6          When Ronald, Jr. testified on direct examination, he admitted to Mr. Peterson that he had been

7   convicted of prior felonies, including one pertaining to marijuana sales in which Berryman also was

8   involved.  *Id.*: 3674.  On cross examination, Mr. Moench explored the prior felonies.  Mr. Moench asked

9   Ronald, Jr. about the felony in which Berryman was involved:

10  | MR. MOENCH: | And the one that your brother was involved in, what one was that? |
11
12  | RONALD, JR.: | That was narcotic – I think that might be when I was first arrested in the city of West Covina, when they had the biggest raid there, and we got caught up in a mix, Catch 22, and got busted. |
13
14  | MR. MOENCH: | Sales of marijuana, from an investigation coming from – |

    | RONALD, JR.: |  The West Covina High School. |
15
    | MR. MOENCH: | West Covina High School? |
16
    | RONALD, JR.: | Uh-huh, it was undercover in the West Covina High School. |
17
    | MR. MOENCH: | Yeah, they thought you were selling to kids; is that correct? |
18
19  | RONALD, JR.: | Well, not I, myself, but my brother, my brother was in high school at the time, so he was able to do that, because he was a high school kid himself. |
20
21  | MR. MOENCH: | You were supplying the stuff and he was actually doing the transaction, the transporting? |

22  | RONALD, JR.: | Do I have to answer that?  That's not – I'm not in here for that. |

23  | THE COURT: | Just answer the question. |

24  | RONALD, JR.: | No. |

25

26

27

28      [138] The introduction of the grand theft conviction has not generated a constitutional challenge to Berryman's conviction or sentence.

*Id*.: 3678-79.  Mr. Moench did not mention the marijuana conviction, or the circumstances underlying the conviction again during the proceeding.  Mr. Simrin opines that even if objectionable material was volunteered, defense counsel should have moved to strike the offending testimony.

### 2.    Extra-Marital Relations.

Quite a bit of evidence was introduced about Berryman's upbringing and his emotional needs which led Mr. Moench to emphasize Berryman's sexual infidelity.  Friends and relatives of Berryman were asked about his character and the manner in which he treated women.  The responses were unanimous and plentiful that Berryman was kind and attentive to women, and that he had many girlfriends.  Berryman points to three of these witnesses, his aunt Karen Bonty, his younger brother Bryan Berryman, and his wife, Carol, as instances where Mr. Moench's cross examination was prejudicially inappropriate.

Karen Bonty testified on cross examination that prior to the crime she did not know Berryman was married to one, living with another, and dating others.  RT-27.: 3563.  Younger brother Bryan Berryman testified about living arrangements of Berryman after he moved out of his mother's house at age 16.  Bryan testified that during the ensuing few years, Berryman lived in various places, including with his grandmother, in Bryan's room, and with various girlfriends.  He stated that Berryman had many girlfriends and that he (Bryan) was pretty sure he met them all.  *Id*.: 3623.  No quantity was assigned to the number of girlfriends.  On cross examination, Carol Berryman testified she knew Berryman was living with another woman in Delano, and having intercourse with several other women.  RT-28: 3801.

As set out in connection with Claims 18, 19, and 52, Part XXI.A., *supra*, Ronald, Jr., stated during *direct examination* that Berryman had many girlfriends and was "like Casanova."  RT-27: 3672.  Mr. Moench did not ask Ronald, Jr. any further questions about this characterization on cross examination.  Mr. Simrin offers that Mr. Peterson should have moved to strike this answer.

The defense experts, Drs. Pierce and Benson, provided a psychological explanation for Berryman's attraction to women.  First, Dr. Pierce testified that Berryman's lack of maternal nurturing from childhood through puberty left his dependency needs unfulfilled.  Since his mother couldn't provide the nurturing he needed, he had a way of finding people who would take him in.  RT-28: 3858.  Berryman's attraction and intimate relationships with numerous females was driven by his "need for

nurturance" he missed in his early childhood. It wasn't so much his attraction to sexuality that impelled him, as his need to be around someone who would treat him nicely. *Id*.: 3870. Part of his behavior was to try fill the gap in his interpersonal relationships, particularly with women. *Id*.: 3871. Similarly, Dr. Benson observed that Berryman's lifestyle was characterized by a kind of dependency, particularly on women, in wanting to be taken care of. He tended to get very close and obtain nurturing by being charming and somewhat immature. In Dr. Benson's opinion, Berryman seemed to need more than the average person would need. *Id*.: 3905-06.[139]

On penalty summation, Mr. Moench reviewed Berryman's attitude toward women and his multiple sexual liaisons. He reviewed that after the crime, Berryman returned to the Clark residence and awakened his girlfriend Crystal so he could get something to eat. Mr. Moench argued Berryman couldn't do it for himself, that's what he had women for, to take care of him and comply with his sexual needs. RT-29: 3979. Mr. Moench posited that Berryman became angry with Ms. Hildreth for refusing to give him the sexual affection he wanted. *Id*.: 3990-91. Finally, he referred to the testimony of Ronald, Jr.:

> The defendant's brother is the one who calls him a Casanova. I assume he's not talking about Giacoma Casanova's ability to write music or anything like that, [b]ut his philandering, and his name has become synonymous with philandering. And I would suggest to you that this is [a] factor in aggravation and even more so than it would in mitigation.

*Id*.: 3995. Mr. Simrin opines this argument should have been tested by defense objection and that the failure to do so was constitutionally incompetent.

## B.    Berryman's Contentions.

Berryman claims he (his attorneys) were affirmatively misled by the lack of notice of aggravating factors. He characterizes the stipulation regarding the marijuana transportation conviction as an explicit ruling by the trial court that evidence of the circumstances of that conviction were "excluded." Finally, recognizing that the United States Supreme Court decision in *Gray v. Netherland*, 518 U.S. 152 (1996), is adverse to his claim as to the existence of a due process violation, Berryman endeavors to distinguish the facts of *Gray* from the facts of his own case. Specifically, Berryman points out that the Virginia

---

[139] The declarations of Berryman's mother, Lestine Bonty corroborated the expert testimony as she described the paucity of maternal nurturing she offered her children, particularly Berryman.

1   statute governing notice of aggravating factors in penalty proceedings at issue in *Gray* did not have a

2   statutory notice requirement, whereas, the California statute, Penal Code § 190.3 does have a notice

3   requirement.

4       **C.      Analysis.**

5           The language of Penal Code § 190.3 provides in pertinent part: "[N]o evidence may be presented

6   by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the

7   defendant within a reasonable period of time prior to trial, as determined by the court."   Berryman's

8   claim is that Mr. Moench's exuberant impeachment of Ronald, Jr. regarding the marijuana offense, his

9   excessive testing of lay character witnesses about Berryman's infidelity, and his argument that

10  Berryman's philandering was more aggravating than mitigating all required notice under § 190.3, and

11  the fact that notice wasn't given constitutes a due process violation entitling him to habeas relief on his

12  death sentence.   There being no such rule, the Court declines to address the Warden's *Teague*-bar

13  argument.   *See* discussion of Claims 7, 8, 9, 10, and 23, Part VII.C., *supra*.

14          *Gardner v. Florida*, 430 U.S. 349 (1977), recites the relevant due process concerns at penalty

15  proceedings. First, sentencing, especially capital sentencing, is a critical stage of a criminal proceedings,

16  at which a defendant is entitled to effective assistance of counsel.   *Id.* at 358.   Second, although a capital

17  defendant may have no right to object to a particular result of the sentencing process, s/he does have "a

18  legitimate interest in the character of the procedure which leads to the imposition of sentence."   *Id.*

19  Third, as part of a defendant's entitlement to effective assistance of counsel, full disclosure of

20  information upon which a sentencing decision may be based is essential if counsel is going to have "an

21  opportunity to comment on facts which may influence" that decision.   *Id.* at 360.   In conclusion, the

22  Court held "the petitioner was denied due process of law when the death sentence was imposed, at least

23  in part, on the basis of information which he had no opportunity to deny or explain."   *Id.* at 362.

24          In *Gray*, 518 U.S. 152, the Court did not find the due process violation present in *Gardner*.   In

25  that case, as here, the petitioner claimed his due process rights were violated because he was not given

26  adequate notice of the evidence to be used against him during penalty proceedings.   *Id.* at 155.   At the

27  beginning of Gray's trial, the prosecutor represented he intended to introduce statements made by Gray

28  to his co-perpetrator and fellow inmates concerning his involvement in a separate but theretofore

1    unsolved double homicide in a nearby community. *Id.* at 156-57.  On the day before penalty proceedings

2    commenced, however, the prosecutor stated he also intended to call police authorities who had

3    investigated the other, double homicide to show similarities between that crime and the one for which

4    Gray had just been convicted.  *Id.* at 157.  Over Gray's objections, the evidence proffered by the

5    prosecutor was introduced and the jury returned a death sentence verdict. *Id.* at 157-58.  Even prior to

6    the police officer's testimony, however, Gray knew the prosecutor intended to offer evidence concerning

7    his involvement in the separate double homicide through the testimony of his co-perpetrator and fellow

8    inmates.  The sole basis for his contention that all evidence concerning the separate homicide should be

9    excluded was that the prosecutor intended to call investigating police officers *in addition* to the

10   previously identified co-perpetrator and fellow inmates.  *Id.*  This was not enough for a due process

11   violation.

12          Similarly, here, there also is no due process violation.  With respect to evidence elicited from

13   Ronald, Jr. that Berryman had been involved in an operation selling marijuana to high school students,

14   the prosecutor never argued this fact was an aggravating factor.  Further, as the California Supreme

15   Court found, it simply came out  voluntarily during the cross examination of Ronald, Jr., *see* 6 Cal. 4th

16   at 1094, and was not mentioned again in the proceedings.  Thus this evidence cannot be characterized

17   as evidence in aggravation within the meaning of Penal Code § 190.3.  Berryman was given notice of

18   the evidence in aggravation Mr. Moench intended to and did introduce, that is evidence regarding the

19   circumstances of the crime under § 190.3(a), evidence of two prior violent acts which did not result in

20   a conviction under § 190.3(b) (that is the altercation with his father-in-law and the confrontation with

21   motorist David Perez), and his two prior convictions under § 190.3 (c) (that is the three-count marijuana

22   conviction and the grand theft conviction).

23          With respect to the marijuana conviction, any constitutional violation was harmless, as previously

24   noted in connection with Claims 7, 8, 9, 10, and 23, Part VII.C., *supra*.  *See Brecht*, 507 U.S. at 637.

25   Claims 56, 62, 88, 89, and 90 also address evidence of the marijuana convictions.  *See* Part XXX., *infra*.

26   While selling marijuana may point to the fact that Berryman was opportunistic, the sale of marijuana is

27   not a heinous crime causing the victims great pain.  Any prejudice is ameliorated by the fact that the

28   marijuana sales activities were not mentioned again in the proceedings, and further, as explained in Part

XXX., *infra*, because the trial court instructed the jury to consider Berryman's prior convictions for grand theft and marijuana *transportation* (not sales).   The Court reiterates it is convinced that Mr. Moench's elicitation of details regarding the marijuana offense had no impact on the jury's death verdict.

Assertive cross examination of lay witnesses about Berryman's good character and kindness toward women also does not constitute evidence subject to the § 190.3 notice requirement.   As sanctioned by the Supreme Court in *Dawson v. Delaware*, 503 U.S. 159, 167 (1992), Mr. Moench was simply rigorously testing the lay opinions of family and friends about Berryman's character.   Similarly, Mr. Moench's summation in which he recounted the description of Berryman as a "Casanova" by his brother, Ronald, Jr. amounted to fair rebuttal to the character evidence of the lay witnesses and more substantially, to the expert testimony of Drs. Pierce and Benson about Berryman's need for female affection.   The net result of this evidence and argument was to show two sides of Berryman – one that he was emotionally needy, but still a nice guy, and two, that he was manipulative, selfish, and unwilling to put his own desires (or sexual urges) aside when he did not have a willing partner.   This was appropriate material for the jurors to consider in deliberating Berryman's penalty.   The Court agrees, however, that Mr. Moench resorted to improper argument when he stated Berryman's philandering should be viewed by the jurors as aggravating.   Nonetheless, Berryman's sexual infidelity was no secret. It was presented by the defense through expert and lay testimony.   The fact that Berryman attempted to maintain and participate in multiple sexual relations in a single evening before killing Ms. Hildreth is also a circumstance of the crime.   He spent the day with Ms. Armendariz and went apartment hunting with her for the purpose of cohabiting with her and her infant twins.   Telling Ms. Armendariz he was going to visit his grandmother, he proceeded to ask Donna Faye Warner for a date.   When she declined, he asked Melinda Pena for a date, and was successful.   When his date with Ms. Pena ended, he picked up Ms. Hildreth, but the attempt to engage in another romantic, sexual union had tragic consequences. What was aggravating was that in the process of trying to fulfill his goal of multiple female relationships or philandering, he killed Ms. Hildreth.   In light of the circumstances of the crime, including evidence of violence committed against Ms. Hildreth, the Court finds it implausible that the jury would have considered Berryman's philandering as a factor in aggravation of his sentence separate from the circumstances of the crime.   The improper argument was harmless.

1    Claims 13 and 14 are denied.  Further evidentiary development also is denied.

2    **XXIV.      Berryman's Challenge to Evidence and Argument that He Stood on the Victim's**

3    **Face for Three to Five Minutes (Claims 29 and 75).**

4    Claims 29 and 75 reiterate the challenge to the prosecution argument that Berryman stood on Ms.

5    Hildreth's face for three to five minutes as she lay bleeding to death.  In a previous section of this

6    Memorandum Order, the Court addressed that portion of Claim 29 alleging that defense counsel should

7    have retained a pathologist to testify at trial about the rape charges.  *See* Part XIX., *supra*.  This portion

8    of Claim 29 alleges an independent pathologist should have been engaged to testify there was no

9    evidence Berryman stood on Ms. Hildreth's face for three to five minutes and trial counsel were

10   constitutionally incompetent for not retaining one.  Claim 75, Berryman alleges prosecutorial misconduct

11   for Mr. Moench's cross examination of defense witnesses and penalty summation about standing on the

12   victim's face for three to five minutes..  An evidentiary hearing is requested to demonstrate that the

13   evidence of Berryman standing on Ms. Hildreth's face was particularly compelling to the jury.

14   **A.      Statement of the Facts Relevant to Berryman's Challenge to Evidence and**

15   **Argument He Stood on the Victim's Face for Three to Five Minutes.**

16   The record evidence supporting these claims has been fully recounted in connection with related

17   claims, notably those dealing with Mr. Moench's status as an elected judge, and the inattention of

18   defense counsel to the proceedings.  *See* discussion of facts relevant to Claims 7, 8, 9, 10, and 23, Part

19   VII.A., *supra*, and to Claims 18, 19, and 52, Part XXI.A., *supra*.  This includes Mr. Moench's cross

20   examination of defense witnesses where he challenged them to still maintain their favorable opinion of

21   Berryman even though he stood on the victim's face for three to five minutes.  In addition, the actual

22   guilt phase testimony of the trial pathologist, Dr. Holloway is reviewed in Part III.A., *supra*.  The only

23   additional evidence offered with respect to this portion of Claim 29 and Claim 75 is the declaration of

24   David Armendariz.  Specifically, Mr. Armendariz states:

25   To me, my feeling for the death sentence was affected most by the fact that Rodney
     stepped on the victim's face – the severity and callousness of it.  And they had the tennis

26   shoe to prove it.  I was particularly impressed when Deputy DA Moench placed a
     stopwatch down and described how the victim must have struggled on the ground as the

27   seconds went by.  Moench described how the victim would have had the foot on her face
     to stop her squirming.  Her jugular was cut and blood was shooting out on to his

28

1   [Berryman's] shoes.  Then the alarm went off.  I was impressed by how slowly the time
2   passed and how long she must have suffered in suffocating.

3   **B.      Berryman's Contentions.**

4   Berryman argues his attorneys should have hired their own pathology expert to controvert the

5   notion suggested by Dr. Holloway that he (Berryman) stood on Ms. Hildreth's face for three to five

6   minutes.  He also argues Mr. Moench committed prosecutorial misconduct for misstating and

7   misconstruing the evidence given by Dr. Holloway.  Berryman vigorously complains that Mr. Moench's

8   use of his watch to time three minutes during his summation was so prejudicial so as to warrant relief.

9   *Darden*, 477 U.S. at 181.

10   **C.      Analysis.**

11   The prejudicial impact of Mr. Moench's argument about standing on Ms. Hildreth's face is

12   evaluated in connection with Berryman's complaint that Mr. Moench was an elected judge at the time

13   he tried Berryman's case.  *See* Part VII.C., *supra*.  To reiterate, the erroneous argument about the length

14   of time Berryman stood on the Ms. Hildreth's face constitutes one of the least prejudicial misdeeds Mr.

15   Moench committed in the course of the trial.  The evidence adduced at trial was that a patterned bruise

16   on Ms. Hildreth's face bore similarities to the tread design on the bottom of Berryman's Brooks athletic

17   shoes.  Dr. Holloway opined that the bruise was the result of sustained pressure of the perpetrator's foot

18   on Ms. Hildreth's face.  He also testified that Ms. Hildreth's survival time from her neck wound was

19   from three to five minutes.  Thus, even if Berryman had not stood on Ms. Hildreth's face the entire three

20   to five minutes Dr. Holloway stated was her maximum survival time, the fact remains that Berryman did

21   apply sustained pressure of his foot for some significant amount of time in order to generate the

22   patterned bruise.  Had Mr. Moench advanced an argument more consistent with Dr. Holloway's

23   testimony, the argument still would have been highly prejudicial.  The incorrect information about the

24   exact duration of the sustained pressure was insignificant.  The error did not infect the trial process with

25   unfairness as to make the resulting conviction a denial of due process.  *See DeChristoforo*, 416 U.S. at

26   643; *Darden*, 477 U.S. at 181 (1986); *Thompson*, 74 F.3d at 1576.

27   Mr. Armendariz's declaration is not necessary to establish the prejudicial impact of the fact that

28   Berryman stepped on Ms. Hildreth's face and in so doing, applied sustained pressure.  Moreover, since

1   Mr. Armendariz's declaration recounts how the trial evidence influenced his thoughts and emotions
2   during deliberations, it is inadmissible under Federal Rule of Evidence 606(b).

3       The remaining portion of Claim 29 as well as Claim 75 are denied on the merits.  The request
4   for an evidentiary hearing also is denied.

## XXV.   Berryman's Challenge to Constitutionally Inadequate Investigation Efforts and Resulting Failure to Develop Mitigating Evidence at Penalty Proceedings (Claims 6, 63, 64, 65, 69, and 70).

8       This group of claims challenges effective assistance of counsel due to the failure to retain a
9   competent investigator and/ or to supervise the investigators that were retained, Bruce Binns and staff.
10  Berryman requests an evidentiary hearing with respect to Claims 63, 65, and 69.

### A.       Statement of the Facts Relevant to Investigator Inadequacies.

12      The facts document lack of qualification of Mr. Binns and his staff and demonstrate what
13  evidence counsel could have developed had they retained competent investigators (or properly
14  supervised Mr. Binns and his staff).  The sources for evidence relevant to these claims is varied,
15  including declarations appended to Berryman's First and Second State Habeas Petitions, as well as
16  declarations offered with his motion for an evidentiary hearing.[140]

### 1.       Qualifications of the Investigative Staff.

18      Anthony Gane, Berryman's investigator in these federal proceedings has been working with
19  Berryman's federal counsel since late 1995.  Mr. Gane looked into the trial defense investigation firm
20  of Bruce Binns.  This investigation reveals that Mr. Binns handled only certain aspects of Berryman's
21  case and delegated other portions to unlicensed, untrained, unskilled, and unsupervised employees,
22  Douglas Lemmons and Ed Beadle.  The delegated tasks included arranging for laboratory tests of
23  empirical evidence, gathering other documentary evidence, interviewing witnesses, and arranging
24  Berryman's transportation for tests requested by the experts.

---

27      [140]   As noted above, Berryman's first state habeas petition was filed September 3, 1993.  His
28  Second State Habeas Petition was filed on March 20, 1998.  The declarations of friends and relatives appended to Berryman's motion for evidentiary hearing were executed between February and July 2001.

1    Mr. Gane interviewed people who were called as defense witnesses at Berryman's trial.  He

2    confirmed that defense counsel, Mr. Peterson, consistently made a point of not speaking to penalty phase

3    defense witnesses before calling them, with the result that he (Mr. Peterson) didn't know whether

4    testimony he elicited would be helpful, harmful, or he was overlooking helpful information.  Similarly,

5    Mr. Gane confirmed that the defense investigator Mr. Binns delegated to his unlicensed, untrained,

6    unskilled, and unsupervised employees the task of identifying defense witnesses.  None of the defense

7    witnesses (largely family members) were meaningfully interviewed prior to their trial testimony.

8    Federal co-counsel Mr. Morris interviewed Mr. Lemmons.  Mr. Morris learned that after working

9    on Berryman's case, Lemmons, a Vietnam veteran, was admitted to the Menlo Park Veteran's Hospital

10   for three months and then a mental hospital in Bakersfield.  At some point in his life, he was granted a

11   100 percent mental disability rating for post-traumatic stress syndrome, but he was also said to have

12   worked as a private security guard for ten years.

13              **2.    Efforts Undertaken to Have Berryman Tested for Neurological Problems.**

14   Mr. Soria executed a declaration October 29, 1991 which Berryman's appellate counsel, Mr. Paul

15   Posner, submitted with the first state habeas petition.  In this declaration Mr. Soria discusses efforts

16   undertaken to have Berryman undergo neurological tests requested by Drs. Pierce and Benson.  The

17   County Hospital advised the defense team that an alcohol induced EEG required special expertise which

18   the County Hospital did not have.  Mr. Soria explains that "for some reason the test could not be

19   performed at the other hospital in Kern County," and that other than these two hospitals, no other

20   hospitals could perform the tests.  Although Dr. Benson informed Mr. Soria that the testing could be

21   performed at a hospital in Oakland, Mr. Soria did not ask for funding to have Berryman transferred

22   because he "believed at the time the [trial] court would not issue such an order."  *Strickland* expert Mr.

23   Simrin opines it was incompetent for trial counsel not to have requested to conduct the tests

24   recommended by the experts.  Mr. Soria notes that in a subsequent capital case he did request that testing

25   be performed outside the county, and the request was granted by the same trial judge who presided over

26   Berryman's case.[141]

27   _____

28        [141] That case was *People v. John Lee Holt*, Kern County Superior Court Case No. 39910, which also is pending before this Court on federal habeas corpus under the name *Holt v. Ayers*.

3.        **Mitigation Evidence Not Uncovered.**

The record before the Court contains a wide variety of evidence that has been developed post-conviction, beginning with Berryman's first state habeas petition through declarations appended to his motion for evidentiary hearing.  Except for a description of various of Berryman's school, juvenile, early criminal, and medical records, summarized immediately below, Part XXV.A.3.a., *infra*, all of the evidence consists of declarations from lay witnesses and various attorneys who have represented Berryman over the years.

a.        **Pertinent Records Not Uncovered.**

Appended to the first state habeas petition are a number of documents from various sources.  In the first category are several Los Angeles Superior Court Minute Orders regarding the two convictions Berryman suffered prior to the present offense (for transportation of marijuana and grand theft).  The next category is comprised of two sets of school records, the first nearly illegible, but which show Berryman's progress in school from third grade through high school.  At the high school level, Berryman was earning F's and D's with unsatisfactory effort.  The second set of school records are also from the high school level, but the grades vary from B's and C's to D's and F's.  Berryman attended at least three public junior high schools and seven public high schools, plus school at the Sacramento Boys Ranch.  As his school attendance at the Sacramento Boys Ranch indicates, there are quite a large number of documents concerning Berryman's association with the juvenile system in Sacramento in the state record.

Berryman was first introduced into the juvenile system in August 1980, when he was 14 ½ years old on an arson charge.  At that time, he was living with his father in Sacramento.  Thereafter, there were several additional charges, including Berryman being a runaway, escalating to shoplifting, burglary, a sexually charged assault on a teenage girl, possession of a machete, and fighting at school.  Although Berryman's father participated in family reunification sessions, due to his work schedule he was not able (or willing) to devote sufficient time to Berryman's supervision.  Berryman's mother, who lived in Los Angeles County, with a new family, told juvenile probation officers she could not handle Berryman either.  Group home officials and probation officers during Berryman's adolescence described him as being aggressive, manipulative, and untrustworthy.  He also reportedly was sexually active at the age

of 15 and claimed when he was 17 that his girlfriend (unnamed) was pregnant.[142]  Berryman's last

placement while under the jurisdiction of the Sacramento Juvenile Court was at the Sacramento Boys

Ranch, where he was said to have made an "outstanding" adjustment to the requirements of the program.

He was released from the wardship petition in June 1983, when he was 17 ½. He was going to go to his

paternal great grandmother's house in Delano, but ended up staying with his mother in Los Angeles

County, where he attended West Covina High School until his arrest for the marijuana transportation

charge in the spring of 1984, mentioned above.

The last category of documents pertains to injuries Berryman sustained beginning with he was

16.  All of these records, except the Worker's Compensation Appeals Board and related documents

regarding his work injury, are from Queen of the Valley Hospital in the Los Angeles County community

of West Covina.  First, in August 1982, Berryman sustained a laceration to his scalp from being hit with

a baseball.  The x-ray taken was negative for a skull fracture.  A few years later, when he was 18, in July

1984, he fell off a motorcycle and sustained a laceration to his chin as well as abrasions to his chest and

hand.  In December 1984, just before he turned 19, he fell from a forklift while working as an insulation

cutter.  The fall caused an injury to his low back, for which he ultimately received a worker's

compensation settlement of $3,200.  Between the date of the injury and the settlement, Berryman spent

some time in jail (presumably for the marijuana transportation and theft charges).  In April 1985, when

he was 19, and again in January 1986, just after his 20th birthday, he sustained lacerations from

(unexplained) glass cuts.  In November 1986, after Berryman was married and his son had been born,

he went to the emergency room for a frontal headache.[143]  There are no follow up records regarding

headaches or seizures.  Other than the disposition on the emergency department form for Tylenol, no

other treatment is mentioned.  Later that same year, in December 1986, just before Berryman's 21st

birthday, he was seen in the emergency room for hemorrhoids.  Finally in August 1987, after his

---

[142] Nothing further observed in the record confirms, refutes, or explains this statement.

[143] This emergency room visit coincides with the incident reported to the social historian by Berryman's mother that Carol Berryman hit him over the eyebrow with a metal flashlight.  *See* Part XII.A.3.d., *supra.*

1   separation from his wife, he was seen in the same West Covina Hospital for a penile discharge.

2   Attending medical personnel noted a strong odor of alcohol from Berryman's breath at the time.

3                    **b.      Declarations Of Berryman's Mother, Lestine Bonty.**

4          The declarations of Berryman's mother, Ms. Bonty, provided with the first state habeas petition

5   gives a detailed chronology establishing the transient nature of life for her children as youngsters.

6   Because Ms. Bonty never spoke to Berryman's trial counsel prior to her testimony, she was not prepared

7   to describe this life of transience when she was before the jury.  She also describes that Mr. Peterson

8   appeared equally unprepared, often surprised by her answers (as when she answered negatively to

9   whether Berryman was affectionate with her).  Although she states that she loves all of her children, she

10  seldom showed overt affection, particularly with respect to Berryman.  In fact, Berryman was a lonely,

11  unhappy child.  By way of example, Berryman was a bed wetter until age 11 or 12, but Ms. Bonty's

12  response was not nurturing.   Another example was Ms. Bonty's response to Berryman's poor

13  performance in elementary school and placement in special education; at the time Ms. Bonty responded

14  that she thought he could do better.

15         Regarding the transient nature of the childhood, Ms. Bonty describes that Berryman was the

16  second child born when she was just 17 years old and barely a year after the first son was born.[144]

17  Berryman was premature and unloved by Ms. Bonty when he was a baby because she did not want to

18  have another child at that time.  After the father, Mr. Berryman (Ronald, Sr.), was discharged from the

19  service, he and Ms. Bonty lived with her family in Delano, then moved to Los Angeles, then separated,

20  and then reunited in San Jose when their third son was born.[145]  The parents finally divorced in 1974

21  (having married on January 27, 1965, just about a month after their first son, Ronald, Jr. was born).

22         Ms. Bonty reports that Mr. Berryman (Ronald, Sr.) drank, experimented with drugs, and gambled

23  heavily.  According to Ms. Bonty, he also "preferred to live on welfare."  She did not share his values.

24  She states he was not a good role model for Berryman because he also was "a woman chaser who

25  thought he was the idol of women."  He was tall and handsome, but could not keep a job and had dreams

26

27     [144] Berryman was born December 29, 1965.  His older brother, Ronald, was born in December
     1964.

28     [145] Between Berryman's and the younger brother's birth, a sister was born.

he could never accomplish.  She recounts that Berryman was addicted to sex and women, and except that Berryman did not gamble, he was very much like his father.  Berryman also was influenced by his older brother, who abused alcohol and drugs for pleasure.  Both of her older sons developed the opinion that education wasn't worth the effort, seeing her work so hard, going to school and barely making ends meet.

There also was violence.  During the last three and a half years of the marriage of Berryman's parents, there was a great deal of conflict.  The parents would fight and Mr. Berryman (Ronald, Sr.) hit and beat Ms. Bonty.  The last time he beat her, right before she filed for divorce, she ran from the house into the street to escape the abuse and was nearly struck by a car.  Later, after the divorce, in the early 1980's, when Berryman received news of his father's death, Ms. Bonty observed that he was devastated, but she was not asked anything about this during Mr. Peterson's examination.

Before and after the divorce, when Ms. Bonty attended school and worked, she left the children with her parents and as many of their children who were at home (some younger than the Berryman children).  Some time in 1987, prior to Berryman's arrest, Ms. Bonty learned that one of her brothers, Kanda Bonty, had molested her daughter, Ronnique.  At the time of the molestation, Kanda Bonty was about 15; Ronnique was about five or six years old.  When Ms. Bonty visited Berryman in the County Jail, after his arrest, he told her that two of his uncles (Ms. Bonty's brothers) had molested him as well, when he was eight years old.  One of them was Kanda Bonty the same uncle who molested Ronnique.  The other was Lester Bonty.  At the time of Berryman said he molested, Kanda Bonty was age 15 while Lester Bonty was 18 or 19.  Ms. Bonty never conveyed this information to Berryman's trial lawyers, "assuming" that Berryman would have told them or that they would have obtained the information from the taped telephone conversation during the jailhouse visit.

The declaration of Ms. Bonty attached to the second state habeas petition adopts a long portion of the second state petition and includes many conclusory statements about Berryman's mental state, facts of the crime leading to Ms. Hildreth's death, the quality of trial counsel's representation, Berryman's interaction with other relatives, and Berryman's medical problems.  The Court does not credit the allegations pertaining to matters clearly outside of Ms. Bonty's personal knowledge.

Ms. Bonty reports that Berryman was neglected as a child, both physically and emotionally. When his father died, Berryman became extremely depressed. But his problems really began at birth, which was premature by two months. Berryman weighed only 4 ½ pounds. The pregnancy which produced him was unplanned and unwanted. The lives of his parents was somewhat transient. When Mr. Berryman (Ronald, Sr.) was discharged from the Air Force, the family moved from Delano to Los Angeles to San Jose so he could find work. But, he wasn't able to keep a job, and this led to escalating problems between his parents. In Delano, where the whole family lived for a time, and Berryman lived with his paternal grandmother, apart from his parents and siblings, there was pervasive racial tension and segregation.

After his parents separated and Berryman lived with Ms. Bonty. While she was working and attending school, Berryman and his siblings were babysat by her siblings and Berryman as well as his sister Ronnique were molested. Berryman became withdrawn. He also resented Ms. Bonty's boyfriends and did not feel welcome. At the age of 12, he started running away from home. He seemed to enjoy the freedom of being on his own, except when it came to finding a place to sleep. Ms. Bonty reports that when Berryman was first married, he had a job, a family, and went door-to-door to proselytize, but that a work injury caused him pain and his working ability was interrupted by headaches.[146] When Berryman received his award for the injury, he purchased his pick up truck and returned to Delano to live with his grandmother. Berryman became paranoid after his arrest, believing people were spying on him and listening to his conversations. He believed his own attorneys were working with the prosecution. The submissiveness of his attorneys toward the attorneys contributed to Berryman's impression of a conspiracy.

Ms. Bonty's third declaration, submitted with Berryman's evidentiary hearing motion, is substantially corrected in handwriting. She reiterates the difficulties she experienced during her first two pregnancies, with Berryman and his older brother, Ronald Jr., because of her youth, her unmarried status,

---

[146] According to the medical records, however, the work injury occurred in December 1984, long before Berryman was married (May 1986) or his son was born (August 1986), and involved an injury to his low back, not his head. Berryman's mother told the social historian that the headaches were caused by Carol Berryman hitting Berryman in the forehead with a metal flashlight. The discrepancy is not explained.

and her family's unhappiness about her first pregnancy (when she was only 15 years old).  Ms. Bonty suffered severe postpartum depression after the birth of Ronald Jr.  This depression was amplified when she learned she was pregnant a second time (with Berryman) when Ronald Jr. was only around six months old.  At 16 or 17, Ms. Bonty was not looking forward to caring for another infant, which she found overwhelmingly difficult.  Once born (and prematurely), Ms. Bonty did not bond with Berryman as an infant for a number of reasons.  Before he was born, she did not want another baby (not that she didn't want *him*), soon after he was born, she became pregnant again, and suffered a miscarriage, and shortly thereafter, she became pregnant again and gave birth to a premature daughter at five months.  The child only lived a short time and Ms. Bonty spiraled into an even more severe depression.  A fifth pregnancy produced Berryman's younger sister, Ronnique, born when Berryman was two and a half.  During the last "several months" of that pregnancy, Ms. Bonty was bedridden and stayed with her husband's mother in Sacramento.  During those months Ronald Jr. and Berryman stayed with other relatives.  While Berryman was a baby, he was often ill and taken to relatives in California to be nursed back to health.  During this time, Ms. Bonty was often angry because her husband was unfaithful to her.  When she was about nine months pregnant with her last Berryman baby, Bryan, her husband was living with another woman.

During the four-year period after her husband left the service, the family moved around frequently in California.  Sometimes it was because the couple was separated, and sometimes it was because they couldn't pay rent.  She thinks her husband may have lost money gambling.

Once the couple was separated for good, Ms. Bonty focused on her own life, obtaining an education and a better job.  This did not leave her much time for her children.  Also, she became involved with a man (Jon January), married another, left him after six months, and returned to the first.  She and Mr. January then began living together, while at least Berryman and his younger siblings were with her.[147]  Ms. Bonty recites that she had surgery for a benign lung tumor, then an abortion, then she and Mr. January lost their house after he lost his job, and Ms. Bonty went to live with her parents.  Berryman, who was then 12 ½,  went to live with his father.  During the entire period of time from his

---

[147] Based on other accounts, Berryman's older brother, Ronald Jr. may or may not have already left to live with his father.

1    parent's final separation until Berryman went to live with his father, Ms. Bonty was unavailable for her

2    children, a period she describes as "missing in action."  She continued to be uninvolved in Berryman's

3    life, having no contact with him until he came back to live with her when he was 17 years old.[148]

4          When Mr. Berryman was killed in the airplane crash, the behavior of both Ronald Jr. and

5    Berryman worsened.  Ms. Bonty also went into a deep depression upon learning that her ex-husband had

6    been killed.  She was not able to offer Berryman or his brother any attention or consolation.

7                    **c.    Declaration of Ronnique Berryman Appended to Berryman's First**

8                          **State Habeas Petition, executed August 26, 1993.**

9          Ronnique reiterates her mother's declaration testimony regarding the fighting and physical

10   violence between her parents, which Berryman witnessed, and including the occasion when Ms. Bonty

11   ran into the  street to escape the father's abuse and was nearly struck by a car.  Ronnique also discusses

12   the molestation that she and Berryman suffered at the hands of their maternal uncles, Kanda and Lester

13   Bonty, when they were children.  She recounts the unpleasant experience of having been repeatedly

14   molested by Kanda Bonty when he was babysitting the Berryman children.  These episodes began when

15   Ronnique was 5 or 6 years old and included oral copulation as well as sexual intercourse.  She first told

16   her mother about having been molested by Kanda after Berryman's arrest for the present crime.  She also

17   told Berryman during one of their visits at the Kern County Jail about being molested by Kanda.  In

18   response, Berryman told Ronnique that he had been molested by Kanda as well, and also that he had

19   been molested by Kanda's older brother, Lester.  She relayed the fact of  her own molestation to the

20   defense investigator, but did not mention Berryman's molestation, and the investigator didn't ask.

21   Before Ronnique testified at the penalty phase proceedings, Mr. Peterson asked her about her

22   molestation, but he did not ask about whether Berryman had been molested.  He did not ask her anything

23   about her own molestation when she testified.  She confirms her trial testimony that neither she nor

24   Berryman were loved by their mother or other relatives.  Berryman began running away to obtain love

25   from other sources.

26

27   _____

28          [148] Other records indicate that she actively rebuffed Sacramento juvenile authorities assigned to
     Berryman's juvenile case.

1

**d.     Other Family and Friend Declarations.**

2         A total of twenty-four family and friend declarations are appended to Berryman's motion for an

3 evidentiary hearing.  The declarants and the dates their declarations were executed include: Johnetta

4 Reed, April 24, 2001; Odessa Pearson, March 13, 2001; Kandy Rumford, March15, 2001; Yolande

5 Trinidad Rumford, May 10, 2001; Maxine Coleman, March 13, 2001; Carol Berryman (Fuller), March

6 15, 2001; Sonia Counts, March 13, 2001; Fred Sikes, March 21, 2001; Lester Bonty, March 14, 2001;

7 Francis Bonty, April 21, 2001; Kanda Bonty, March 14, 2001; Linda Mitchell, March 14, 2001; Carolyn

8 Bonty, May 10, 2001; Terrie Bonty, March 12, 2001; Karen Bonty, March 15, 2001; Sharon Bonty,

9 March 14, 2001; Kenneth Bonty, 2001 (month and day not stated); Marcia Garcia, March 15, 2001;

10 Ruben Hill, February 3, 2001; Ann Bonty, July 14, 2001; Helen Fuller, March 29, 1001; Emery Bonty,

11 March 14, 2001; Donna McBride, March 13, 2001; Perry McBride, March 13, 2001.  These declarations

12 recount facts about Berryman's childhood, character, struggles with alcohol, brief marriage to Carol

13 Berryman, injuries, and relationships.  Rather than summarize each of the twenty-four declarations

14 individually, the information contained in the declarations is summarized by topic, with the source

15 attributed to the witnesses who provided the information.

16

**(1)     Disbelief Regarding the Charges Against Berryman.**

17         Odesser Pearson states she was very surprised to learn Berryman was convicted of the crimes at

18 issue.  Kandy Rumford cannot believe and Yolande Rumford states it is difficult for her to believe that

19 Berryman committed the crimes for which he was convicted.  Ms. Y. Rumford's difficulty in this regard

20 follows from the fact that Berryman was a man who "has a great love for women," and therefore, he

21 couldn't have killed a woman.  Berryman's cousin Maxine Coleman, cannot believe the charges against

22 Berryman.  She knew him well all his life, and there "was no hint that he [wa]s capable of committing

23 the crime he was convicted of."  A maternal uncle, Kanda Bonty, describes his reaction to the charges

24 against Berryman as being "shocked."  He cannot see Berryman "throwing his life away like that."  A

25 maternal aunt, Linda Mitchell, also describes her reaction to the charges as being "shocked."  Another

26 maternal aunt, Carolyn Bonty, states that she doesn't believe Berryman is guilty.  Berryman's maternal

27

28

great aunt (in-law), Ann Bonty,[149] also states she is shocked by his conviction and "can't imagine him deliberately killing anyone."  Ms. A. Bonty states it must have been "an accident, or, something he was caught up in" rather than a deliberate act.  Maternal aunt Donna McBride also registers her reaction to the charges against Berryman as being "shocked."  Like her Aunt Ann (Bonty), Ms. McBride believes the killing of Ms. Hildreth must have been an accident.  Ms. McBride states that the young man she "watched grow up and become an adult and a father was incapable of committing such a crime."  Ms. McBride's ex-husband, Perry McBride, states he was stunned when he heard of the verdict because he assumed Berryman could not be guilty of the crime; that there was a mistake.

### (2)    Church Related Activities.

According to family friend Johnnetta Reed, Berryman and his (former) wife Carol were involved in church youth activities and the church choir at the Friendship Missionary Baptist Church, where Carol's father, Rev. Fuller, was the pastor.  Margie Garcia, Rev. Fuller's daughter and Carol's sister also states she and her husband attended church activities with Berryman and Carol.

Fred Sikes, an elderly former minister to the New Allen Chapel in Delano, knew Berryman and his older brother Ronald Jr. when they came to church as children with their paternal great-grandparents, Thelma and Levi Mitchell.  Mr. Sikes knew Berryman's maternal grandparents, Francis and Lester Bonty from church as well.  Mr. Sikes reports that Berryman and his brother "were very good kids" when their great-grandparents brought them to church.  Both boys were baptized "when they were twelve," participated in the church youth group, and sang in the choir.  Berryman was well-disciplined in church.

### (3)    Lack of Gang Affiliation.

Yolande Rumford states she has no recollection of Berryman ever being involved in a gang.

### (4)    Childhood Neglect and Other Stressors.

Odesser Pearson was not aware of Berryman's feelings for his father, about his father's disappearance, or about his parents' divorce.

Berryman's cousin, Maxine Coleman, observed Berryman when he was child.  The father, Ronald, Sr., was not around much and the mother, Ms. Coleman's cousin, Lestine, worked quite a bit,

---

[149] Ms. Ann Bonty avers that she is the former wife of Berryman's maternal great-uncle Kenneth Bonty (the uncle of Berryman's mother, Lestine).

but Berryman "never complained of being neglected.  He was a quiet boy and not the kind to complain when he was upset."  Ms. Coleman avers that Berryman's mother, Lestine, was a battered woman (by Berryman's father).  Berryman never talked to Ms. Coleman about how he felt concerning his parents' discordant marriage.  As far as Ms. Coleman knows, Berryman and his siblings were not deprived; "Lestine was a good mother."

A younger sister of Lestine, Sonia Counts, avers that she was aware of the stormy relationship between her sister and Berryman's father, including the incident about Lestine almost getting hit by a car.  Ms. Counts reports, however, that Lestine didn't talk about the incident.  Ms. Counts describes Berryman's father as a person who was very controlling and manipulative.  Unlike her cousin Maxine Coleman, Ms. Counts understands why Berryman and his siblings would have felt deprived of parental affection since their father was absent and their mother worked all the time.

Maternal uncle Lester Bonty (approximately 10 years older than Berryman) drew the conclusion that Berryman was neglected as a child based on what other family members told him about the absence of both parents.  He describes Berryman's father as a person who was not all the concerned with his children and that had a reputation in the family for drinking.  Mr. L. Bonty learned from a family member that Lestine's second husband (referring Jon January) did not want Berryman in the home.  Mr. L. Bonty avers that he personally did not see the Berryman children often when they were young, and only became acquainted with Berryman when he was older.[150]  Mr. L. Bonty does not know how Berryman took his father's death because he didn't observe Berryman's reaction.  He did observe Ronald Jr., who did not take the news well.

Lester's younger brother, maternal uncle, Kanda Bonty (about six years older than Berryman), testified that he actually lived with the Berryman family from 1977 to 1978 after Lestine and Ronald, Sr. were divorced (or separated).  Even though they were divorced (or separated), Ronald, Sr. still

---

[150] Mr. L. Bonty does not say anything about having molested Berryman when he (Mr. L. Bonty) was in his late teens and Berryman was approximately 8 years old as reported by Berryman's mother, Lestine Bonty and his sister Ronnique Berryman.

visited.  Mr. K. Bonty baby sat for Berryman and his siblings.[151]  Mr. K. Bonty describes Berryman as a compliant, pleasant child.  He doesn't have any kind words for Berryman's father.  Mr. K. Bonty describes Berryman's father as a man who was aggressive, unhelpful around the house, and who eschewed work.  He describes the incident where Ronald, Sr. pushed Lestine down the stairs causing her to fall into the street where she was almost hit by a car.  Mr. K. Bonty was just coming home from school at this time.  He states it was common knowledge in the family that Ronald, Sr. "slapped Lestine around."  Mr. K. Bonty never saw Ronald, Sr. abuse the children.  Like Maxine Coleman, Mr. K. Bonty describes his sister's mothering efforts in a favorable light, recognizing that she had to work many hours a day.  He states: "She spent as much time with the kids as she could, but it's possible they felt the need for more attention than Lestine could give them."  He states the children were not deprived when they lived with their mother.  A maternal aunt, Linda Mitchell, states she never observed Ronald, Sr. acting inappropriately from too much alcohol consumption.  Ms. Mitchell is not aware of any lack of attention or affection by Berryman's parents, but she concedes she "really wouldn't know about that."  She is aware that during the marriage between Ronald, Sr. and Lestine, Ronald Sr. was "in and out of employment," but that "Lestine was always able to provide food and shelter for her children."

Another maternal aunt, Carolyn Bonty, babysat for Berryman when he was a little baby and had contact with him until he was in his "early teens."  She recalls that Ronald, Sr. "was mean and rough, and hard on the kids," but was not physically abusive.  Ms. C. Bonty is aware that Ronald, Sr. beat Lestine.  He was "hard on women."  He also drank a lot.  Ms. C. Bonty believes it was hard on Berryman to have been shuttled between relatives when he was growing up.  She also recalls that Berryman had glasses, which he did not like.  "He would break them or hide them and say that he lost them."  Berryman held things in as a child.  Berryman and Lestine's second husband (referring to Jon January), did not get along.  She states Jon "wasn't good to the kids.  And he was a womanizer.  But so was Ronald, Sr."  Ms. C. Bonty is not personally aware that Berryman suffered any sexual abuse at the hands

---

[151] There is no indication that Mr. K. Bonty is aware of allegations from Ronnique Berryman and Lestine Bonty that he molested Ronnique and Berryman when they were youngsters during the time he stayed at the Berryman home.

1    of any of her brothers.  She relates that Lestine told her about supposed sexual abuse approximately three

2    years before she executed her declaration (which was in May 2001).

3        Maternal aunt Terrie Bonty began helping her sister Lestine with Berryman and his siblings when

4    she (Ms. T. Bonty) was in the 10th grade in high school.  At the time, the Berryman family was living

5    in San Jose.  Ms. T. Bonty also helped with child care when she was in the 11th and 12th grades in Los

6    Angeles.  Berryman was "a pretty good kid, well-behaved, well-mannered."  Though Lestine and

7    Ronald, Sr. were separated, he still came to visit the family and always provoked an argument.  Ms. T.

8    Bonty saw Ronald, Sr. strike Lestine on multiple occasions.  Ms. T. Bonty was present in the house when

9    the argument between Lestine and Ronald, Sr. resulted in Lestine falling or running down the stairs and

10   falling in the street where she almost was run over by a car.  The children also witnessed this incident.

11   It was terrifying for Ms. T. Bonty, and she imagines for the children as well.  Ms. T. Bonty can

12   understand that Berryman would have felt neglected, since his father was always gone and his mother

13   was always working.  Ms. T. Bonty is aware that at times Lestine had problems providing for the

14   children.  There was at least a year when all Lestine could feed them was popcorn and oatmeal.  Ms. T.

15   Bonty does not know how Berryman took news of his father's death, because he did not show his

16   feelings.  His older brother, Ronald, Jr., however, "took it really hard."

17       Berryman's maternal twin aunts, Karen and Sharon Bonty, who are approximately a year older

18   than Berryman, spent quite a bit of time with Berryman and his siblings when they all were children.

19   Ms. K. Bonty reports that the Berryman children spent quite a bit of time in the Bonty household.  She

20   heard that Berryman's father had a drinking problem, but she states she has no personal knowledge of

21   this.  Berryman never spoke to Ms. K. Bonty about his father's death.  Ms. K. Bonty describes her

22   sister's second husband (referring to Jon January) as mean, evil, and rude.

23       Due to the closeness in their ages, her twin,  Sharon Bonty, describes Berryman as a brother

24   rather than as a nephew.  She describes the times Berryman and his siblings came to the Bonty residence

25   (while Berryman's mother worked) favorably.  The children all played together in normal, active

26   childhood pursuits (bicycling, skateboarding, skating).  Ms. S. Bonty is not aware that Berryman's father

27   had a drinking problem.  She was too young to notice when he was around.  Ms. S. Bonty does not know

28   that Berryman went to live with his father after the divorce.  Berryman never discussed with Ms. S.

Bonty his feelings about the divorce, the reasons he went to live with his father, or his feelings about his father's death. Ms. S. Bonty recalls Berryman "as being clingy, needing attention" when he was a youngster. She notes that Berryman very well may have wanted more attention because his mother worked a lot and his dad was gone. Ms. S. Bonty affirmatively states, however, that Lestine gave Berryman love and that her children were not deprived. Any emotional deprivation visited upon Berryman was inadvertent. Nor did Ms. S. Bonty ever observe that Berryman's parents favored Ronald, Jr. over Berryman. Unlike some of her other siblings, Ms. S. Bonty is not aware of any problems Berryman had with Lestine's second husband (referring to Jon January). And, she never heard anything from Berryman or anyone else in the family about physical abuse or molestation.

Berryman's maternal great-uncle, Kenneth Bonty, knew the Berryman family when they returned to California from Wyoming (after Berryman's father was discharged from the service) in 1970 or 1971. Mr. Kenneth Bonty states that the family stayed at his house at that time. He knew Ronald, Sr. well, as they often went out together. Mr. Kenneth Bonty reports that Ronald, Sr. drank more than he should have and was short tempered when he drank. He believes that Ronald, Sr. got into altercations when drinking, though he witnessed none of them. Mr. Kenneth Bonty also recalls seeing Berryman's mother, Lestine, with a swollen lip. His former wife, Ann Bonty, was familiar with Berryman's family. When Lestine gave birth to Berryman's older brother, Ronald, Jr. (before she and Ronald, Sr. were married), Lestine lived with him (Kenneth Bonty) and his wife (Ann Bonty).

Ms. A. Bonty (Kenneth Bonty's former wife) recalls that when Berryman was a baby, Lestine brought him to Delano because he was sick. Lestine and Berryman (as an infant) stayed with the grandparents of Ronald, Sr. (presumably the Mitchells) until he recovered. Berryman apparently was quite ill and suffered from fevers, but Ms. A. Bonty does not recall specific ailments he suffered. Ms. A. Bonty was around the Berryman children when they were small. She does not believe the parents' marital discord had a major impact on Berryman or that what was happening to Berryman's mother affected him. She did not observe problems with the child. Although she never observed it, she heard that Ronald, Sr. abused Lestine. One of the sources of this information was Lestine, herself. Ronald, Sr. wasn't a good husband and always tried to cover up. Ronald, Sr. did not work that much and wanted Lestine to take care of him. Ms. A. Bonty states that Ronald, Sr. took Lestine's money, possibly for

1   drugs or gambling.  She believes that when Berryman was very small "there were difficulties feeding

2   and taking care of the kids."  The rest of the family helped them out.  When the Berrymans lived in Los

3   Angeles, the children stayed with Francis Bonty (Lestine's mother) quite a bit of the time.  Ms. A. Bonty

4   does not believe that Lestine neglected the children; she loved them.

5         Maternal uncle Emery Bonty remembers Berryman as a "mostly happy" boy and young man.

6   Mr. E. Bonty states that Berryman "partied all of the time as a young man," but was still quiet and gentle,

7   more so than other young men his age.  Berryman's father, Ronald, Sr. was a "playboy" and an alcoholic.

8   Mr. E. Bonty discouraged his sister Lestine from getting involved with Ronald, Sr. because he was

9   "spoiled and self-centered and, [Mr. E. Bonty] knew he wouldn't take care of her."  Mr. E. Bonty heard

10  about Ronald, Sr. abusing Lestine from their siblings.  When Mr. E. Bonty was discharged from the

11  service, and the Berrymans lived in Los Angeles, he states he "must have moved Lestine ten or twelve

12  times."  According to Mr. E. Bonty, Lestine kept moving to "get away from Ronnie [Ronald, Sr.]."  Mr.

13  E. Bonty doesn't believe that Berryman ran away to live with his father, but that Ronald, Sr. took

14  Berryman from Lestine.  Mr. E. Bonty doesn't know the effect the death of Ronald, Sr. had on Berryman.

15  Berryman kept his feelings inside.  Mr. E. Bonty does know that Ronald, Jr. took the news very hard.

16  Mr. E. Bonty doesn't believe that Berryman received adequate attention from his parents due to Lestine's

17  constant work and the fact that Ronald, Sr. was absent.

18        Maternal aunt Donna McBride lived with the Berryman family for two years starting when

19  Berryman was five or six.  Then she lived across the street from them.[152]  Berryman seemed very normal

20  to Ms. McBride.  There were no serious temper tantrums; he "was always real quiet, polite and easy to

21  care for."  There was, however, discord in the home between Ronald, Sr. and Lestine.  Ms. McBride

22  never saw Ronald, Sr. hit Lestine, but she did observe him push her around and curse her.  He was a

23  terrible father, very aggressive, tough, demanding, belittling, and controlling.  As to Lestine, even when

24  they were separated, he "wouldn't let her see other men."  He also was a poor provider to the family

25  because he "had a hard time holding on to a job" and "he didn't like to work."  Berryman, as well as his

26  siblings were afraid of Ronald, Sr.  Because of the controlling character exhibited by Ronald, Sr., Ms.

27

28        [152] This description indicates that the Berryman family stayed in a single location for
      approximately three years, contradicting the other accounts that indicated frequent moves.

1  McBride doesn't believe Berryman ran away to be with his father (when he was 12); she believes that

2  Ronald, Sr. took the boys to have control over them.  Lestine raised the children alone, providing a

3  decent home without "serious physical deprivation."  Ms. McBride believes that his father's death was

4  hard on Berryman despite the father's cruelty to the children. Ms. McBride recounts that Berryman came

5  to live with his mother and her new husband (referring to Jon January) when he was a teenager.  Ms.

6  McBride recalls there were problems between Berryman and his stepfather.  Berryman would not have

7  received much attention from his mother at that time, since she had a new baby by her husband

8  (January).

9       Perry McBride, Donna McBride's ex-husband, knew Berryman since he was an infant.  When

10 Mr. McBride and his former wife, Donna, were first married, they stayed with Lestine and her children.

11 Berryman was just a little boy then.  Lestine and Ronald, Sr. already were separated at that time, but he

12 still came around the house.  When he did, he and Lestine would argue.  Mr. McBride did not see

13 Ronald, Sr. strike Lestine, but he was aware of the incident where Lestine was running away from his

14 assault, tripped, fell, and was almost struck by a car.  Lestine worked a great deal and left the children

15 alone. With Ronald, Sr. absent as well, the children likely didn't receive adequate attention.  When

16 Berryman was 17 or 18, he moved in with Mr. McBride for the better part of two years.  Berryman did

17 not use drugs and remained "a well-adjusted, bright-eyed, personable young man."  Berryman was

18 always sad when he spoke of his father (after the father's death).  Mr. McBride believes Berryman took

19 his father's death hard.

20      Carol Berryman relays how Berryman described his childhood.  He told her that "he and his

21 siblings frequently witnessed their father beating their mother," and in particular the incident where the

22 mother fell down a flight of stairs to the street and was almost hit by a car.  Berryman further said that

23 when he was a child, his mother "had other things she wanted to do than care for her children," and thus,

24 they stayed with various relatives.  Berryman, in particular, was not allowed to stay with his mother by

25 the time he was 12 or 13, so he stayed with "an older woman with whom he had a sexual relationship."[153]

26

27      [153] All other accounts of Berryman's pre-teen and early teen life place him with his father, first
in Long Beach and then in Sacramento.  Carol Berryman's account about an older woman in Berryman's
28 early life is the first in the record, and totally uncorroborated.

1   Ms. Berryman's sister, Margie Garcia, relates that Berryman told her he had a hard time growing up,

2   living with grandparents part of the time.  She retains the impression that "his childhood had been

3   tough."  Ms. Berryman's mother, Helen Fuller recalls Berryman talking about "how he was put out of

4   his home at a very early age to fend for himself."  She recalls that his childhood "was particularly

5   rugged" because his mother put him out of the home when he was 12 or 13.

6       Berryman was close with his father because the father included Berryman in activities.  Berryman

7   did not tell his wife how he felt when his father died.  Berryman related that both his mother and father

8   favored Ronald, Jr. over him.  Ms. Berryman personally observed that Ronald, Jr. received favored

9   treatment by Berryman's mother, grandmother, and great-grandmother.

10      Francis Bonty, Berryman's maternal grandmother, speaks ill of her late son-in-law, Ronald, Sr.

11  She states he "was extremely jealous and domineering of Lestine."  When the Berryman family lived

12  in Los Angeles, they moved constantly because Ronald, Sr. gambled away the rent money and the family

13  would be evicted.  Mrs. Bonty also does not care for Lestine's second (ex-)husband, Jon January,

14  because like Ronald, Sr., he was involved with other women the whole time he was married.

15      Family friend Ruben Hill was well-acquainted with Berryman's paternal great-grandfather, Levi

16  Mitchell (who lived in Delano).  Mr. Hill extolls Mr. Mitchell's virtues as a role model.  He notes that

17  when Berryman and his brother, Ronald, Jr. were living with their great-grandparents, Mr. Mitchell "was

18  always bragging" on the boys.  Thelma Mitchell (the great-grandmother) also was very proud of her

19  great-grandsons.  Berryman and his brother didn't live with the Mitchells for very long.  They were in

20  the 10 to 12 year old stage.  They came and went often.  Mr. Hill also knew Ronald, Sr. when he visited

21  his grandparents (the Mitchells), but makes no comment about his character or parenting skills.  He does

22  not know the reason Berryman and Ronald, Jr. stayed with their great-grandparents.  He believes that

23  after they stayed in Delano, they went to live with their father when they were in their early teens.  Mr.

24  Hill is "unaware of any serious deprivations Rodney may have experienced as a young boy."

25                    **(5)      Pre-Marital Living Arrangements.**

26      According to Carol Berryman, when she and Berryman met in 1985, Berryman was living in Ms.

27  Odesser Pearson's house.  After they met, Berryman moved out of the Pearson home and stayed in

28

1    various places, including with friends and in cars.  After Ms. Berryman became pregnant, she and

2    Berryman married in 1986 and then moved in with her parents in La Puente, California.

3                    **(6)    Industrial Accident.**

4        Odesser Pearson "heard about" Berryman industrial accident, but recalls no specifics.  Kandy

5    Rumford is not aware Berryman suffered an industrial accident.  Yolande Rumford doesn't recall

6    anything about Berryman's accident, except, once Berryman told her he was hit in the head.  Carol

7    Berryman states she met Berryman after his industrial accident, which she believes was caused by his

8    falling from a forklift.  Berryman's maternal aunt, Sonia Counts recalls the industrial accident Berryman

9    suffered.  Afterwards, he complained that his back hurt him.  Berryman complained to his Aunt Sonia

10   about back pain shortly before his arrest for the present conviction.  Berryman's maternal uncle, Lester

11   Bonty was neither familiar with Berryman's industrial accident nor any chronic pain he suffered as

12   result.  Neither was maternal aunt Carolyn Bonty familiar with Berryman's industrial accident, although

13   she had "heard that he suffered a head injury."  One of his maternal aunts, Karen Bonty states she recalls

14   that Berryman was employed at a job where he sustained injuries and that he received a settlement from

15   which he purchased (or put a down payment on) a truck (his Mitsubishi pick up truck).  Karen Bonty's

16   twin sister, Sharon Bonty, also was aware that Berryman suffered an industrial accident that caused him

17   to suffer headaches.  The issue of Berryman's back injury also was brought to the fore during the May

18   1988 *Marsden* motion proceedings.  During a weekend break in the course of these proceedings,

19   Berryman claimed unable to walk and in need of a wheelchair.  *See* Part V.A., *supra*.

20                   **(7)    Severe Headaches.**

21        Friend Johnnetta Reed reports that Berryman complained about severe headaches.  Odesser

22   Pearson, on the other hand, was not aware of headaches Berryman experienced.[154]  Kandy Rumford was

23   not aware that Berryman suffered from headaches.  Berryman told Yolande Rumford that he had

24   headaches.  One occasion Yolande does remember was when Berryman came to her parents' home

25   complaining of a severe headache.  His nose was bleeding at the time.  Yolande and her mother

26

27        ──────────────────

     [154] This may be because when Berryman lived with Mrs. Pearson, he had not sustained the injury
28   (being hit on the head with a flashlight by his wife) which caused the headaches.  The evidence is that
     Berryman moved out of Mrs. Pearson's home when he started dating Carol.

transported Berryman to the hospital.  Without specifying a time-frame, Berryman's wife, Carol, avers

that he "would experience a short, sharp headache," lasting five minutes about once or twice a month.

During these headaches, Ms. Berryman observed a vein on his right temple throbbing.  When the

headaches passed, the vein ceased throbbing.  When Berryman gave up alcohol, the headaches were

more frequent.

Although maternal aunt Carolyn Bonty had heard that Berryman suffered a head injury, she did

not know whether he suffered from headaches.  Maternal aunt Terrie Bonty also does not "recall any

complaints he might have had about headaches or back pain."  Maternal aunt Karen Bonty also was not

aware that Berryman complained of headaches.  Her twin sister, Sharon Bonty, however states that

Berryman did complain of headaches (which she associated with the industrial accident).  He complained

to Ms. S. Bonty about his headaches twice that she can recall, but he "didn't make a big deal out of it."

Maternal great aunt (in-law) Ann Bonty is unfamiliar with any complaints about headaches Berryman

suffered.  Maternal aunt Donna McBride is not familiar with any details of Berryman's industrial

accident.

**(8)     Academics.**

Odesser Pearson did not know how well or poorly Berryman did in school.  As a school teacher,

herself, she always encouraged Berryman to study, even after he was in prison.  His maternal aunts and

uncles didn't know how well or poorly Berryman did in school.  Maternal uncle Emery Bonty surmises

that it must have been difficult for Berryman to succeed in school given the many times he moved

around, changing school all the time.

**(9)     Employment.**

Odesser Pearson didn't know what kind of work Berryman did when he was finished with high

school.  His maternal uncle (in-law), Perry McBride avers that when Berryman came to live in his (Mr.

McBride's) apartment, he brought Berryman to a music studio to teach Berryman the technical end of

the music industry business.  Berryman did very well in these endeavors.  When Johnnetta Reed knew

Berryman (after his marriage to Carol), he worked detailing cars.  Yolande Rumford was aware that

Berryman worked in construction work and detailing cars.  According to Berryman's wife, Carol, he

worked "almost the entire time [they] were together.  First he worked on a janitorial crew for Sears, then

1  moved to detailing cars, for two different employers.  He hoped he have a detailing shop of his own

2  some day.  Berryman's former sister-in-law (Carol's sister), Margie Garcia reports that Berryman was

3  employed cleaning and detailing cars with other members of the church.

4                              **(10)     Relationship with Son.**

5          Johnnetta Reed reports that Berryman adored his son.  Yolande Rumford similarly states that

6  Berryman was very proud and protective of his son.  Carol Berryman avers that Berryman loved their

7  son very much and that the reason he married Ms. Berryman was so his son would have a home.  Her

8  sister, Margie Garcia avers that Berryman loved his child and was always bragging about him.  (The

9  child was just barely a year old when Berryman was arrested.)  Even long since the trial, Berryman's son,

10  Rodney, Jr. visits his father at San Quentin whenever he can.  Ms. Garcia describes an enduring close

11  bond between Berryman and his son.  Berryman's former mother-in-law, Helen Fuller, describes how

12  Berryman interacted with his infant son before the arrest.  Berryman showed great love and devotion to

13  his child.

14                              **(11)     Alcohol Consumption.**

15          Declaration testimony of Berryman's excessive alcohol consumption is set out, in full, in

16  connection with the discussion about a mental state defense.  *See* discussion facts in support of Claims

17  15 and 16, Part XII.A.1., *supra*.

18                              **(12)     Mild Manner and Good Character.**

19          In Johnnetta Reed's opinion, Berryman was kind, helpful, and caring.  His involvement in the

20  church was deep and sincere.  Odesser Pearson found Berryman to be courteous, polite, and respectful

21  when he lived in her home, and afterwards, when he would come to visit, as well.  Berryman was not

22  violent and Mrs. Pearson saw no indication he had a temper.  She allowed Berryman to live in her home

23  while Berryman was still in high school (at West Covina High School).  Kandy Rumford observed

24  Berryman at the Friendship Baptist Church, where he attended with his wife and son.  He "behaved with

25  absolute respect" toward Ms. K. Rumford's family and friends.  He did not display a bad temper.

26  Yolande Rumford states she never observed Berryman irritable.  She states that Berryman was always

27  a "big flirt" who always joked and laughed with everyone, male and female.  Maxine Coleman describes

28

Berryman as "a fun person with a good personality, easy going, polite."  He was "just a happy guy, laughing, a tall good looking, quiet young man."

According to wife Carol, Berryman was selfless.  He sold his truck (before the Mitsubishi) so he and Ms. Berryman could put down a deposit for an apartment.  Sometimes Berryman and Ms. Berryman would get into arguments, and Ms. Berryman reports sometimes he would grab her and shake her, but he never struck her with a closed fist and she does not recall that he ever slapped her.  She describes herself as someone with "the ability to push people until they get very angry," and that she "pushed" Berryman in this manner many times.  She also reports that she slapped or "smacked" Berryman when he grabbed her.  When she did so, he usually would let her go or back off and leave.  She was never afraid Berryman would hurt her.  The extent of Berryman's abusiveness, if any, toward Ms. Berryman was verbal not physical.  Berryman's former mother-in-law states that she is "not aware that he was ever violent toward [her] daughter [Carol]."  With respect to Berryman's assault on Ms. Berryman's father (as Rev. Fuller testified at trial), Ms. Berryman contradicts her father's version of the events.  First, Ms. Berryman recounts that her father, not Berryman, provoked the incident because he would not permit Berryman to come into the house to see his (Berryman's) infant son.  Second, Rev. Fuller did not suffer a broken nose as he told others, but rather, simply a cut on the nose and "two small black eyes."[155]  Ms. Berryman's sister, Margie Garcia, states that the understanding of family members about this altercation is that it was a pushing (rather than a striking) incident where no one was injured.  Ms. Garcia states that she believed Berryman and her father always got along well.  She did not see Berryman in the six to eight months prior to his arrest, but up until that time, his behavior had not changed.  She states that the fact there was an altercation between Berryman and her father "does seem unusual and out of character" for Berryman.

Ms. Berryman avers that she did not know about the incident where Berryman assaulted David Perez.  She speculates that an assault may have occurred when Berryman chased a motorist who tried to run Ms. Berryman (in her car) off the road when she and Berryman were married.

---

[155] Rev. Fuller told the jury that Berryman hit him on the bridge of his nose, following which Rev. Fuller summoned the police.  He did not testify that Berryman broke his nose.

1    Berryman's maternal grandmother, Francis Bonty states she remembers how nice Berryman was

2    to his sister-in-law, when his brother, Ronald Jr. was abusive to her.  Mrs. Bonty states that Berryman

3    did not begin to drink until he married Carol Fuller and that she (Carol) "was very jealous, bossy and

4    provocative" just like Berryman's father.

5    Maternal aunt Sonia Counts avers that she has never seen Berryman angry.  He was quiet and

6    well-mannered.  During the four to six months prior to Berryman's arrest, Ms. S. Counts saw Berryman

7    two times.  On those occasions, she did not observe any changes in Berryman's behavior.  Nor had she

8    heard that he had changed from other family members.  This, however, would not be unusual because

9    Ms. Counts' family (Lestine Bonty's family) was very private. Another maternal aunt, Linda Mitchell,

10   states that Berryman was quiet, well-behaved child.  She did not observe a change in his behavior as he

11   grew to a teenager.  He was not a violent person.  Maternal aunt Carolyn Bonty similarly described

12   Berryman as a quiet, shy boy.  Ms. C. Bonty states she did observe that Berryman changed as he got

13   older, becoming "more aggressive like his daddy."  He became less shy and more outspoken.  Again,

14   however, Ms. C. Bonty concedes she saw little of Berryman as he became a teenager.  According to

15   maternal aunt Terrie Bonty, Berryman "has always been very quiet and kept to himself."  Ms. T. Bonty

16   never observed him display a temper or irritability.  He always seemed to get along with people.  After

17   Berryman was married and had his son, Ms. T. Bonty would see him at her mother's (Berryman's

18   grandmother's) house.  Ms. T. Bonty saw nothing that "he was having any problems either physically

19   or with the law."  Maternal aunt Karen Bonty describes Berryman as normal and active in his childhood

20   and overall as "being playful, friendly, sweet tempered, a lot of fun to be with."  Her twin sister, Sharon

21   Bonty states she did not observe a change his Berryman's behavior.  Except for the headaches he

22   complained of, he "seemed like himself – shy, quiet, friendly and good-natured."

23   Family friend Ruben Hill coached community football (in Delano) and both Berryman and his

24   brother were on the team.  Mr. Hill retains no "strong impression of either boy," but he remembers that

25   Berryman was "always a pretty good boy, quiet, cordial and respectful."  As Berryman grew up and Mr.

26   Hill saw him in town, Berryman remained "pretty much the same, a respectful boy."  He noticed no

27   significant changes.  Mr. Hill "did not notice him being prone to violent or hostile behavior."

28

Berryman's maternal great aunt (in-law), Ann Bonty, describes Berryman as a quiet, soft-spoken child, who would always give his aunt a hug.  The last time Ms. A. Bonty saw Berryman was after he was grown, married, and had a baby.  At that time, he was "still a quiet, polite young man."  Ms. A. Bonty never witnessed Berryman with "a bad temper, or any anger management problems."  She "never saw him violent."

Maternal aunt Donna McBride always found Berryman "to be polite,  kind and quiet[,] though outgoing."  Ms. McBride doesn't recall that Berryman ever lost his temper.  He was quiet.  When he talked to Ms. McBride from jail (in Kern County) "he cried and cried."  She states that knowing him, "under normal circumstances, he would not commit the crime he was charged with."  In the year before Berryman left for Delano, Ms. McBride would see Berryman once or twice a week at her mother's (his grandmother's) house.  She states she observed no changes in his behavior or personality during those visits.

Maternal uncle (in-law) Perry McBride states that from an early age, Berryman "was gentle, calm, and relaxed."  He "never seemed angry or temperamental."  Mr. McBride majored in psychology when he attended California State University at Bakersfield and even worked as a counselor to troubled juveniles for a year.  Based on his background and the fact that Berryman lived in his apartment for approximately two years, Mr. McBride believes he "should have seen some evidence of pent-up hostility if it was there."  Mr. McBride reports that Berryman's behavior around women was "always well-mannered and he treated women with respect."  Mr. McBride observed "no evidence of hostility toward women."

     **e.**  **Report From Counsel Regarding Great-Grandmother Thelma Mitchell.**

In a declaration appended to Berryman's second state habeas petition, co-counsel, Jessie Morris, Jr. reports that Berryman's paternal grandmother, Thelma Mitchell, would have been a helpful mitigation witnesses, although convincing her testify and controlling her testimony would have been challenging. The challenge derives from the fact that she did not believe Berryman committed the rape or homicide. Nonetheless, Mr. Morris offers his opinion that experienced investigators could have drawn out her testimony.

1    In fact, the record in these federal proceedings reveal that Berryman's current litigation team

2  noticed Ms. Mitchell's deposition for Monday, March 26, 2001.  On the record, co-counsel Jessie Morris

3  read a statement into the record:

> Thelma Mitchell, the witness, is not going to be showing for this deposition.  I had made contact with her late yesterday, and she said that she received a letter from Rodney Berryman.  And, I'll quote part of that letter.
>
> "I don't want you to help them, Mama.  God has won this case for us, not us with the lawyers.  So please, if my lawyers come again to talk to you, tell them I said I don't want them dragging you places.  I want you to rest.  An you're giving me the best help I can get, your prayers to God."
>
> The witness, Thelma Mitchell, is 97 years old.  She said that she is going to follow her great grandson's wishes and will not be answering questions or coming to this deposition.

Declaration of Non-Appearance of Thelma Mitchell, Dated March 26, 2001.

### 4.    Appellate Counsel Mr. Posner's Opinion Regarding Investigation Efforts.

    Mr. Posner recounted that after having been appointed to represented Berryman on direct appeal proceedings on December 27, 1990, he attempted to secure the trial records retained by his trial attorneys, Mr. Soria and Mr. Peterson.  When Mr. Posner finally connected with Mr. Soria in September 1991, the results were very disappointing; the documents Mr. Soria handed over to Mr. Posner did not even fill one expando file.  Mr. Soria claimed that the remainder of the file was in possession of the defense investigator, Bruce Binns or co-counsel Mr. Peterson.  When Mr. Posner finally was able meet with Mr. Binns, Mr. Binns informed him that he had divorced and lost his office.  He did not maintain any files, but suggested that Mr. Posner contact Mr. Peterson, who handled the penalty trial.  Mr. Posner's contact with Mr. Peterson similarly was unsuccessful, for he claimed he had no files.  Mr. Posner found this state of affairs particularly irksome in as much as Mr. Peterson had informed the jurors that he ten brown expansion folders full of documents located in two banker's boxes full of documents.  Mr. Posner found it incredulous that in presenting evidence in a death penalty case, counsel would not have maintained and preserved trial records for use on appeal.  In his 38 years of practicing law, Mr. Posner found this appalling lack of record keeping to be unprofessional and incompetent.

1          **B.      Berryman's Contentions.**

2          Underlying Berryman's challenges to the manner in which evidence was investigated (or not

3   investigated) and presented (or not presented) is his complaint in Claim 6 that investigator Bruce Binns

4   overbilled the county and provided unlicenced, unskilled, and untrained services.  Berryman alleges that

5   whereas Mr. Binns billed the county $40 per hour, the actual investigative work was performed by

6   amateur independent contractors Ed Beadle and Douglass Lemmons at the much lower rate of $10 per

7   hour.  Mr. Binns reportedly provided no training or supervision of Messrs. Beadle and Lemmons.  With

8   respect to Mr. Lemmons, particularly, Berryman points out that he has been admitted to the Veteran's

9   Administration Hospital in Menlo Park, California and a mental hospital in Bakersfield for the effects

10  of post-traumatic stress syndrome as a result of his service during the Vietnam conflict.  Recognizing

11  that his attorneys bore the ultimate responsibility for ensuring competent investigative services,

12  Berryman complains of poor investigative efforts and mitigation evidence development.

13         In Claims 63 and 64, Berryman complains that no neurological tests were conducted on

14  Berryman to confirm diagnoses of Drs. Pierce and Benson, although both doctors recommended testing.

15  Mr. Lemmons was the investigator in charge of finding a facility to perform the neurological tests.  As

16  a result, the experts' opinions were greatly undermined, more so because Mr. Moench argued the defense

17  purposefully did not make arrangements to conduct the neurological tests discussed by the experts in

18  order give the experts "something to talk about" during their testimony.  *See* Part III.B., *supra*.

19         Claim 65  focuses on the failure of investigators to uncover relevant, personal and family history

20  of Berryman's "extremely disruptive, abusive, and neglectful" background, particularly from his mother

21  Lestine Bonty and his sister Ronnique, who among other statements have described that Berryman was

22  the subject of sexual abuse as a child.  The omitted evidence carried with it no risk of casting Berryman

23  in a bad light.  Citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) and *Mak v. Blodgett*, 970 F.2d

24  614, 619 (9th Cir. 1992), Berryman claims the attorneys' failure to present mitigating evidence was

25  extremely harmful to the defense.  The facts of his upbringing Berryman emphasizes are supported by

26  the post-conviction evidence obtained from his mother and sister, as well as from other sources.  It

27  reveals Berryman was born pre-mature and spent his first month in an incubator.  His mother didn't want

28  him when she was pregnant with him and never bonded with him.  His father drank heavily, did not keep

regular employment and abused his wife in front of the children (including Berryman).  The parents

eventually divorced on 1974, after which his mother was compelled to neglect the children while she

worked and attended school.  The Berryman children were "cared" for by maternal relatives, during

which care he claims he and his sister, Ronnique, were sexually molested, repeatedly.  Berryman did not

bond with his step-fathers.  He went to live with his father in Long Beach and then Sacramento, but his

father was a poor role model who drank, gambled, and had many girlfriends.  In addition to being

influenced by his father, Berryman was influenced by his older brother, Ronald, Jr., who used drugs and

alcohol.  Berryman claims to have suffered a severe psychological impact from the news of his father's

disappearance and presumed death.  His points and authorities recite, "to this day he believes his father

is still alive and has abandoned him."  Although Berryman appeared stable during his first year of

marriage, when he lost his job, his drinking increased, he could not find work, and his drinking increased

more and more.  Because the foregoing evidence was not developed, the view the jurors had of Berryman

"did not take into account the extent to which he was a victim of the circumstances of his upbringing."

This is said to have been highly mitigating (although not an excuse or basis for acquittal).  The prejudice

occasioned by the alleged omissions is highlighted because he claims this "case was closely balanced

in the penalty phase."

Claim 69 reviews a great deal of evidence from other lay witnesses and documents giving a

picture of his life.  The offered evidence of friends and family is set out above.[156]  With respect to that

evidence, Berryman reiterates the many positive characteristics.  Fred Sikes, who baptized Berryman

thinks well of him for his regular church attendance, membership in the church choir, and gentle nature.

Delano Fire Chief Reuben Hill, who coached Berryman in basketball and football when Berryman was

12 observed Berryman to be a good athlete and a good sportsman with a good aptitude for mechanics.

Mr. Hill also knew Berryman from church.  Berryman's family members describe positive past

associations, Berryman's reputation as a non-violent person, their own deep sense of loss if Berryman

is executed, the tumult of his early upbringing, being passed from one care giver to another, Berryman's

---

[156] There are a number of witnesses and documents mentioned in Berryman's supporting points and authorities that were not presented in his offer of proof supporting the motion for evidentiary hearing.  Included in this category is Rev. Howard Fuller, Berryman's former father-in-law and juvenile probation officers.

1   sorrowful reaction to his father's death as a teenager, the poor school services he received, and the racial

2   discrimination he endured.  His juvenile probation officers and juvenile attorneys also purportedly had

3   positive impressions of Berryman as a youth.  They also noted learning disabilities and family difficulties

4   resulting in poor adjustment to adult life.

5         Claim 70 focuses on the failure of Berryman's trial attorneys to secure the cooperation of his

6   great grandmother, Thelma Mitchell.  In his points and authorities, he describes Ms. Mitchell as a pivotal

7   figure in his early life.  Because she believed Berryman was innocent of the rape and murder, however,

8   Berryman recognizes it would have been difficult to convince her to testify.  He also asserts that with

9   experienced investigation personnel, she could have been convinced.

10        **C.      Analysis.**

11        With the exception of the claim that Berryman was sexually molested by his maternal uncles (or

12  by any one) as a child, let alone repeatedly molested, and the contention that the case was closely

13  balanced in the penalty phase, the Court accepts the proffered evidence.   The Court accepts that

14  Berryman was born pre-maturely, the second child of two teenagers unprepared and somewhat

15  unqualified for parenthood.  The Court recognizes that the instability in the parental relationship, the

16  moving around, the joblessness of the father, the violence between the parents, and their ultimate

17  separation would take a toll on the children.  The Court further acknowledges that Berryman's father was

18  less than a perfect parent, gone much of the time, and engaged in a life-style hardly conducive to strong

19  family values.  Berryman's poor academic achievements also must have had a role in his failures in the

20  employment world as well as in his inter-personal relations.   His injuries, including the industrial

21  accident and the incident where his wife struck him with a metal flashlight also likely left him with

22  residual headaches, perhaps coupled with his well-documented excessive drinking.  Many of his friends

23  point out that he was not a violent person by nature or reputation, leading to the supposition that his

24  escalating violent outbursts was attributable to an external cause or causes.  The Court's impression of

25  Berryman is that he was a young man who had become trapped in a cycle of bad choices and escalating

26  violent outbursts occasioned by those bad choices, including the assault on motorist David Perez,

27  punching his father-in-law in the nose, continued drinking, not getting help for his drinking, not

28  obtaining regular employment, trying to maintain multiple simultaneous intimate relationships, and, as

1   Dr. Benson testified running away to Delano rather than trying to deal with his problems.  *See* Part III.B.,

2   *supra*.

3          The Court specifically rejects the contention that Berryman, himself, was sexually abused.

4   Neither his mother's nor his sister's declaration statements to that effect are based on first-hand, personal

5   knowledge, and, accordingly are not credited.  *See* Fed. R. Evid.702.  The statements also are hearsay

6   and no hearsay exceptions or non-hearsay uses are applicable.  Fed. R. Evid. 802, 803, and 804.  No

7   other credible, supported testimony made on personal knowledge is offered (including from the alleged

8   molesters, Lester Bonty and Kanda Bonty, both of whom supplied declarations).  The Court also rejects

9   the notion that the penalty case was "close."   According to the state record,[157] penalty deliberations

10  commenced on Thursday October 27, 1988 at 3:47 p.m.  CT-4: 855, RT-29: 4041.  At 4:48 p.m., the

11  jurors requested a read back of Carol Berryman's testimony.  *Id*.: 4042, after which the jurors were

12  allowed to adjourn for the day.  They resumed deliberations the following morning at 9:00 a.m..  CT-4:

13  858.  Portions of the expert witness testimony were read back.  RT-29: 4046-51.  After further

14  deliberations and a lunch break, the jurors notified the trial court they had reached a verdict at 2:50 p.m.

15  *Id*.: 4053.  There is no evidence in the record that the vote for the death penalty and life without parole

16  was evenly balanced at any point during the deliberations, even from Mr. Armendariz, the juror from

17  whom Berryman has secured a declaration.  Nor has Berryman pointed to any evidence, documentary

18  or declaratory, that would support such a conclusion.  Finally, as previously discussed in connection with

19  Claims 15 and 16, Part XII.C.3., *supra*, even if the Court accepts the proposition that the neurological

20  tests ultimately performed on Berryman demonstrate the existence of a seizure disorder, there is no

21  evidence that Berryman was experiencing or did experience a seizure at the time he killed Ms. Hildreth.

22          Without a medical cause for the attack, Berryman's conduct on the night of September 6, 1987

23  is reduced to a fatally bad choice, even though it may have been exacerbated by emotional turmoil,

24  which in turn is attributable to his unhappy childhood.  None of the proffered evidence persuasively

25  demonstrates that Berryman's history, intellectual functioning, and compromised emotional stability in

26  any way led him to commit the sexual assault and fatal stabbing attack on Ms. Hildreth.  Rather, the

27

28          [157] *See also*, Part III.B., *supra*.

proffered evidence suggests that the fatal assault was the culmination of frustration over the self-created life predicament in which he found himself.  Berryman's insatiable need for female attention to make up for the lack of attention from his mother in his childhood does not amount to mitigation.  His botched attempt to have a romantic interlude with Ms. Hildreth to have his immediate needs met, was not compelled by uncontrollable mental infirmities, but was a result of a volitional act.  This conclusion is informed by the trial testimony of both Dr. Pierce and Dr. Benson.

Dr. Pierce's trial opinion that Berryman's act in raping and stabbing Ms. Hildreth must have been the result of an alcohol induced seizure was based on Berryman's pattern of past behavior that when he couldn't get his needs met, he would leave or avoid the situation or just become frustrated.  Dr. Pierce conceded, however, that Berryman had the capacity for violence.  Dr. Benson similarly conceded that a sexual assault was inconsistent with a blackout.  He also noted a streak of aggression in Berryman after he lost his job, his wife, and his apartment.  Other than the disputed neurological test results that Berryman suffers from a seizure disorder, there is no corroboration in the record that Berryman actually suffered a blackout (as opposed to a headache) at any time before or since the attack on Ms. Hildreth.  The additional proffered evidence is not sufficient to have made a difference in the outcome of the penalty proceedings under *Strickland* or *Brecht.*  Claims 6, 63, 64, 65, 69, and 70 are denied on the merits.  Berryman's request for an evidentiary hearing with respect to Claims 63, 65 and 69 is denied.

## XXVI. Berryman's Assertion of Ineffective Assistance of Counsel for Failure to Obtain a Social History of Berryman (Claim 59).

In Claim 59 Berryman alleges ineffective assistance of trial counsel because his attorneys failed to obtain a social history of Berryman and argue mitigation based on that history.  He requests an evidentiary hearing with respect to this claim.

### A. Statement of the Facts Relevant to the Obtaining a Social History.

The facts pertinent to Claim 59 have already been set out in connection with the discussion of guilt phase mental defenses in Claims 15 and 16.  *See* Part XII., *supra*.  Specifically, Berryman offers the social history report of Dr. Gretchen White as an example of the type of material counsel could have presented had they commissioned a social historian.  *See* Part XII.A.3.d., *supra*.  In addition, Mr. Soria's statement in his September 17, 2001 declaration that at the time of Berryman's trial, he "had not been

1    introduced to the practice of obtaining social histories in capital cases," is taken into account.  *See* Part

2    XII.A.5., *supra*.

3         **B.**     **Berryman's Contentions.**

4         Berryman complains that instead of preparing a professional social history, the defense relied on

5    random interviews by Douglas Lemmons, who Berryman describes as unlicensed, untrained, and

6    medically disabled.  The social history reveals the many deprivations Berryman endured as a child and

7    teenager, including sorrow over the death of his father.  Relying on *Castro v. State of Oklahoma*, 71 F.3d

8    1502 (10th Cir. 1995), Berryman claims the coherent expert testimony explaining mitigating evidence

9    would have made a difference to his penalty proceedings.

10         **C.**     **Analysis.**

11         The Court does not agree that Dr. White's social history presents such a persuasive picture of

12    Berryman's life that the jury would have been persuaded to mitigate his sentence from death to life

13    without the possibility of parole.  Although he did endure a tumultuous and unstable childhood, he

14    received care from his mother and her relatives.  All lay witnesses indicate that although Ms. Bonty

15    struggled to make ends meet for her four children she was a good mother who was diligent in making

16    child care arrangements while she pursued an education and better employment.  The fact that

17    Berryman's father was largely absent and less than a stellar role model also does not engender

18    compelling sympathy.  Berryman's social history, as presented in Dr. White's report and as described

19    in the lay testimony of friends and family, shows a young man who consistently made poor choices.

20    Although his intellectual capacity was not particularly high, it was within normal ranges.  The Court's

21    analysis regarding undeveloped and unpresented mitigating evidence is set forth in the discussion of

22    Claims 6, 63, 64, 65, 69, and 70.  *See* Part XXV.C., *supra*.  In particular, the Court rejects the assertion

23    that any of Berryman's emotional problems are based upon him being a victim of childhood molestation.

24         The Court finds that the testimony of a social historian at Berryman's trial would not have made

25    a difference in the outcome.   Moreover, Berryman has yet to establish that retaining a social historian

26    in 1987 and 1988 was the standard for competent counsel.  Claim 59 is denied on the merits.

27    Berryman's request for an evidentiary hearing with respect to Claim 59 is denied.

28

XXVII. **Berryman's Challenges Arising from Miscellaneous Instances of Alleged Prosecutorial Misconduct During Summation (Claims 76, 79, and 80).**

Claim 76 alleges Mr. Moench committed prosecutorial misconduct for arguing Berryman's expert stated he was "amoral," when in fact the expert testified he had an "asocial" personality. Claim 79 alleges ineffective assistance of counsel for three separately articulated failures by defense counsel, the first of which is the failure to object to Mr. Moench's "amoral" mischaracterization. The other instances involve the defense attorneys' failure to object for two additional prosecutorial misdeeds: one when Mr. Moench argued Berryman's "Casanova" life-style was a factor in aggravation and the other when he equated the statutory mitigating factor of impaired capacity with the "old insanity defense." As relevant to alleged prosecutorial misconduct, Berryman also asserts trial error in Claim 80 for the trial court's failure to cure these three improprieties.[158] Berryman requests an evidentiary hearing with respect to the portion of Claim 79 dealing with Mr. Moench's equating philandering with a factor in aggravation.

A.      **Statement of the Facts Relevant to Miscellaneous Instances of Prosecutorial Misconduct.**

Mr. Moench's arguments that Berryman was "amoral" rather than "asocial" and that his philandering amounted to a factor in aggravation have been laid out in connection with Claims 7, 8, 9, 10, and 23, *see* Part VII.., *supra*, and Claims 18, 19, and 52, *see* Part XXI., *supra*. The argument about Berryman's philandering is additionally addressed in the discussion of Claims 13 and 14. *See* Part XXIII., *supra*. Mr. Moench's comment that the sentencing factor addressing Berryman's impaired mental state was "the old insanity defense," appears in the state trial record.

In accordance with Penal Code § 190.3(h), also referred to as the factor (h) instruction, the trial court directed the jury to, consider, take into account, and be guided by:

> whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

RT-29: 3970-71.

---

[158] Claim 80 also alleges trial error for the trial court's failure to correct misstatements of Mr. Peterson during his penalty summation. This portion of Claim 80 is addressed in connection with Claim 91. *See* Part XXIX., *infra*.

1    In commenting on this particular factor, Mr. Moench reiterated the language of the instruction,

2    and then stated:

3        That's the old insanity defense.  Did he know what he was doing was criminal?  Did he
         have the ability to [con]form it, his behavior?  No indication from anyone he had any sort
4        of psychotic break or anything even approaching it that he didn't know what he was
         doing was criminal.  Not a factor in mitigation.

5

6    *Id*.: 3992.

7        **B.      Berryman's Contentions.**

8        Berryman's arguments in Claims 76 and 79 regarding the "amoral" and philandering summation

9    statements do not expand upon the arguments previously advanced in prior claims.  *See* discussion of

10   Claims 7, 8, 9, 10, and 23, Part VII.., *supra*, Claims 18, 19, and 52, Part XXI., *supra*, and Claims 13 and

11   14, Part XXIII., *supra*.

12       In reference to Mr. Moench's "old insanity defense" statement, Berryman points out that an

13   insane person is "incapable of knowing or understanding the nature and quality of his act or incapable

14   of distinguishing right from wrong at the time of the commission of the crime."  Since the standard for

15   the insanity defense is "considerably higher" than the standard for diminished or impaired capacity under

16   the factor (h) instruction, introducing the issue of insanity eliminated consideration of a  significant

17   mitigating factor, namely inability to conform conduct to the requirements of the law due to mental

18   impairments.  Contrary to the legal definition of insanity, Berryman points out that the factor (h)

19   instruction did not require him to show he did not know what he was doing was wrong or that he could

20   not distinguish right from wrong, which is the standard for insanity.  Relying on *Collier v. State*, 705

21   P.2d 1126, 1130-31 (Nev. 1985), he argues the trial court should have interrupted and corrected the

22   prosecution misstatements under a higher duty of sua sponte intervention in death penalty proceedings.

23       **C.      Analysis.**

24       The prosecutorial misconduct, attorney error, and trial error claims with respect to the "amoral"

25   and philandering statements are resolved in the analyses of Claims 7, 8, 9, 10, and 23, *see* Part VII..,

26   *supra*, and Claims 13 and 14, *see* Part XXIII., *supra*.  Those claims are denied.  The prosecutorial

27   misconduct, attorney error, and trial error claims with respect to "the old insanity defense" fare no better.

28       The issue was addressed by the California Supreme Court on direct appeal:

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd                    220

1
2
3
4

> Defendant is right that the prosecutor misstated the law in remarking that the penalty factor on impairment of capacity was "the old insanity defense" [citation omitted] – although his mistake is readily understandable[159]. . . . But misstatement is not enough. Defendant is wrong, however, in the rest of his complaints. Contrary to his assertion, the prosecutor did not lead "the jury away from considering [potentially] mitigating evidence. . . ."

5   6 Cal. 4th at 1094-95.   The conclusion of the California court that the Mr. Moench's summation, even

6   though it included a misstatement, did not eliminate from the jury's consideration valid mitigating

7   evidence is entirely reasonable and dispositive to the analysis on federal habeas. 28 U.S.C. § 2254(d)(1).

8   Besides the factors mentioned by the California Supreme Court, the Court is struck by the improbability

9   the jurors had any idea what the legal definition of insanity might have been or that insanity required a

10  higher standard than impaired capacity under the factor (h) instruction.  The real import of Mr. Moench's

11  argument was that Berryman was not impaired at the time he killed Ms. Hildreth.  That argument was

12  appropriate.  Further, had Mr. Peterson objected or the trial court interrupted with a curative instruction

13   to the "old insanity defense" reference, there may have been an explanation as to the definition of the

14  insanity – thereby emphasizing a concept for the jury that, from the defense point of view, would be

15  better left alone.

16      In light of this analysis, the trial court was under no sua sponte duty to correct alleged

17  prosecutorial misstatements.  Berryman's reliance on *Collier v. State* 705 P.2d at 1130-31, to the

18  contrary is inapposite.  In that case the Nevada Supreme Court had before it a case where the prosecutor

19  injected statements about the effect of the victim's death on the family and the cost of life imprisonment

20  if the death penalty were not carried out.  The appellate court labeled both arguments as manifestly

21  improper, so much so that they warranted the trial court's sua sponte intervention.  Here, the complained

22  of statements by Mr. Moench were minor, harmless, and/ or appropriate.  There were no manifest

23  improprieties and no basis for trial court intervention.

24
25
26

---

27  [159] The remark that the prosecutor's mistake in equating the impairment of capacity factor with the insanity defense was "readily understandable" is explained by the Warden.  Insanity requires that the defendant lacks "substantial capacity" to appreciate the criminality of his conduct.  The factor (h) instruction requires that the defendant's capacity is impaired.

28

1    Claims 76, 79, and that portion of Claim 80 addressing alleged improper prosecution argument

2    on penalty summation are denied on the merits.  Berryman's request for an evidentiary hearing to

3    develop Claim 79 is denied.

4    **XXVIII.  Berryman's Challenge to Improper Cross Examination Suggesting Berryman Subjected**

5    **the Victim to Involuntary Oral Copulation (Claims 53 and 54).**

6    In Claims 53 and 54, Berryman reiterates his complaint that Mr. Moench suggested during cross

7    examination of Yolande Rumford that Ms. Hildreth had been subjected to forced oral copulation.  Claim

8    53 is pleaded in terms of prosecutorial misconduct; Claim 54 is predicated on ineffective assistance of

9    counsel.  Berryman requests an evidentiary hearing with respect to Claim 54.

10    **A.    Statement of the Facts Relevant to the Involuntary Oral Copulation Suggestion.**

11    During direct examination of Ms. Rumford by Mr. Peterson, she testified that Berryman was a

12    nice person.  Testing Ms. Rumford's favorable character opinion, Mr. Moench asked her if her opinion

13    would change knowing that Berryman tricked a 17 year-old girl to go out to the countryside, beat her,

14    raped her, and then tried to force her to orally copulate him, "give him a blow job."  RT-28: 3817.  *See*

15    Parts III.B. (summary of penalty proceedings) and XXI.A. (facts relevant to Claims 18, 19, and 52),

16    *supra*.  *Strickland* expert Mr. Simrin opines  that competent counsel would have objected immediately

17    to Mr. Moench's baseless hypothetical.

18    **B.    Berryman's Contentions.**

19    Berryman claims that a prosecution argument not based on evidence and that introduction of an

20    aggravating factor without notice violate of his due process rights.  He argues the oral copulation

21    question "was certainly meant to form part of the prosecution case, as an advance summary of the

22    penalty phase argument."  He characterizes the hypothetical as a serious allegation because it represented

23    a detail of humiliation the victim endured before death, which, coming from the prosecutor carried with

24    it a heavy presumption of truth.

25    **C.    Analysis.**

26    As a preliminary matter, the Court agrees with Berryman's contentions that the oral copulation

27    hypothetical constitutes misconduct on cross examination.  The only support for the hypothetical was

28    the presence of a pubic hair found on Ms. Hildreth's face that was said to have been consistent with a

1    sample of Berryman's pubic hair.   The presence of this hair, however, is far from sufficient to

2    demonstrate or even suggest oral copulation.  *See* discussion of Claims 7, 8, 9, 10, and 23, Part VII.C.,

3    *supra*.  The conclusion on this preliminary matter requires analysis of the impact of the hypothetical.

4         To be entitled to relief, Berryman must demonstrate that the hypothetical so infected the trial

5    process with unfairness as to make the resulting sentencing decision a denial of due process.  *See*

6    *DeChristoforo*, 416 U.S. at 643; *Darden*, 477 U.S. at 181; *Thompson*, 74 F.3d at 1576.  While Mr.

7    Moench's suggestion that Berryman forced Ms. Hildreth to orally copulate him is a serious allegation,

8    by the time it was mentioned, the jury already had convicted Berryman of first degree murder, rape, and

9    use of a knife to commit both offenses.  The suggestion of forced oral copulation would be merely

10   cumulative of Berryman's violent acts.  The Court also notes that the misconduct was isolated.  Contrary

11   to Berryman's contentions, the oral copulation allegation was not advanced by Mr. Moench on

12   summation.  It was not mentioned again after examining Ms. Rumford.  Under these circumstances, the

13   Court declines to find a due process violation.  *See Ortiz*, 149 F.3d at 934 (no due process violation

14   where improper prosecutorial remark is an isolated or one-time event).[160]

15        Claims 53 and 54 are denied on the merits.  Berryman's request for an evidentiary hearing with

16   respect to Claim 54 is denied.

17   **XXIX.  Berryman's Challenges Arising from Defense Misstatement About the Burden of Proof**

18       **(Claims 80 and 91).**

19        Four instances of ineffective assistance of counsel with respect to Mr. Peterson are enumerated

20   in Claim 91.  First, according to Berryman's rendition of the facts, Mr. Peterson informed the jurors that

21   Berryman bore the burden of proof on penalty issues.  Second, he suggested to the jurors that Berryman

22   might be a danger to the community in the future.  Third, he informed the jurors that if Berryman

23   received a life without parole sentence, the governor could unilaterally commute the sentence to life with

24   parole.  Finally, he insulted the jurors for neglecting their sworn duty to carefully deliberate on the

25   evidence during guilt phase deliberations.  Related Claim 80 asserts trial error because the trial court did

26

27       [160] The Warden argues that the California Supreme Court addressed the contentions in Claim 53
28   on direct appeal.  The Court has searched the California opinion in vain for a decision on the oral
     copulation hypothetical.

1   not sua sponte admonish the jurors about Mr. Peterson's misstatements of law.  Berryman requests an

2   evidentiary hearing with respect to Claim 91.

3         **A.**      **Statement of the Facts Relevant to Defense Misstatements.**

4         The misstatement concerning the burden of proof occurred during Mr. Peterson's opening penalty

5   phase statement:

6         Mr. Moench will introduce items that the People are compelled to introduce by way of
      aggravation in order that you will at his request return a verdict of death. [¶] *The defense*

7         *has the burden of introducing to you evidence* which will assist you in making that
      decision, and that evidence, by way of notation, in order that you would return a verdict

8         of life imprisonment, which is without the possibility of parole, that is, never to get out,
      and that is the law of this state and cannot be changed; *and the only way the person can*

9         *be released is if the governor makes that decision*, and that will be Governor Deukmejian
      or his . . . successors, and the evidence that will be introduced for your consideration will

10        be that with which you will ultimately make your decision.

11  RT-27: 3529-30 (emphasis added by Berryman).

12        The testimony of former San Quentin State prisoner, E.J. Corum is relevant to the issue of

13  Berryman's potential future dangerousness and the governor's power to commute a sentence.  After

14  describing the deplorable conditions in prison for inmates with life sentences, Mr. Corum declared to

15  the jurors that if Berryman were given a life without parole sentence, he would serve life without parole.

16  RT-28: 3708, 3722.  He then explained the excruciatingly painful death a human being suffers in the gas

17  chamber.  *Id*.: 3727-29.  Mr. Peterson's summation, also broached the subjects of Berryman's potential

18  dangerousness and the governor's power to commute a sentence:

19        Life without possibility of parole means that he will spend the rest of his life in prison,
      in a cell.  He will probably not see the sun set, he will not see the moon rise.  He may

20        never see the sun rise.  Justice will be served by a sentence of life without possibility of
      parole.

21
      That sentence is so severe that it denies the person so sentenced of ever hoping to get out.

22        But it's the sentence that Rodney Berryman must serve if you decide that he shall serve
      life without parole.

23
      Now I want to turn to your second concern, that our community will be protected by

24        insuring that Rodney Berryman does not move within the community to commit another
      crime.

25
      That's what life without possibility of parole means, that he poses absolutely no threat

26        to you or to your family or to the family of the victim, or to your neighbors, or to anyone
      in the community.

27
      Now, please don't confuse life without possibility of parole with the lesser sentence of

28        life with the possibility of parole.  And there is such a sentence.  We citizens of this state

1    reenacted the death penalty, and unless we, the citizens of this state, remove it, I have no
     reason to believe that that law will change.

2

3    *Only the governor of the State of California has the authority to commute a sentence*.
     Governor George Deukmejian is not going to do that, and I cannot conceive of any
     governor of this great state in the future doing so.

4

5    RT-29: 4011-12 (emphasis added by Berryman).

6         Further in his summation, Mr. Peterson explained how laborious, for the prosecution, the defense

7    and the trial court, the presentation of the case had been. *Id*.: 4022-23.  Yet, he continued, the guilt phase

8    deliberations for murder were very brief.  The jurors were put in the care of the bailiff on October 18,

9    1988 at 12:35 p.m., taken to lunch, returned to deliberate, and at 1:45 requested a tape player.  A tape

10   player was provided by 2:15 and the jurors listened to the 45 minute tape (until 3:00 p.m.).  By 3:15, the

11   jury had reached a verdict on Count I.   *Id*. 4023-24.   Mr. Peterson stated, "giving you the greatest

12   latitude, it took you 15 minutes to reach a verdict."  He said it "was an insult" to trial judge, the

13   prosecutor, and the defense.  He said the general rule of thumb was that deliberations should take one

14   hour for each court day. *Id*.: 4024.

15        Mr. Moench's rebuttal seized on the jury criticism:

16        [N]ever in my wildest dreams, never in my experience, never in – there's no way I could
          have foreseen that he [Mr. Peterson] would suggest that the time of your deliberation was

17        an insult to me or this honorable court.   . . .

18        To suggest to you that there is a rule of thumb that you deliberate a certain amount of
          time when the evidence is clear to you and would be clear to anyone, that you somehow

19        have to sit and ponder for a period of time when you are satisfied that the evidence has
          met the burden that you are required to find in this particular case, is reprehensible.

20

21        I feel insulted if I am lectured to in such a manner.  And I can only assume that you felt
          as well [sic], and I apologize on behalf of the attorneys.

22   *Id*.: 4026-27.

23        On sur-rebuttal, Mr. Peterson again raised the issue of the abbreviated guilt phase deliberations.

24   He stood by his earlier criticism of the jurors for taking only 15 minutes to deliberate and reach a verdict.

25   He stated that his job was to question the jury's verdict.  He argued that it was not possible for the jury

26   to examine 114 exhibits, plus listen to a 45 minute tape, and re-examine the jury instructions in that

27   length of time. *Id*. 4033-34.

28

1    Jury instructions read by the trial judge also bear on this set of claims.  With respect to the burden

2    of proof, the court stated: "To return a judgment of death, each of you must be persuaded that the

3    aggravating evidence is so substantial in comparison with the mitigating circumstances, that it warrants

4    death instead of life without parole."  *Id*: 4038.

5         With respect to all of Mr. Peterson's misstatements and jury criticism, Mr. Simrin avers, "I would

6    never have done any of the three things[161] complained of in Mr. Peterson's closing argument.[162] . .

7    . I think all of those individually were harmful and should not have been made.  The accumulated impact

8    of all three of those improper statements do irreparable harm to the defendant's position with the jury."

9    Mr. Simrin concludes that no matter what mitigation evidence was presented, it was undercut by Mr.

10   Peterson's tactical mistakes.

11        **B.    Berryman's Contentions.**

12        In addition to citing *Strickland v. Washington*, 466 U.S. 668, Berryman claims Mr. Peterson's

13   misstatements create an Eighth Amendment violation for misinforming the jury as to it's role in the

14   sentencing process under *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  He points out that under

15   California law, there actually is no burden of proof at penalty proceedings (except as to unadjudicated

16   criminal activity).  *People v. Davenport*, 11 Cal. 4th 1171, 1224 (1995) (*abrogated on other grounds,*

17   *People v. Griffin*, 33 Cal. 4th 536 (2004)).  His challenge to comments about his dangerousness and the

18   governor's power to commute his sentence emphasizes that Mr. Peterson was the only person to have

19   raised those concepts.  Mr. Moench did not mention either factor in his presentation of evidence or

20   argument and the trial court did not instruct on either concept.  Further, although a jury instruction on

21   the governor's authority to commute a life without parole sentence to life with parole, the so called

22   "Briggs Instruction," has passed constitutional muster, *see California v. Ramos*, 463 U.S. 992, 1013

23   (1983), subsequent Ninth Circuit authority dictates that the instruction must accurately express the law

24   to be upheld.  Citing, *Hamilton v. Vasquez*, 17 F.3d 1149, 1162 (9th Cir. 1994), *Gallego v. McDaniel*,

25

26        [161] The implication that the governor might commute a life without parole sentence and
     Berryman's future dangerous are not treated separately in Mr. Simrin's declaration.

27

28        [162] The burden of proof misstatement was made by Mr. Peterson in his opening penalty phase
     statement.

1   124 F.3d 1065, 1076 (9th Cir. 1997), *McLain v. Calderon*, 134 F.3d 1383, 1385 (9th Cir. 1998), and

2   *Coleman v. Calderon*, 150 F.3d 1105, 1119 (9th Cir. 1998), Berryman argues that when the Briggs

3   Instruction misleads the jury because of inaccuracies conveyed in the commutation process, the death

4   sentence has been set aside.  In his case, as in the cases cited, Mr. Peterson's statement to the jury was

5   that the governor could unilaterally commute Berryman's sentence (even though he didn't think it was

6   likely).  The true facts are, however, that the process of commuting Berryman's sentence from life

7   without parole to life with parole would require participation of the Board of Prison Terms and the

8   Supreme Court because of his prior felony convictions.  Accordingly, to say the governor had unilateral

9   authority to commute his sentence was misleading.

10       Berryman's argument concerning the criticism of the jury is based on analogy to cases where the

11  defense attorney spoke of his own client in derogatory terms, *see Harris v. Wood*, 64 F.3d 1432, 1438

12  (9th Cir. 1995) and a prosecutor made derogatory comments about defense counsel, *see People v. Hill*,

13  17 Cal. 4th 800, 821 (1998).  He argues the extension of these cases occurs when the defense attorney

14  makes derogatory comments to the jurors.  He also points out that the jury criticism was not isolated.

15  Mr. Peterson first raised the matter in his summation.  It was raised again by Mr. Moench in his rebuttal

16  argument, and then one more time in Mr. Peterson's sur-rebuttal.

17       Finally, with respect to the trial error claim, Berryman argues that the gravity of the alleged

18  misstatements, mandated sua sponte intervention by the trial court to neutralize the damage to the jurors.

19  *See Collier v. State*, 705 P. 2d at 1130-31.

20       **C.      Analysis.**

21       With respect to the burden of proof claim, Mr. Peterson's statement that the defense had the

22  burden of introducing evidence was not an announcement that the defense bore the burden of proof, but

23  merely an acknowledgment that the defense presented evidence to show a basis for mitigation.  The

24  record flatly does not support Berryman's contention that Mr. Peterson misstated the law.  Mr.

25  Peterson's statement that the defense had the burden of introducing evidence was part of his formalistic

26  style of addressing the jury.  No reasonable juror would have understood that he was allocating the risk

27  of non-persuasion to the defense.  Further, as pointed out by the Warden, the trial court's instruction to

28  the jury that a judgment of death required a finding that aggravating evidence was so substantial in

1  comparison with the mitigating circumstances that death rather than life without parole was warranted,

2  completely negates any ambiguity in Mr. Peterson's early comments.  The jury was not misinformed of

3  its sentencing responsibility under *Caldwell*, 472 U.S. 320.

4          Complaints about addressing Berryman's dangerousness to the community and the governor's

5  commutation authority also must fall.   Berryman correctly notes that the Supreme Court upheld the

6  Briggs Instruction about executive clemency, which as drafted, read:

7          You are instructed that under the state constitution, a governor is empowered to grant a
           reprieve, pardon or commutation after sentence following conviction of a crime.  Under
8          this power a governor may in the future commute or modify a sentence of life
           imprisonment without possibility of parole to a lesser sentence that would include the
9          possibility of parole.

10  *California v. Ramos*, 463 U.S. at 996-97.  The high Court characterized this instruction as "merely an

11  accurate statement of a potential sentencing alternative," since a life without parole sentence is amenable

12  to commutation to life with parole.  *Id*. at 1009.

13          The four Ninth Circuit cases relied on by Berryman which distinguish the facts in *Ramos*, and

14  resulted in vacating the death sentences there at issue, are inapposite.[163]  While it is true that they are

15  based on instructions which conveyed inaccuracies to the respective juries about the scope of the

16  governor's commutation authority, in each case the challenged instructions were requested by the

17  respective prosecutors for purposes of convincing the juries to vote for the death penalty.  In *Hamilton*,

18  17 F.3d 1149, the modified Briggs Instruction requested by the prosecutor actually informed the jurors

19  that Hamilton would be eligible for parole in fewer than 17 years if a verdict of life without parole was

20  returned.  This was a plain misstatement.  *Id*. at 1161.  The modified instruction further failed to take

21  into account that because Hamilton was a twice-convicted felon, under California law, both the Board

22  of Prison Terms and the California Supreme Court had to be involved before the governor could

23  commute his sentence.  Thus, the governor could not act unilaterally.  *Id*. at 1162.  The jury was thus

24  invited to speculate that the only way to avoid Hamilton's likely release was to return a death verdict.

25  _____

26      [163] Moreover, one of the four opinions, *Coleman*, 150 F.3d 1105, was reversed by *Calderon v. Coleman*, 525 U.S. 141, 147 (1998). The high Court directed the Ninth Circuit to undertake a harmless error analysis of the faulty instruction on remand.  *Id*. at 147. Two of the four opinions, *Hamilton*, 17 F.3d 1149, and *McLain*, 134 F.3d 1383, were abrogated, to the extent they found entitlement to relief without undertaking an harmless error analysis under *Brecht* required under *Calderon v. Coleman*, 525 U.S. 141.

1   *Id.*  In *Gallego*, 124 F.3d 1065, over defense objections, the trial court instructed that if the jury

2   sentenced Gallego to life with parole (under Nevada law), he would be eligible for parole in ten years

3   and, separately, that the governor had authority to commute a death or life without parole sentence. *Id.*

4   at 1074.  In fact, under Nevada law, if sentenced to life with parole, Gallego could not be paroled until

5   serving at least 20 years.  Further, he could not receive commutation for a death sentence or life without

6   parole sentence because he was currently under a sentence of death for a murder committed in

7   California. The instruction about executive clemency therefore was impermissibly misleading. *Id.* at

8   1076.   The death sentence in *McLain*, 134 F.3d 1383, similarly was vacated because McLain's

9   conviction history and the modified Briggs Instruction given were "materially indistinguishable" from

10  the situation in *Hamilton*, 17 F.3d 1149.  *See*, 134 F.3d at 1385.  Accordingly, the instructions read to

11  McLain's jury were impermissibly misleading because the jury would "have believed that the governor,

12  acting alone could commute McLain's sentence." *Id.* at 1386.  The same result obtained in *Coleman*,

13  150 F.3d 1005.  Citing *McLain*, 134 F.3d 1383, and *Hamilton*, 17 F.3d 1149, the court in *Coleman* found

14  that the instruction read to the jury failed to take into account Coleman's felony conviction record and

15  thus was inaccurate in informing the jurors that the governor had unilateral authority to commute a life

16  without parole sentence to life with parole.  150 F.3d at 1118-19.[164]

17       In stark contrast, the gravamen of Mr. Peterson's evidentiary presentation of E.J. Corum's

18  testimony about the endurance of a life without parole sentence as well as his argument about

19  Berryman's dangerousness and the governor's commutation authority was that a sentence of life without

20  parole would permanently remove any threat Berryman could pose to the community and that the

21  chances of commutation of that sentence were non-existent.  The very purpose of the evidence and

22  argument to this effect was to convince Berryman's jurors that life without possibility of parole was a

23  harsh sentence and that commutation was extremely remote. This is entirely distinguishable from the

24  situations in the cases cited by Berryman.  Besides giving inaccurate descriptions of the governor's

25  commutation authority, the primary concern addressed in those cases was that disclosure of the

26

27       [164] On remand from the Supreme Court reversal, *Coleman*, 525 U.S. 141, the Ninth Circuit
28  reinstated its earlier grant of the writ of habeas corpus, having found a constitutional error and that the
    error was not harmless under *Brecht*.  *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000).

possibility of commutation could diminish the jurors' sense of individual responsibility in deciding the appropriate penalty proscribed under *Caldwell*, 472 U.S. at 328-29.  There is no such danger here.  Even taking into account the fact that Mr. Peterson failed to discuss Berryman's felony history and the extra steps necessary for commutation of a life without parole sentence, no reasonable juror would have been induced to vote in favor of the death penalty out of concern Berryman might otherwise be released.  Had Mr. Peterson not made the remarks, the outcome of the proceedings would have been no different.  *See Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000) (holding that once commutation instruction is found infirm, court must undertake a harmless error analysis under *Brecht*).  Also of significance, the cases upon which Berryman relies involve actual jury instructions, which carry with them the authority of the trial court.  Here the executive clemency issue was raised only by Mr. Peterson.  Mr. Moench did not capitalize on the concept and the trial court did not reinforce it.  Finally, as the California Supreme Court observed, "The remarks appear to be a reasonable attempt to anticipate and allay a possible concern on the part of the jurors."  6 Cal. 4th at 1109.  There is no reason to question the California Supreme Court's decision in this regard.  28 U.S.C. § 2254(d)(1).

As for Mr. Peterson's criticism of the jury for the brevity of guilt phase deliberations, the Court does not find incompetent representation.  The Court agrees with the Warden's characterization of Mr. Peterson's decision to criticize the jury as a reasonable defense tactic.  Mr. Peterson's argument emphasizing the breadth of evidence presented during guilt proceedings and the need for careful consideration was the equivalent of a plea to find lingering doubt upon reevaluation of the evidence in deliberating the penalty.  The Court "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight."  *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689.)  Rather, in assessing trial counsel's performance, the Court applies "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and hence that "scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.

Finally, the trial court was under no sua sponte duty to correct the alleged misstatements and criticisms of Mr. Peterson.  Berryman's reliance on *Collier v. State* 705 P.2d at 1130-31, to the contrary is misplaced.  That case involved manifestly improper prosecution argument, so much so that sua sponte

1   intervention by the trial court was warranted.   In contrast, Mr. Peterson's closing argument was

2   reasonably delivered and based on informed strategic concerns.  There was no error.

3          Claims 91 and the balance of Claim 80 are denied on the merits.  Berryman's request for an

4   evidentiary hearing respecting Claim 91 is denied.

5   **XXX.   Berryman's Challenges Arising From Evidence and Instructions Concerning his Prior**

6          **Convictions (Claims 56, 60, 62, 88, 89, 90 and 93).**

7          This group of claims pertains to the introduction of evidence concerning Berryman's two prior

8   convictions and evidence of prior violent acts which did not result in convictions.  Claim 56 asserts that

9   the evidence of the circumstances underlying Berryman's marijuana transportation conviction were

10  actually ruled inadmissible by the trial judge and were inadmissible because transportation of marijuana

11  is a non-violent criminal act.  Claim 60 alleges ineffective assistance of counsel for the failure of trial

12  counsel to object to the testimony of Rev. Howard Fuller on grounds that his testimony did not establish

13  a violent act within the meaning of the statute.  In Claim 62, Berryman alleges ineffective assistance of

14  counsel for his trial attorneys' failure to challenge the validity of both prior convictions.  Claims 88, 89,

15  and 90 allege that pinpoint instructions of Berryman's prior convictions unduly emphasized those

16  aggravating factors in violation of his constitutional rights, under the theories of trial error (for giving

17  the instructions), ineffective assistance of trial counsel (for failing to object to the instructions), and

18  ineffective assistance of appellate counsel (for failure to raise trial error for giving the instructions on

19  direct appeal), respectively.   Repeating the allegations of Claim 89, Claim 93, in part, asserts Mr.

20  Peterson should have more effectively argued against the allegedly erroneous pinpoint instructions.[165]

21  Berryman seeks an evidentiary hearing with respect to Claims 56 and 60.

22          **A.      Statement of the Facts Relevant to Berryman's Prior Convictions.**

23          The facts surrounding the introduction of a stipulation regarding Berryman's prior felony

24  convictions are fully recounted in the summary of the penalty phase proceedings, *see* Part III.B., *supra*,

25  and the discussion of his claims challenging the adequacy of penalty evidence notice in Claims 13 and

26  14, *see* Part XXII.A.1., *supra*.  The facts regarding Mr. Moench's elicitation of testimony from friends

27  _____

28          [165] The balance of Claim 93 pertains to other jury instructions and is discussed in connection with
    Claims 82, 83, 84, 85, 86, 87, and 92, Part XXXI, *infra*.

1   and family members about Berryman's marijuana sales activities is recounted in the discussion of Claims

2   18, 19, and 52, *see* Part XXI.A., *supra*.[166]  The full account of the discussion about the contingency under

3   which the underlying circumstances of the marijuana transportation conviction would be introduced also

4   is relevant.

5   MR. MOENCH:          . . . And I'm pointing out that he suffered that conviction, and I
                             would not say anything further about it, unless they [the defense]
6                            try and present him [Berryman] as, one, either trying to make a
                             choir boy out of him, or, two, try to downplay it [the marijuana
7                            transportation conviction] in some form of testimony.

8   THE COURT:           All right.

9   MR. PETERSON:        Your Honor, I think it appropriate for the record to state we
                             understand and we anticipated that Mr. Moench would make that
10                           statement on the record, and that has been his conduct throughout
                             this trial.  Mr. Moench is a gentleman, Mr. Moench is a true
11                           professional, he's going to play by the rules, and everything has
                             been above board.  We want the record to be crystal clear that we
12                           have discussed this.

13  THE COURT:           All right.

14  MR. PETERSON:        Now, with respect to this making the defendant look like a choir,
                             boy, that may occur, but the fact that that – that the defense
15                           succeeds in portraying the defendant as a choir boy does not then
                             give the prosecution license, because it's done in some other
16                           fashion, to then bring in the undercover officer in the narcotics
                             matter.
17
    MR. MOENCH:          No.
18
    MR. PETERSON:        And that should be crystal clear on the record.
19
    THE COURT:           I don't think there's any question about that, Mr. Peterson.
20
                             What I understand Mr. Moench to say basically is that I'm not
21                           going to say anything more about this incident unless the defenses
                             attempts to say well, you know, transportation of marijuana, what
22                           could that be.  That could be simply driving down the street in
                             your car with one joint in your glove compartment, something
23                           like that.

24                           If that happens, Mr. Moench obviously would have the right, in
                             my view, to come forward and say that really wasn't what it was
25                           folks.

26   _____

27   [166] The witnesses questioned about Berryman's marijuana sales activities include his younger
     brother Bryan, his sister, Ronnique, occasional girlfriend Melinda Pena, wife Carol Berryman, and friend
28   Yolande Rumford.  In his points and authorities for this group of claims, Berryman emphasizes only the
     cross examination of Ronald, Jr. and Yolande Rumford.

1    MR. PETERSON:        Yes, we understand that --

2    MR. MOENCH:          And I'd approach the bench before I —

3    THE COURT:           Obviously.

4  RT-27: 3499-3500.

5       The facts relevant to the altercation between Berryman and his father-in-law, Rev. Fuller are

6  recounted in the summary of the penalty phase proceedings, *see* Part III.B., *supra*.  For the viewpoint

7  of Carol Berryman, confirming the notion that her father suffered no more than two small black eyes,

8  the substance of her declaration is summarized in connection with Claims 6, 63, 64, 65, and 70, *see* Part

9  XXV.A.3.d.(12), *supra*

10      Prior to deliberations, the Court read two instructions, reproduced below in pertinent part, which

11 Berryman now challenges.

12       Now evidence has been introduced for the purpose of showing that the defendant Rodney
         Berryman has been convicted of the crimes of transportation of marijuana and grand theft
13       prior to the offense of murder in the first degree for which he has been found guilty in
         this case.

14

15       Before you may consider any of such alleged crimes as an aggravating circumstance in
         this case, you must first be satisfied beyond a reasonable doubt that the defendant was,
         in fact, convicted of such prior crimes.
16                                                   . . .

17 RT-29: 3971-72; CT-4: 879.

18       Now evidence has been introduced for the purpose of showing that the defendant Rodney
         Berryman has committed the following criminal acts which did not result in a conviction:
19       That he assaulted his father-in-law, Reverend Fuller on or about August, 4, 1988, and
         that he assaulted David Perez with a tire iron on or about July 19th, 1988.  These
20       offenses involved the express or implied use of force of violence or the threat of force
         or violence.

21

22       Before you may consider any such criminal acts as an aggravating circumstance in this
         case, you must first be satisfied beyond a reasonable doubt that the defendant did, in fact
23       commit such acts.  You may not consider any evidence of any other criminal acts not
         resulting in conviction as an aggravating circumstance.

24 RT-29: 3972; CT-4: 880.

25      Mr. Simrin ventures his opinion that Berryman's trial counsel were ineffective for not objecting

26 to testimony elicited on cross examination about the facts leading to Berryman's marijuana

27 transportation conviction.  He further opines that trial counsel should have registered an objection to

28 evidence of the altercation between Berryman and his father-in-law on the grounds that the altercation

1   did not actually qualify for a violent act under Penal Code § 190.3(b) and because eliciting evidence

2   from an ordained minister was prejudicial.  Finally, Mr. Simrin remarks that no tactical reason for

3   permitting Mr. Moench to delve into these subjects is apparent.

4          **B.**       **Berryman's Contentions.**

5          Berryman's two prior felony convictions which were the subject of the stipulation were for three

6   counts of transporting marijuana and grand theft.  The stipulation was entered under Penal Code §

7   190.3(c), which directed the jury to consider the "presence or absence of any prior felony conviction"

8   in deliberating on an appropriate penalty.  He complains vehemently that evidence of the circumstances

9   underlying the marijuana transportation conviction were inadmissible under the stipulation approved by

10  the trial court.  Separately, he argues that because the felony marijuana transportation is not a crime

11  involving violence, a recitation of the facts underlying the conviction was prohibited under § 190.3(b),

12  which explicitly delimits evidence of prior criminal acts to violent conduct involving the use of force

13  or threat of using force.  Citing *People v. Kaurish*, 52 Cal. 3d 648, 702 (1990), he argues that mere

14  evidence of bad conduct does not fit any statutory category and therefore is inadmissible.  He also relies

15  on a decision rendered by a district court in Arkansas for the proposition that evidence of prior non-

16  violent convictions is prejudicial when considered by the jury in assessing penalty.  *See Ford v.*

17  *Lockhart*, 861 F.Supp. 1447, 1469-70 (E.D. Ark. 1994).  With respect to the validity of both convictions,

18  Berryman stresses that there was no "personal waiver" of the right to trial on the validity of the priors,

19  citing *Curl v. Superior Court*, 51 Cal. 3d 1292 (1990).  He maintains that trial counsel could have

20  mounted a constitutional challenge to the validity of the prior convictions, citing *Gretzler v. Stewart*, 112

21  F.3d 992 (9th Cir. 1997).

22         Berryman's contention regarding evidence of the altercation between himself and his father-in-

23  law Rev. Fuller has two components.  First, he argues that because the argument involved "mutual

24  combat" it did not qualify for a prior violent act under § 190.3(b).  Second he claims the evidence was

25  independently prejudicial under Evidence Code § 352 because of Rev. Fuller's status as a Baptist

26  minister.  Since the altercation involved nothing more than a family quarrel, the introduction of evidence

27  elicited from an ordained minister was more prejudicial than probative.

28

1    With respect to the pinpoint instructions that identified the crimes for which Berryman suffered

2    prior felony convictions as well as the violent criminal acts which did not result in convictions, he claims

3    the were unfairly highlighted for the jury, and thus skewed the deliberations in favor of the death penalty.

4    He alleges trial error for reading the challenged instructions, relying on *Arave v. Creech*, 507 U.S. 463,

5    470 (1993), ineffective assistance of trial counsel for not objecting to the pinpoint instructions, relying

6    on *United States v. Span*, 75 F.3d 1383, 1387 (9th Cir. 1996), and ineffective assistance of appellate

7    counsel for not challenging the pinpoint instructions on direct appeal, even in the absence of an objection

8    by trial counsel, relying on California Penal Code § 1259.

9        **C.      Analysis.**

10    Contrary to Berryman's argument, *Ford v. Lockhart*, 861 F.Supp. 1447 is inapposite.  Although

11    the case involved introduction by the prosecution of prior non-violent convictions and the district court

12    was unable to conclude that the jury's consideration of those convictions was non-prejudicial, the

13    statutory scheme governing imposition of the death penalty in Arkansas specifically proscribed the

14    introduction of such evidence.  In California, evidence of prior felonies, including non-violent felonies,

15    is a statutory factor under § 190.3(c) to be considered by the jury in determining the appropriate penalty.

16    Berryman's reliance on *People v. Kaurish*, 52 Cal. 3d at 702 is equally misplaced.  In that case, the

17    evidence of prior criminal activity introduced by the prosecutor was that the defendant violated the terms

18    of probation on a prior conviction and thereafter re-committed to Florida state prison.  The court

19    determined this evidence was erroneously introduced because it did not fit the statutory definition of

20    either § 190.3(b) or § 190.3(c).  *Id*.  In the present case, the evidence introduced was the background

21    for Berryman's prior felony marijuana transportation conviction under § 190.3(c).  Although it was

22    introduced in contravention to the terms of the stipulation described in the factual summary, the

23    introduction was harmless as discussed in the analysis of Claims 7, 8, 9, 10, and 23, *see* Part VII.C.,

24    *supra*, and Claims 13 and 14, *see* Part XXIII.C., *supra*.  This finding tracks the holding of the California

25    Supreme Court in *Kaurish*, 52 Cal. 3d at 703.  Comparable to the past parole violation in *Kaurish*, the

26    fact that Berryman was arrested when he attempted to sell marijuana to undercover agents posing as high

27    school students "could hardly have figured significantly in [the jury's] decision, given the circumstances

28    of the crime."  *Id*.  Moreover, when the trial court read the instructions, the jurors were told only the

1  consider the fact of the prior, stipulated to convictions for marijuana *transportation* (not sales) and grand

2  theft.

3       As to whether trial counsel should have subjected the validity of the prior convictions to

4  collateral attack, Berryman's reliance on *Curl v. Superior Court*, 51 Cal. 3d 1292 for the proposition that

5  he did not enter a "personal waiver" of the right to trial on the validity of the priors, also is misplaced.

6  *Curl*, stands for the proposition that a defendant may challenge the constitutional validity of a prior-

7  murder special circumstance by means of an evidentiary hearing, but that the defendant bears the burden

8  of proof.  *Id*. at 1296.  Since no evidence about the validity of either prior conviction have been

9  presented in this proceeding, the Court cannot agree with Berryman's contention that such a challenge

10  should have been advanced at trial.  His corollary assertion that under *Gretzler*, 112 F.3d 992, trial

11  counsel *could have* mounted a constitutional challenge to the validity of the prior convictions is

12  irrelevant.

13       The Court also must reject Berryman's argument that evidence of the altercation between himself

14  and Rev. Fuller was inadmissible on either of the theories advanced.  As previously stated in discussion

15  of Claims 7, 8, 9, 10, and 23, *see* Part VII.C., *supra*, evidence of the altercation was entirely relevant as

16  a prior violent act under § 190.3(b).  As a result of Berryman's frustrated attempts to gain entrance into

17  the Fuller house to speak to his recently estranged wife, he and Rev. Fuller engaged in a shoving match

18  which ended when Berryman punched Rev. Fuller in the nose.  It cannot be seriously disputed that

19  striking someone in the face is an act of violence, whether or not there was mutual shoving.  Nor is the

20  fact that his father-in-law happened to be an ordained minister mandate that evidence of the altercation

21  should have been excluded.  The evidence was clearly probative of the shoving and hitting incident.

22  Prejudice occasioned by the fact of Rev. Fuller's station in life did not outweigh the fact of the

23  altercation.  Moreover, the Court cannot ignore the fact that Rev. Fuller's status as an ordained minister

24  was used to Berryman's advantage when evidence about his church-going activities was introduced by

25  friends and family members.

26       Finally, the Court finds that the complained of pinpoint instructions with respect to both the prior

27  felony convictions and the prior violent conduct did not improperly divert the jurors' discretion in

28  deliberating on the appropriate penalty under *Arave v. Creech*, 507 U.S. at 470.  To the contrary the

1    instructions informed the jurors they had to be convinced the *convictions* (not the facts underlying the

2    convictions) were suffered and the violent conduct committed was beyond a reasonable doubt.  Distilled

3    to its essence, Berryman's argument is that the reiteration of the prior felonies and prior violent acts

4    which had been presented during the penalty proceedings necessarily skewed the deliberations in favor

5    of the death penalty.  The argument is unsupported.

6         Claims 56, 60, 62, 88, 89, 90, and that part of Claim 93 predicated on Claim 89, are denied on

7    the merits.  Berryman's request for an evidentiary hearing as to Claims 56 and 60 is denied.

8    **XXXI.   Berryman's Challenges Arising from Miscellaneous Instructional Errors During Penalty**

9    **Proceedings.  (Claims 81, 82, 83, 84, 85, 86, 87, 92, 93, and 94).**

10        This group of claims challenges nine miscellaneous instructions alleged to have been erroneously

11   refused and erroneously read to Berryman's jury prior to penalty deliberations.  Claim 93 relates to seven

12   of these instructions challenged in Claims 82, 83, 84, 85, 86, 87, and 92, alleging Mr. Peterson should

13   have argued in favor of the refused instructions and against the erroneous instructions.  Berryman does

14   not seek an evidentiary hearing for these claims.  For clarity, the challenges are treated by topic.

15        **A.      Double Counting of the Rape Conviction (Claim 81).**

16        During Mr. Moench's penalty summation, he argued the jurors should consider the circumstances

17   of the crime in assessing the penalty.  Characterizing Berryman's attitude toward the killing of Ms.

18   Hildreth, he stated: "Never one statement, never one comment of sorrow or concern, and about as cold

19   blooded as you can get, going back and waking up her cousin so she can come out and reheat the lasagna

20   in the microwave."  RT-29: 3978-79.  Moving on to the other factors, but then regressing, Mr. Moench

21   continued:

22        The next factor, and so I would suggest to you all those factors around the killing and the
          rape are strong, exceedingly strong factors in aggravation.

23

24        The presence or absence of criminal activity by the defendant , which involved the use
          or attempted use of force or violence or the express or implied threat to use force or
          violence.  Already touched upon the rape and the murder and the way it was done.  And

25        it wasn't just a passing thing.

26   *Id*.: 3980.

27        After both sides concluded their respective summation arguments, the trial court instructed the

28   jury:

95dp05309.MemOrdReEvidHrg&MeritsResol.Ber.wpd          237

1

2
[Y]ou shall consider, take into account, and be guided by the applicable factors of aggravation and mitigating circumstances upon which you have been instructed. The weighing of the aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side, of an imaginary scale, or the arbitrary assignment of weight to any of them.

3

4
You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

5

6 *Id*.: 4037-38

7      Berryman argues that based on Mr. Moench's summation, the rape conviction likely was counted

8 twice as an aggravating factor, first under the circumstances of the crime factor (a) instruction, and

9 second under the prior acts of violence which did not result in a felony conviction factor (b) instruction.

10 He maintains that because the circumstances of the crime factor (a) is undefined and vague, the fact the

11 jury determined Berryman raped Ms. Hildreth, means that it applied the violent criminal act factor

12 (factor (b)) in addition to considering the rape as a circumstance of the crime

13      The Warden candidly concedes that Mr. Moench's argument was confusing in conflating the

14 circumstances of the crime with acts of prior violence. The Court agrees that the prosecution summation

15 was confusing, if not erroneous. The risk of double counting the rape conviction, however, was defused

16 by the trial court's instruction directing the jurors not to mechanically count the factors in aggravation

17 and mitigation. The instruction clearly was not erroneous; it was proper.

18      Moreover, in *Tuilaipa v. California*, 512 U.S. 967, 976 (1994), the United States Supreme Court

19 specifically has rejected a vagueness challenge to the circumstances of the crime factor (factor (a)) under

20 the California death penalty statute. Berryman's current assertion that the phrase "circumstances of the

21 crime" is undefined and unclear is without merit.

22      **B.      Failure to Adequately Instruct that Pity and Sympathy Could Be Considered**

23              **(Claims 82 and 93).**

24      Directly after both sides rested, but prior to summation, the trial court delivered the bulk of the

25 penalty phase instructions. Most of these were written instructions to which the jurors had access during

26 their deliberations. One instruction was stated which did not have an accompanying written counterpart:

27
The instructions that I previously gave you in the guilt-innocence phase of the trial will be applicable to the extent that they're relevant to the issues that you will be deciding in this phase of the trial and to the extent that they are not inconsistent with the instructions

28

1     that I'm giving you now. *The instructions that I'm giving you now, if there are any*
      *inconsistencies, will prevail.*
2
      For example, you were previously instructed not to consider penalty in the guilt of
3     innocence phase of the trial, and of course, that is your consideration in this phase. That
      instruction would be totally inapplicable.
4
      You will also be instructed at this time that you can consider sympathy for the defendant
5     in deciding this continuing issue, and that was, of course, precluded from the guilt or
      innocence phase of the trial. Those are [a] couple of examples.
6

7  RT-29: 3966-67.

8        In reading the catchall factor (k) instruction under § 190.3(k), the trial court directed the jury to

9  consider,

10     any other circumstance which extenuates the gravity of the crime even though it is not
       a legal excuse for the crime. And any sympathetic or other aspect of the defendant's
11     character or record that the defendant offers as a basis for a sentence less than death,
       whether or not related to the offense for which he is on trial.
12
       Now you must disregard any jury instruction given to you in the guilt or innocence phase
13     of the trial which conflicts with this principle.

14 *Id.*: 3971.

15       During the pre-summation instruction conference, the defense had proffered Special Instruction

16 "16" which among other things would have provided: "In this part of the trial you may consider pity,

17 sympathy, or mercy for the defendant in deciding on the appropriate penalty for him." CT-4: 902. This

18 instruction was similar to the concluding instruction that was given, that is, "You are free to assign

19 whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are

20 permitted to consider." *See*, CT-4: 884; RT-29: 4037-38 (recited above in Part XXXI.A., *supra*).

21 Accordingly, Mr. Peterson invited the trial court to refuse Special Instruction "16." *Id.*: 3944. The trial

22 court did so.

23       Berryman maintains that the absence of a written instruction regarding the fact that the jury could

24 consider pity and sympathy in rendering a penalty verdict actually removed the pity factor from the

25 sentencing process. He does not acknowledge that the written forms of the factor (k) instruction or the

26 concluding instruction was given to the jury before deliberations commenced.

27       The California Supreme Court rendered an extensive analysis pertaining to this challenge on

28 direct appeal. The court first noted the jury was directed not to consider "mere sentiment, conjecture,

sympathy, passion, prejudice, public opinion or public feeling" during guilt proceedings, and further that when considering which penalty instructions to give, the trial judge rejected the defense proffer of a specific instruction which affirmatively told the jurors they could consider "pity, sympathy or mercy" in rendering their penalty verdict. 6 Cal. 4th at 1097. In light of the instructions the trial court did give, including the initial instruction about conflicts between guilt and penalty instructions as well as the factor (k) instruction, the California Supreme Court rejected "the claim out of hand." *Id*. 1098. It held:

> [a] reasonable juror would have understood and employed the instructions in question to allow him [or her] to consider and give effect to pity, sympathy, and mercy to the extent he [or she] deemed appropriate in this case – and indeed required him [or her] to do so. There is no reasonable likelihood that the jury misconstrued or misapplied the instructions in violation of the Eighth or Fourteenth Amendment or any other legal provision or principle.

*Id*. Though Berryman's challenge on federal habeas alleges a violation of the Fifth and Sixth Amendments in addition to the Eighth and Fourteenth Amendments, the California Supreme Court opinion is dispositive under 28 U.S.C. § 2254(d)(1). Moreover, as the Warden points out, under *California v. Brown*, 479 U.S. 538, 543 (1987), even when a penalty jury is instructed *not* to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," so long as the jury is also not precluded from considering valid mitigating evidence there is no constitutional infirmity. *Id*. at 542-43.

Separately, Berryman argues Mr. Peterson was incompetent for his failure to forcefully argue for giving Special Instruction "16" on pity and sympathy as mitigating factors. There being no error in the failure to give the instruction, there can be no error for counsel's failure to argue for the instruction more forcefully. In any event, the Court notes that during his summation, Mr. Peterson did raise the issue by emphasizing that life is sacred, that life without parole is a severe punishment, and that death by execution in the gas chamber would result in an excruciatingly painful death. He further implored the jurors not to be too harsh on a man who had sinned, unless they could be certain they also had not sinned. Even in the absence of Special Instruction "16," the jurors had the concept of sympathy, pity, and mercy before them in the instructions read.

**C.    Instructions Implying A Single Mitigating Factor Could Not Outweigh All Aggravating Factors (Claims 83 and 93).**

Just before sending the jury out for deliberations, the trial court instructed:

> In weighing the various circumstances, you simply determine, under the relevant evidence, which penalty is justified and appropriate, by considering the totality of the aggravating circumstances, with the totality of the mitigating circumstances.

> To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances, that it warrants death instead of life without parole.

*Id*.: 4038.

Berryman challenges that part of the instruction which directed the jurors to consider "the totality of the aggravating circumstances with the totality of the mitigating circumstances."   He claims a reasonable juror would find it "almost impossible to conclude from this instruction that a single mitigating factor would be enough to outweigh multiple aggravating factors."

The California Supreme Court specifically held that a reasonable juror would have understood this language to mean exactly the opposite of Berryman's construction.

> Certainly , such a juror would not have interpreted or used its language referring to the "totality" of the aggravating and mitigating circumstances in a "death oriented" fashion to "relate[]" solely to the "quantity . . . of the factors " and not to their "quality," or to entail " 'a *mere mechanical counting* of factors on each side of the imaginary scale ...'"  [ ] There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction in violation of the Eighth or Fourteenth Amendment to the United States Constitution or any other legal provision or principle.

6 Cal. 4th at 1099 (citing *People v. Grant*, 45 Cal. 3d 829, 857, n. 5 (1988) (emphasis in original). Given the instructions as a whole, this state court conclusion is not unreasonable and therefore unassailable on federal habeas for the Eighth and Fourteenth Amendments as well as the Fifth and Sixth Amendments.  28 U.S.C. § 2254(d)(1).

Separately, the Court finds no merit to the contention that the failure of Mr. Peterson to have argued against the "totality of aggravating and mitigating factors" instruction constitutes ineffective assistance of counsel.  First, the instruction was not erroneous.  Second, the concept that a single mitigating factor could be enough to outweigh multiple aggravating factors, was before the jury on the instruction that weighing the aggravating and mitigating factors did not mean to mechanically count the factors. *See*, CT-4: 884; RT-29: 4037-38 (recited above in Part XXXI.A., *supra*).

**D.    Refusal of Instruction that Aggravating Evidence Was Limited to the Statutory Factors (Claims 84 and 93).**

The defense offered Special Instruction "1" to limit the jurors' consideration of aggravating evidence to statutory factors previously enumerated. It provided: "The only aggravating factors which you may consider are those listed in CALJIC 8.84.1.[recitation of the statutory penalty factors (a) through (k)], the instruction I have just read to you. No other facts of circumstances may be considered in aggravation or as a reason to support a verdict of death." CT-4: 887.

The trial court refused proposed Special Instruction "1" because the instruction in the introductory paragraph to the sentencing factors adequately informed them of their sentencing responsibilities. RT-29: 3935 (recounting the jury instruction conference).

As read, the introductory paragraph to the sentencing factors advised:

> Now, in determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial or this case, except as you may hereafter be instructed. You shall consider, take into account, and be guided by the following factors *if applicable*.

*Id*.: 3970; *see also* CT-4: 876 (emphasis added).

The trial judge further found Special Instruction "1"confusing, since factor (k), in particular is always mitigating, and other of the factors also could be considered mitigating.

> Okay. One problem that you might have by giving this instruction is that the item K under 8.84.1 says any other circumstance, which extends – sorry, extenuates the gravity and so forth. I would not want the jury to feel that the specific list of one or rather A through J is what we're talking about as opposed to K, which [is] kind of a catch all for the defense. So I think we're better off not giving instruction number one. So I will refuse that instruction.

*Id*.: 3935-36.

On summation, Mr. Peterson clarified that other than the circumstances of the crime, there were only four incidents which qualified as aggravating factors under the instructions. Two were prior convictions under factor (c), namely transporting marijuana and grand theft. Two were prior violent acts under factor (b), namely the assault on David Perez and the altercation with Rev. Fuller.

> And that brazen individual [David Perez] comes into this court and says to you I was assaulted, and it's a factor which you can use to kill this man [Berryman].

1   We have another one.  We have the father-in-law, who comes into this court to respond
2   that [he] pushed Rodney Berryman, Rodney Berryman struck and left, ran away.  You're
    asked to accept that as such conduct that it warrants your sentencing this man to death.

3   Those are the aggravating circumstances, together with some convictions for which he
    served some time in Los Angeles.  *That's the extent of the aggravation that your asked*
4   *to use as your justification for the death penalty.*

5   *Id.*: 4021 (emphasis added).

6        Berryman's primary concern in raising the challenge to omitted Special Instruction "1" revolves

7   around the argument made by Mr. Moench that Berryman's philandering was a "factor in aggravation

8   and even more so than it would be in mitigation."

9        The California Supreme Court held that since the introductory paragraph the to enumeration of

10  the sentencing factors instructed the jurors to consider the factors "if applicable," there was "no

11  reasonable likelihood that the jury would have construed or applied the standard instruction otherwise,"

12  including that the jurors would have considered outside or additional aggravating evidence.  6 Cal. 4th

13  at 1100.  In so holding, the court also took into account the misstatements of Mr. Moench regarding

14  Berryman's philandering.

15       Although the proffered instruction was admittedly not improper, a constitutional violation does

16  not necessarily occur because a proper instruction has been omitted or refused.  The Court concurs with

17  the reasoning of the California Supreme Court that the jurors would not have considered aggravating

18  factors in addition to the statutory factors enumerated in the instructions.  With respect to the Mr.

19  Moench's misstatement that Berryman's philandering was an aggravating factor, the Court has addressed

20  the harmlessness of this comment in the analysis of Claims 7, 8, 9, 10, and 23, *see* Part VII.C., *supra*,

21  and Claims 13 and 14, *see* Part XXIII.C., *supra*.  In summary, given the considerable defense evidence

22  that Berryman's tendency to maintain multiple sexual relations was impelled by his childhood lack of

23  maternal nurturing, it is implausible that the jury would have considered his philandering, particularly

24  on the night Ms. Hildreth was killed, apart from the circumstances of the crime, which was entirely

25  proper.  Finally, as the Warden argues, Mr. Peterson's summation clarified for the jury that the only

26  evidence, other than the circumstances of the crime, which the jury could consider in aggravation of

27  Berryman's sentence were the two prior convictions (transporting marijuana and grand theft), and the

28  two prior acts of violence (assault on David Perez and altercation with Rev. Fuller).  To the extent Mr.

1    Moench's argument was confusing or misleading by suggesting additional aggravating factors, Mr.

2    Peterson's argument clarified the matter.  It is for this reason plus, the reading of the introductory

3    paragraph to the sentencing factors instruction, the Court separately rejects Berryman's argument that

4    Mr. Peterson provided constitutionally incompetent representation for not arguing more strenuously for

5    Special Instruction "1."  The jurors' attention to relevant aggravating factors was suitably circumscribed.

6          **E.      Double Counting of the Murder Conviction (Claims 85 and 93).**

7          The factor (c) instruction concerning evidence of prior felony convictions, discussed in

8    connection with Claims 88, 89, and 90, *see* Part XXX., *supra*, is relevant to the allegation of double

9    counting of the murder conviction.  The trial court instructed on factor (c) as follows:

10         Now evidence has been introduced for the purpose of showing that the defendant Rodney
11         Berryman has been convicted of the crimes of transportation of marijuana and grand theft
           prior to the offense of murder in the first degree for which he has been found guilty in
12         this case.

           Before you may consider any of such alleged crimes as an aggravating circumstance in
13         this case, you must first be satisfied beyond a reasonable doubt that the defendant was,
           in fact, convicted of such prior crimes.
14
           *You may not consider any evidence of any other criminal conviction other than the*
15         *conviction in this case as an aggravating circumstance.*

16   RT-29: 3971-72; CT-4: 879 (emphasis added.)

17         The trial court had earlier refused Special Instruction "4" that would have stated, "The fact that

18   defendant Rodney Berryman has been found guilty of first degree murder is not itself an aggravating

19   factor."  CT-4: 890; RT-29: 3937.  Mr. Moench objected to the proposed instruction because the

20   circumstances of the crime factor (factor (a)) clearly permitted the jury to consider the facts surrounding

21   Berryman's convictions of murder and rape and the proffered instruction conflicted with that concept.

22   *Id*.  The trial court stated, "you have to be careful in saying [the jurors] cannot consider any other

23   criminal conviction.  You have to be careful to point out they can consider the facts and circumstances

24   of the conviction in this case."  *Id*.

25         The double counting of the murder conviction contention under factors (a) and (c) stems from

26   the combination of trial court's refusal to read the proffered Special Instruction "4" with the manner in

27   which the factor (c) instruction was modified by the trial court.  Berryman claims that without the

28   instruction that the murder conviction was *not* an aggravating factor, the modified factor (c) instruction,

as read (particularly the italicized portion), carried the implication that the conviction in the present case could be considered in aggravation under factor (c) in addition to a circumstance of the crime under factor (a).

There was no error in the trial court  refusal of the instruction stating that the murder conviction was not to be considered an aggravating circumstance.  This notion conflicted with the factor (a) instruction that the circumstances of the crime *were* to be considered.  The California Supreme Court's holding on this issue, 6 Cal. 4th at 1102, is unassailable.  28 U.S.C. § 2254(d)(1).  The modification of the factor (c) instruction, however, is more troubling.  The California Supreme Court refers to the modified language as "somewhat awkward phrasing" but holds that "a reasonable juror would probably have construed and applied [this language] so as not to bar consideration of the 'circumstances of the crime of which the defendant was convicted in the present proceedings. . . .'" 6 Cal. 4th at 1102, n. 25.

Based on the Court's review of the record, including the instructions and argument of counsel, the conjecture by the California Supreme Court about what a reasonable juror probably would have thought is too speculative to accord it deference under § 2254(d).  To tell the jurors they are not to consider any other criminal conviction other than the conviction in the case seems to say they are not to consider the prior convictions for transporting marijuana or grand theft.  But this construction is in direct conflict with the language of the instruction immediately preceding the challenged sentence.  Frankly, the instruction is internally inconsistent and hopelessly confusing.  The Court cannot tell what the trial court or the trial attorneys intended, and most certainly cannot guess how the jurors would have understood it.

Nonetheless, the confusing and internally inconsistent instruction did not have a impact on the jury's death verdict under *Brecht*, 507 U.S. at 637.   In the first place, the Court cannot see how the defective instruction would or could  have resulted in the double counting of the murder conviction.  As phrased the instruction directs the jurors not to consider Berryman's prior convictions for transporting marijuana and grand theft, not that the murder conviction is a circumstance of the crime and a prior conviction to be double counted.  Second, any risk was defused by the trial court's instruction directing the jurors not to mechanically count the factors in aggravation and mitigation.  The jurors were directed

1 to consider the evidence qualitatively, not quantitatively.   The deliberative process was suitably

2 channeled.

3        The Court similarly rejects the related ineffective assistance of counsel claim that Mr. Peterson

4 failed to argue forcefully in favor of refused Special Instruction "4."  As noted above (and held by the

5 California Supreme Court), Berryman's guilt of first degree murder in this case *was* an aggravating

6 factor to be considered in conjunction with the circumstances of the crime.  The proffered instruction

7 was confusing and thus properly refused.  Further entreaties by Mr. Peterson would and should have

8 been unavailing.

9        **F.      Refusal of Instruction That Less Than Extreme Mental or Emotional Disturbance**

10               **Was Mitigating (Claims 86 and 93).**

11        The defense offered Special Instruction "7" on the subject of Berryman's mental state as a factor

12 in mitigation: "You may consider any evidence tending to show that defendant Rodney Berryman was

13 under the influence of a mental or emotional disturbance at the time of the offense, regardless of the

14 degree of that disturbance."  CT-4: 893.  This instruction is similar, but not as exacting as the factor (d)

15 and factor (h) instructions, which were read to the jury.  Because of these similarities, Mr. Moench

16 objected to Special Instruction "7" and the trial court agreed.  Mr. Peterson did not protest.  RT-29:

17 3938-39.  The factor (d) and factor (h) instructions read to the jurors instructed them to consider:

18        whether or not the offense was committed while the defendant was under the influence
         of extreme mental or emotional disturbance

19

20                              . . . [and]

21        whether or not at the time of the offense the capacity of the defendant to appreciate the
         criminality of his conduct or to conform his conduct to the requirements of law was
         impaired as a result of mental disease or defect or the effects of intoxication.

22

23 *Id.*: 3970, 3971.

24        On summation, Mr. Moench then argued no evidence supported the notion that Berryman

25 suffered a psychotic break.  *Id.*: 3992.

26        Berryman argues that because the prosecutor essentially argued that a mental or emotional

27 disturbance less than extreme, that is, a psychotic break, was required to apply factors (d) and/ or (h),

28 he steered the jurors away from considering as mitigating the mental and emotional disturbances

1    Berryman did suffer.  In support of his argument, Berryman primarily relies on the California Supreme

2    Court opinion in *People v. Wright*, 52 Cal. 3d 367 (1990).  That case found that similar prosecutorial

3    argument "carried some potential for confusing the jury into believing that the defendant's evidence of

4    emotional disturbance was not a 'legitimate' mitigating circumstance – even under factor (k) – unless

5    it was extreme."  *Id*. at 444.  However, the court further noted that defense counsel's astute closing

6    argument negated any possibility of prejudice."  *Id*.  In contrast, Berryman maintains that Mr. Peterson

7    did nothing to negate the impact of Mr. Moench's closing argument in the present case.

8            Addressing this challenge, the California Supreme Court first found that the essence of Special

9    Instruction "7" was covered by the factor (d), factor (h), and factor (k) instructions.  6 Cal. 4th at 1103.

10   Separately, with respect to Mr. Moench's argument, the court found that it "simply [was] not the case"

11   that the prosecution argument urged that "less than extreme 'mental or emotional disturbance' could not

12   be considered as a circumstance in mitigation."  *Id*. at 1103, n. 27.  The Court finds this conclusion

13   reasonable under § 2254(d)(1).  As explained in the analysis of Claims 76, 79, and 80, the essence of

14   Mr. Moench's argument was that Berryman was not impaired at the time he killed Ms. Hildreth.  *See*

15   Part XXVII.C., *supra*.  Berryman's reliance on *Wright*, accordingly, is overemphasized.  This is not a

16   case where mental or emotional impairments were dispositive.  The evidence of such impairments at trial

17   was not overwhelming, and, in any event unsubstantiated by empirical tests (which have since been

18   conducted).  Rather, this is a case where the defendant suffered from a personality disorder and exercised

19   poor impulse control.  In so concluding, the Court is mindful of the conflicting evidence adduced in post-

20   conviction proceedings about whether Berryman suffers from an alcohol induced seizure disorder.  *See*

21   discussion of Claims 15 and 16, Part XII.C.3., *supra*.  Post-conviction evidence, however, is irrelevant

22   to this claim, which challenges instructions given and arguments made based on evidence adduced

23   during the trial.

24           Separately, the Court rejects Berryman's claim that Mr. Peterson was ineffective for not arguing

25   in favor of the refused instruction.  Contrary to Berryman's argument, Mr. Peterson did raise the issue

26   on summation.  As the summary of the penalty proceedings show, he argued Berryman's alcohol

27   consumption and resulting intoxication should be considered by the jury in assessing penalty, in

28   accordance with the factor (d) instruction.  Under factor (h), he argued  Berryman's lack of capacity to

1    appreciate the criminality of his conduct should not be discounted merely because he had developed a

2    tolerance to alcohol and did not appear intoxicated.  He also highlighted the experts' conclusions by

3    arguing that no contradictory evidence had been advanced by the prosecution.  There was no prejudice

4    for refusing Special Instruction "7" of for any perceived omission by Mr. Peterson.

5         **G.    Refusal of Instruction Permitting Jurors to Consider Lingering Doubt (Claims 87**

6              **and 93).**

7         Special Instruction "11", offered by the defense would have informed the jury: "It is appropriate

8    for you to consider in mitigation any 'lingering doubts' you may have concerning the defendant's guilt.

9    Lingering or residual doubt is defined as that state of mind between 'beyond a reasonable doubt' and

10   'beyond all possible doubt.'" CT-4: 897.  During the instruction conference, Mr. Moench urged refusal

11   of Special Instruction "11" because the concept of lingering doubt would be covered by the

12   circumstances of the crime factor (a).  Mr. Moench also mentioned that the jurors would be told they

13   could consider sympathy (presumably under factor (k)).  RT-29: 3940-41.  Mr. Peterson argued that

14   without an instruction on lingering doubt any argument he would make on the subject would fall on deaf

15   ears.  He urged the trial court to read the instruction in order to give his proposed argument on the

16   subject of credibility.  *Id*.: 3941.  The trial court took the matter under advisement to read a 1964

17   California Supreme Court case cited in support of Special Instruction "11," *People v. Terry*, 61 Cal. 2d

18   127 (1964).[167]  *Terry* involves a penalty phase retrial where the defendant attempted to introduce

19   evidence of his innocence claiming he was not present at the scene of the robberies and murder of which

20   he previously had been convicted.  *Id*. at 140.  Specifically, during voir dire examination, the trial court

21   refused to permit the defendant to ask of prospective jurors about "possible reaction to his claim of

22   innocence and misle[ading] the jury into believing that they could not take into consideration that claim."

23   *Id*. at 147.  The defendant was sentenced to death following his penalty retrial and on direct appeal the

24   trial court was found to have committed error so the penalty again was reversed. *Id*.  After reading this

25   case, the trial judge in Berryman's case found it did not compel giving the lingering doubt instruction,

26   and in any event was inapplicable because it involved voir dire examination.  RT-29: 3964.  The trial

27

28        [167] *Terry* recently was overruled on other grounds, *People v. Laino*, 32 Cal. 4th 878, 893 (2004).

1  judge further agreed with Mr. Moench that the concept of lingering doubt could be considered in

2  conjunction with the circumstances of the crime factor (a).  *Id*.  The California Supreme Court agreed

3  on direct appeal, holding that together the factor (a) and factor (k) instructions were broad enough to

4  embrace lingering doubt.  6 Cal. 4th at 1104.

5         Berryman argues the California courts were both wrong because the concept of lingering doubt

6  is not included in an examination of the circumstances of the crime.  Nor is it embraced by the

7  extenuating circumstances factor (k).  He relies on the plurality and concurring opinions in *Franklin v.*

8  *Lynaugh*, 487 U.S. 164 (1988),.  Neither opinion, however, offers support for his argument.  The

9  plurality opinion by Justice White states:

10         Our edict that, in a capital case, "'the sentencer . . . [may] not be precluded from
           considering, *as a mitigating factor*, any aspect of the defendant's character or record and
11         any of the circumstances of the offense,'" [citation to *Eddings v. Oklahoma*, 544 U.S.
           104, 110 (1982)], in no way mandates reconsideration by capital juries, in the sentencing
12         phase, of their "residual doubts" over a defendant's guilt.  Such lingering doubts are not
           over any aspect of petitioner's "character," "record," or a "circumstance of the offense."
13         This Court's prior decisions as we understand them, fail to recognize a constitutional
           right to have such doubts considered as a mitigating factor.

14

15  *Id*. at 174.

16         The concurring opinion written by Justice O'Connor states unequivocally, "the Eighth

17  Amendment does not require" consideration of lingering doubt..  The entirety of her statement[168] is:

18         Our decisions mandating jury consideration of mitigating circumstances provide no
           support for petitioner's claim because "residual doubt" about guilt is *not* a mitigating
19         circumstance.  We have defined mitigating circumstances as facts about the defendant's
           character or background, or the circumstances of the particular offense, that may call for
20         a penalty less than death. [Citations.] "Residual doubt" is not a fact about the defendant
           or the circumstances of the crime.  It is instead a lingering uncertainty about facts, a state
21         of mind that exists somewhere between "beyond a reasonable doubt" and "absolute
           certainty."

22

23  *Id*. at 188 (emphasis added).

24         Even in the face of authority that a lingering doubt instruction is not constitutionally mandated,

25  Berryman argues that the differences between the Texas statute at issue in *Franklin* and the California

26  statute mean that defense counsel in California were *precluded* from arguing the concept of lingering

27  ───────────────────

28         [168] Berryman excerpted only a part of this quote and attributed a conclusion Justice O'Connor
       did not make.

1    doubt in the absence of an instruction.  This argument is unfounded and clearly contrary to the holding

2    of the California Supreme Court in his case.  In reviewing the trial court refusal of Special Instruction

3    "11," the court noted that the circumstances of the crime and extenuating circumstances under the factor

4    (a) and factor (k) instructions would have permitted counsel's proposed argument on lingering doubt.

5    6 Cal. 4th at 1104.  Mr. Peterson was not precluded from arguing lingering doubt, and he did adequately

6    present this subject.  As set forth in the summary of the penalty phase proceedings, Part III.B., *supra*,

7    Mr. Peterson spent a great deal of time addressing the concept of lingering doubt during his summation.

8    He argued that Ms. Hildreth may have precipitated the assault by arguing with Berryman about whether

9    she would or would not tell her cousin Crystal about their "relationship."  Mr. Peterson also suggested

10   that Ms. Hildreth may have been the one to have brought the murder weapon (knife) to the crime scene.

11    Berryman's challenge is without merit.  Accordingly, his separate argument that Mr. Peterson provided

12   constitutionally incompetent representation for failing to argue for the lingering doubt instruction also

13   fails.

14        **H.       Failure to Request Deletion of Inapplicable Sentencing Factors (Claims 92 and 93).**

15        The sentencing factors described to Berryman's jury included all the factors enumerated in Penal

16   Code § 190.3. They include:

17        (a) The circumstances of the crime of which the defendant was convicted in the
     present proceeding and the existence of any special circumstance found to be true.

18

19        (b) The presence or absence of criminal activity by the defendant which involved
     the use or attempted use of force or violence or the express or implied threat to use force
20   or violence.

21        (c) The presence or absence of any prior felony conviction.

22        (d) Whether or not the offense was committed while the defendant was under the
     influence of extreme mental or emotional disturbance.

23        (e) Whether or not the victim was a participant in the defendant's homicidal
     conduct or consented to the homicidal act.
24

25        (f) Whether or not the offense was committed under circumstances which the
     defendant reasonably believed to be a moral justification or extenuation of his conduct.

26        (g) Whether or not the defendant acted under extreme duress or under the
     substantial domination of another person.

27

28

1    (h) Whether or not at the time of the offense the capacity of the defendant to
2    appreciate the criminality of his conduct or to conform his conduct to the requirements
     of law was impaired as result of mental disease or defect or the affects of intoxication.

3    (i) The age of the defendant at the time of the crime.

4    (j) Whether or not the defendant was an accomplice to the offense and his
     participation in the commission of the offense was relatively minor.
5
6    (k) Any other circumstance which extenuates the gravity of the crime even though
     it is not a legal excuse for the crime and any sympathetic or other aspect of the
     defendant's character or record that the defendant offers as basis for a sentence less than
7    death, whether or not related to the offense for which he is on trial.

8    CT-4: 876-77; RT-29: 3970-71.

9    Berryman points out that no defense objection to the reading of all the statutory factors was

10   registered even though several of the factors had no bearing on the evidence before the jury.  Those

11   irrelevant factors include factor (e), the victim-participant factor, (f), the moral justification factor, (g),

12   the extreme duress factor, and (j), the accomplice factor.  He further notes that in the prosecution

13   summation, Mr. Moench pointed out the inapplicability of factors (e), (f), (g) and (j).  RT-29: 3990-93.

14   He argues that despite California Supreme Court precedent that it is not necessary to edit out

15   inapplicable penalty factors from the instructions, citing *People v. Wright*, 52 Cal. 3d at 446 and *People*

16   *v. Marshall*, 50 Cal. 3d 907, 931-33 (1990), "freighting" the instructions "with useless baggage" has

17   helped contribute to death verdicts and the practice *should be* unconstitutional.  No other authority is

18   cited.

19   These claims must fall based on lack of legal support, both for alleged trial error in giving the

20   challenged instruction and ineffective assistance of counsel for Mr. Peterson's failure to object to reading

21   all the statutory factors.  In any event, the Court notes that the introductory paragraph read to the jurors

22   before the actual sentencing factors specified they were only to take into account and be guided by the

23   following factors, *if applicable.  See* RT-29: 3970; *see also* CT-4: 876 (emphasis added), Part XXXI.D.,

24   *supra*.

25

26

27

28

1    **I.      Failure to Request an Instruction that Defendant's Failure to Testify Should Not**
2    **Be Treated as an Aggravating Factor (Claim 94).**

3    Berryman complains that his trial attorneys erred during penalty proceedings for not requesting
4    the standard jury instruction that Berryman's failure to testify could not be considered against him in
5    assessing the penalty.  After the close of evidence during guilt proceedings, the trial court instructed:
6    "Now, it is the constitutional right of a defendant in a criminal trial that he may not be compelled to
7    testify.  You must not draw any inference from the fact that he does not testify.  Further, you must neither
8    discuss this matter nor permit it to enter into your deliberations in any way."  RT-25: 3300; CT-4: 768.
9    In addition, as previously noted in Part XXXI.B., *supra*, the trial court instructed the jurors: "The
10   instructions that I previously gave you in the guilt-innocence phase of the trial will be applicable to the
11   extent that they're relevant to the issues that you will be deciding in this phase of the trial and to the
12   extent that they are not inconsistent with the instructions that I'm giving you now."  RT-29: 3966.

13   Berryman perceives a claim because the instruction about his decision not to testify was not
14   repeated while other instructions given in the guilt phase were repeated in the penalty phase, including
15   those about  the credibility of witnesses and the evaluation of expert testimony.  No authority is cited
16   for the proposition that all relevant guilt phase instructions must be repeated in penalty phase
17   proceedings.  The claim is without merit.  Moreover, as the Warden argues, Mr. Peterson may well have
18   made a tactical decision not focus on the fact that Berryman did not attempt to explain his conduct.

19   Claims 81, 82, 83, 84, 85, 86, 87, 92, 94, and the remaining portion of Claim 93, predicated on
20   Claims 82, 83, 84, 85, 86, 87, and 92, are denied on the merits.

21   **XXXII. Berryman's Assertion of Ineffective Assistance of Counsel for Miscellaneous Short-**
22   **Comings (Claims 58, 61, 66, 67, 68, and 72).**

23   In these miscellaneous challenges to the performance of his trial attorneys, Berryman complains
24   of their failure to object to Mr. Moench's references to Charles Manson and Sirhan Sirhan during cross
25   examination of Dr. Pierce in Claim 58, their failure to object to mention of Los Angeles street gang the
26   "Cryps" by David Perez during direct examination in Claim 61, their failure to prepare their witnesses
27   for their testimony in Claims 66 and 68, the elicitation from Ronald, Jr. that Berryman would have to
28   stab other inmates and staff if sentenced to prison in Claim 67, and their failure to interview and call

1  Detective Mike Lage to the stand to discuss his observation of bibles in Berryman's pick up truck in

2  Claim 72.  He requests an evidentiary hearing with respect to Claims 61, 66, 68, and 72.

3        **A.**      **Statement of the Facts Relevant to Miscellaneous Attorney Short Comings.**

4       As set forth in Part III.B., *supra*, during the cross examination of Dr. Pierce, Mr. Moench referred

5  to a previously unidentified expert, Dr. Pollack who apparently discussed various types of mental

6  conditions in ascending and descending levels of seriousness.  RT-28: 3886.  To give further recognition

7  to Dr. Pollack, Mr. Moench referred to him as the "head of the Institute for Forensic Psychiatry at the

8  University of Southern California, the one who did the Manson cases and Sirhan Sirhan cases . . ." in

9  his follow-up question to Dr. Pierce.  *Id*.  Mr. Peterson objected to some portion of this question, but

10  the objection was not fully articulated.  Rather, the trial judge interrupted and informed Mr. Moench the

11  court was not interested in the order of ascension or descension of  mental impairment seriousness, but

12  whether Berryman suffered from neurosis.  *Id*.  There was no further reference to Charles Manson,

13  Sirhan Sirhan, or Dr. Pollack.

14       The mention of "L.A. Cryps" by witness David Perez was related as part of a narrative response

15  to Mr. Moench's general question as to whether Berryman said anything to Perez while striking him with

16  the tire iron.  RT-27: 3536.  *See* previous rendition of this testimony, Part III.B., and in connection with

17  Claims 7, 8, 9, 10, and 23, Part VII.A., *supra*.  Relevant to this incident is the opinion of *Strickland*

18  expert Mr. Simrin that since the "L.A. Cryps" statement was included in police reports of David Perez,

19  and the police reports were made available to defense counsel prior to trial, they should have known

20  Perez was prepared to give this testimony.  Mr. Simrin believes defense counsel should have made a

21  motion in limine to exclude the reference to a notorious street gang.  If not a motion in limine, they

22  should have interposed an objection when Mr. Moench asked if Berryman said anything to Perez during

23  the attack.  And if not an objection, then, at the least, they should have presented a motion to strike and

24  request for an instruction for the jury to disregard the statement.  Mr. Soria does not recall there being

25  a reference to the "L.A. Cryps" during Mr. Perez's penalty phase testimony, and does not know why an

26  objection would not have been interposed.  He agrees, however, that a reference to gangs or Berryman's

27  association with gangs should not have been allowed at the penalty phase proceedings.

28

1    A further mention of L.A. Cryps was made when Mr. Moench was cross examining former San

2  Quentin inmate E. J. Corum.  After explaining that status among prisoners is based on seniority, Mr.

3  Moench asked, "If a hit is going to be made, Aryan Brotherhood, Blood, Cryp, BGF, Black Gorilla

4  Family, any of the other groups, they usually pick a lifer to do the hit because there's nothing you can

5  do to a lifer; right?"  Mr. Corum disagreed with Mr. Moench's assessment, testifying that, rather than

6  senior prisoners committing murders in prison, "[t]he game goes down on the youngsters that are very

7  immature, lacking experience."  *Id*.

8    Lack of witness preparation is presented in declarations of Mr. Soria together with witnesses

9  Carol Berryman, Maxine Coleman, and Yolande Rumford.  Regarding the presentation of mitigating

10  evidence in general, Mr. Soria avers he does not recall the details of the testimony of the defense

11  witnesses and that Mr. Peterson had the primary responsibility for penalty phase investigation and

12  presentation of evidence.  He opines that a complete investigation should be conducted and that an

13  attorney should, if possible, interview witnesses in person.

14    Except for Berryman's wife, Carol, and one of his maternal cousins, Maxine Coleman, none of

15  the twenty-four witnesses providing declarations, *see* Part XXV.A.3.d., *supra*, were contacted by any

16  member of Berryman' state trial defense team in connection with developing mitigation facts.  The

17  record reflects that Mr. Peterson succeeded in having each testifying witness, except for Ms. Berryman

18  and Ms. Coleman,  affirm that he or she had not spoken to any member of the defense team before

19  testifying.  Those who testified aver that they were unprepared for their testimony and had no idea what

20  questions would be asked of them.  For instance, as a result of not being contacted about and prepared

21  for her testimony, Yolande Rumford avers that she gave incorrect information about when she first met

22  Berryman (testifying she met him in 1984 or 1985, rather than 1982 or 1983), because she didn't have

23  an opportunity to consider the question before giving a response.  Another example occurred when Mr.

24  Peterson was examining Tamara Pearson, with whom Berryman lived after leaving his mother's house.

25  Mr. Peterson learned, apparently for the first time, that Berryman's relationship with Ms. Pearson was

26  sexual:

27    Q. [Mr. Peterson] Would you say that over the years that your relationship with him has
      been close?
28    A. [Tamara Pearson] Yeah, I think so.

1
Q. Intimate?
A. Intimate in are you saying physical sense? As well?
2
Q. If you wish.
A. Both ways.
3

4   RT-28: 3767.

5        Statements made by Ronald, Jr. that prison inmates must and do use deadly force to protect

6   themselves in prison is part of the record.  Mr. Peterson instructed Ronald, Jr. to "[t]ell the Ladies and

7   Gentlemen of the jury what the general prison population attitude is towards people who have been

8   convicted of rape."  RT-27: 3675.  Ronald, Jr. responded:

9            It's dangerous, in other words, you to up there and the find out your case, which
             everybody knows what your case is, once you get there, what you've been convicted for.
10

             And they go up there and they threaten you, they'll try and rape you, they're going
11           to beat you up, not just by one and two, but maybe three, four, five and six people at a
             time.
12

             And the guards, and the guards won't have nothing to say about it, they don't
13           write nothing up in there, they don't write anything, and they will get you, *and if you
             don't cut a couple people up trying to save you're a[- -], then you won't make it, you*
14           *won't make it, it's just that rough, it's that aggressive.*

15   *Id*. (emphasis added).

16        Evidence regarding the two bibles observed in Berryman's pick up truck, but never recovered

17   by the defense team is presented in the declarations of his present appointed counsel, Charles M.

18   Bonneau and Jessie Morris, Jr.  First, Mr. Morris, in his declaration appended to Berryman second state

19   habeas petition, indicates that Detective Mike Lage actually seized two bibles from Berryman's truck.

20   Mr. Morris opines that this information would have supported the notion that Berryman took his

21   Christian affiliation seriously.  Mr. Morris also recounts the substance of reports obtained by Berryman's

22   current habeas investigator from his former father-in-law, Rev. Fuller, despite the altercation in which

23   he and Berryman participated, Berryman was a good person.  Similar accounts were obtained from  a

24   former coach, family members, and, from Berryman's juvenile court experience, a former attorney and

25   his probation officer.  Many of these interviews have been presented in declarations discussed in

26   connection with Claims 6, 63, 64, 65, 69, and 70, *see* Part XXV.A.3.d.(2).  With respect to church

27   related activities, in particular, declarations of friend, Johnetta Reed, (former) wife Carol Berryman,

28   (former) sister-in-law Margie Garcia, and childhood pastor Fred Sykes are presented.  Berryman's mild

manner and good character are similarly presented in Part XXV.A.3.d.(12) through the declaration testimony of Johnetta Reed, Carol Berryman, elderly friend, Odessa Pearson, (peer) friend Kandy Rumford, (peer) friend Yolande Rumford, grandmother Francis Bonty, aunt Sonia Counts, aunt Linda Mitchell, aunt Carolyn Bonty, aunt Terrie Bonty, aunt Karen Bonty, aunt Sharon Bonty, youth football coach Ruben Hill, great-aunt Ann Bonty, aunt Donna McBride and uncle Perry McBride.[169]

Next, in Mr. Bonneau's declaration appended to the evidentiary hearing motion, he describes an inventory of items observed, photographed, and/or seized from Berryman's pick up truck following his arrest. Among the items inventoried were two bibles, a New Testament in the driver's door pocket and a New Testament under the driver's seat. The inventory lists technical officer (Opal L.) Chappell and Detective (Mike) Lage as the authorities present during the inventory. Mr. Bonneau states his belief that the inventory he describes was among the discovery the prosecution turned over to Berryman's trial counsel. Either Ms. Chappell or Detective Lage would have been able to testify that two copies of the New Testament were found in Berryman's pick up truck after his arrest.

This evidence is significant because Mr. Peterson tried to elicit testimony about the existence of the bibles from Detective Lage's partner, Detective Culley. As noted in the summary of the penalty proceedings, Part III.B., *supra*, Detective Culley noted that one or two bibles were observed in the truck cab, but he did not know what had become of them. RT-28: 3829.

## B. Berryman's Contentions.

Berryman suggests that Mr. Moench's mention of Charles Manson and Sirhan Sirhan during his cross examination of Dr. Pierce compared Berryman to historic villains, strongly discouraged in *People v. Bloom*, 48 Cal. 3d 1194, 1213 (1989). He argues Mr. Peterson should have objected to the question as argumentative. Regarding the allusions to his gang membership, Berryman contends that irrelevant evidence of gang membership is forbidden by United States Supreme Court precedent, citing *Dawson v. Delaware*, 503 U.S. 159, 160 (1992) (holding that "the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of the Aryan Brotherhood, where the evidence ha[d] no relevance to the issues being decided in the proceeding").

---

[169] Absent from this list were an actual declarations from his former father-in-law, Rev. Fuller, and probation officer(s).

1   Berryman's complaint about trial counsel's lack of witness preparation highlights two pitfalls.

2   First, as a result, usable mitigating evidence was not developed.  The declarations referred to in the

3   discussion of Claims 6, 63, 64, 65, 69, and 70, *see* Part XXV., *supra*, are illustrative.  Second, when Mr.

4   Peterson posed questions to unprepared witnesses, he didn't know what the answers would be.  For

5   instance, he was unprepared for the responses of Ronald, Jr., notably about Berryman's marijuana sales

6   activities, Ronald's expressed opinion Berryman was a "Casanova," and the notion that Berryman would

7   have to "cut a couple people" if imprisoned for life, and that Berryman had a sexual relationship with

8   yet another witness (Tamara Pearson).  The defense strategy was to demonstrate that the witnesses were

9   not coached.  But, Berryman alleges, it was not a sound strategy because harmful testimony was

10  unwittingly elicited and significant positive information was overlooked.  Regarding overlooked positive

11  information, Berryman highlights the fact that two bibles were actually seized from Berryman's pick up

12  truck.  Citing to *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995), Berryman argues that lack of

13  witness preparation is a consideration in evaluating ineffective assistance of counsel claims.

14      **C.    Analysis.**

15      None of Berryman's miscellaneous challenges to his attorneys' representation during penalty

16  proceedings entitles him to relief.  First, his suggestion about being compared to Charles Manson and/

17  or Sirhan Sirhan is unfounded.  Although he is correct about the law, that is, the California Supreme

18  Court strongly discourages comparisons of defendants to historic villains, *see Bloom*, 48 Cal. 3d at 1213,

19  no such comparison was made in his case.  Rather, Mr. Moench was describing an expert to Dr. Pierce

20  as the psychiatrist who worked on the Manson and Sirhan cases.  From the context of the transcript, this

21  reference was to give the expert (Dr. Pollack) credibility.  The reference to Manson and Sirhan had

22  nothing to do with Berryman.  Besides, and also contrary to Berryman's argument, Mr. Peterson did

23  object to the question, and there were no more references to these two notorious individuals.  Next, the

24  gang reference elicited by Mr. Moench, while inappropriate was not so significant to have had an impact

25  on the jury's verdict.[170]  For the very reason gang reference was inappropriate, that is, its irrelevance to

26

27      [170] The Court rejects the Warden's argument that Mr. Perez's reference to L.A. Cryps on Mr. Moench's direct examination was totally unanticipated in light of the police report reflecting the same information.  The Court also rejects the Warden's contention that Mr. Moench's reference to various gangs, including the Cryps, during his cross examination of E.J. Corum was relevant or based on

28

1   the crime, the Court finds it was not prejudicial.  Nor was gang reference mentioned during summation

2   or otherwise emphasized.  Unlike the situation in *Dawson*, 503 U.S. 159, on which Berryman relies,

3   gang affiliation (even the suggestion of it) was not a significant prosecution anchor for arguing in favor

4   of the death penalty.

5        With respect to the defense team failure to prepare witnesses for testimony, the Ninth Circuit

6   recently has held that an "attorney's failure to prepare for and challenge the testimony of a critical

7   witness may be so unreasonable as to violate both prongs of the *Strickland* test.  *Silva v. Woodford*, 279

8   F.3d 825, 833 (9th Cir. 2002).  There can be no question but that competent counsel would retain

9   investigators to develop mitigating evidence from friends and family members and would personally

10  interview at least the more important witnesses prior to their penalty phase testimony.  The Court finds

11  Berryman's defense attorneys did not measure up to this standard and proceeds on the assumption that

12  their penalty phase representation in the particular was substandard.  Accordingly, the resolution of these

13  miscellaneous ineffective counsel claims turns on the prejudice of *Strickland*.  Under that standard,

14  Berryman must establish "there is a reasonable probability that, but for counsel's unprofessional errors,

15  the result of the proceeding would have been different" with a "reasonable probability" being one

16  sufficient to undermine confidence in the outcome" of the trial.  466 U.S. at 694.   This he cannot do,

17  singularly or cumulatively.

18       The Court already has assessed the impact of additional proffered mitigation evidence developed

19  during post-conviction proceedings and concluded it would not have made a difference.  *See* discussion

20  of Claims 6, 63, 64, ,65, 69, and 70, Part XXV.C., *supra*.  The impact of the unexpected testimony also

21  is too minimal to have altered the verdict.  *Brecht*, 507 U.S. at 637.  Evidence elicited from Ronald, Jr.

22  about the marijuana sales activities and his "Casanova" life-style already have been reviewed.  *See*

23  discussion of Claims 7, 8, 9, 10, and 23 in Part VII.C., *supra*, Claims 13 and 14 in Part XXIII.C., *supra*,

24  and Claims 56, 60, 62, 88, 89, and 90 in Part XXX.C., *supra*.  The additional evidence elicited from

25  Ronald, Jr., that is that Berryman would have to "cut a couple of people" if incarcerated under a life

26

27  foundation or appropriate under any of the statutory penalty factors.  In fact, under prevailing authority
    cited by Berryman, it was clearly inappropriate because it had no relevance to Ms. Hildreth's killing.
28  *Dawson*, 503 U.S. at 165.

without parole term emphasized the punitive and dangerous conditions of prison.  The purpose of testimony about the hardships inmates suffer in prison from both Ronald, Jr. and E.J. Corum was to impress upon the jurors the severity of a life without parole sentence, in case the jurors might have felt such a sentence would be too lenient.  While it was imprudent to say that Berryman might have to resort to violence in self-defense, the comment did not portray Berryman as a predator who necessarily would commit violence in prison.  It was not testimony about his future dangerousness.  Nor was the revelation during examination of Tamara Pearson that she had been sexually involved with Berryman harmful.  By the end of the case, the jury was informed that Berryman had a need for female attention to fulfill a longing for maternal nurturing. Evidence of the relationship with Ms. Pearson was merely cumulative of the descriptions of his many girlfriends by other witnesses.

Finally, the failure to interview and call Detective Lage to the witness stand about his seizure of the bibles from Berryman's pick up truck was harmless.  Detective Culley actually did testify about the bibles, although he didn't actually seize them and didn't know what became of them.  Thus, the fact that the bibles had been in Berryman's truck and that he may have resorted to biblical passages from time to time was before the jury.  That fact complemented the testimony of family members and friends that Berryman's Christian faith was genuine.

Claims 58, 61, 66, 67, 68, 72 are denied on the merits.  Berryman's request for an evidentiary hearing with respect to Claims 61, 66, 68, and 72 is denied.

**XXXIII.  Berryman's Challenges Arising from the Automatic Modification Hearing (Claims 95 and 96).**

Berryman claims his attorneys were poor advocates to save his life at the sentence modification hearing and that the trial court committed two substantial errors.  These claims are record-based and no further evidentiary development is requested.

**A.     Statement of the Facts Relevant to the Automatic Modification Hearing Challenges.**

After the jury returned its verdict that Berryman should suffer the death penalty and was discharged, the trial judge set November 28, 1988 as the date for hearing on Berryman's motion for modification of sentence and sentencing.  RT-29: 4059.  His attorneys filed a motion pursuant to Penal Code § 190.4(e) for that purpose.  CT-4: 918-27.  No grounds specific to Berryman's case were stated

1    in the motion.  Rather counsel simply recited statutory authority for the motion and urged that the trial

2    court exercise independent judgment as to whether the imposition of death was appropriate.   The

3    accompanying declaration of Mr. Soria stated: "Counsel for defendant will address the court during oral

4    argument, and will be prepared to respond to the court's specific questions regarding the points and

5    authorities filed herewith, and to the court's specific questions regarding the evidence." *Id.*: 927.

6         During oral argument, Mr. Peterson stressed that the case did not involve a dramatic brutal

7    slaying,[171] or multiple killings, or torture, or use of an explosive, and therefore the death penalty was not

8    warranted.   JdgmtRT: 5-6.  Mr. Moench responded that Berryman dragged 17-year old Florence

9    Hildreth from his truck, so that she didn't even have a chance to put her feet down.  He stabbed her with

10   a knife, which broke in three pieces, stood on her face while she bled to death, cleaned himself up,

11   changed a tire on his truck, and returned to the Clark residence to ask his girlfriend, Ms. Hildreth's

12   cousin, to prepare a snack for him.  Mr. Moench argued the killing was cruel, callous, and heartless.  *Id.*:

13   7-8.   In discussing the trial judge's duties under § 190.4(e), Mr. Moench explained the judge is to

14   determine "whether the jury's findings and verdicts of the aggravating circumstances outweigh[ing] the

15   mitigating circumstances, are contrary to law, or the evidence presented." He characterized this process

16   as there being "a presumption . . . in favor of the jury's findings" which could be set aside only if those

17   findings were found by the judge to be "contrary to law." *Id.*: 9.  Mr. Moench then asked the trial court

18   to consider the circumstances of the crime evidence, previously considered by the jury under § 190.3(a).

19   *Id.*

20        The trial court recited its duty of independent review under § 190.4(e):

21        [T]he court recognizes its duty in making a ruling on the motion to independently
22        determine whether the jury's findings and verdicts on that issue, that is, that the
          aggravating circumstances, as specified in Penal Code section 190.3 outweigh the
          mitigating circumstances, whether those findings are contrary to law or the evidence that
23        was presented.

24   *Id.*: 11.  Referring to the sentencing factors in § 190.3 (a) through (k), the court noted that factor (e)

25   (providing that the victim was a participant in the homicidal conduct), factor (f) (providing that the

26   defendant reasonably believed he had a moral justification for his conduct), factor (g) (providing that

27   _____

28        [171] He did note that the shoe tread impression on Ms. Hildreth's face and the duration of the
     pressure that caused that impression was argued by Mr. Moench to be brutal.

1   the defendant was acting under duress), and factor (j) (providing that the defendant was an accomplice)

2   were irrelevant, since no evidence was presented on these subjects. *Id.*: 11-12.

3       The trial court found factor (i), regarding Berryman's age, was neutral. Although Berryman was

4   young, 21 years old at the time of the crime, he was not that young. He had been out of school for

5   several years, was married, and had a child. Under factor (c), the court considered the prior felonies of

6   grand theft and transportation of marijuana, noting they were nonviolent, but still indicative of "disregard

7   for being a law-abiding citizen." This was a moderate consideration. *Id.*: 12. Next, the court considered

8   factor (d), whether Berryman was under the influence of extreme mental or emotional disturbance at the

9   time of the crime. In this process, the court reviewed the testimony of Drs. Pierce and Benson about

10  Berryman's "alcohol induced disorder" and the possible organic mental syndrome. The court recited

11  Dr. Pierce's axis two diagnosis of a personality disorder with dependent narcissistic and depressive

12  features. *See* Part III.B. The court concluded that the observed condition of Berryman's mental and

13  emotional state did not meet the factor (d) criteria, but rather indicated Berryman was "a self-oriented

14  young man, that needs the attention of young women, and he becomes depressed and possibly angry if

15  he doesn't get his way in that respect." *Id.*: 13.

16      Moving to factor (h), whether Berryman was impaired in his capacity to appreciate the

17  criminality of his action or conform his conduct to law because of mental disease, defect, or intoxication,

18  the court again reviewed the evidence adduced during the proceedings. The court concluded there was

19  no evidence of the level of intoxication amounting to an impairment of capacity to appreciate the

20  criminality of his act or to reduce his ability to conform his conduct to the law. *Id.*: 14.

21      Regarding factor (b) (prior acts of violence which did not result in a conviction), the court

22  considered both Berryman's assault on his father-in-law and on David Perez. With respect to the former,

23  the court felt it was minor, a family matter, carried out without weapons, and provoked to some extent

24  by the father-in-law interfering with Berryman's marriage. With respect to the latter, the court found

25  that striking someone with a tire iron demonstrated a "total disregard . . . of human life."[172]

26  ───────────────

27  [172] The trial court also noted, erroneously, but as argued by the prosecutor, that Mr. Perez was struck in the back of the head by Berryman while he (Mr. Perez) was being held by another of the attackers. *Id.* This Court has carefully re-read the transcript and finds that Mr. Perez did not testify he

28  was being held while Berryman struck him. *See* Part III.B., *supra*, and note 27, *supra*.

1    Finally, the trial court reviewed factor (a), the circumstances of the crime.  Finding this factor

2  "an extremely substantial factor in aggravation," the court stated:

3       The court is satisfied, in reviewing that evidence, that this was a particularly vicious and
        brutal and senseless killing of a 17 year old girl, who apparently refused to give into the
4       amorous advances of Mr. Berryman.  He thereafter forced himself on her, and stabbed
        her in the neck, and apparently stood over her with his foot on her face until she bled to
5       death.

6       Then not long after that, he return[ed] home for a little lasagne.

7       This is an extremely substantial factor in aggravation, and in the court's view, this factor
        in aggravation, in and of itself, would outweigh all of the mitigating circumstances that
8       the court has referred to.

9       There were no other mitigating circumstances in the court's opinion under subsection
        [(k)] of 190.3.
10
        Under those circumstances, the court having considered all of the factors under Penal
11      Code section 190.3, and having independently determined that the circumstances in
        aggravation outweigh the circumstances in mitigation, and that the verdict of the jury
12      recommending a sentence of death is in accordance with law and the evidence presented,
        the motion of the defendant under Penal Code section 190.4, subsection (e) . . . is denied.
13

14  *Id.*: 15-16.

15    After this determination, the making of a correction to the probation report,[173] and the denial of

16  the defense motion for a new trial, Berryman addressed the court prior to sentencing.  He stated that he

17  had given himself to the Lord and asked the court for mercy.  He stated he felt he could be of some help

18  in the prison, helping other prison inmates turn their lives around, because of his religious beliefs.  If he

19  could not be with his family, he wanted, at least to be of some service.  He implored the trial court to let

20  the Lord decide when he should die.  *Id.*: 17-22.  As noted in the summary of post-verdict sentencing

21  proceedings, Part III.C., *supra*, Berryman expressed sorrow for the victim and her family, but did not

22  take responsibility for the crime.  He also complained about his lawyers.  *Id.*: 18-19.  He emphasized that

23  except for the assault on David Perez, he had no history of violence.  *Id.*: 20.  He appealed to the trial

24  court's sympathy for his then two-year old son and the trauma he would suffer because his father had

25  to be executed.  *Id.*: 21.  He also pleaded for the suffering of his other family members.  *Id.*: 22.

26

27      [173] The probation report indicated that Ms. Hildreth suffered multiple stab wounds to the neck.
    Mr. Moench clarified there was only a single stab wound, and the report was so corrected.  JdgmtRT:
28  16.

1    The court then referred to the (corrected) probation report before rendering a sentence.  The trial

2    judge specifically mentioned the uniform determinate sentencing act, as set forth in the report, as well

3    as to statutory mitigating circumstances under Penal Code §§ 1203.065 and 1203.  *Id.*: 23.

4    **B.    Berryman's Contentions.**

5    Berryman's complaint about his defense attorneys is that they made no more than a perfunctory

6    argument at the sentence modification hearing.  He refers to his own impassioned plea to the trial judge

7    for mercy by way of comparison.  He then recounts what arguments could have been raised, including

8    residual doubt that the victim had been raped, the fact that one of the jurors (David Armendariz) was

9    related to the victim's family, the overreaching misconduct of the prosecutor in suggesting Berryman

10   subjected Ms. Hildreth to forced oral copulation, violating the terms of the stipulation about his prior

11   marijuana transportation conviction, and erroneously reciting that Berryman's own expert had referred

12   to him as "amoral."

13   Seizing on Mr. Moench's statement that there is a presumption in favor of the jury's findings,

14   Berryman argues that the trial court adopted this formulation for review and did nothing more than

15   determine whether the evidence supported the verdict.  This was error, Berryman argues, because in fact

16   the trial court was to have exercised independent judgment to assess the suitability of the death penalty.

17   Second, Berryman argues the trial court erroneously relied on the probation report and specifically on

18   two aggravating factors listed in that report that Berryman's prior convictions are numerous and that he

19   was on probation when he committed the present offenses.  He claims the fall out of asserted errors for

20   this reliance is great: Berryman was not given notice of these factors; evidence of these factors was not

21   introduced at trial; and under California law, presentence reports are not to be considered on a motion

22   to modify the penalty under § 190.4(e), citing *People v. Kipp*, 18 Cal. 4th 349, 383 (1998).

23   **C.    Analysis.**

24   In spite of the perfunctory argument at the sentence modification hearing, Berryman has not

25   described any argument trial counsel could have made that would have altered the result of the trial

26   court's ruling.  The rape conviction was fully substantiated.[174]   The relationship between David

27   _____

28   [174] Even with the additional evidence proffered in these post-conviction proceedings, it remains
     so.

Armendariz and Ms. Hildreth's family (specifically Crystal Armendariz) was appropriately addressed by the trial court.  Mr. Armendariz was determined to be impartial, and properly so.  Nor were any of the instances of alleged prosecutorial misconduct significant enough, singularly or cumulatively, to have impelled the trial judge to rule differently.  As the record demonstrates, the most compelling evidence in the case to the trial judge was the circumstances of the crime factor.  Any actual or perceived shortcomings of trial counsel would not have altered his ruling denying modification of the sentence.[175]

With respect to the trial error assertions, they are unsupported by the record.  Contrary to Berryman's contentions, the trial court did not evaluate Berryman's sentence modification motion by entertaining a presumption that the jury's sentencing verdict was correct.  The record clearly demonstrates that the trial judge examined each of the sentencing factors under § 190.3 and assessed each such factor in connection with the evidence adduced at trial.  This is the correct procedure, as explained by the California Supreme Court:

> In ruling on a verdict-modification application, the trial judge is required to make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.  That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported.  And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. [ ] The trial judge's function, it must be emphasized, is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict*. [ ] Further, in deciding the question, the trial judge must specify reasons sufficient to assure thoughtful and effective appellate review.

6 Cal. 4th at 1105-06 (citations, ellipses, and quotation marks omitted) (emphasis in original).  Applying this procedure, the California Supreme found that the trial court correctly and appropriately executed its duty under the statute.  *Id*. at 1106-07.

Also contrary to Berryman's contentions, the trial court's reference to the probation report did not inform the ruling on the sentence modification motion.  As the record reflects, the trial court did not mention the probation report until after it had ruled on the sentence modification motion.  It must be

---

[175] The Court also has no doubt that if the trial judge had not perceived David Perez was being held at the time Berryman struck him with a tire iron, he (the trial judge) would have reached the same conclusion.  The trial judge made very clear that the circumstances of the crime factor, standing alone was so substantial that it outweighed all mitigating evidence.

1   emphasized again that the trial court found the circumstances of the crime factor compelling and

2   sufficient in and of itself justify the death penalty.  The trial court also found there were no mitigating

3   factors.  Moreover, even if the trial court had considered the probation report before ruling on the

4   sentence modification motion, vacating the sentence is not warranted.  Under California law, in the event

5   a trial court does read or consider a presentence probation report in advance of ruling on a sentence

6   modification motion, the reviewing court is to "examine the record to determine whether the [trial] court

7   may have been improperly influenced by material in the report. [ ] If the [trial] court does not mention

8   any material in the report when giving its reasons for denying the modification motion, [ ] there was no

9   improper influence."  *Kipp*, 18 Cal. 4th at 383 (citations omitted).  There was no mention of the

10  probation report factors during the trial court's ruling on the sentence modification motion in Berryman's

11  case.  There was no error; no prejudice.

12      Claims 95 and 96 are denied on the merits.

13  **XXXIV.  Berryman's Assertion the Death Penalty Charged Against Him Was Racially Motivated**

14      **(Claim 11).**

15      In Claim 11 Berryman asserts that the death penalty is imposed disproportionately on African-

16  American males in California and Kern County.  He argues his race was the reason he was capitally

17  charged in this case.  No evidentiary hearing is requested.

18      **A.      Berryman's Presentation of the Claim.**

19      Berryman claims his relatively minimal record of prior violence, the uncertainty of evidence of

20  rape, and evidence suggesting lack of necessary mental states were all factors against capitally charging

21  him, but that his race was the determining consideration.  He offers no statistical support about how

22  frequently African-American males in California and Kern County were capitally charged during the

23  relevant time period and no evidence of discriminatory purpose or racial animus at the Kern County

24  District Attorney's Office.  The only law Berryman cites are general references to *McClesky v. Kemp*,

25  481 U.S. 279 (1987) and *Carriger v. Lewis*, 971 F.2d 329 (9th Cir. 1992), with no analysis or point

26  pages.

27

28

B.      **Analysis.**

In *McClesky*, the defendant, Warren McClesky, challenged the Georgia death penalty statute on the grounds it violated the Equal Protection Clause of the Fourteenth Amendment because race "infected the administration" of the statute.  481 U.S. at 291.  He challenged every actor in the Georgia capital sentencing process, "from the prosecutor who sought the death penalty and the jury that imposed the sentence, to the State itself that enacted the capital punishment statute."  *Id*. at 292.  The high Court found McClesky could not prevail under the Equal Protection Clause due to a failure of proof. McClesky was required to "prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id*. (emphasis in original).  Yet, he offered no evidence" specific to his "own case" to "support an inference that racial considerations played a part in his sentence."  *Id*. at 292-93.   Instead, he relied solely on the Baldus study, a statistical comparison of 2,000 murder cases in Georgia filed in the 1970's. While the high Court has accepted statistical evidence as proof of discriminatory intent in venire-selection and Title VII contexts, statistics are not sufficient to establish the discretionary judgments necessary to impose the death penalty.  *Id*. at 293-97.  The Ninth Circuit decision in *Carriger*, 971 F.2d 329, reiterates the principle that to prove discrimination, the defendant must establish that the decisionmakers in *his* case acted with discriminatory purpose.  *Id*. at 334.

Berryman has not attempted to satisfy these requirements.  Nor does the record support the contentions.  Claim 11 is denied on the merits.

**xxxv. Berryman's Challenges to the California Death Penalty Statute (Claims 97, 98, and 100).**

Berryman advances three primary challenges to the death penalty statute.   In Claim 97, he maintains the statute unconstitutionally fails to require specific findings on the aggravating factors relied on by the jury at sentence selection and that the California death penalty statute is constitutionally infirm for its failure to include inter-case proportionality.  In Claim 98 and 100, he charges the statute fails to narrow the set of first degree murderers who are death eligible both in terms of a straight constitutional challenge and ineffective assistance of trial counsel for failure to advance the constitutional challenge.

A.      **Berryman's Presentation of the Claims.**

With respect to the lack of specific jury findings on aggravating factors and lack of inter-case proportionality review, Berryman points out mitigation theories that could have been presented during

1  penalty proceedings.  He notes he had an exaggerated need for affection due to his fractured family

2  background and, as a consequence, *may have* had an exaggerated reaction to romantic rejection.  He also

3  reiterates that he suffered from an impaired mental capacity and resultant limited ability to deal with the

4  threat posed to his living situation by disclosure of his multiple sexual liaisons.  Finally, he points out

5  that he had a genuine ability to express concern and affection in situations unrelated to sexual

6  encounters.

7      His lack of sufficient narrowing claim is predicated on two foundations.  First, specific to his

8  own case, he argues that the statute fails to narrow the class of death eligible defendants by reason of the

9  frequency of felony rape allegations and the relative likelihood that a killing may be associated with rape.

10  In a general sense, he also argues that aside from the rape murder situation, virtually any murder could

11  carry the lying in wait special circumstance.  He relies on *Zant v. Stephens*, 462 U.S. 862, 877 (1983),

12  and claims his trial attorneys should have raised the issue before the trial court.

13      **B.      Analysis.**

14      In summary fashion, the California Supreme Court held that Berryman's facial challenge to the

15  1978 death penalty law had been previously rejected in other California Supreme Court decisions and

16  that the court declined to revisit prior holdings.  6 Cal. 4th at 1109.  In light of this lack of analysis, *see*

17  *Delgado*, 223 F. 3d at 981-82, this Court is constrained to examine federal law construing the same

18  issues of narrowing, written findings and inter-case proportionality.

19      United States Supreme Court jurisprudence requires that death penalty schemes distinguish

20  between "the few cases in which it [the death penalty] is imposed from the many cases in which it is

21  not."  *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring).  This is accomplished by

22  channeling the jury's discretion using objective standards capable of appellate review, *Godfrey v.*

23  *Georgia*, 466 U.S. 420, 428 (1980), by findings of specifically defined "aggravating circumstances."

24  In California, the narrowing "aggravating circumstances" are referred to as "special circumstances."  *See*

25  Penal Code § 190.2(a).

26      The narrowing function of a death penalty statute can be satisfied by one of two methods.  The

27  statute may narrow the definition of a capital offense so that death eligibility occurs at the guilt phase.

28  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (discussing Louisiana and Texas death penalty statutes

1   which operate in this manner).  Like the Louisiana and Texas statutes at issue in *Lowenfield*, California

2   law places the narrowing function in the guilt phase proceedings by the jurors' unanimous finding of at

3   least one statutory special circumstance beyond a reasonable doubt.  *People v. Bacigalupo*, 6 Cal. 4th

4   457, 468 (1993).  Other states define capital offenses more broadly and "provide for narrowing by jury

5   findings of aggravating circumstances at the penalty phase."  *Lowenfield*, 484 U.S. 246 (referring to the

6   Georgia death penalty statute at issue in *Zant v. Stephens*, 462 U.S. 862), *see also Bacigalupo*, 6 Cal.

7   4th at 468 (discussing the same statutory process in Arizona, Florida, and Georgia).

8        In *Williams v. Calderon*, 52 F.2d 1465 (9th Cir. 1995), the court held that the 1977 California

9   death penalty statute, which is the predecessor to the 1978 statute under which Berryman was convicted,

10  offered "constitutionally-sufficient guidance to jurors to prevent arbitrary and capricious application of

11  the death penalty."  52 F.3d at 1484 (citing *Pulley v. Harris*, 464 U.S. 37, 51-54 (1984)).  As relevant

12  to Berryman's claims, here, the court further held that the statute did not suffer from the failure to require

13  written findings.  *Id*. at 1484-85.  Berryman fails to suggest any meaningful distinction between the 1977

14  statute referred to in the *Williams* and *Harris* cases and the 1978 statute under which he was sentenced.[176]

15  Apart from these holdings, two recent Ninth Circuit cases separately have addressed the topic of

16  narrowing of the 1978 statute.  In *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2002), the court denied

17  a certificate of appealability as to whether the 1978 California death penalty law adequately narrows the

18  class of persons eligible for the death penalty.  The court held the 1978 statute does narrow the class of

19  persons eligible for the death penalty at both the guilt and penalty phases.  *Id*. at 924.  The same year the

20  Ninth Circuit again addressed this issue in *Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002), holding:

21

22        [176] Under the 1977 statute, like the 1978 statute,
           a person convicted of first-degree murder [wa]s sentenced to life imprisonment unless
23         one or more "special circumstances" [we]re found, in which case the punishment [wa]s
           either death or life imprisonment without parole. [Citation omitted.] Special
24         circumstances [we]re alleged in the charging papers and tried with the issue of guilt at
           the initial phase of the trial.  At the close of evidence, the jury decide[d] guilt or
25         innocence and determine[d] whether the special circumstances alleged [we]re present.
           Each special circumstance [had to] be proved beyond a reasonable doubt. [Citation
26         omitted.] If the jury f[ound] the defendant guilty of first-degree murder and f[ound] at
           least one special circumstance, the trial proceed[ed] to a second phase to determine the
27         appropriate penalty.

28  *Pulley v. Harris*, 465 U.S. 37, 51 (1984).

1
2
3
4
5
6

> [W]e reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The [1978] California statute satisfies the narrowing requirement set forth in *Zant v. Stephens*, 462 U.S. 862 [ ] (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. *See id.* at 972. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. *See id.* California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Arave v. Creech*, 507 U.S. 463, 476 [ ] (1993).

7   *Id.* at 1141, n. 11. There being no constitutional violation regarding the absence of written findings or

8   the  narrowing function of the 1978 California death penalty statute, trial counsel could not have been

9   and were not ineffective for failure to advance the challenge.

10          Also with respect to the 1977 death penalty statute, the high Court specifically held in *Harris v.*

11   *Pulley*, 465 U.S. 37 that inter-case proportionality review is not required, even though other states had

12   adopted this procedure. *Id.* at 44-45. This holding is reiterated in *Allen v. Woodford*, 395 F.3d 979 (9th

13   Cir. 2005) with respect to the 1978 death penalty statute,[177] where the court observed, "neither the Eighth

14   amendment nor due process requires comparative proportionality review in imposing the death penalty."

15   *Id.* at 1018.

16          The 1978 California death penalty law has not infringed on Berryman's constitutional rights for

17   its alleged failure to narrow the class of death eligible defendants, for not requiring written findings with

18   respect to aggravating factors at sentencing, or for failure to require inter-case proportionality.

19   Berryman's asserted exaggerated need for female affection, the possibility that he experienced an

20   exaggerated reaction to Ms. Hildreth's rejection of his romantic advances, and his inferior cognitive

21   abilities add nothing to his challenges. In the first place the statute under which he was convicted

22   provided ample opportunity to develop evidence of these mental states. Second, and wholly dispositive,

23   none of these mental states is particularly mitigating given the circumstances of the crime. Claims 97,

24   98, and 100 are denied on the merits.

25
26
27

---

28   [177] The crimes at issue in *Allen* were committed in September of 1980, well after the 1978 statute became effective. *See Allen*, 395 F.3d at 988.

XXXVI. **Berryman's Assertion He Was Denied Meaningful Review on Direct Appeal and State Habeas (Claims 99 and 101).**

Claim 99 alleges two separate constitutional violations, one for denial of meaningful appellate review and one for denial of meaningful post-conviction review.  Claim 101 also alleges lack of meaningful state post-conviction review.  No further evidentiary development is requested for these claims

A.    **Berryman's Presentation of the Claims.**

The asserted lack of meaningful appellate review stems from Berryman's contention that the California Supreme Court failed to address two claims briefed in his opening appellate brief.  He points out that the challenges in these two claims replicate Claims 13 and 54, herein.  Claim 13 alleges lack of adequate pre-trial notice of penalty aggravating evidence because of introduction of the circumstances underlying his marijuana transportation conviction and his numerous extra-marital affairs.  Claim 54 asserts ineffective assistance of trial counsel for failure to object to the hypothetical question posed to Yolande Rumford suggesting Berryman had subjected Ms. Hildreth to forced oral copulation.

Berryman also claims that lack of investigative funding and denial of an evidentiary hearing on state habeas resulted in inadequate state post-conviction review.  In particular, Berryman requested funding to obtain laboratory testing "which was omitted at the state trial court level."  He contends this denial of evidentiary development significantly hampered his ability to present the issues raised in Claims 6, 7, 10, 18, 29, 65, and 69, herein.  Claim 6 alleges ineffective assistance of counsel for failure to retain and supervise competent investigators.  Claim 7 and 10 allege constitutional violations on account of Mr. Moench's prosecution of the case when he was an elected judge.  Claim 18 alleges a denial of counsel on account of Mr. Soria's alleged somnolence during trial.  Claim 29 alleges ineffective assistance of counsel for the failure Messrs. Soria and Peterson to retain a forensic pathologist on the credibility of the rape charge and the prosecution contention that Berryman stood on Ms. Hildreth's face for three to five minutes.  Claim 65 alleges ineffective assistance of counsel for failure to develop mitigation evidence through the testimony of Berryman's mother and sister, particularly with respect to childhood turbulence and sexual molestation.  Claim 69 alleges ineffective assistance of counsel for failure to develop mitigation evidence through the testimony of numerous other witnesses.

1    His final challenge to his state post-conviction is that the Kern County Superior Court dismissed

2    his state habeas petition, when it was in the best position to have considered the petition on the merits,

3    and therefore should have addressed the merits.

4    **B.    Analysis.**

5    With respect to the alleged failure of adequate review on direct appeal, Berryman's assertion

6    must fail for lack of prejudice.  Even if there was an omission of the California court on direct review,[178]

7    the issues raised in the omitted claims do not entitle Berryman to relief and do not warrant further

8    evidentiary development.  Claim 13, herein, is addressed in Part XXIII., *supra*.  Claim 54, herein, is

9    addressed in Part XXVIII., *supra*.

10   Berryman's complaints about the adequacy of state review on post-conviction proceedings both

11   respect to the failure of the Superior Court to review his claims and the lack of funding and evidentiary

12   development at the Supreme Court level are simply not cognizable because, in essence, he is

13   complaining about the manner in which state law is applied.  *See Campbell v. Blodgett*, 977 F.2d 512,

14   522 (9th Cir. 1993).  Moreover an alleged error in state post-conviction proceedings does not amount

15   to a challenge to a prisoner's conviction or sentence.  *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir.

16   1989).  Further, with the exception of Claim 18, herein, this Court has determined that all of the claims

17   specifically mentioned are without merit and require no further evidentiary development.  *See* Part VII.

18   (for Claims 7 and 10); Part XIX. (for Claim 29, part one); Part XXIII. (for Claim 13); Part XXIV. (for

19   Claim 29, part two); Part XXV. (for Claims 6, 65, and 69); and Part XXVIII. (for Claim 54).  In fact,

20   with the exception of Claim 18, none of the claims in the petition have merit and none warrant further

21   evidentiary development.[179]   With respect to Claim 18, the Court is ordering further evidentiary

22   development in these proceedings.  *See* discussion in Part XXI., *supra*.  Berryman is not entitled to relief

23

24   [178] The Court is by no means convinced that merely because a claim was not written about in the
     direct appeal opinion the California high court failed to consider it.  The direct appeal opinion provides
25   in a concluding footnote about cumulative error, *inter alia*: "Whether or not expressly discussed, we
     have considered and rejected all of the assignments of error presented in all of defendant's briefs."  6
26   Cal. 4th 1110-11, n. 33 (quotation marks, citation, and internal ellipses omitted).

27   [179] The Court does not imply by this statement any finding regarding the merits of Claim 18.
     Since further evidentiary development is warranted, the Court's ruling on the merits of Claim 18 is
28   reserved.

1  respecting regarding state appellate or post-conviction proceedings.  Claims 99 and 101 are denied on

2  the merits.

3  xxxviI.  **Order.**

4          With the exception of Claim 18, all claims and arguments presented in the Petition are denied

5  and all requests for further evidentiary development are denied.  With respect to Claim 18, Berryman

6  will have 45 days from the filing of this Memorandum Order to move for appropriate funding for an

7  investigator and/or discovery.  The funding request shall be filed under seal.  The inquiry shall be strictly

8  limited to observations of Mr. Soria's trial conduct, demeanor, and attentiveness.  Berryman may address

9  inquiries to actual jurors, the trial judge, the trial prosecutor, any reliable spectators, and any other trial

10 participants.  All investigation and/or discovery shall be completed within 60 days from the issuance of

11 the funding order.  Any evidence to be offered, in the form of declarations and/ or deposition transcripts

12 must be lodged with the Court no later than 90 days following the issuance of the funding order.  The

13 parties are advised that the Court finds good cause for conducting discovery pursuant to Rule 6 of the

14 Rules Governing § 2254 cases.  In the 45 days between the filing of this Memorandum Order and the

15 due date for  Berryman's funding request, the parties shall meet and confer for purposes of agreeing on

16 discovery authorized by this order.  The results of conferences between the parties shall be referenced

17 in a status report to be filed by counsel for the Warden within 40 days from the filing of the

18 Memorandum Order.  Upon receipt of Berryman's renewed offer of proof for Claim 18, the Court will

19 issue a ruling.  Until then, the decision is reserved.

20

21 IT IS SO ORDERED.

22

23 Dated:_____July 10, 2007_____

24                                        /s/ Anthony W. Ishii
                                        Anthony W. Ishii
25                                   United States District Judge

26

27

28